**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| J-M MANUFACTRING COMPANY, INC., <br><br> Plaintiffs, <br><br> v. <br><br> SIMMONS HANLY CONROY, LLP, NICOHLAS ANGELIDES, PERRY BROWDER, AMY GARRETT, BENJAMIN GOLDSTEIN, SUVIR DHAR, CRYSTAL FOLEY, DEBORAH ROSENTHAL, STAN JONES, and JOHN AND JANE DOES 1-25, <br><br> Defendants. | Civil Action No. 1:24-cv-_____ <br><br> Count I: RICO (18 U.S.C. § 1962(c)) <br> Count II: RICO (18 U.S.C. § 1962(d)) <br> Count III: Common Law Fraud <br> Count IV: Unjust Enrichment <br> Count V: Civil Conspiracy |

## <u>COMPLAINT</u>

Plaintiff J-M Manufacturing Company, Inc. ("J-M Manufacturing") brings this action against Simmons Hanly Conroy, LLP ("Simmons Hanly"), Nicholas Angelides, Perry Browder, Amy Garrett, Benjamin Goldstein, Suvir Dhar, Crystal Foley, Deborah Rosenthal, Stan Jones, and John and Jane Does 1-25 (collectively, the "Simmons Hanly Defendants" or "Defendants") for a multi-year pattern of racketeering activity in which the Simmons Hanly Defendants filed sham lawsuits, pursued baseless claims, and otherwise sought to extract money from J-M Manufacturing through a pattern of fraud, coercion, and the suppression of evidence.

## INTRODUCTION

1.      As asbestos-related disease fades into the past, it has been replaced by a new malignancy: asbestos litigation. Courts, commentators, and the United States Department of

Justice have all recently highlighted a concerning pattern of misconduct by plaintiff's law firms in asbestos litigation.[1]  This case focuses on the unfortunate perpetuation of that trend by Simmons Hanly and the individual Defendants across many lawsuits at the expense of J-M Manufacturing.

2.      Over the last 20 years, Simmons Hanly and its professionals have used asbestos litigation to enrich themselves.  The firm has filed thousands of cases and "recovered" in excess of $9 billion.  But a recent lawsuit has cast a different light on this "success."  According to a former Simmons Hanly partner (Scott Peebles), the firm has engaged in a pattern of "unlawful, unethical conduct, and fraudulent conduct" to gain the upper hand in asbestos litigation.  This includes the use of false statements of fact, the subornment of perjury, and other acts of moral turpitude, dishonesty, and corruption.

3.      The pattern of fraud and misconduct extends to the cases that the firm has brought against J-M Manufacturing.  Simmons Hanly has filed hundreds of cases against the company, causing it to spend significant sums of money in defense of sham asbestos lawsuits.  As part of those cases, the firm has used a coordinated, well-developed, and long-running strategy that involves evidence suppression, shifting narratives, and fraud.

---

[1] *See, e.g.*, *Garlock Sealing Techs., LLC v. Shein*, No. 3:14-cv-116, 2015 WL 5155362, at *3 (W.D.N.C. Sept. 2, 2015) (stating asbestos litigation misconduct alleged "goes well past the kind of routine litigation activities" in an ordinary case); *In re Garlock Sealing Techs., LLC*, 504 B.R. 71, 86 (Bankr. W.D.N.C. 2014) (observing a "startling pattern of misrepresentation" in asbestos litigation"); *CSX Transp., Inc. v. Gilikison*, No. 5:05CV202, 2012 WL 1598081, at *10 (N.D. W. Va. May 3, 2012) (concluding alleged conduct amounted to a complex fraud scheme that went beyond ordinary litigation activity); Lester Brickman, Civil RICO: An Effective Deterrent to Fraudulent Asbestos Litigation?, 40 Cardozo L. Rec. 2301 (2019); Honorable Peggy L. Ableman, The Garlock Decision Should Be Required Reading for All Trial Court Judges in Asbestos Cases 37 Am. J. Trial Advoc. 479 (2014); Lester Brickman, Fraud and Abuse in Mesothelioma Litigation, 88 Tul. L. Rev. 1072 (2014); Roger Parloff, The $200 Billion Miscarriage of Justice, Fortune, Mar. 4, 2002; U.S. Dep't of Justice, Justice Department Files Statement of Interest Urging Transparency in the Compensation of Asbestos Claims (Dec. 28, 2020).

4.      The strategy, which was developed by management of the firm's Asbestos Department and implemented by the asbestos litigators, centers on a "story" that the firm has developed about J-M Manufacturing.  The "story" includes an implausible, but difficult to affirmatively disprove, narrative about the manner in which the firm's clients were purportedly exposed to asbestos in J-M Manufacturing's asbestos-cement pipe, complete with a plan for demonstrating consistent and prolonged exposure.

5.      To support the "story," the firm "find[s] the evidence" and "build[s]" its case, with the help of its asbestos case investigators.[2]  This is done by reconstructing – or sometimes just fabricating – the client's work history, determining what products are relevant to that work history, and fitting that work history around the "story" for each defendant.  As part of this process, and based on information and belief, the firm identifies any solvent company that may have had an asbestos-containing product at any worksite at which its clients might have worked, naming that company as a defendant in order to extract money from as many companies as possible.

6.      After the firm constructs the narrative, it prepares and files the lawsuit in one of a few specific jurisdictions known to be favorable to asbestos plaintiffs.  Each lawsuit that the firm files generally accuses more than 20 defendants.

7.      Once the lawsuit is filed, the firm employs a very specific strategy in an attempt to maximize recovery.  Based on the evidence detailed below, the components of that strategy include (a) offering scripted product identification and exposure testimony; (b) downplaying any evidence of exposure to a product of a bankrupt company or to product warnings; (c) in certain instances, concealing information about claims filed with asbestos bankruptcy trusts or delaying the filing of

---

[2]  Simmons Hanly Conroy, Mesothelioma Law Firm, https://www.simmonsfirm.com/ mesothelioma/; Simmons Hanly Conroy, What to Expect When Filing a Mesothelioma Claim, https://www.youtube.com/watch?v=_dmUEVn7ZIk.

those claims until the tort litigation is concluded; (d) offering vague, unverifiable, or, in some instances, fraudulent details about employers and co-workers to limit the ability to refute product identification and exposure testimony; and (e) obstructing efforts by defendants to obtain evidence that may refute the firm's narrative.

8.      As part of a broader strategy, the firm appears to have made sham filings against numerous defendants, including J-M Manufacturing, in an effort to extract a settlement or to use as a bargaining chip to entice settlement in other matters. The firm knows both the cost of defense and the risk of a runaway verdict in its handpicked forum provide it settlement leverage even for the most dubious lawsuits.

9.      The firm reportedly goes to great lengths to cover up its fraud and misconduct. As illustrated by the circumstances surrounding the complaint filed by former Simmons Hanly partner Peebles, the firm attempts to silence anyone who may expose its scheme, making retaliatory filings, terminating employees who will not fall in line, and fighting the release of any information that might reveal the fraud.

10.     As part of a case review done by J-M Manufacturing, it has found evidence of the scheme and each of these tactics across a number of different lawsuits in many different jurisdictions over a number of years.  The evidence includes perjured testimony, falsified sworn statements, untrue discovery responses, asbestos bankruptcy claims that were not disclosed, and sham lawsuits that were dismissed voluntarily as part of a settlement of another firm matter or to avoid exposure of the fraud.  In other words, the allegations of the former firm partner Peebles are not mistaken.

11.     Since 2001, Simmons Hanly has filed more than 430 cases against J-M Manufacturing.  J-M Manufacturing has settled more than 75 of those cases based on its evaluation

of the "facts" presented by Simmons Hanly. It is now clear that at least some of those "facts" were not facts at all; they were falsehoods peddled by Simmons Hanly. These untrue statements have caused J-M Manufacturing to incur vast sums of litigation fees and expenses defending against claims brought by the firm. Were it not for the flow of falsehoods about their clients' workplaces and alleged exposure, J-M Manufacturing also likely would have avoided or reduced the sums paid to Simmons Hanly and its clients in connection with underlying asbestos lawsuit settlements and judgments.

12.    J-M Manufacturing brings this lawsuit to redress the harm caused to it by Simmons Hanly and ensure that the firm's scheme does not continue. The conduct at the center of this case "goes well past . . . routine litigation activities." It is not zealous advocacy. It is fraud, and Simmons Hanly and the professionals who participated in the fraud should be held accountable.

## PARTIES

13.    Plaintiff J-M Manufacturing Company, Inc. (previously defined as "J-M Manufacturing") is a Delaware corporation with its principal place of business in Los Angeles, California. The company is one of the largest plastic pipe manufacturers in the United States and has more than 800 employees located in manufacturing facilities across the country. From 1983 to 1988, J-M Manufacturing sold a limited amount of cement pipe that contained asbestos ("ACP") to accommodate water districts until those clients transitioned to PVC pipes.

14.    Defendant Simmons Hanly Conroy, LLP (previously defined as "Simmons Hanly" or the "firm") is an Illinois limited liability company that is based in Alton, Illinois. The shareholders or partners of Simmons Hanly reside in various states in which the firm has offices, including Illinois, California, New York, Missouri, and Massachusetts. During the relevant time period, Simmons Hanly maintained an office in Chicago, Illinois, and the firm currently lists 28 lawyers on its website as located in Chicago.

15.     Defendant Nicholas Angelides is a partner at Simmons Hanly and part of the firm's leadership team.  Angelides is based in the firm's locations in Chicago and Alton, Illinois, and serves as the Chair of the firm's Asbestos Department.  According to his Simmons Hanly webpage, Angelides has "directed the legal strategy of all of the firm's asbestos and mesothelioma cases" since 2012.[3]

16.     Defendant Perry Browder is a partner at Simmons Hanly and part of the firm's leadership team.  Browder is based in the firm's locations in Chicago and Alton, Illinois, and serves as the Head of the firm's Asbestos Department.  According to his Simmons Hanly webpage, Browder "manages the firm's more than 50 asbestos attorneys" and "oversees all asbestos cases to ensure they are handled in an efficient manner that maximizes results."[4]

17.     Amy Garrett is a partner at Simmons Hanly and the Assistant Managing Partner of the firm.  Garrett is based in the firm's locations in Chicago and Alton, Illinois, and is a member of the firm's Asbestos Department.[5]  Garrett is identified in the *Peebles* complaint as the member of Simmons Hanly "upper management" to whom Peebles reported the unethical and unlawful conduct that was occurring in the Asbestos Department.  The *Peebles* complaint also identifies Garrett as one of the individuals who summarily fired Peebles.

18.     Benjamin Goldstein is of counsel at Simmons Hanly and a member of the firm's Asbestos Department.  Goldstein is based in the firm's office in San Francisco, California, and

---

[3] Simmons Hanly Conroy, Nicholas J. Angelides, https://www.simmonsfirm.com/about-us/our-attorneys/nicholas-j-angelides/.

[4] Simmons Hanly Conroy, Perry J. Browder, https://www.simmonsfirm.com/about-us/our-attorneys/perry-j-browder/.

[5] Simmons Hanly Conroy, Amy E. Garrett, https://www.simmonsfirm.com/about-us/our-attorneys/amy-e-garrett/.

serves as the firm's West Coast Asbestos Litigation Manager.[6] Goldstein supervised Scott Peebles when Peebles worked at the firm and is identified in the *Peebles* complaint – concerning a pattern of fraud at the firm – as ROE 1. Goldstein previously was a shareholder at the firm, but transitioned to "of counsel" after the filing of the *Peebles* complaint.

19.    Suvir Dhar is a former Simmons Hanly partner and was in the firm's Asbestos Department. Dhar was based in the firm's office in Alton, Illinois. Dhar admitted that Simmons Hanly filed a complaint against J-M Manufacturing knowing it contained false information.

20.    Crystal Foley is a partner at Simmons Hanly and part of the firm's Asbestos Department. Foley is listed in the firm's office in El Segundo, California but resides in and works from Illinois. Foley "oversees the firm's California dockets, or cases that are scheduled for trial in the California courts."[7] On repeated occasions, Foley signed discovery responses that contained false information and transmitted them through interstate commerce in furtherance of the Simmons Hanly Defendants' scheme.

21.    Deborah Rosenthal is a partner at Simmons Hanly and part of the firm's Asbestos Department.[8] Rosenthal is based in the firm's office in San Francisco, California. Rosenthal has been involved in some of the firm's cases involving egregious misconduct and has threatened and sought to intimidate lawyers working on J-M Manufacturing cases to prevent the firm's fraud from being exposed.

---

[6] Simmons Hanly Conroy, Benjamin Goldstein, https://www.simmonsfirm.com/about-us/our-attorneys/benjamin-goldstein/.

[7] Simmons Hanly Conroy, Crystal Foley, https://www.simmonsfirm.com/about-us/our-attorneys/crystal-foley/.

[8] Simmons Hanly Conroy, Deborah Rosenthal, https://www.simmonsfirm.com/about-us/our-attorneys/deborah-rosenthal/.

22.     Stan Jones is or was an asbestos case investigator at Simmons Hanly.  Jones is or was based in the firm's office in Alton, Illinois.  Jones was assigned to or involved in the cases that Peebles alleged were fraudulent, and was the first person that Peebles sought to depose to prove his allegations against the firm.

23.     John and Jane Does 1-25 are individuals who were part of the scheme described in this complaint who either are current or former employees of Simmons Hanly or worked with the Simmons Hanly Defendants to effectuate the scheme.  Since much of the evidence about the scheme is in the exclusive knowledge or control of the Defendants, these individuals are currently unknown to J-M Manufacturing.  Discovery will reveal the identity of these individuals.

## JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States, specifically, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) and (d).

25.     This Court has supplemental jurisdiction over the pendent state-law claims pursuant to 28 U.S.C. § 1367(a) because they are so related to the RICO claims that they form part of the same case or controversy.  The claims are all based on the same underlying facts and involve all of the same parties.

26.     Venue is proper and appropriate in this district under 28 U.S.C. §§ 1391(b)-(d). Simmons Hanly is headquartered in Alton, Illinois and maintained an office in Chicago, Illinois through at least October 2021.  Pursuant to 28 U.S.C. § 1391(d), Simmons Hanly resides in this district.  The firm also conducts significant activities in the district.  Simmons Hanly, for example, lists 28 lawyers on its website as located in Chicago.  Those lawyers include Defendants Perry Browder (who appears to live in the district), Nicholas Angelides, and Amy Garrett.  Simmons

Hanly also markets itself as "Chicago Mesothelioma Lawyer(s)" who have been working in this district for over 20 years.

27.     In addition to a presence in the district, a substantial part of the events or omissions giving rise to the claims occurred here, including (a) the provision of false or perjured deposition testimony in this district; (b) preparing and sending filings and correspondence to and from this district related to Simmons Hanly's attempt to cover up the allegations in the *Peebles* complaint; and (c) directing correspondence, discovery, deposition testimony, emails, and pleadings in furtherance of the scheme to lawyers representing J-M Manufacturing, or lawyers representing the company's co-defendants, who maintain an office in the district, including those involved in *Perkins*, *Morgan*, and *Yates* (described below). A substantial part of the events or omissions giving rise to the claims in this case also occurred in this district because Simmons Hanly directed its scheme at J-M Manufacturing co-defendants in the district, including in *Swiger* (described below). In addition, and based on information and belief, Browder resides in this district and engaged in decision-making, oversight, and predicate acts in this district.

28.     Each of the defendants is subject to personal jurisdiction in Illinois. Simmons Hanly is a citizen of Illinois based on its principal place of business and its status as an Illinois limited liability company with shareholders based in Illinois.

29.     Certain of the individual Simmons Hanly Defendants are citizens of Illinois because they reside in Illinois, which include, based on J-M Manufacturing's research, Nicholas Angelides, Perry Browder, Amy Garrett, Crystal Foley, and Stan Jones. These individual Defendants and Suvir Dhar also worked out of offices in Illinois during the relevant time and engaged in a majority of the conduct that forms the basis of the claims while in Illinois, including, among other things, (a) devising the scheme described in this complaint; (b) preparing and filing sham complaints;

preparing, serving, or receiving fraudulent discovery responses; (c) preparing witnesses who offered perjured testimony or soliciting perjured testimony from witnesses during depositions; (d) negotiating settlement agreements with J-M Manufacturing; (e) developing a strategy related to asbestos bankruptcy trust claims and preparing and filing asbestos bankruptcy trust claims; and (f) engaging in communication by email, phone, and the mail in furtherance of the scheme.

30.     The individual Simmons Hanly Defendants who are based in the firm's California offices and located in California – Goldstein and Rosenthal – are subject to personal jurisdiction because they purposefully availed themselves of doing business in Illinois and took substantial actions in furtherance of the scheme in Illinois.  This includes (a) working with case team members based in Illinois – including, in particular, Foley and Angelides – to develop the "story" to be used in each case that was subject to the fraud scheme; (b) sending pleadings, discovery responses, and correspondence containing false information or in furtherance of the scheme to Illinois and working with case team members in Illinois to prepare such documents and correspondence; (c) extracting settlement payments through the use of the fraudulent scheme to be paid to Simmons Hanly in Illinois; and (d) working with members of firm management in Illinois to further the scheme and to cover up the scheme.

## BACKGROUND

31.     This case centers on a complicated fraud scheme designed and implemented by Simmons Hanly and the individual Defendants.  The scheme was deployed over a course of years in litigation brought by the firm against J-M Manufacturing to extract settlements and obtain jury verdicts or otherwise force J-M Manufacturing to spend money on litigation.

32.     The scheme was disguised as aggressive litigation tactics and could not be understood in the context of any single lawsuit against J-M Manufacturing.  The scheme could only be detected and understood once (a) former Simmons Hanly partner Scott Peebles filed a

lawsuit against the firm and exposed that the firm was engaged in a pattern of fraud and misconduct in asbestos litigation, and (b) J-M Manufacturing investigated the alleged pattern of fraud and misconduct after learning of the *Peebles* complaint.

33.     As part of that investigation, J-M Manufacturing reviewed historic cases involving Simmons Hanly to identify and evaluate potential patterns of fraud and misconduct.  The company discovered that the scheme described by Peebles was used across a number of Simmons Hanly cases filed against the company.  The company also discovered that the primary case discussed as fraudulent by Peebles in his complaint was a case against J-M Manufacturing.

34.     To understand the full extent of the scheme implemented by the Simmons Hanly Defendants, the manner in which it operated, and why it worked, it is important to understand the history of asbestos and asbestos litigation, J-M Manufacturing's limited role in selling asbestos-containing products, and the frauds that have been uncovered in asbestos litigation brought by other members of the plaintiff's bar.

A.      **History of Asbestos Usage in the United States**

35.     Asbestos was once considered a "miracle mineral."  This naturally occurring silicate has a number of favorable characteristics that led to its widespread use.  It is resistant to fire, heat, and corrosion.  It is strong, durable, and flexible with fibers than can be woven into cloth.  And it is inexpensive because of its abundant quantities.

36.     The versality of asbestos led to its use in a number of different products in a variety of industries.  Asbestos was used in insulation, roofing, flooring, ceilings, brake and boiler linings, wire insulation, gaskets, ship building, and household products like stove pads, ironing board covers, and hairdryers.

37.     The use of asbestos peaked in 1973, and it was nearly impossible not to be exposed to at least some product containing asbestos.  The most significant form of exposure came by way

of friable asbestos or asbestos-containing material that can be crumbled, pulverized, or reduced to powder by human pressure and released in the air.

38.     In 1970, Congress passed the Occupational Safety Health Act (OSHA), which led to regulations that required the use of safety precautions in the workplace to reduce occupational exposure to asbestos.

39.     Labor unions followed the lead of OSHA and required union workplaces to follow strict safety standards to mitigate the potential harm of asbestos.

40.     Once it became common knowledge that asbestos exposure can be harmful, the use of asbestos dropped significantly and continued to drop for the next three decades.  But asbestos-related diseases, which have an average latency period of approximately 30 years, continued to manifest many years after the exposure that caused the disease.

**B.     J-M Manufacturing's Limited History Selling Asbestos-Cement Pipe**

41.     J-M Manufacturing is not in the business of manufacturing asbestos products.  It manufactures plastic pipe, including polyvinyl chloride ("PVC") and high-density polyethylene pipe.

42.     For a limited period of time, J-M Manufacturing sold ACP as a transitional product until water districts started to utilize PVC pipe.  This occurred from 1983 to 1988, long after the implementation of OSHA regulations and union requirements that imposed strict safety standards to limit workplace exposure to asbestos.

43.     By the time J-M Manufacturing started supplying ACP, ACP had been manufactured and installed by other companies for decades.  These companies included Johns-Manville, CAPCO, CertainTeed, and Flintkote.

44.     ACP was not available to the general public or in hardware store, and only experienced contractors worked with ACP.  The pipe was installed in an outdoor environment, with cutting and drilling activity only occupying about 1.1% of the total field installation time.

45.     A market for ACP persisted because it performed to the standard required by municipalities and water districts, was impervious to acids in soils, was corrosion-resistant, and could be worked with safely if handled in accordance with OSHA standards.  Even today, thousands of miles of ACP carry safe and clean drinking water to many Americans.

46.     The asbestos in ACP is encapsulated, which means that it was modified by a bonding agent, coating, binder, or other material that limit any airborne release to levels well below OSHA exposure limits.  Higher levels of exposure only occur if the pipe is cut with an unventilated power saw or drilled into using a power drill.

47.     ACP, however, is specifically designed and manufactured so that it does not need to be cut or drilled.  The pipe is joined by coupling systems so that the pipe sections fit together to form a seal without drilling or cutting.

48.     On the rare occasions that ACP needed to be cut, J-M Manufacturing's warning on the pipe specifically stated "not" to "use power saws to cut th[e] pipe."  This was reinforced in the company's manufacturing data safety sheets and installation guide.

49.     J-M Manufacturing advised end users to cut the pipe using a snap cutter or a wheel cutter, which limited any exposure to asbestos while cutting the product.  OSHA regulations and other workplace safety standards prohibited cutting ACP with an unventilated power saw or drilling into the ACP without significant safety precautions.

50.     Despite the limited duration of J-M Manufacturing's sale of ACP and the limited circumstances under which an individual could have been exposed to asbestos in ACP, J-M

Manufacturing has been the target of more than 6,000 asbestos lawsuits since 2000. One of the most prolific filers of these asbestos lawsuits – which ordinarily involve individuals who have an asbestos-related disease, such as mesothelioma, that generally only occurs with prolonged exposure to asbestos – is Simmons Hanly. Why J-M Manufacturing became a target of meritless asbestos lawsuits becomes clear upon an examination of the history and dynamics of asbestos litigation.

> ### C. A Primer on Asbestos Litigation

51. Mass asbestos litigation began in earnest in the 1970s after the Fifth Circuit upheld a strict liability asbestos product liability verdict. Asbestos litigation grew into what the Supreme Court has called an "elephantine mass," led to the bankruptcies of some of the country's most prominent companies, and developed into a Petri dish for fraud.

> #### 1. The Various Waves in Asbestos Litigation

52. The initial asbestos lawsuits were focused on companies that manufactured or distributed friable asbestos products — a group of companies that has come to be known as the "Big Dusties." The first target was Johns-Manville, which was the largest producer of asbestos-containing products in the United States. By the early 1980s, Johns-Manville was facing 16,000 asbestos claims, mostly related to insulation products, and made the surprising decision to file for bankruptcy, which halted litigation against the company. When the company filed for bankruptcy, there was not a single asbestos claim against the company related to ACP.

53. The plaintiff's law firms then turned their attention to other friable asbestos manufacturers and distributors, including boilermaker Babcock & Wilcox, insulation maker Owens Corning, and chemical giant W.R. Grace. The potential exposure scenarios for plaintiff claims underlying these lawsuits was nearly infinite because of the ubiquity of exposure to friable asbestos. The recovery that could be obtained in these cases also was significant. The crush of

claims that these companies faced led to a wave of bankruptcy filings that crested in the early 2000s and involved nearly all of the friable asbestos manufacturers and distributors.

54.     With the most obvious asbestos defendants out of the picture as a result of bankruptcy, plaintiff's law firms turned to second- and third-tier defendants to bear the brunt of litigation. These companies were not sued because it was likely that their products were the cause of the plaintiffs' asbestos-related disease, but because they were solvent. Plaintiff's lawyers saw this as a natural evolution of asbestos litigation, whereas defense lawyers saw this as a "search for the solvent bystander."

55.     As part of this post-bankruptcy wave of asbestos litigation, plaintiff's law firms, including Simmons Hanly, started to file lawsuits against J-M Manufacturing. The complaints filed in these cases typically expanded the number of companies named as co-defendants in an obvious attempt to use a lawsuit to go hunting for a case against a solvent defendant.

### 2.     The Bankruptcy Trusts

56.     As part of the bankruptcy proceedings that started with Johns-Manville, the bankruptcy courts approved the creation of asbestos personal injury bankruptcy trusts. These bankruptcy trusts assume all of the debtor's asbestos-related liabilities and are funded through the contribution of debtor assets to the trusts for investment and management. The purpose of the bankruptcy trusts is to provide compensation to present and future claimants for harm caused by exposure to asbestos for which a particular company is responsible.[9]

---

[9] The U.S. Government Accountability Office has issued a report that provides detailed information about the role and administration of asbestos trusts and explains the significant role of the plaintiff's law firms in their operation and management. U.S. Gov't Accountability Office, Asbestos Injury Compensation: The Role and Administration of Asbestos Trusts (Sept. 2011).

57. The fox is guarding the proverbial hen house of these trusts. The trusts are privately managed and operated with little to no judicial or federal oversight. The trusts generally consist of one or more trustees, a trust advisory committee, and a future claims representative. Leading plaintiff's law firms with the largest quantum of asbestos plaintiffs populate the trust advisory committees, write the trust distribution procedures, and appoint the future claims representative and trustees.

58. The trust distribution procedures include sections related to the intake and evaluation of claims, payment processes, and audit programs. These procedures also set out whether and when claims information will be made publicly available.

59. The trust distribution procedures are typically written to limit transparency into the trust and facilitate quick payment of trust claims with limited oversight. Information about claimants typically is only available when a claimant consents or a court issues a subpoena requiring disclosure.

60. The bankruptcy trusts make available a second avenue of compensation for asbestos plaintiffs. Asbestos plaintiffs can pursue compensation in both tort litigation and through bankruptcy trust claims.

### 3. Opportunity to Commit Fraud

61. The parallel sources of compensation – tort and trust – create an environment that facilitates fraud. Asbestos litigation focuses on exposure events that occurred 30 or 40 years in the past. Because records are discarded and memories fade, it is difficult to refute the testimony of witnesses about exposure in asbestos litigation.

62.     As part of the tort litigation, asbestos plaintiffs rarely mention the names of bankrupt companies as a source of potential exposure.[10]  They, instead, focus testimony and evidentiary development on solvent defendants.  By focusing on solvent companies and minimizing the role of bankrupt ones, an asbestos plaintiff's law firm can maximize recovery by avoiding apportionment of liability to an insolvent entity.

63.     At the same time, the rules around the bankruptcy trusts provide an asbestos plaintiff's law firm with an avenue to delay the filing of claims or to make claims against a trust under the veil of confidentiality beyond which defendants have limited, if any, ability to see unless they can take discovery in lawsuits like this one.

64.     The opportunities for fraud related to asbestos bankruptcy trusts and in the underlying asbestos lawsuits are well documented.  A former Deputy Assistant Attorney General of the Department of Justice's Civil Division has recognized that "[i]t has become increasingly common for claimants' counsel to seek duplicative recoveries from multiple sources by misrepresenting the asbestos products to which claimants were exposed."[11]  The academic community has also documented the potential for, and occurrence of, fraud in asbestos lawsuits.  Appendix A to this complaint contains a selection of relevant literature about fraud in asbestos litigation.

---

[10] *See, e.g.*, U.S. Chamber of Commerce for Legal Reform, The Asbestos Over-Naming and Trust Transparency Problem: A Philadelphia Case Study (Mar. 2024); RAND Corp., Bankruptcy Trusts Complicated the Outcomes of Asbestos Lawsuits.

[11] U.S. Dep't of Justice, Justice Department Files Statement of Interest Urging Transparency in the Compensation of Asbestos Claims (Dec. 28, 2020).

### D. Past Instances of Fraud in Asbestos Litigation

65. In the past, certain plaintiff's law firms have found it too difficult to resist the temptation to commit fraud. There have been a handful of high-profile cases arising from their misconduct.

66. The first such case was filed by G-I Holdings, which was a successor to a manufacturer of insulating cement named GAF Corporation.[12] In connection with that case, G-I Holdings learned that the law firm Baron & Budd had created a twenty-page "witness preparation" memorandum – the "Baron & Budd Memo" – that set forth specific instructions to clients as to the answers to give during a deposition, including answers about the products to which they were exposed, the products to which they were not exposed (products of bankrupt companies), and the absence of warning labels.[13] The memorandum assured clients that the defense lawyers deposing them would have no way of knowing what products they had actually used, inferring that they could not be challenged regardless of how false their exposure claims were.

67. The second case was filed by CSX Transportation ("CSX"). As part of that case, CSX discovered that a plaintiff's law firm and doctor had engaged in a pattern and practice of unlawful conduct in connection with asbestos litigation in an attempt to enrich themselves.[14] The unlawful scheme included bribing transportation union officials to obtain clients, generating claimants through mass screenings and fraudulent x-ray readings, and filing mass lawsuits against CSX in an effort to force the settlement of thousands of bogus claims. The unlawful scheme was exposed when CSX successfully convinced the West Virginia courts to issue a case management

---

[12] *G-I Holdings, Inc. v. Baron & Budd*, 179 F. Supp. 2d 233 (S.D.N.Y. 2001).

[13] A copy of the Baron & Budd Memo is attached as Exhibit A.

[14] Third Amended Complaint, *CSX Transp., Inc. v. Peirce*, No. 2:05-cv-202, 2011 WL 9698685 (N.D. W. Va. Oct. 19, 2011).

order that required the claimants to certify in writing that their claims "are well-founded in fact" and required the production of evidence related to their claimed exposure and asbestos-related disease. In response to this order, the plaintiff's law firms moved to dismiss all but two (2) of the approximately 1,400 claims to which the case management order applied. These claims were dismissed with prejudice, lending support that these claims were fraudulent. After that dismissal, CSX filed a lawsuit against the plaintiff's law firm and doctor for RICO violations, which led to a multi-million dollar verdict.

68. The third and fourth cases were respectively filed by Garlock Sealing Technologies, LLC ("Garlock") and John Crane, Inc. ("JCI").[15] In connection with these lawsuits and with the help of a bankruptcy court in North Carolina, Garlock and JCI uncovered evidence that a series of plaintiff's law firms had engaged in an ongoing scheme to defraud the companies by concealing material evidence of their clients' exposures to asbestos-containing products of companies that had gone bankrupt. As part of the ensuing litigation, the principal of one of the plaintiff's law firms admitted that it was his regular practice to delay filing trust claims until after the personal injury cases against solvent entities were settled. Garlock also presented evidence that the plaintiff's law firms presented conflicting work histories and perjured testimony to conceal exposure to products of bankrupt companies. On top of that, Garlock found instances in which the

---

[15] *Garlock Sealing Techs., LLC v. Shein*, No. 3:14-cv-137, 2015 WL 5155362 (W.D.N.C. Sep. 2, 2015); *Garlock Sealing Techs., LLC, v. Waters & Kraus, LLP*, No. 3:14-cv-00130, 2015 WL 1022291 (W.D.N.C. Mar. 9, 2015); *Garlock Sealing Techs., LLC v. Simon Greenstone Panatier Bartlett*, No. 3:14-cv-00116, 2015 WL 5148732 (W.D.N.C., Sep. 2, 2015); *Garlock Sealing Techs., LLC v. Belluck & Fox, LLP*, No. 3:14-cv-118, 2015 WL 1022279 (W.D.N.C. Mar. 9, 2015); Complaint, *John Crane, Inc. v. Shein Law Ctr., Ltd.*, No. 1:16-cv-5913, 2016 WL 3251230 (N.D. Ill. June 6, 2016); Complaint, *John Crane, Inc. v. Simon Greenstone Panatier Bartlett*, No. 1:16-cv-5918, 2016 WL 3251232 (N.D. Ill. June 6, 2016).

plaintiff's law firm submitted bankruptcy trust claims that the law firm failed to disclose in tort litigation.

69.     These cases highlight the historical *modus operandi* of plaintiff's law firms engaged in fraud and misconduct in connection with underlying asbestos lawsuits.

### E.      The Simmons Hanly Defendants' Fraudulent Scheme

70.     Simmons Hanly is one of the most prolific asbestos litigation law firms in the country.  It has represented more than 6,000 asbestos claimants and recovered more than $9.3 billion in asbestos litigation.[16]  Based on information and belief, those recoveries have netted the firm more than $3 billion.  Asbestos litigation is big business for Simmons Hanly.

71.     To ensure continued recoveries, the Simmons Hanly Defendants have developed and implemented a fraudulent *modus operandi* – the "Simmons Hanly Fraud Playbook" –that crosses all objective legal and ethical boundaries.  Based on J-M Manufacturing's investigation and for the reasons described below, J-M Manufacturing reasonably believes that Simmons Hanly's approach involves a coordinated and well-developed scheme to offer perjured testimony, suppress evidence of exposure to the products of bankrupt companies, make misrepresentations of fact about the existence of bankruptcy trust claims, file baseless claims in an attempt to extract settlements, and silence anyone who attempts to expose the firm's fraud.

72.     The Simmons Hanly Defendants, including lawyers, non-legal professionals, consultants, and clients working with the firm's Asbestos Department, are a quintessential RICO enterprise.  The enterprise is highly structured.  Everyone has a role to play, and they all work toward the same goal of extracting settlements and obtaining jury verdicts through a pattern of

---

[16]  Simmons Hanly Conroy, Mesothelioma Law Firm, https://www.simmonsfirm.com/ mesothelioma/.

unlawful conduct, including racketeering activity. The paragraphs below described how the enterprise is structured, explain the enterprise's pattern of unlawful conduct, and set out examples of the enterprise's conduct that has manifested in sham asbestos lawsuits against J-M Manufacturing.

### 1.     The Structure and Operation of the RICO Enterprise

73.     The RICO enterprise is a corporate entity and an association-in-fact enterprise that consists of the firm, the various professionals working in and with the Asbestos Department, including the individual Defendants and John and Jane Does 1-25, certain asbestos litigation plaintiffs, other witnesses represented by Simmons Hanly, and law firms that serve as co-counsel with J-M Manufacturing on asbestos lawsuits.[17]

74.     The enterprise is led by members of management of the firm and the Asbestos Department, including Nicholas Angelides, Perry Browder, and Amy Garrett.[18]  Angelides is the mastermind of the enterprise's strategy in asbestos and mesothelioma litigation, Browder oversees the operation of the enterprise to ensure that it maximizes results, and Garrett ensures that the enterprise's affairs are not exposed.  The leaders of the enterprise have worked up a "story" about each asbestos defendant, including a bogus J-M Manufacturing exposure "story," that forms the basis of the scheme.

---

[17] No asbestos plaintiff or claimant is being sued for liability in this complaint.  Based on information and belief, these individuals have been exploited by the Simmons Hanly Defendants to effectuate the scheme.

[18] Simmons Hanly Conroy, Meet our Asbestos Leadership, https://www.simmonsfirm.com/mesothelioma/lawyer/asbestos-leadership/.

75. The case teams that are part of the Asbestos Department are the means by which the enterprise implements its scheme.[19] These professionals know "what is needed" and "do all the work" necessary to effectuate the modus operandi of the fraud and misconduct.[20] The asbestos case investigators, including Stan Jones, and other members of the team "build" the cases by "find[ing] the evidence" to support the "story" about each defendant, while the medical professionals develop evidence about the asbestos plaintiffs' injuries.[21]

76. As part of building the case, the case team purports to reconstruct the plaintiff's work history and consults an "internal warehouse of evidence" in search of solvent companies and products that have any relevance to the type of work done by the plaintiff to generate a list of defendants.[22] The team makes the list of solvent companies as large as possible, commonly identifying nearly 70 companies as defendants.[23] Simmons Hanly appears to name all solvent entities whose names crop up in a plaintiff's work history as defendants in its asbestos cases regardless of whether there is any evidence of exposure to the defendant's asbestos-containing product. As stated on the firm's website, a lack of information about exposure is not a problem;

---

[19] Simmons Hanly Conroy, Mesothelioma Law Firm, https://www.simmonsfirm.com/ mesothelioma/ (describing the case teams).

[20] Simmons Hanly Conroy, What to Expect When Filing a Mesothelioma Claim, https://www.youtube.com/watch?v=_dmUEVn7ZIk.

[21] *Id.*; Simmons Hanly Conroy, Mesothelioma Law Firm, https://www.simmonsfirm.com/ mesothelioma/.

[22] Simmons Hanly Conroy, Mesothelioma Settlements & Verdicts, https://www.simmonsfirm.com /mesothelioma/settlements/; Simmons Hanly Conroy, Asbestos Companies, https://www. simmonsfirm.com/mesothelioma/asbestos-exposure/companies/; Simmons Hanly Conroy, Asbestos Products, https://www.simmonsfirm.com/mesothelioma/asbestos-exposure/products/; Simmons Hanly Conroy, Asbestos Occupations, https://www.simmonsfirm.com/mesothelioma/ asbestos-exposure/occupations/.

[23] Simmons Hanly Conroy, Mesothelioma Settlements & Verdicts, https://www.simmonsfirm.com /mesothelioma/settlements/.

the firm will just "[i]dentfy the asbestos-containing products [the plaintiff] *may* have been exposed to" and seek to "[h]old the manufacturers of these products accountable."[24]

77.    The lawyers, with the help of the paralegals and in some cases local counsel, prepare and file a lawsuit based on the "evidence" often fabricated by the case investigators and others and develop "plans on how to move forward."[25]  The lawsuit is filed in a plaintiff-friendly "court system that avoids any potential complications and awards the most compensation possible."[26]  Based on information and belief, the firm files in these jurisdiction because it knows that it can engage in misconduct and the court is unlikely to sanction the firm or reign it in.  The firm also files in these jurisdictions because it knows that it will put pressure on the defendants to settle regardless of the merits of any particular lawsuit.

78.    After the case team files the lawsuit, the case team sets about extracting settlements from as many defendants as possible and pursuing claims from asbestos trusts.[27]  In the words of the firm, the case team "targets all potential sources of compensation."[28]  The goal is to "maximize . . . total results" and get money in the door as "quickly" as possible.[29]  The firm prides itself on being "one of the fastest asbestos law firms in the country" in extracting money from the process.[30]

---

[24] *Id.* (emphasis added).

[25]  Simmons Hanly Conroy, What to Expect When Filing a Mesothelioma Claim, https://www.youtube.com/watch?v=_dmUEVn7ZIk.

[26] Simmons Hanly Conroy, Mesothelioma Settlements & Verdicts, https://www.simmonsfirm.com /mesothelioma/settlements/.

[27] *Id.*

[28]  Simmons Hanly Conroy, Asbestos Trust Funds, https://www.simmonsfirm.com/ mesothelioma/asbestos-trust-funds/.

[29] Simmons Hanly Conroy, Mesothelioma Settlements & Verdicts, https://www.simmonsfirm.com /mesothelioma/settlements/.

[30] *Id.*

79.     As is apparent from the chronology of many of its cases, part of the firm's strategy is to maximize the recovery by the artful timing of filings and by concealing evidence of trust claims or exposure to products of bankrupt companies in order to avoid an apportionment of liability to bankrupt companies. The "trust fund claims are handled separately from [the] lawsuit against solvent (non-bankrupt) defendants" and include the involvement of the firm's bankruptcy lawyers that are part of the Asbestos Department.[31] The firm knows that the trust process involves little transparency and offers streamlined access to compensation, with members of the firm being part of more than 20 trust advisory committees.[32]

80.     As exposed in the *Peebles* complaint, the firm's strategy involves fraud, perjury, and other misconduct. Based on information and belief, the fraud and misconduct often include plans about what to say and not say at depositions, strategies for responding to discovery without revealing information that could lead to discovery that the plaintiff was not exposed to a defendant's product, and strategies about what to say about asbestos trust claims. Based on information and belief, the lawyers also determine what discovery to resist, the timing of litigation activities like the plaintiff's deposition to ensure that adverse evidence cannot be developed, and when to use entirely baseless asbestos lawsuits as bargaining chips to extract a settlement.

81.     The firm has been very successful implementing this strategy, extracting settlements in "most" of its cases while obtaining payouts from a number of different asbestos

---

[31] Simmons Hanly Conroy, Asbestos Trust Funds, https://www.simmonsfirm.com/mesothelioma/asbestos-trust-funds/.

[32] Simmons Hanly Conroy, Lisa Nathanson Busch, https://www.simmonsfirm.com/about-us/our-attorneys/lisa-nathanson-busch/.

trusts.[33]  Part of the reason for the firm's success is that it is difficult to affirmatively disprove the firm's narrative about exposure, the firm's clients are highly sympathetic plaintiffs, and the firm has filed its cases in "state court[s] that [are] likely to provide . . . the most compensation."[34]

## 2. The Objectives of the RICO Enterprise

82.     The primary objective of the enterprise is to secure the most compensation possible for clients and the firm regardless of whether that requires fraud and misconduct.  To do that, the enterprise members know what is important.

83.     First, the enterprise members know that it is important for the asbestos plaintiff to clearly and specifically identify the asbestos-containing products corresponding to one or more named defendants in the underlying asbestos lawsuit.  In the firm's words, the timing and amount of a settlement (and jury verdict) depend on "the strength of the evidence showing which asbestos products [the] asbestos plaintiff" was exposed to.[35]  That "evidence," which almost always comes by way of deposition of a single witness represented by the firm, relates to events that occurred approximately 30 to 40 years ago so it is extremely difficult to affirmatively disprove.  Based on information and belief and supported by the cases discussed below, the enterprise members work together to ensure that the deposition testimony follows closely to a script that includes specific details about asbestos-containing products and how the exposure supposedly occurred, even though these same witnesses recall virtually no other details related to the exposure.

---

[33]     Simmons      Hanly      Conroy,      Mesothelioma      Settlements      &      Verdicts, https://www.simmonsfirm.com/mesothelioma/settlements/; Simmons Hanly Conroy, Asbestos Trust Funds, https://www.simmonsfirm.com/mesothelioma/asbestos-trust-funds/.

[34]     Simmons     Hanly     Conroy,     Mesothelioma     Claims,     https://www.simmonsfirm.com/ mesothelioma/claims/.

[35] Simmons Hanly Conroy, Mesothelioma Settlements & Verdicts, https://www.simmonsfirm.com /mesothelioma/settlements/.

84. Second, the enterprise members know that it is important to present facts that show actual exposure to asbestos in the tort litigation defendants' products and for product identification witnesses to claim that the exposure occurred frequently and over a long period of time. Based on information and belief and supported by the cases discussed below, the enterprise members work together to craft a narrative about how the exposure occurred, stressing that it occurred on "hundreds" of occasions.

85. Third, the enterprise members know that it is important to deny the existence of visible warnings on the asbestos-containing products. Based on information and belief and supported by the cases discussed below, the enterprise members work together to ensure that there is no evidence about warnings on the asbestos-containing products.

86. Fourth, the enterprise members know that it is important to limit the provision of facts that may give the defendants the opportunity to disprove the "story." Based on information and belief and supported by the cases discussed below, the enterprise members work together to craft vague details about work history, job sites, and co-workers that in many instances are false. Based on information and belief and supported by the cases discussed below, the enterprise members also work together to resist discovery efforts that might frustrate the story.

87. Fifth, the enterprise members know that it is important to suppress any evidence about exposure to asbestos-containing products of bankrupt companies. Based on information and belief and as discussed below, the enterprise members work together to conceal information about certain product exposures at depositions and in written discovery. Based on information and belief and as discussed below, the enterprise members also work together to hide the details of bankruptcy trust claims filed by the plaintiff.

88.     Sixth, the enterprise members know that the firm's asbestos plaintiffs are highly sympathetic and that the jurisdiction in which they file their cases will ease the path to trial.  Based on information and belief and supported by the scores of the firm's voluntary dismissals, the enterprise members assert baseless claims to include as many defendants as possible in the lawsuit and to extract settlements from as many solvent defendants as possible.  The enterprise members often use these claims as bargaining chips to secure a settlement in another asbestos matter of the firm.

89.     Seventh, the enterprise members know that it is important to protect the secrecy of the Simmons Hanly Fraud Playbook.  Based on information and belief and supported by the dismissals in the cases discussed below, the enterprise members work together to dismiss bogus asbestos lawsuits when they are so infected by misconduct that they may expose the scheme.  Based on information and belief and supported by the circumstances surrounding the *Peebles* complaint, the enterprise members also work together to stop any efforts to make public the details of the Simmons Hanly Fraud Playbook and address firm employees who do not fall in line.

**F.      The Simmons Hanly Fraud Playbook at Work in Litigation Against J-M Manufacturing**

90.     For the first two decades of its existence, J-M Manufacturing was rarely mentioned in asbestos lawsuits.  The same was true of other manufacturers and suppliers of ACP, as it was highly improbable that ACP – with its encapsulated asbestos – led to a significant amount of asbestos-related disease and much more likely that asbestos-related disease was the result of exposure to products containing friable asbestos.

91.     That changed following the bankruptcy wave in asbestos litigation in the 2000s.  Simmons Hanly soon turned its focus on J-M Manufacturing and started to file asbestos lawsuits against the company.

92.     In connection with its litigation against J-M Manufacturing, Simmons Hanly developed and refined a "story" about exposure to asbestos in the company's ACP that was repeatable.  The "story" that has been offered in case after case is that the asbestos plaintiff or decedent was exposed to asbestos in the ACP at nonspecific locations and job sites when the pipe was specifically cut with a power saw or drilled with a power drill.  That exposure invariably occurred – according to the bogus claims – on "hundreds" of occasions.[36]

93.     The *Peebles* complaint – which arose from the corrupt handling of a case against J--M Manufacturing – revealed that the telling of this "story" relies on perjured testimony, false statements, and other acts of moral turpitude, dishonesty, and corruption.  The *Peebles* case also highlighted how the firm's fraudulent conduct – the Simmons Hanly Fraud Playbook – was likely part of "a larger pattern and practice" potentially affecting thousands of Simmons Hanly clients.

94.     A sampling of recent case files (cases resolved within the last five years) filed against J-M Manufacturing by Simmons Hanly confirms Peebles' allegations.

### 1.     *Sebastian Bretado v. 3M Company et al.*

95.     The asbestos lawsuit at the center of the *Peebles* case is *Bretado v. 3M Company* in which J-M Manufacturing was a defendant along with 27 other separate defendant entities.  That case was filed by Simmons Hanly on October 15, 2018.  Bretado claimed that his mesothelioma was caused by working with ACP as a day laborer doing "line drainage" for several landscaping employers in the 1980s.  The complaint was filed by Simmons Hanly attorney Crystal Foley and

---

[36] This "story" is told regardless of whether the case is alleged as a primary exposure or a so-called take-home exposure case.  The cases based on alleged take-home exposure generally include additional inconceivable allegations about how the asbestos made its way to the asbestos plaintiff or decedent's home and how the exposure repeatedly occurred.

alleged that Bretado had been exposed to asbestos in J-M Manufacturing's ACP while working for Oak Ridge Landscaping.

96.     Foley first noticed the deposition of Bretado about a month after the complaint was filed.  The deposition went forward a little over two-and-half months after the lawsuit was filed and before the defendants had any opportunity to meaningfully conduct discovery into Bretado's allegations.[37]  This was done in an apparent attempt to lock in favorable testimony from Bretado at a time when the defendants did not have adequate means and ammunition with which to cross-examine him.

97.     Bretado was the sole product identification in the case.  At his deposition, Bretado offered very specific testimony about the ACP he was supposedly exposed to while working as a landscaper from 1979 to 1989, despite being unable to provide nearly any other details about the circumstances of his employment.  For example, Bretado testified that he used ACP that was labeled "Johns-Manville transite" until 1982.  Bretado then testified that in 1982 (which happened to be the year that Johns-Manville filed for bankruptcy), he started to work with ACP that was labeled "J-M transite" and worked with that ACP until 1989.  Bretado also implausibly testified that he recalled seeing the names of ACP distributors, such as Grinnell, written on delivery trucks at his work sites and at other locations, even though he failed to recall the location of those worksites.

---

[37] The deposition occurred over the course of seven days (January 9-10, 2019, January 16-18, 2019, January 31, 2019, and February 1, 2019), and lawyers participated in person and by telephone.  Lawyers based in Texas appeared telephonically on January 16-17, 2019, and a lawyer from Wisconsin appeared telephonically on January 18, 2019.  Based on information and belief, the transcript was distributed to lawyers representing a defendant in Milwaukee, Wisconsin.  Stan Jones participated in the deposition and assisted with translation.

98.     During the deposition, the Simmons Hanly lawyer conducting the examination "helped" Bretado answer product identification by showing him pictures that contained the label of the ACP ahead of the identification of the ACP and by suggesting answers.  For Johns-Manville, J-M Manufacturing, and CertainTeed, the lawyer showed Bretado a picture that included each company's label and then asked him if he recalled working with that pipe and to confirm that the label was the one he remembered.  When Bretado had trouble reading the company's name on the CertainTeed ACP in the picture he was shown, the Simmons Hanly lawyer suggested the answer by asking "Is it CertainTeed" pipe?

99.     When not being shown pictures of the ACP, Bretado referred to Johns-Manville as "Johns Medville" on at least four occasions and as "John Mable" on at least one occasion. Recognizing the importance of the testimony for the product identification issue, the Simmons Hanly lawyer corrected Bretado, stating "[w]e will get it right.  It's Johns Manville."

100.     Bretado also followed the narrative on asbestos exposure related to ACP.  He specifically recalled that he would cut the pipe with a power saw and drill pipe with a power drill. The Simmons Hanly lawyer helped this testimony by showing Bretado pictures of power saws to lock in testimony about the types of saws Bretado purportedly used.

101.     Aside from being able to provide a remarkable level of detail about the ACP he supposedly used, who supposedly supplied it, and how he was supposedly exposed to asbestos from it, Bretado recalled virtually no other detail about the landscaping work he performed. Bretado, for example, testified that he could not recall a single specific location where he worked with ACP, the full name of any co-workers, or the name of any customer for whom he did landscaping work.

102.    Bretado did provide the names of three employers – Oak Ridge Landscaping and two individuals – that he claimed he worked for that used ACP in their landscaping businesses. Though Bretado provided no real detail about those employers, J-M Manufacturing was able to track them down.  The two employers who were individuals were deceased; but their immediate family members who were deposed in June 2019 testified that those individuals did not even run landscaping businesses, let alone landscaping businesses that would use ACP.  The principal of the third employer – Oak Ridge Landscaping – testified in June 2019 that his company never used ACP and that he had no recollection of Bretado.  These witnesses, in other words, confirmed that Bretado had provided false testimony.

103.    The false testimony that Bretado provided was reinforced by the Simmons Hanly lawyers as part of written discovery.  On January 30, 2019, attorney Foley signed and served responses to J-M Manufacturing's form interrogatories and separate special interrogatories stating that Bretado worked with J-M Manufacturing ACP and was exposed to asbestos from that ACP while working with the employers that Bretado identified at his deposition.  On June 14, 2019, Foley signed and served responses to J-M Manufacturing's supplemental interrogatories and made the same statements.

104.    As set out in the *Peebles* complaint and confirmed above, the Bretado case was infected by perjury and false statements.  In addition to Peebles and Foley, Nicholas Angelides and Benjamin Goldstein actively facilitated the application of the Simmons Hanly Fraud Playbook to fabricate Bretado's allegations against J-M Manufacturing or were part of the attempt to cover up the misconduct described in the *Peebles* complaint.

105.    J-M Manufacturing spent significant sums to mount a defense to that case and counter the product identification and exposure testimony.  Given the uncertainty of litigation, the

company ultimately settled the case in August 2019 and made a settlement payment in or around September 2019. Perry Browder was one of the primary Simmons Hanly lawyers involved in the settlement and signed the settlement paperwork.

106. The settlement was done before J-M Manufacturing learned of the *Peebles* complaint. That complaint suggests that the lawsuit was a sham and that Simmons Hanly caused J-M Manufacturing to unnecessarily spend money on and settle the lawsuit.

## 2. *Reyna Carranza v. 3M Company et al.*

107. Simmons Hanly filed the *Carranza* case on November 7, 2018, which was a wrongful death mesothelioma case in which J-M Manufacturing was a defendant. Crystal Foley and Suvir Dhar were involved in the case as counsel from Simmons Hanly. The initial complaint was filed by Foley and listed approximately 26 separate entities as defendants. In the complaint, Simmons Hanly stated that Carranza had been exposed to asbestos in J-M Manufacturing's ACP while working for Indelcor from approximately 1983 to 1988.

108. The alleged exposure in the complaint was completely false. At his deposition, the owner of Indelcor testified that the company *did not exist* until the mid-1990s. J-M Manufacturing also learned that Indelcor's owner had spoken with Suvir Dhar on the day that the initial complaint was filed and informed Dhar that the allegations about Indelcor in the complaint were not accurate. Dhar reportedly stated that Simmons Hanly *already* knew that, meaning that the firm knew the complaint against J-M Manufacturing was not based in fact and filed it anyway.

109. During the litigation, the sole product identification witness was Carranza's brother, who was represented by Simmons Hanly. Dhar presented Carranza's brother for deposition and conducted an examination of him. That deposition was in person and by telephone and occurred over the course of six days, including June 6, 2019, June 7, 2019, June 11, 2019,

June 12, 2019, June 13, 2019, and November 13, 2019. Stan Jones attended the deposition for Simmons Hanly's initial examination of Carranza's brother and helped with translation.

110. The deposition followed a familiar pattern. Carranza's brother testified that his brother worked under the table installing sewer ACP at "hundreds" of locations throughout Southern California and claimed that the pipe said "J-M Transite" (despite being unable to write or spell the word "Transite"). But Carranza's brother could not remember the specific location or address of any of that work, the full names of any of the "hundreds" of employers involved, or the names of other co-workers. When confronted with his brother's social security records showing non-construction related work in the time frame relevant to J-M Manufacturing, the witness claimed his brother's social security number had been stolen and that his brother never worked at the listed jobs. The brother also claimed that Carranza dropped out of high school to perform the relevant construction work with him.

111. Carranza's brother also testified that Carranza was exposed to asbestos in the ACP because Carranza cut ACP "hundreds" of times using a power saw. According to Carranza's brother, there were no warnings on any ACP.

112. J-M Manufacturing was able to obtain Carranza's high school and immigration records, at significant time and expense. These records showed that Carranza was in high school and/or working at the non-construction jobs listed in his social security records in the 1980s, rather than installing underground ACP with his brother. J-M Manufacturing also discovered that ACP was not even used for sewer systems in Southern California in the 1980s.

113. Both before and after the deposition of Carranza's brother, Simmons Hanly continued to promote in written discovery the narrative about Carranza's exposure that had been described by Carranza's brother. The firm did this in at least five interrogatory responses that were

signed by Foley and served on April 8, 2019, June 19, 2019, November 21, 2019, and February 3, 2020. The narrative was also repeated in a summary judgment brief filed and served by Rosenthal and Peebles on November 26, 2019.

114. On March 27, 2020, after forcing J-M Manufacturing to litigate for approximately a year and a half at great expense, Simmons Hanly dismissed the case with prejudice. Foley and Benjamin Goldstein were involved in the dismissal. The with-prejudice dismissal of *Carranza* confirms that the case was a sham. But by the time of the dismissal, J-M Manufacturing had spent a significant sum responding to the allegations in the case.

### 3. *Dennis Perkins v. A.W. Chesterton et al.*

115. On November 18, 2019, Simmons Hanly filed the *Perkins* case in Illinois state court. The case involved allegations by Dennis Perkins that his wife died of mesothelioma as a result of cleaning his uniforms that had been contaminated with asbestos. The Illinois complaint named 24 defendants, including J-M Manufacturing and CertainTeed.

116. On January 23, 2020, CertainTeed/DBMP filed for bankruptcy.

117. On August 19, 2020, Perkins was deposed in the Illinois case by multi-platform video conference with participants located in Illinois and North Carolina. At least one of the participants was located in Chicago for that deposition. During the deposition, Perkins testified about how he was purportedly exposed to asbestos that he brought home and that made his wife sick. Perkins testified that he was exposed when replacing pipe for the City of Barre in the 1980s. Perkins could not recall the name of the pipe he removed but supposedly recalled clearly that the new pipe he installed was labeled "J-M Transite," had a waffle print, and was delivered by E.J. Prescott. Perkins testified that he cut that ACP with a gas powered saw on "[a] lot" of occasions.

118.    Perkins was asked if he installed any other type of pipe while working for the City of Barre.  Despite naming CertainTeed in his complaint, Perkins denied being familiar with CertainTeed or its ACP, or ACP made by other bankrupt ACP manufacturers, such as CAPCO and Flintkote.  By this time, of course, CertainTeed/DBMP had filed bankruptcy.

119.    On July 15, 2021, the *Perkins* case was refiled in Vermont state court based on a jurisdictional defect in Illinois.  Since CertainTeed/DBMP had filed bankruptcy, the Vermont complaint did not name that company.

120.    On August 24, 2022, Simmons Hanly filed a proof of claim on behalf of Perkins in the CertainTeed/DBMP bankruptcy.  In the proof claim, the Simmons Hanly attorney declared under the penalty of perjury that the decedent had mesothelioma and had a claim against CertainTeed/DBMP.  In other words, Simmons Hanly asserted in a sworn filing that the decedent's mesothelioma was caused in part by CertainTeed, which would have been the result of Perkins' exposure to asbestos in CertainTeed asbestos-containing products.

121.    In written and signed discovery responses in *Perkins*, Simmons Hanly did not disclose the proof of claim that it had caused to be filed in the CertainTeed/DBMP bankruptcy case or the attendant claimed exposure to asbestos in CertainTeed asbestos-containing products.  On November 10, 2022, for example, Simmons Hanly responded to requests for production of documents, interrogatories, and requests for admission on behalf of Perkins.  In response to the requests for admissions, Simmons Hanly, through admissions and denials, claimed that (a) the only other "claim[s]" filed "with any court or entity other than the instant matter for the injuries alleged in the Complaint" were the claims contained in the Illinois state court complaint and (b) there was no claim in any bankruptcy trust related to the alleged injury.  The second assertion, at best, was highly misleading, and the first assertion was just false.

- 35 -

122.    In response to the interrogatories and document requests, Simmons Hanly continued its misdirection.  In the interrogatories, for example, J-M Manufacturing asked Perkins to describe all exposures to asbestos-containing products to which the decedent was exposed, *regardless if alleged in the complaint*.  Simmons Hanly did not identify CertainTeed, despite having a proof of claim on file based on purported exposure to asbestos in CertainTeed asbestos-containing products.  Simmons Hanly, instead, referred J-M Manufacturing to the Perkins' deposition testimony, where Perkins denied exposure to asbestos in CertainTeed asbestos-containing products.  Simmons Hanly also failed to provide information related to the CertainTeed proof of claim in response to interrogatories that asked Perkins to identify (a) any asbestos bankruptcy trusts from which Perkins was or may be entitled to receive compensation but had not yet filed a claim or (b) all claims for payment of any type submitted to any claims processing entity, trust, bankruptcy trust, or claim facility with respect to the claimed injury.  The proof of claim had to be responsive to one of these interrogatories, and Simmons Hanly failed to disclose it.

123.    The discovery responses, which were transmitted by email across state lines, concealed the proof of claim that Simmons Hanly and Perkins had filed in the CertainTeed/DBMP bankruptcy.  This, in itself, was fraud, which was compounded by the inconsistent positions that Simmons Hanly and Perkins took in the asbestos litigation and the CertainTeed bankruptcy.  Either Perkins and the decedent were exposed to asbestos in CertainTeed asbestos-containing products and had a bankruptcy claim against that company's estate, making the statements in the Vermont litigation untrue, or Perkins and the decedent were not exposed to asbestos in CertainTeed asbestos-containing products and the proof of claim was fraudulent.

124.     On August 10, 2023, J-M Manufacturing settled the *Perkins* case.  Perry Browder
was the primary Simmons Hanly attorney involved in the settlement.  At the time of the settlement,
Simmons Hanly had not disclosed the CertainTeed bankruptcy claim.

### 4.     *Robert Yates and Maria Yates v. Basco Drywall & Painting Co. et al.*

125.     On May 20, 2019, Simmons Hanly filed the *Yates* case in California state court,
which ultimately became a wrongful death mesothelioma case.  Crystal Foley, Benjamin
Goldstein, and Deborah Rosenthal were all involved in the case, and both the initial complaint and
the amended complaint – which was filed on June 24, 2020 – were signed by Foley.

126.     The complaint named 17 entities, including J-M Manufacturing.  Simmons Hanly
alleged that Yates was exposed to asbestos while working as a pipe worker from approximately
1998 to 2008 for TT Technologies at "[v]arious locations throughout California."

127.     On June 13, 2019, Yates and Simmons Hanly provided a response to the
defendants' standard interrogatories, which was signed by Foley.  In that response, Yates and
Simmons Hanly again claimed that he was exposed to asbestos from ACP while working at TT
Technologies from approximately 1998 to 2008.  Specifically, Yates and Simmons Hanly claimed
that Yates "worked throughout the State of California in the pipe bursting field, a process by which
existing underground pipe is burst and new pipe is simultaneously pulled in behind the pipe
bursting tool."  According to the interrogatory response, Yates was responsible for digging an
entry pit and removing the first few feet of existing pipe to place the pipe bursting tool.  The
interrogatory response also claimed that Yates worked with and cut various types and brands of
pipe including J-M Transite pipe.  This narrative about exposure was repeated in various
interrogatory responses signed by Foley and served on August 28, 2020 and April 19, 2021.

128.    On June 26, 2019, J-M Manufacturing filed a demurrer to plaintiff's complaint. The basis for the demurrer was that the complaint did not identify any facts showing that Yates worked with or around an asbestos-containing product supplied by J-M Manufacturing.  J-M Manufacturing noted that the complaint listed Yates' work at TT Technologies from 1998 through 2008 as the source of exposure and did not refer to J-M Manufacturing.  J-M Manufacturing did not supply any ACP from 1998 to 2008; the company had stopped supplying ACP a decade earlier.

129.    Before filing the demurrer, counsel for J-M Manufacturing conferred with Rosenthal at Simmons Hanly.  Rosenthal claimed that the proposed demurrer was a "bad faith demurrer," stated that J-M Manufacturing was "needlessly wasting the resources of the court and of the plaintiffs," and stated that if the demurrer was filed, she would file for sanctions against J-M Manufacturing's lawyer.  Rosenthal's attempt at intimidation was both unwarranted and unfounded.

130.    The evidence that came to light in the course of discovery made clear that there was no basis for Simmons Hanly to claim that Yates was exposed to asbestos in J-M Manufacturing ACP approximately 10 years after J-M Manufacturing stopped selling that pipe.  On May 13, 2021, J-M Manufacturing deposed the President and CEO of TT Technologies.  This witness testified that the company did not burst any asbestos-containing material, including pipe, and did not let anyone operate any type of power saw in a pipe bursting line.  Nor did the company dig any pits. The witness also testified that he had no evidence suggesting that Yates ever encountered ACP while working at TT Technologies.  In other words, the witness refuted almost everything that Simmons Hanly had represented about Yates' exposure to ACP.

131.    Product exposure information was not the only untrue information that Simmons Hanly provided to J-M Manufacturing.  On August 28, 2020, Simmons Hanly provided a response

to interrogatories, which again was signed by Foley. In that response, Simmons Hanly stated that no autopsy had been performed on Yates after he passed away.

132. The interrogatory response related to the autopsy was false. On or around September 29, 2021, the defendants obtained records that demonstrated that not only had an autopsy been performed, Simmons Hanly had paid for it.

133. On October 14, 2021, Simmons Hanly dismissed the *Yates* case, which lent proof that the case against J-M Manufacturing was baseless. The dismissal request was signed by Foley on October 12, 2021.

### 5. *Bernice Montgomery v. Caterpillar et al.*

134. On January 11, 2021, Simmons Hanly filed the *Montgomery* case in California state court, which was a wrongful death mesothelioma case filed against J-M Manufacturing and a number of other defendants. Crystal Foley, Benjamin Goldstein, and Nicholas Angelides were all involved in the case. In the complaint, which was signed by Foley, Simmons Hanley stated that the decedent had been occupationally exposed to asbestos while working as an operating engineer from 1968 to 1990 for "various employers" at "various jobsites."

135. On March 12, 2021, Simmons Hanly served a response to interrogatories, which were signed by Foley. In those interrogatories, Simmons Hanly stated that Montgomery worked with and cut J-M Manufacturing branded ACP while working for Clark & Jack Lambert, Inc. from approximately 1968 to 1974 and Camozzi Excavating, Inc. from approximately 1974 to 1980. These statements could not possibly be true because J-M Manufacturing did not sell ACP until 1983.

136. Simmons Hanly also stated that Montgomery worked with and cut J-M Manufacturing branded ACP while working with a series of construction companies, including

Burke Construction Co., from approximately 1980 to 1995. Simmons Hanly reinforced these answers, including the inaccuracies about ACP before 1983, in another response to interrogatories signed by Foley and served on April 19, 2021.

137.    On October 5, 2021 and November 10, 2021, Simmons Hanly proceeded with the deposition of the sole production identification witness in the case – Steve Burke – over the objection of J-M Manufacturing's attorneys. At the time, J-M Manufacturing was waiting for social security records for Montgomery and believed the deposition should not be scheduled until those were produced. The product identification witness was represented by the firm. The deposition was conducted over video conference technology and was attended by lawyers in Illinois and California.

138.    The product identification witness testified that he worked with Montgomery at Burke Construction from 1981 to 1987. That witness claimed that Montgomery was exposed to asbestos contained in "J-M Transite" ACP, which was "[r]ough" and had a honeycomb look, and the exposure occurred when Montgomery cut the pipe with a power saw. The witness admitted that he had been provided photos of transite pipe by Simmons Hanly before his deposition.

139.    J-M Manufacturing obtained Montgomery's social security records after the deposition of the product identification witness. Those records showed that Montgomery did not work at Burke Construction from 1981 to 1987. They showed that Montgomery worked at the company in 1981 and then again in the 1990s. At a deposition, the president of Burke Construction confirmed the dates of employment in Montgomery's social security records. He also testified that there were no records suggesting that Montgomery ever worked with J-M Manufacturing ACP while employed at Burke Construction or that Burke Construction ever worked with J-M Manufacturing ACP for that matter.

140.     Despite the information contained in the social security records and the testimony of the president of Burke Construction, Simmons Hanly persisted in claiming that Montgomery worked at Burke Construction during the period in which J-M Manufacturing sold ACP.   In responses to interrogatories signed by Foley and served on August 25, 2022, Simmons Hanly listed Montgomery as working at Burke Construction from 1980 to 1995.

141.     In the context of the case, J-M Manufacturing also sought discovery around the *Peebles* complaint because many of the same lawyers working on *Montgomery* worked on the cases described in the *Peebles* complaint.   Simmons Hanly vigorously resisted these discovery requests, with Deborah Rosenthal claiming in a January 24, 2022 letter that the requests were in "bad faith" and made with "nefarious intent" and again threatening sanctions.

142.     After J-M Manufacturing filed a motion for summary judgment, Simmons Hanly decided to abandon the case, announcing its intention to dismiss it with prejudice.   The *Montgomery* case that Simmons Hanly now has dismissed caused J-M Manufacturing to spend a significant sum of money to defend against the bogus allegations.

## G.     Additional Detail About Simmons Hanly's Pattern of Racketeering Activity

143.     The cases described above highlight the elements of the Simmons Hanly Fraud Playbook.  In the context of any one case and in the heat of litigation, the pattern remains hidden under the veil of aggressive litigation or careless lawyering.  But the number of times the elements of the firm's scheme have arisen in its cases against J-M Manufacturing, coupled with the *Peebles* complaint, demonstrate that the firm has a well-developed plan to extract money from J-M Manufacturing through a long-running pattern and practice of fraud (*i.e.*, the Simmons Hanly Fraud Playbook).

144.     The section shows how pervasive and persistent the different aspects of the scheme have been in Simmons Hanly's litigation against J-M Manufacturing, the individual Simmons

Hanly Defendants' repeated touch points to the scheme, and why this case is not just about ordinary litigation but about a pattern of racketeering activity.

          **1.**      **Extensive and Repeated Use of the Simmons Hanly Fraud Playbook**

145.    The cases described in detail above were not isolated incidents. In case after case, Simmons Hanly has put forward the same "story" and used the same tactics as part of the Simmons Hanly Fraud Playbook. The pattern described by Peebles in his lawsuit against the firm is undeniable.

          **a.**      **Scripted Product Identification Testimony**

146.    In asbestos litigation, the product identification and exposure evidence are the most important for a case against a defendant. Without evidence connecting the plaintiff or decedent to an asbestos-containing product of the defendant, there is no case against the defendant.

147.    Plaintiff's law firms, like Simmons Hanly, are uniquely positioned to control product identification and exposure evidence because their client's testimony is often the primary, and in many cases the only, evidence that connects the plaintiff or decedent to the asbestos-containing products of the defendants. This is because of the long-latency period of asbestos-related disease; the cases focus on events that occurred several decades ago.

148.    The Baron & Budd Memo recognized the importance of the product identification and exposure testimony: "How well you know the name of each product and how you were exposed to it will determine whether the defendant will want to offer you a settlement. If you are confident and knowledgeable, the manufacturers will be more likely to offer you settlements because they will feel they cannot win if your case goes to trial in front of a jury."

149.    The Baron & Budd Memo set out a list of things that a product identification witness must be able to do at the deposition, which included the following:

> The things you *must* be able to do by MEMORY at your deposition are:
>
> 1.  KNOW WHAT GENERAL "TYPES" OF ASBESTOS PRODUCTS YOU WORKED WITH OR AROUND (such as INSULATING CEMENTS, PIPE COVERING, GASKETS, etc.);
>
> 2.  KNOW THE NAMES OF ALL THE PRODUCTS LISTED ON YOUR WORK HISTORY SHEETS (such as A.P. GREEN, KAYLO, GARLOCK, etc.);
>
> 3.  KNOW WHICH NAMES GO WITH WHICH "TYPES" OF PRODUCT (for instance GARLOCK made GASKETS and KAYLO made PIPE COVERING, etc.)
>
> 4.  KNOW WHICH PRODUCTS WERE AT EACH JOBSITE, according to your work history sheets;

150.    The Baron & Budd Memo also stressed that it was important to understand the appearance of the product and the name that was printed on the product.

151.    Like the Baron & Budd Memo, Simmons Hanly recognizes the importance of product identification and exposure evidence.  In words similar to the Baron & Budd Memo, Simmons Hanly recognizes on its website that a defendant's willingness to settle depends on the strength of the product identification and exposure evidence:

> The time it takes to settle a mesothelioma case **depends on many factors**, like your lawyer's negotiation skills and the strength of the evidence showing which asbestos products you were exposed to.

152.    The Simmons Hanly case team works with product identification witnesses to ensure that they offer strong product identification testimony.  This includes "refreshing" the witnesses' memory either before the deposition or at the deposition with a picture of the product to facilitate the identification.  For example, at the product identification witness depositions in *Bretado* (January 9, 2019), *Boyance* (February 26, 2020), *Montgomery* (October 5, 2021 & November 10, 2021), and *Azevedo* (May 14, 2020), the witness was shown a picture of J-M Manufacturing's ACP either at or before the deposition to facilitate the product identification.

With that picture, the witness could just testify about product characteristics by just looking at the picture as opposed to having an actual memory of the ACP.

153. Of the cases that were part of J-M Manufacturing's investigation, the product identification witness provided remarkably consistent identifications of J-M Manufacturing's ACP. To distinguish J-M Manufacturing's ACP from historic Johns-Manville pipe, the witnesses made sure to emphasize "transite" and "J-M":

| *Bretado* (January 9, 2019) | *Carranza* (June 7, 2019) | *Perkins* (August 19, 2019) |
|---|---|---|
| Q. [W]hat is familiar to you? <br><br> A. The name. <br><br> Q. The name? What – what are the letters of the name there? <br><br> A. J-M transite pipe | Q. Do you remember what numbers and letters you saw? <br><br> A. The letters said, "J-M Transite." | Q. What do you recall about the writing? <br><br> A. It was in red and it said J-M Transite Pipe. |
| *Swiger* (July 17, 2019) | *Montgomery* (October 5, 2021) | *Morgan* (May 2, 2018) |
| Q. Did you see any writing or stenciling on the pipe itself?" <br><br> A. "J&M Transite Pipe." <br><br> Q. Anything else on the pipe? <br><br> A. No. Nothing – I mean, it would say J&M and say Transite several times down the pipe. | Q. Was there any writing or stenciling on the pipe? <br><br> A. Yes. <br><br> Q. Please tell us. <br><br> A. "J-M Transite" is what I remember. | Q. Do you recall who manufactured the asbestos cement pie? <br><br> A. CertainTeed and later J-M Transite. <br><br> Q. Is that J, dash, M Transite? <br><br> A. Yes. That's what was stenciled at least on the pipe, J-M. |

| Azevedo (May 14, 2020) | Boyance (February 26, 2020) | Noll (April 17, 2013) |
|---|---|---|
| Q. Okay. Now, sir, specifically with the transite pipe, do you recall any brand name or manufacturer name of the pipe?<br><br>A. J.M.<br><br>. . .<br><br>Q. So you do you specifically recall your working with J.M. transite pipe?<br><br>A. Yes. Sir.<br><br>Q. Sir, how is it that you recall that it was J.M. transite pipe?<br><br>A. It was printed on the outside.<br><br>Q. Okay. What was?<br><br>A. J.M. | Boyance described photograph as "J-M Transite pipe, Ring-Tite water pipe."<br><br>Q. Yeah, I was going to ask you to describe what's on there, but more importantly, is that a familiar name to you and designation?<br><br>A. It is. | Q. And with respect to these jobs for Hallett, what brand pipe was used, if you recall?<br><br>A. It was J-M.<br><br>Q. And how do you know that?<br><br>A. It was stamped on the pipe with black ink.<br><br>Q. Was there anything else stamped on the pipe?<br><br>A. Not to my knowledge. Not that I recall at this time. |

154.    The witnesses also had surprisingly clear memories about the color, texture, look, and characteristics of the ACP:

| Bretado (January 9, 2019) | Carranza (June 6, 2019) | Perkins (August 19, 2019) |
|---|---|---|
| Q. Okay. And can you describe the asbestos cement pipe? What did it look like, the color? | Q. Do you remember the diameter of these pipes? | Q. Do you recall any differences in the cement pipe that you were installing and cutting in 1979 than the cement pipe you installed as a |

A. It looked, like, gray color.

Q. Okay. And how long was the pipe?

A. Ten and other longer than ten.

. . . .

Q. From 1979-1989 what diameter sizes of asbestos cement pipe would you generally use?

A. The most common one was 4 and up, 4, 6, 8, 10, 12.

A.· Thickness, it was 6, 8, 10.· And some of them were 4 inches.

Q. And when you say the "thickness," you're talking about the diameter or the size of the hole of the pipe

A.· Yes

Q. How long were the pipes that J-M Transite made?

A. 10 feet, more or less

Q. What color was the J-M transite pipe?

A. It was like gray.

Q. When you carried the pipe, what did the outside of the pipe feel like?

A. It's not smooth. It's like – it's rough

light equipment operator or heavy equipment operator?

A. Yes. The latter part of my years there, the pipe looked like – between '83 to '85 it looked like a waffle. It wasn't a real smooth pipe. It was a – like a waffle print around it.

. . . .

Q. What was the color of the waffle print cement pipe?

A. What was the color of the waffle print? The whole pipe was gray.

. . . .

Q. For the waffle print cement pipe, what was the diameter of the pipe you used?

A. The diameter of the pipe we used?

Q. Yeah, in reference to that waffle print on that pipe.

A. Whatever it took for the sewer pipe. 6 to 10 inches. Somewhere between 6 to 10 inches.

. . . .

Q. What was the length of that pipe?

A. 13 feet.

| ***Swiger***<br>**(July 17, 2019)** | ***Montgomery***<br>**(October 5, 2021)** | ***Morgan***<br>**(May 2, 2018)** |
|---|---|---|
| Q. Describe to me what you recall – what was the size of this Transite pipe? The – the length of the pipe?<br><br>A. It was 13-foot sticks. 13 foot joints.<br><br>Q. Okay. Diameter, did it range, or was there only one?<br><br>A. No. It would range from 4-inch – 4-inch through 12-inch . . . .<br><br>Q. What color was the pipe?<br><br>A. It's kind of a dirty brown. Most usually a – kind of a – between a dirty brown and an off-white. And it would be – depending on what type of pipe it would be, if it was classified as rough barrel, on the outside of it would be like a waffle-type pattern and stuff.<br><br>Q. Would this pipe, these links of pipe, would they all be 13 feet, or were there shorter lengths as well?<br><br>A. Sometimes there were shorter lengths. | Q. Could you describe what this Transite pipe looked like in the 1980s, from 1981 to 1987?<br><br>A. It was kind of blue flakey kind of a honeycomb look.<br><br>Q. Honeycomb look?<br><br>A. Uh-huh.<br><br>Q. When you – when you rubbed your hand across it, how did it feel?<br><br>A. Rough.<br><br>Q. And how long was it?<br><br>A. Typical, 13-foot sections. | Q. What color was the J-M Transite pipe?<br><br>A. Gray.<br><br>Q. How long was the J-M Transite pipe?<br><br>A. Ten feet.<br><br>Q. What was the diameter of the J-M Transite pipe?<br><br>A. On my sites 4 to 6 inches.<br><br>Q. Was there a design on the J-M Transite pipe?<br><br>A. I remember it being a rough texture. I can't remember exact design.<br><br>Q. What did the inside feel like?<br><br>A. Smooth. |

| *Azevedo* (May 14, 2020) | *Boyance* (February 26, 2020) | *Noll* (April 17, 2013) |
|---|---|---|
| Q. Okay. Sir, can you describe the J.M. transite pipe?<br><br>A. It is grayish, rough on the outside, smooth on the inside, 6 inch diameter, 13 feet long.<br><br>. . .<br><br>Q. Sir, do you know what the J.M. transite pipe was to be use for in terms of what was to flow through the pipe?<br><br>A. Sewerage. | Q. Let's talk about your work or working with cement asbestos pipe. Can you describe what the color of the pipe is that you recall being cement asbestos?<br><br>A. It was maybe an off white or sort of a gray.<br><br>Q. And can you describe the texture on the outside?<br><br>A. The texture on the outside was rough.<br><br>Q. And what about on the inside?<br><br>A. It was smooth, smooth on the inside.<br><br>. . . .<br><br>Q. Okay. What lengths of pipe did they arrive at your jobsite?<br><br>A. I remember ten footers and thirteen footers.<br><br>Q. Okay. And what diameter size was the pipe you typically work with?<br><br>A. The minimum we used for the fire protection that was approved was four inch, and then we would use four, six and eight with the standards. We would get into ten inch. | Q. And do you recall ever seeing -- well, can you describe the pipe for me? What did it look like?<br><br>A. It was -- it was gray. It was rough outside and the inside was smooth. It was kind of a grit, you know, the texture on the outside<br><br>Q. Okay. Did it differ in any way from what you recall the CertainTeed pipe looked like?<br><br>A. They were close but I think the outside was a little bit rougher on J-M.<br><br>. . . .<br><br>Q. Do you recall what lengths the pipes came in?<br><br>A. 13 feet, around. |

155. The consistency with which these witnesses testified over many different years in many different jurisdictions with many different Simmons Hanly lawyers involved yields the ineluctable inference of a coordinated product identification testimony strategy without regard for the actual facts of usage or exposure. After all, the testimony of these witnesses is about ACP that they supposedly encountered 30 to 40 years ago and is nearly uniform. This can only be explained by what Peebles observed: coached and perjured testimony.

### b. Scripted Exposure Story

156. The exposure narrative is just as important as the product identification testimony. As discussed above, Simmons Hanly has developed a "story" about how its asbestos plaintiffs or the decedents were exposed to the asbestos in J-M Manufacturing's ACP and the frequency of that exposure. That story – which involves assertions about cutting or drilling the pipe with power tools "hundreds" of times – appeared over and over in the cases J-M Manufacturing reviewed:

| Bretado (January 9 & 16, 2019) | Carranza (June 6, 2019) | Perkins (August 19, 2019) |
|---|---|---|
| Q. Yeah. Can you recall and/or estimate how many times a month or week you worked with asbestos cement pipe over that ten years?<br><br>A. Yes. Yes. I worked – we worked all the time doing line drainage with asbestos cement pipe.<br><br>. . . .<br><br>Q. What did you use to cut asbestos cement pipe from 1979 to 1989?<br><br>A. A whole line chop saw. | Q. Can you give us an estimate of the total number of times your brother would have cut J-M transite pipe?<br><br>A. Yes.<br><br>Q. How many times?<br><br>A. Hundreds of times.<br><br>. . . .<br><br>Q. What tools did you and your brother use to cut J-M transite pipe?<br><br>A. We would use an electric saw. No. a gasoline-powered | Q. Okay. And can you -- you mentioned something about cutting. Would you ever personally have to cut any of the new pipe?<br><br>A. Yes.<br><br>Q. Okay. And how did you go about doing that?<br><br>A. We had a gas powered saw that would cut pipe.<br><br>. . . .<br><br>Q. Dennis, do you have an estimate as to the number of 13-foot lengths J-M transite |

| | | |
|---|---|---|
| . . . . | saw. And electrical as well. Depending on the thickness. | pipe sections that you installed for the City of Barre between '83 and '85? |
| Q. Okay. What tool did you use to cut the holes, perforate the pipe? | . . . . | A. I'd probably say 3- to 400 pieces. |
| A. I would use the chop saw and the drills. | Q. Okay. Elias, when you and your brother used the electric or the gasoline saw to cut J-M transite pipe, can you describe to us what the working conditions were like? | Q. Can you estimate for me the percentage of those 3- to 400 pieces of pipe you had to cut? |
| Q. And drills? | A. It was – there was a lot of dust – | Q. Can I have the answer, please, Dennis? |
| A. Yes, yes, the drills. | Q. Could you see – | A. 80 percent. |
| . . . . | A. from the pipe. From the pipe that we were cutting. | |
| Q. What kind of tool did you use to cut the asbestos cement pipe for Oakridge? | Q. Could you see that dust in the air? | |
| A. Saws, disk saws. | A. Everybody could see it. Even from far away. | |
| Q. And was that a power saw or a handsaw? | | |
| A. Electric. Motor, engine, yes. | | |
| Q. And was it electric or gas or something else? | | |
| A. Gas. | | |
| . . . . | | |
| Q. Was the drill also a gas-powered drill? | | |
| A. Drill to make the holes on the pipes was electric. | | |
| ***Swiger*** **(July 17, 2019)** | ***Montgomery*** **(October 5, 2021 & November 10, 2021)** | ***Morgan*** **(May 2, 2018)** |
| Q. Okay. Now, for the fitting purpose, what tool or | Q. [Sharing picture] Is this a true and accurate representation of the cutting you saw at the work site | Q. During this time period do you have a specific recollection of the plumbers |

tools would you use to cut the pipe?

A. We used what was called a cutoff saw. It's like a chainsaw, has a circular blade out on the end of it and you would . . .

Q. And do you remember the name or manufacturer of the cut-off saw?

A. I think it was a Stihl, but I'm not really 100 percent sure.

. . . .

Q. But let me ask you this. You just – when I asked you about just making – I'm – I'm asking you about a small category – just making cuts to fit on new pipe between '82 and '89, you said at least one cut every time.

A. Yes, sir.

Q. and you did that at least once a week?

A. Most usually, yeah. It would average out to like once a week.

Q. Okay. So with that knowledge, can you estimate how many cuts are we talking about?

A. Throughout the whole time period, I mean, it would have been a few hundred.

. . . .

during the 1980s of the Transite pipe you described?

A. Yes, it was also not on the stand, sometimes it was just on the – it was either cut sometimes in the ditch, if that was possible, or it would also be sometimes cut on the spoil.

. . . .

Q. And you mentioned, when Burke Construction employees would cut transite pipe, they would use a power saw –

A. Yes.

Q. – is that right?

A. Yes.

. . . .

Q. When Burke construction employees would use the power saw to cut transite pipe, during the 1981 to 1987 time period, do you recall seeing dusty conditions in the air?

A. Yes.

cutting the asbestos cement pipe?

A. Yes.

Q. Can you please described how the plumbers cut the asbestos cement pipe?

A. They would either use a gas or electric saw and it created dust?

. . .

Q. Hold up. From 1979 through 1985 while working for Spriggs & Company at the two or three projects a year where the asbestos cement pipe was cut, how many cuts did you observe at each project?

A. 20 to 50, depending on the project.

Q. With regard to that Transite pipe that you worked on, I think between December '82 until the late '80s or early '90s, can you estimate for me how many times you had to manipulate that pipe in any way?

A. Altogether, it was probably thousands.

| *Azevedo* (May 14, 2020) | *Boyance* (February 26, 2020) | *Noll* (April 17, 2013) |
|---|---|---|
| Q. Can you describe the cutting tool or tools that you used to cut the J.M. transite sewer pipe?<br><br>A. Used a saw with a carborundum blade I think they call it.<br><br>Q. Can you describe the conditions in the air when you would use a saw with the carborundum blade to cut through the J.M. transite sewer pipe?<br><br>A. Very thick dust.<br><br>. . .<br><br>Q. And, sir, this saw -- how is the power?<br><br>A. It was -- it was a gas saw.<br><br>. . . .<br><br>Q. Now, sir, on these 5 to 6 jobs between '84 to '87, did | Q. Let me show you what I have marked as Exhibit 6 and if you take a look at it and then hold it up to the video.<br><br>Q. Is that a familiar photograph to you?<br><br>A. It is.<br><br>Q. And what is it depict – what does it depict?<br><br>A. It depicts a carborundum cutoff saw cutting the pipe, and over here is a rasp for machining the end, the end of the pipe.· And this looks like a lot of dust coming off of the blade that's cutting the pipe.<br><br>. . . .<br><br>Q.· Over this ten-year period of time that we are talking about, did -- how many times do you estimate you cut pipe with a carborundum saw like in Exhibit 6? | Q. And how did you cut that pipe?<br><br>A. We cut it with an electric saw. And there would be cloud of asbestos dust, you know.<br><br>. . .<br><br>Q. Right. And while you were working these jobs, these jobs for Hallett, what did you – what did you use to cut the pipe?<br><br>A. We used electric saw.<br><br>Q. And when you say electric saw, is this like a Skil Saw?<br><br>A. Yes.<br><br>. . . .<br><br>Q. Okay. Regarding those eight projects that you worked with J-M asbestos cement pipe with Dennis Hallett, on average how many |

| | | |
|---|---|---|
| these vary in times of length, length of time?<br><br>A. Yes, sir.  Yes, sir, they did.<br><br>Q.  Do you recall the shortest job that you worked with the J.M. transite sewer pipe?<br><br>A.  Two weeks.<br><br>Q.  And, sir, do you recall the longest job?<br><br>A.  Four weeks.<br><br>Q.  Sir, whether it be a 2 week sir or up to a 4 week job, can you gives us an idea without you guessing how often that you cut and, you know, filed the ends of the J.M. transite sewer pipe at a job?<br><br>A.  Each day.<br><br>Q.  Okay.<br><br>A.  10 times.<br><br>Q.  That does answer my followup question.  On an average day, is it your testimony that you cut and rasped and filed the J.M. transite sewer pipe 10 times?<br><br>A.  Yes. | A. Every job, at least for a final cut or whatever, every job would require this to be done.<br><br>Q.  Well, you said you have done hundreds of jobs.· Did you do this hundreds of times or is this –<br><br>A.  Hundreds of times.<br><br>. . . .<br><br>Q. Okay.· And how many times in the 1970s·time period we are talking about did you actually rasp and machine the ends of cement asbestos pipe?<br><br>A.  Hundreds of times.<br><br>. . . .<br><br>Q. Okay. Yeah. Do you have an estimate of how many times you worked with cement asbestos pipe and was labeled such as in Exhibit 14?<br><br>A.  Hundreds of times. | cuts would you make during a project installing that pipe?<br><br>A.  During the whole project?<br><br>Q.  Uh-huh.<br><br>A.  It would be hundreds.<br><br>Q.  Okay. And I'm just talking about on one project, how many --<br><br>A.  Oh, on one project?<br><br>A. Probably 50 or more. |

157.    Again, the consistency of the narrative across cases lends proof to the allegations in the *Peebles* complaint about perjured testimony and the subornment of perjury.

158.     At the time of all this supposed cutting and drilling of ACP with power tools, there were strict workplace regulations that required significant safety precautions related to cutting ACP.

159.     Because cutting ACP in the field with power tools was the rare exception rather than the rule, it is not credible that asbestos plaintiff after asbestos plaintiff represented by Simmons Hanly did not follow OSHA and other workplace regulations and was exposed to the asbestos in J-M Manufacturing's ACP in the exact same way.

160.     In addition, J-M Manufacturing had express warnings on its ACP that cautioned not to cut the ACP with a power saw, and the literature that J-M Manufacturing provided with the ACP contained similar warnings.

### c.     Scripted Denials about Warning Labels

161.     Simmons Hanly understands that the warnings on the J-M Manufacturing ACP could present problems for its cases.

162.     The Baron & Budd Memo instructed witnesses to "maintain that [they] NEVER saw any labels on asbestos products that said WARNING or DANGER."

163.     The Simmons Hanly plaintiffs routinely testified as if they had received this instruction as part of their deposition preparation:

| *Bretado*<br>**(January 16, 2019)** | *Carranza*<br>**(June 6, 2019)** | *Perkins*<br>**(August 19, 2019)** |
|---|---|---|
| Q.  Did you ever see the word "asbestos" on any— printed on any asbestos cement pipe?<br><br>A.  I never saw any label of warning that it was dangerous. | Q.  At any point on the J-M Transit pipe between 1984 and 1989, did you ever see a warning on the pipe warning you of the dangers of asbestos?<br><br>A.  No.  Never. | Q.  And I can go ahead and read it.  Am I correct that Defense Exhibit 3 reads: Caution.  Do not use power saws to cut this pipe. Breathing dust created by improper work practices may cause serious bodily harm. When cutting, machining, or |

| | | |
|---|---|---|
| . . . .<br><br>Q. I'm not sure I asked you about this during Oakridge. During your entire time when you worked at Oakridge, did you ever see any warning or labels on any asbestos cement pipe?<br><br>A. No. | Q. Did you ever see a skull and crossbones?<br><br>A. No. If I had seen it, that means there's a danger. My brother and I would have stopped. | tamping, refer to the recommended work practice guide furnished to your employer. Did I read that correctly?<br><br>A. Yes.<br><br>Q. Did you ever see this warning on any piece of asbestos cement pipe or cement pipe -- well, strike that. Did you ever see this warning on any piece of J -- J-M Manufacturing Company, Inc. asbestos cement pipe?<br><br>A. No.<br><br>. . . .<br><br>Q. Counsel for J-M showed you a warning that they claim was on that pipe. Just to be clear, you never saw that warning on any piece of transite pipe you ever worked with for the City of Barre, is that correct?<br><br>A. I never seen that warning on any of the pipe. |
| ***Swiger***<br>**(July 17, 2019)** | ***Morgan***<br>**(May 2, 2018)** | ***Azevedo***<br>**(March 3, 2020)** |
| Q. Was there any – to your recollection on the pipe, both the JM and the CertainTeed, were there ever any warnings on that pipe?<br><br>A. Not that I remember, no. It was just the – the wording, the "Transite," the "JM Transite Pipe" and | Q. Did you ever see any warnings about the dangers of asbestos on the CertainTeed pipe?<br><br>A. No.<br><br>Q. Did you ever see any warnings about the dangers of | Q. Was there any warning on the pipe?<br><br>A. No. |

| | | |
|---|---|---|
| "CertainTeed." I never seen no warnings or anything on there. | asbestos on the J-M Transite pipe?<br><br>A. No.<br><br>Q. Did you ever receive any warnings about the dangers of asbestos from the J-M employees?<br><br>A. No. | |
| ***Boyance***<br>**(February 26, 2020)** | ***Noll***<br>**(April 17, 2013)** | |
| Q. Did any distributor that you mentioned of cements asbestos pipe ever warn you that the dust was potentially hazardous to your health?<br><br>A. Definitely not. I wouldn't have ordered it or I wouldn't have installed it or I wouldn't have machined it. I wouldn't have had anybody working for me either.<br><br>. . . .<br><br>Q. Did any distributor or manufacturer of J-M Transite pipe ever warn you in writing or --<br><br>A. Never warned.<br><br>Q. -- about the potential health hazards of working with it?<br><br>A. That's correct. Never. | Q. Do you recall ever seeing any warnings on the pipe?<br><br>A. I don't recall seeing warnings. | |

**d.      Vague and Deceptive Testimony and Discovery Responses to Avoid Discovery That Might Frustrate the "Story"**

164.     Another common pattern in Simmons Hanly cases is for the product identification and exposure witnesses represented by the firm to provide vague or incorrect details about employers, job locations, and co-workers.   This makes it difficult, if not impossible, for J-M Manufacturing to affirmatively disprove Simmons Hanly's narrative.   At the very least, J-M Manufacturing ordinarily has to hire an investigator to look into the asbestos plaintiff or decedent's work history.   This also creates a question of fact that is unlikely to be resolved on summary judgment, exposing J-M Manufacturing to the costs and hazards of continued litigation

165.     On a number of occasions, J-M Manufacturing has discovered that the information provided by Simmons Hanly and the Simmons Hanly represented witness was fabricated.   This was true in at least *Bretado*, *Carranza*, *Yates*, and *Montgomery*.

166.     Regardless of the case, however, the Simmons Hanly product identification and exposure witness has testified in ways designed to make it extremely difficult to test the narrative that the firm has crafted and laid out in discovery:

| *Bretado* (January 16, 2019) | *Carranza* (June 6-7, 2019) | *Perkins* (August 19, 2019) |
|---|---|---|
| Q.  [D]o you recall any locations at which you did any landscaping work, whether by address or the major cross – cross streets or anything like that that we could identify where the job was?<br><br>A.  No, I don't remember.<br><br>. . . . | Q.  The construction work you and your brother performed together; was that residential, commercial, or industrial construction work?<br><br>A.  It's industrial, commercial.· Everything. And residences too.<br><br>. . . .<br><br>Q.· Do you remember beginning in 1984 or '85 who | Q.  Do you recall any of the addresses where any of the waffle print cement pipe was installed during your tenure at the City of Barre?<br><br>A.  I don't remember.<br><br>Q.  Do you recall any specific landmarks or locations that would help pinpoint where the work took place? |

Q. Okay. Do you know the addresses of any of the locations where you did drainage work for Oakridge?

A. No, I don't remember.

. . . .

Q. All right. Can you recall any locations at which you did drainage work for Dean Hensley?

A. No, honestly, no.

. . .

Q. Do you recall the names of any of the private owners that you did this drainage work for?

A. No.

Q. Do you recall the names of any contractors or parties that may have hired Hensley to do the drainage work?

A. No, I don't remember.

. . . .

Q. Do you recall any names of any coworkers by first and last name at Hensley?

A. Names that – the names I remember, but not the last names –

. . . .

Q. Do you recall any locations at which you worked for Mr. Tatoshician?

you and your brother worked for?

A. We made friends with some men. They were Americans. Gringos. And they gave us a chance to work with them. And then they themselves would refer us to other people. The name of one of those guys is Gregorio. And Rogelio.

Q. And is the American version of that name Greg and Roger?

A. Yes.

Q. Were Greg and Roger partners?

A. Yes. Yes.

Q. Do you remember their last names?

A. I never knew their last names. They always paid us cash.

. . . .

Q. Can you give us an estimate of the total number of jobs that you and your brother worked on between 1984 and 1989 where you used J-M transite pipe?

A. Hundreds

A. Hundreds of places we used it.

. . . .

A. No.

A. No, I don't remember.

Q. Do you know any of the names of any contractors or landowners who may have hired Bob Tatoshician to do the drainage work?

A. No, I don't remember.

Q. Where did you go?

A. To work at a construction.

Q. Where?

A. They're in Orange.

Q. Where in Orange?

A. I had gotten there just that weekend. I didn't even know when the sun came up.

Q. Well, as you lived there, you got to know the city.· Looking back on that time, where did you go?

A. I don't even know where it was they took me.

. . . .

Q. Okay. Did you ever, after June of '84, install pipe for anyone other than Roger and Greg?

A. Yes.

Q. Who?

A. Hundreds of persons.

. . . .

Q. Are there any other sites you can recall by street names or addresses where you know you worked with J-M transite?

A. Hundreds. Hundreds of them.

Q. Is there any others by address or street name that come to mind right now?

| | A. We used to use just as much of J-M and then also the CertainTeed.<br><br>Q. Okay.<br><br>A. It would be difficult to tell you so many, so many, so many. | |
|---|---|---|
| ***Swiger***<br>**(July 17, 2019)** | ***Morgan***<br>**(May 16, 2018)** | ***Azevedo***<br>**(May 14, 2020)** |
| Q. Okay. If I asked you for specific dates and times of every day that you worked on that pipe, would you be able to give that to me?<br><br>A. No, sir. Not specific dates and times. I mean, just a basic recollection.<br><br>. . . .<br><br>Q. But is there any more detail in regards to the location on the line of each specific weekly job over nine years that you could provide?<br><br>A. No. Just basically ran from outside of Clarksburg to Smithfield on that 47-mile line. Somewhere – somewhere on that 47 mile line. | Q. Okay. Are you able to identify any of the names of any customers or premises for whom Bill Spriggs did any construction work for during the '79 to '85 time period?<br><br>A. I can't remember at this time.<br><br>Q. Can you identify for us any location by address, landmark, or other identifying feature that might help us figure out what specific locations you worked at for Spriggs?<br><br>A. I cannot -- | Q. Okay. Do you recall where you worked with J.M. transite pipe?<br><br>A. Polaroid and others.<br><br>Q. Do you recall which Polaroid?<br><br>A. No, sir. I do not. |
| ***Boyance***<br>**(March 5, 2020)** | ***Noll***<br>**(April 17, 2013)** | ***Montgomery***<br>**(October 5, 2021)** |
| Q. And do you know of any documents that you could provide me that would | Q. Okay. And what's the next job you worked for him on? | Q. Do you know or have any information about any jobsites by name or |

provide any additional information about your alleged work with a J-M ·Manufacturing product?

A. No. I didn't keep anything over seven years.

. . .

Q. And do you know of any witnesses, other than your two brothers that you've identified, that I can speak to about your alleged work with a J-M Manufacturing product?

A. I don't know of anybody else.

Q. And I couldn't find this, and maybe it's -- it was in the record, and I apologize if it was asked. Are you ever able to estimate the number of times or job sites that you believe you worked with a J-M Manufacturing product?

A. I don't.· I don't recall.

A. We did a lot of jobs, you know, so I don't recall at this time.

Q. Okay. When was the next job that you worked on with him that involved AC pipe?

A. It's the same answer. I don't recall at this time.

Q. Okay. When was the last time you worked on an AC pipe job for Hallett?

A. It's the same. I don't recall.

Q. You just don't recall?

A. I don't recall at this time.

. . .

Q. Is Hallett still alive?

A. I don't know that either.

Q. Okay. Do you know any -- the names of anyone that you worked with at Hallett who were still living?

A. No, I don't.

. . . .

Q. Forgive me if I asked this already. Anyone that you worked with for Hallett that you know is still living?

A. I don't recall their names.

description or location that [Mr. Montgomery] worked at while an employee of Burke Construction?

A. No. Personally, I don't.

e.    **Suppression of Evidence to Asbestos-Containing Products of Bankrupt Companies**

167.    Another component of the Simmons Hanly scheme is to conceal evidence of exposure to asbestos-containing products of bankrupt companies.  In at least one case (*Perkins*), Simmons Hanly failed to disclose a proof of claim that it filed in a bankruptcy of another ACP company.  J-M Manufacturing suspects that this will be true in other cases but does not have access to that evidence because the identity of bankruptcy trust claimants is typically confidential unless the bankruptcy trust claimant consents or the bankruptcy trust receives a subpoena.  Put differently, this information is uniquely in the custody and control of the Simmons Hanly Defendants, and J-M Manufacturing expects to obtain additional evidence of the Simmons Hanly Defendants' fraud related to bankruptcy trust claims in the course of discovery in this action.

168.    Simmons Hanly cases also rarely contain any information about exposure to asbestos-containing products of bankrupt companies.  The absence of details about exposure to friable asbestos products, which were manufactured by now-bankrupt companies, as a contributing cause to the Simmons Hanly plaintiff or decedent's asbestos-related disease defies logic.  Based on information and belief, the Simmons Hanly Defendants keep that information concealed to maximize recovery against solvent defendants like J-M Manufacturing.

f.    **Over-Naming and Filing Baseless Claims in Plaintiff-Friendly Jurisdictions to Extract Settlements**

169.    Simmons Hanly boasts on its website that the typical asbestos lawsuit now names nearly 70 solvent defendants.  In the lawsuits that the firm has filed against J-M Manufacturing, Simmons Hanly routinely has named more than 20 defendants.  The reason that Simmons Hanly casts a wide net is to maximize its potential recovery.  Based on both information and belief and J-M Manufacturing's experience in litigation against the firm, the lawsuits name any solvent entity

even marginally relevant to the asbestos plaintiff or decedent's work history regardless of whether the firm has evidence of any exposure to those entities' asbestos-containing products.

170.    In the litigation that Simmons Hanly has filed against J-M Manufacturing, the firm has routinely named J-M Manufacturing in lawsuits that it knows are baseless for settlement leverage.  The strategy is simple: name J-M Manufacturing in every possible lawsuit that could be potentially relevant to the company's ACP, file that lawsuit in a plaintiff-friendly state court, and rely on the sympathetic nature of its clients to exert as much settlement pressure as possible.  With these baseless lawsuits, the firm (a) attempts to force J-M Manufacturing into a settlement to avoid the risk of an adverse verdict in a jurisdiction in which it knows the company will be treated unfavorably or (b) uses these lawsuits as bargaining chips as part of global settlements.

171.    Since 2019, Simmons Hanly has voluntarily dismissed more than 60 of these sham lawsuits.  This includes instances in which the firm agreed to voluntarily dismiss lawsuits to entice J-M Manufacturing to settle other Simmons Hanly lawsuits against the company.  The willingness of the firm to so easily dismiss lawsuits highlights the firm's misconduct.

g.    **Actions to Silence People and Activity That Might Expose the Scheme**

172.    An additional aspect of the firm's scheme is to ensure that the scheme is not exposed.  Peebles threatened to blow the top off of and expose the Simmons Hanly Fraud Playbook after he was instructed to engage in the scheme as an attorney in the firm's Asbestos Department.

173.    Goldstein did everything he could to keep Peebles quiet.  According to the Peebles complaint, Goldstein "instructed" Peebles not to inform certain members of Simmons Hanly upper management about the Simmons Hanly Fraud Playbook.  When Peebles refused, Peebles alleges that Goldstein retaliated against him "by falsely characterizing him as insubordinate and calling his 'judgment' into question to senior members of the firm."

174. Peebles attempted to turn to Amy Garrett to address the retaliation, informing her about the unlawful conduct and the retaliation. Shortly after that meeting, Garrett and another member of Simmons Hanly's upper management in Illinois flew to San Francisco and fired Peebles without explanation. After the termination, the firm withheld wages from Peebles "seeking to extort a release of claims . . . and a confidentiality agreement, designed to conceal and keep secret the unlawful and unethical conduct." This is when Peebles filed his complaint.

175. The *Peebles* lawsuit was heavily litigated by Simmons Hanly, filing a demurrer, a cross-complaint, and a motion for a preliminary injunction. In connection with filings in the lawsuit, Peebles added additional detail around what he had discovered. According to Peebles, the firm had engaged in "the intentional suppression" and "falsification of evidence." Peebles stated in the lawsuit that the evidence that he uncovered was of "conduct that not only affects himself, his client, and [Simmons Hanly], but conduct that indicates a larger pattern and practice that could affect thousands of [Simmons Hanly] clients." That "unlawful and unethical conduct," according to Peebles, was of an "offensive and shocking nature."

176. The firm's fight against Peebles, which was led by a team that consisted of lawyers in Chicago, and its efforts to keep Peebles silent about the details of his complaint, and ultimately, the Simmons Hanly Fraud Playbook, came to an end when the firm settled with Peebles and imposed a confidentiality obligation on him.

177. Sometime in or after October 2021, J-M Manufacturing learned about the *Peebles* complaint, after the matter had been settled and the case had been dismissed. Knowing that Peebles had worked on Simmons Hanly matters against J-M Manufacturing, the company sought the case number of the primary underling lawsuit reference in the complaint and an unredacted version of the complaint.

178. Almost immediately from learning of the complaint, J-M Manufacturing filed an *ex parte* application to unseal the complaint and track down the case number of the underlying lawsuit discussed in it. Simons Hanly fought every effort by J-M Manufacturing to discovery information about the facts underlying the *Peebles* complaint in an attempt to try to keep the details of the firm's "unlawful, unethical, and fraudulent conduct" quiet, including opposing the application to unseal.

179. The court granted J-M Manufacturing's application in part, unsealing the case number, which is how J-M Manufacturing confirmed the primary underlying asbestos lawsuit discussed in the *Peebles* complaint is *Bretado*. The court denied the company's request to unseal the complaint itself, however, reasoning that the complaint had not been sealed when filed but rather was filed in redacted form. This meant the court did not have an unredacted version of the *Peebles* complaint in its case docket that it could unseal. That decision was affirmed by the Court of Appeals in California in October 2023, in an appeal that also was resisted by Simmons Hanly.

180. Concerned that the misconduct alleged by Peebles might extend to other Simmons Hanly cases against the company, J-M Manufacturing also sought an unredacted version of the complaint as part of discovery in certain underlying asbestos lawsuits, in particular in *Montgomery*. Simmons Hanly resisted that effort too, with Deborah Rosenthal opposing a motion to compel.

181. The court in *Montgomery* denied the motion to compel based on a finding that the complaint was not directly relevant to the *Montgomery* lawsuit. But in doing so, the court noted that "[t]his is a very serious matter" and stated that it "hop[ed]" that Simmons Hanly had "retained counsel" because the court's ruling "does nothing to get [the] firm passed a very, very serious allegation being made against it."

2.     **Additional Allegations About Each Individual Defendant's Specific Involvement in the Racketeering Activity**

182.    The preceding paragraphs in the complaint highlight each Defendant's involvement in the RICO enterprise and development and deployment of the Simmons Hanly Fraud Playbook. This section adds additional detail that illustrates why each individual Defendant has been named in this complaint.

183.    The first individual named as a Defendant in the complaint is Nicholas Angelides. Angelides is a defendant because he is the brainchild of "the legal strategy" – the Simmons Hanly Fraud Playbook – that forms the basis of the Simmons Hanly fraud scheme and is the Chair of the Asbestos department.  Angelides is fairly viewed as the head of the RICO enterprise.

184.    Angelides was on the case team in a number of the sample fraud cases discussed in this complaint, including *Bretado* – the primary asbestos lawsuit underlying the *Peebles* complaint – and *Montgomery*.  In those cases, Angelides is listed as one of the lawyers responsible for the complaints and discovery responses that contained fraudulent information that were sent by interstate wire or mail.   In other words, Angelides was directly involved in predicate acts.  Based on information and belief, Angelides and/or Browder were also involved in the termination of Peebles following his reports of unlawful and unethical conduct in the Asbestos Department.

185.    Put simply, Angelides not only knew about, agreed to participate in, and participated in the fraud scheme, he was in whole or in part responsible for developing the Simmons Hanly Fraud Playbook.  Additional evidence of the involvement of Angelides in the fraudulent scheme is in the exclusive knowledge or control of the Defendants and will be revealed as part of discovery.

186.    The second individual named as a Defendant in the complaint is Perry Browder. Browder is a defendant because he "manages the firm's more than 50 asbestos attorneys" and

"oversees all asbestos cases to ensure they are handled in an efficient manner that maximizes results." Browder is effectively Angelides' deputy and a leader within the RICO enterprise, running the day-to-day operations of the enterprise and overseeing its most lucrative rackets.

187. Browder's primary involvement with the RICO enterprise relates to case settlement and asbestos trust claims. Browder ensures that the Simmons Hanly Defendants cash-in on their scheme. For example, Browder was involved in, signed, and transmitted paperwork related to the settlements in *Bretado* and *Perkins*. Browder sent many emails and letters in interstate commerce in furtherance of the scheme to extract money from J-M Manufacturing through settlement. Browder also was involved in the decisions about and filings of bankruptcy trust claims in *Perkins* and *Swiger*. And based on information and belief, Browder is involved in the decision making related to sham or meritless cases that are filed against J-M Manufacturing and used as bargaining chips to encourage settlement of other Simmons Hanly asbestos cases.

188. Based on information and belief and as stated above, Angelides and/or Browder were involved in the termination of Peebles following his reports of unlawful and unethical conduct in the Asbestos Department. Additional evidence of the involvement of Browder in the fraudulent scheme is in the exclusive knowledge or control of the Defendants and will be revealed as part of discovery.

189. The third individual named as a Defendant in this complaint is Amy Garrett. Garrett is the Assistant Managing Partner of the firm and part of the firm's Asbestos Department. Garrett has knowledge of the Simmons Hanly Fraud Playbook, agreed to participate in the scheme using that playbook, and acted to ensure that the scheme was not exposed. Garrett is crucial to the operation of the RICO enterprise, acting as an advisor and serving as the right-hand person to resolve issues and threats to the success and continued operation of the enterprise.

190.    Garrett is identified in the *Peebles* complaint as the member of Simmons Hanly "upper management" to whom Peebles reported the unethical and unlawful conduct that was occurring in the Asbestos Department.  After receiving this information, Garrett took part in the effort to silence Peebles, including participating in the termination of Peebles.  Garrett also was one of the firm's leaders in responding to Peebles' lawsuit and preventing it from moving forward to avoid exposure of the Simmons Hanly Fraud Playbook.  Garrett, for instance, executed declarations that were transmitted across interstate lines and filed with courts on February 23, 2021, April 23, 2021, June 9, 2021, in support of the firm's motion for injunction, cross-complaint, and motion to stay.  Additional evidence of the involvement of Garrett in the fraudulent scheme is in the exclusive knowledge or control of the Defendants and will be revealed as part of discovery.

191.    The fourth individual named as a Defendant in the complaint is Benjamin Goldstein.  Goldstein serves as the firm's West Coast Asbestos Litigation Manager.  He is in charge of the firm's West Coast asbestos litigators to ensure these litigators do not upset the operation of the Simmons Hanly Fraud Playbook.

192.    Goldstein supervised Peebles when Peebles worked at the firm and is identified in the *Peebles* complaint as ROE 1.  Goldstein was involved in *Bretado*, *Carranza*, *Yates*, *Montgomery*, and *Morgan*, and specifically was targeted by the *Peebles* complaint as knowing about, directing, and taking part in the "unlawful, unethical, and fraudulent" conduct that forms the basis of the Simmons Hanly fraud scheme.  Goldstein is listed as one of the lawyers responsible for the complaints and discovery responses that contained fraudulent information and that were sent by interstate wire or mail.  In addition to these predicate acts, Goldstein took part in the retaliatory conduct described in the *Peebles* complaint when Peebles sought to reveal the Simmons Hanly Fraud Playbook and expose the scheme.  Additional evidence of the involvement of

Goldstein in the fraudulent scheme is in the exclusive knowledge or control of the Defendants and will be revealed as part of discovery.

193.     The fifth, sixth, and seventh individuals named as Defendants in the complaint are Suvir Dhar, Crystal Foley, and Deborah Rosenthal.  These individuals were responsible for implementing the plays in the Simmons Hanly Fraud Playbook on a day-by-day basis.

194.     Their involvement in the scheme includes soliciting perjured testimony (Dhar in *Carranza*); preparing, filing, and serving complaints that contained made-up information about product exposure or other falsities (*Bretado*, *Carranza*, *Yates*, and *Montgomery*), preparing and signing written discovery responses containing fraudulent information (same cases), and sending threatening letters and emails to facilitate or hide the scheme (Rosenthal in *Yates* and *Montgomery*).  These individuals have the most direct involvement in countless predicate acts over the years in furtherance of the scheme.  Additional evidence of the involvement of Dhar, Foley, and Rosenthal in the fraudulent scheme is in the exclusive knowledge or control of the Defendants and will be revealed as part of discovery.

195.     The last individual specifically named as a Defendant in this case is Stan Jones.  Based on information and belief, Jones helped manufacture the testimony and "evidence" used in the sham asbestos lawsuit underlying the *Peebles* complaint and assisted in the coaching of Simmons Hanly represented witnesses both before and during key depositions.

196.     Jones was the first person that Peebles sought to depose to prove his allegations against the firm.  Jones "assisted" the product identification witness in that lawsuit and *Carranza* deliver false and coached testimony to further the firm's "story."  Additional evidence of the involvement of Jones in the fraudulent scheme is in the exclusive knowledge or control of the Defendants and will be revealed as part of discovery.

### 3. Specifics About Predicate Acts of Mail and Wire Fraud and Obstruction of Justice

197. The pattern of racketeering described in this complaint has been a long-running scheme of the Simmons Hanly Defendants. The scheme is nationwide in scope. The firm is headquartered in Illinois and has offices in California, Missouri, Massachusetts, and New York. J-M Manufacturing is based in Los Angeles, California and has been one of the primary targets of the scheme in lawsuits all over the country. Other company targets of the scheme are headquartered throughout the country, including in the Northern District of Illinois.

198. The scheme has included thousands of predicate acts over the course of several years, many of which are described in the preceding paragraphs. The implementation of the Simmons Hanly Fraud Playbook reasonably contemplated and depended on ubiquitous use of interstate mail and wires, including emails, video conferencing technology, telephone, electronic filing systems for filing of court documents and bankruptcy claims over the internet, electronic service systems that transmitted discovery and court filings over the internet, and interstate mail and wires to transmit settlement payments, satisfy judgments, and otherwise further the scheme.

199. The primary predicate acts that form the basis of the pattern of racketeering activity are instances of mail and wire fraud. In this complaint, J-M Manufacturing focuses on instances of mail and wire fraud that primarily took place from 2019 to present in furtherance of the Simmons Hanly fraud scheme. But the predicate acts that were part of the Simmons Hanly Fraud Playbook date back to before 2019.

200. J-M Manufacturing does not have access to all of the evidence showing how the Simmons Hanly Fraud Playbook was actualized but can identify specific mails and wires that were part of the scheme to demonstrate the frequency and long-running duration of predicate acts. This is not an exhaustive list of predicate acts, but provides examples of predicate acts currently known.

The cases and other details of the fraud scheme discussed above are more than sufficient to establish the RICO enterprise, its goals and members, and how it worked, involving thousands of intestate mails and wires sent by the Simmons Hanly Defendants in furtherance of the scheme. The Simmons Hanly Defendants are in the exclusive possession or have exclusive knowledge of many interstate mails and wires – such as between firm attorneys and staff, between firm attorneys and clients, and between firm attorneys or staff and firm agents or local counsel – that were part of the scheme. Discovery will reveal these additional predicate acts.

201. The following are examples of certain interstate mails and wires sent as part of the scheme that contained fraudulent information:

| Specific Date | Mail or Wire | Fraudulent Information |
|---|---|---|
| October 15, 2018 | Transmittal of *Bretado* complaint signed by Foley (and listing Angelides as an attorney of record) for filing in Superior Court in Los Angeles<br><br>Foley based in Illinois and sent complaint from Illinois to California by wire | False exposure information |
| November 7, 2018 | Transmittal of *Carranza* complaint signed by Foley for filing in Superior Court in Los Angeles<br><br>Foley and Dhar based in Illinois and sent complaint from Illinois to California by wire and filed by fax | False work history about work for Indelcor and false exposure information |
| January 16, 2019 | In-Person and telephonic deposition with Simmons Hanly presenting Bretado for deposition<br><br>Transmitted by telephone from California to Texas | Perjured/false testimony about exposure to asbestos-containing products |
| January 17, 2019 | In-Person and telephonic deposition with Simmons Hanly presenting Bretado for deposition | Perjured/false testimony about exposure to asbestos-containing products |

| | | |
|---|---|---|
| | Transmitted by telephone from California to Texas | |
| January 18, 2019 | In-Person and telephonic deposition with Simmons Hanly presenting Bretado for deposition  Transmitted by telephone from California to Wisconsin | Perjured/false testimony about exposure to asbestos-containing products |
| January 31, 2019 | Two sets of interrogatory responses prepared and signed by Foley (and listing Angelides as an attorney of record) in *Bretado*  Transmitted from Illinois to California by wire for service | False exposure information |
| April 8, 2019 | Interrogatory responses prepared and signed by Foley in *Carranza*  Transmitted from Illinois to California by wire for service | False exposure information |
| May 20, 2019 | Transmittal of *Yates* complaint signed by Foley (and listing Rosenthal and Goldstein as attorneys of record) for filing in Superior Court in Alameda  Foley based in Illinois and sent complaint from Illinois to California by wire | False exposure information |
| June 13, 2019 | Interrogatory responses prepared and signed by Foley (and listing Rosenthal and Goldstein as attorneys of record) in *Yates*  Transmitted from Illinois to California by wire for service | False exposure information |
| June 14, 2019 | Interrogatory responses prepared and signed by Foley (and listing Angelides as an attorney of record) in *Bretado*  Transmitted from Illinois to California by wire for service | False exposure information |

| June 19, 2019 | Two sets of interrogatory responses prepared and signed by Foley in *Carranza*<br><br>Transmitted from Illinois to California by wire for service | False exposure information |
|---|---|---|
| November 18, 2019 | E-Filing and service of complaint by Simmons Hanly in *Perkins*<br><br>E-service from Illinois to Missouri | Inaccurate information re CertainTeed if deposition testimony accurate |
| November 21, 2019 | Interrogatory responses prepared and signed by Foley in *Carranza*<br><br>Transmitted from Illinois to California by wire for service | False exposure information |
| February 5, 2020 | Interrogatory responses prepared and signed by Foley in *Carranza*<br><br>Transmitted from Illinois to California by wire for service | False exposure information |
| June 24, 2020 | Transmittal of *Yates* first amended complaint signed by Foley (and listing Rosenthal and Goldstein as attorneys of record) for filing in Superior Court in Alameda<br><br>Foley based in Illinois and sent complaint from Illinois to California by wire | False exposure information |
| August 11, 2020 | Transmittal of *Bretado* first amended complaint signed by Foley (and listing Goldstein and Angelides as attorneys of record) for filing in Superior Court in Los Angeles<br><br>Foley based in Illinois and sent complaint from Illinois to California by wire | False exposure information |
| August 19, 2020 | Multi-platform video deposition of Perkins with Simmons Hanly presenting Perkins | Inaccurate information re CertainTeed if Illinois complaint and proof of claim accurate |

| | | |
|---|---|---|
| | Perkins located in North Carolina and lawyers located in Illinois (including Chicago) | |
| August 28, 2020 | Interrogatory responses prepared and signed by Foley (and listing Rosenthal and Goldstein as attorneys of record) in *Yates*<br><br>Transmitted from Illinois to California by wire for service | False exposure information<br><br>False information about autopsy |
| January 11, 2021 | Transmittal of *Montgomery* complaint signed by Foley (and listing Goldstein and Angelides as attorneys of record) for filing in Superior Court in Los Angeles<br><br>Foley based in Illinois and sent complaint from Illinois to California by wire | False exposure information |
| March 12, 2021 | Interrogatory responses prepared and signed by Foley (and listing Rosenthal and Goldstein as attorneys of record) in *Montgomery*<br><br>Transmitted from Illinois to California by wire for service | False exposure and work history information |
| April 19, 2021 | Interrogatory responses prepared and signed by Foley (and listing Rosenthal and Goldstein as attorneys of record) in *Montgomery*<br><br>Transmitted from Illinois to California by wire for service | False exposure and work history information |
| April 19, 2021 | Twos sets of interrogatory responses prepared and signed by Foley (and listing Rosenthal and Goldstein as attorneys of record) in *Yates*<br><br>Transmitted from Illinois to California by wire for service | False exposure information |
| October 5, 2021 | Virtual deposition of Steve Burke with Simmons Hanly presenting Steve Burke | False exposure and work history information |

| | | |
|---|---|---|
| | Participants in Illinois and California | |
| November 5, 2021 | Virtual deposition of Steve Burke with Simmons Hanly presenting Steve Burke<br><br>Participants in Illinois and California | False exposure and work history information |
| August 24, 2022 | Proof of claim related to CertainTeed filed by Simmons Hanly on behalf of Perkins and transmitted by wire from Illinois to Oregon | Inaccurate information re CertainTeed if deposition and written discovery accurate |
| August 25, 2022 | Interrogatory responses prepared and signed by Foley (and listing Goldstein and Angelides as attorneys of record) in *Montgomery*<br><br>Transmitted from Illinois to California by wire for service | False exposure and work history information |
| November 10, 2022 | Interrogatory responses, responses to requests for admission, and responses to document requests prepared and signed by Simmons Hanly in *Perkins*<br><br>Transmitted from Illinois to Vermont | Concealing proof of claim<br><br>Inaccurate exposure information re CertainTeed if Illinois complaint and proof of claim accurate |

202.    The fraudulent scheme also included many other interstate mailings and wires that were in furtherance of the scheme.  The following are some examples:

| Example Mails and Wires for Settlements and Dismissal Related to Scheme | |
|---|---|
| **Specific Date** | **Mail or Wire** |
| August 22, 2019 | Letter from Browder (IL) to J-M Manufacturing lawyer (LA) sent by UPS with settlement paperwork and requesting stipulation of dismissal paperwork related to *Bretado* |
| March 27, 2020 | Signed request for dismissal with prejudice transmitted by wire from Foley (IL) to J-M Manufacturing lawyer (CA) for dismissal of *Carranza* |
| October 12, 2021 | Signed request for dismissal transmitted by wire from Foley (IL) to J-M Manufacturing lawyer (CA) for dismissal of *Yates* |

| September 28, 2022 | Letter from Browder (IL) to J-M Manufacturing lawyer (LA) sent by UPS and email with settlement paperwork and requesting stipulation of dismissal paperwork related to *Boyance* |
| --- | --- |
| January 16, 2023 | Interstate call between Simmons Hanly and J-M Manufacturing lawyer (MA) re dismissal with prejudice of *Montgomery* |
| January 27, 2023 | Email re dismissals and settlement from Goldstein (CA) to J-M Manufacturing lawyers (MA and CA) including related to *Azevedo* and *Perkins* |
| August 28, 2023 | Letter from Browder (IL) to J-M Manufacturing lawyer (LA) sent by UPS and email with settlement paperwork and requesting stipulation of dismissal paperwork related to *Azevedo* |
| August 31, 2023 | Letter from Browder (IL) to J-M Manufacturing lawyer (LA) sent by UPS and email with settlement paperwork and requesting stipulation of dismissal paperwork related to *Perkins* |
| **Example Interstate Wires Related to Other Depositions Employing Simmons Hanly Fraud Playbook** | |
| **Specific Date** | **Wire** |
| February 25, 2020 | Deposition of Boyance with participants in Arizona and California and interstate telephone to participants in California |
| May 14, 2020 | Deposition of Azevedo by Zoom with participants in Illinois, Massachusetts, Georgia, Connecticut, and Rhode Island |
| July 17, 2019 | Deposition of Swiger in West Virginia with lawyers participating by phone from Pennsylvania and Texas |
| **Example Interstate Mail and Wires Related to Silencing Peebles** | |
| **Specific Date** | **Wire** |
| January/February 2020 | Call between Peebles (CA) and Garrett (IL) regarding unlawful and unethical conduct |
| February 23, 2021 | Transmittal by wire from Illinois to California of Declaration of Amy Garrett f |
| April 23, 2021 | Transmittal by wire from Illinois to California of Declaration of Amy Garrett |

| June 2, 2021 | Transmittal by wire from Illinois to California of Declaration of Amy Garrett |
|---|---|

203.     These are just some examples of the interstate mails and wires used by the Simmons Hanly Defendants to implement the Simmons Hanly Fraud Playbook in furtherance of the fraudulent scheme to extract money from J-M Manufacturing.  Simmons Hanly has filed hundreds of cases against J-M Manufacturing all over the country that involve other defendants who are across the United States. The Simmons Hanly Defendants have sent thousands of interstate mails and wires – many of which are in the exclusive knowledge or control of Defendants – over many years in furtherance of the fraudulent scheme as part of these cases.

204.     In addition, the spreadsheet of 567 emails that Peebles sent to himself and that was attached to the June 2, 2021 Declaration of Amy Garrett identifies many more interstate wires related to the fraudulent scheme.  The identity of the other participants in most of these emails is in the exclusive knowledge or control of the Defendants.  But at least 61 of those emails relate to the implementation of the Simmons Hanly Fraud Playbook in the *Bretado* case, and more than 150 relate to the implementation of the scheme in other contexts, according to the declaration of Garrett.  That declaration and the spreadsheet it attaches are included with and incorporated into this complaint as Exhibit B.

205.     In addition to the predicate acts of mail and wire fraud, the Simmons Hanly Defendants engaged in predicate acts related to witness testimony and obstruction of justice.  As set forth in the *Peebles* complaint, the Simmons Hanly Defendants have a pattern and practice of encouraging or suborning perjured testimony.  The *Peebles* complaint specifically identified the use of this practice in *Bretado*.  Indeed, Bretado offered false testimony at his deposition about using ACP at work sites as a landscaper.  The Simmons Hanly Defendants "helped" Bretado offer that testimony at his deposition.

206.    False testimony of product identification witnesses represented by the firm also has been provided in at least *Carranza* and *Montgomery*, as described above.  The near uniformity and specificity about exposure to asbestos-containing products offered by Simmons Hanly product identification witnesses also strongly suggests that these witnesses have been coached to provide scripted and manufactured testimony.

207.    The circumstances around the testimony offered by Simmons Hanly witnesses and the contents of the *Peebles* complaint demonstrate that the Simmons Hanly Defendants have engaged in witness tampering and obstruction of justice on a number of occasions in violation of 18 U.S.C. §§ 1503 & 1512.  The facts show that Simmons Hanly Defendants knowingly sought to and did corruptly persuade witnesses who it represented to influence testimony and induce the withholding of facts, such as facts related to alternate exposure, at depositions for the purpose of impeding justice and extracting money from J-M Manufacturing.

208.    The facts also show that on repeated occasions at depositions or in discovery responses the Simmons Hanly Defendants solicited and provided false information to corruptly obstruct, influence, and impede justice in many different cases filed by the firm against J-M Manufacturing.  The purpose of this conduct was to cause J-M Manufacturing to settle cases or to corruptly obtain jury verdicts.

**4.      The Simmons Hanly Defendants' Conduct Goes Well Past Routine Litigation Activity and Is Actionable**

209.    The misconduct in this case extends well beyond normal litigation conduct.  It is a persistent pattern of fraud, deceit, and other unlawful conduct.

210.    In this lawsuit, J-M Manufacturing does not seek to re-litigate past state court cases or challenge the validity of any state court judgment.  This case, instead, seeks to hold the Simmons Hanly Defendants accountable for a series of illegal and tortious acts to obtain settlements and

other litigation results at the expense of J-M Manufacturing. This unlawful conduct caused J-M Manufacturing to incur significant fees and costs to fend off claims that the Defendants knew were baseless and affirmative propped up by fraud, and otherwise induced the company into settlements that it would not have entered had it known about the scope and pattern of the Defendants' misconduct.

211. The scheme employed by the Simmons Hanly Defendants was based around sham lawsuits designed to enrich themselves. The Simmons Hanly Defendants developed the Simmons Hanly Fraud Playbook to engage in that scheme at the expense of J-M Manufacturing and other similarly situated companies. Even one the firm's former partners recognized that the firm's "outrageous, unlawful and unethical conduct" over the course of more than three years when he worked at the firm was not "a 'normal part' of the employment relationship." The misconduct, instead, went well beyond routine litigation activity.

212. Moreover, the Simmons Hanly Defendants' misconduct did not just impact J-M Manufacturing. It drained resources that could have been used to compensate people with asbestos-related disease, increased the likelihood of, or contributed to, the bankruptcy of a number of U.S. companies, impacting many people's jobs and retirements; and wasted judicial resources.

213. The Simmons Hanly Fraud Playbook still is being used in asbestos cases and will continue to inflict harm unless it is stopped.

## CLAIMS FOR RELIEF

## COUNT I

### Violations of the Racketeered Influenced Corrupt Organizations Act (18 U.S.C. § 1962(c))

214. J-M Manufacturing incorporates the preceding paragraphs as if fully set forth herein.

215.    Each Defendant is a "person" under 18 U.S.C. § 1961(3).  This is because each Defendant is capable of holding a legal or beneficial interest in property.

216.    Simmons Hanly is a business enterprise, and the individual Defendants willing and knowingly conducted and participated in the firm's affairs through a pattern of racketeering activity that affected interstate commerce.

217.    The Simmons Hanly Defendants collectively also form an association-in-fact enterprise that includes asbestos plaintiffs and witnesses represented by Simmons Hanly and local law firms engaged by Simmons Hanly as part of the firm's asbestos litigation.  The Simmons Hanly Defendants willing and knowingly conducted and participated in that association-in-fact enterprise through a pattern of racketeering activity that affected interstate commerce.

218.    The law firm enterprise and the association-in-fact enterprise affect interstate commerce because the enterprise members knowingly file sham lawsuits leveraging the Simmons Hanly Fraud Playbook across the country for the purpose of extracting settlement and otherwise obtaining recoveries through a pattern of racketeering activity.  The lawsuits specifically mentioned in this complaint alone include lawsuits in Illinois, California, Washington, West Virginia, Massachusetts, and Vermont, and have included defendants from all parts of the United States.  The conduct of the enterprises has affected interstate commerce because the enterprise members have obtained hundreds of millions of dollars in settlement payments, bankruptcy trust payouts, and verdicts against manufacturers and distributors of asbestos-containing products throughout the United States.

219.    The object of the law firm enterprise and the association-in-fact enterprise was to obtain settlements or other recoveries from and cause litigation expense and other loss to J-M Manufacturing and others through a pattern of racketeering activity.

220.     In furtherance of their scheme, the Simmons Hanly Defendants reasonably foresaw the use of, and did in fact repeatedly use, or cause the use of, interstate mails and wires in furtherance of essential parts of the scheme.

221.     Each of the Simmons Hanly Defendants intended to obtain or cause the loss of money or property of J-M Manufacturing and others by means of materially false or fraudulent pretenses or representations that were part of a pattern of racketeering activity.

222.     Each the Simmons Hanly Defendants engaged or took part in multiple instances of mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343) in knowing furtherance of the enterprises' objectives.  Numerous predicate acts of mail fraud and wire fraud effected by the Simmons Hanly Defendants in knowing furtherance of the enterprises' objectives are set forth in detail in this complaint and are included in Exhibit B.  These predicate acts by enterprise members in furtherance of the objectives of the law firm and association-in-fact enterprises span more than five years and were persistent through the entire time period.

223.     The predicate acts of mail and wire fraud include the interstate transmission by mail and wire of fraudulent discovery and pleadings, perjured testimony, and other communications and documents in furtherance of the objectives of the enterprises.

224.     Additional instances of mail and wire fraud effected by the Simmons Hanly Defendants that will demonstrate the pervasiveness of the pattern of racketeering activity are in the exclusive knowledge or control of the Defendants, and discovery will reveal these predicate acts.

225.     In addition to mail and wire fraud, each of the Simmons Hanly Defendants intended to obtain or cause the loss of money or property of J-M Manufacturing and others by means of witness tampering and obstruction of justice that was a part of the pattern of racketeering activity.

226.     Each of the Simmons Hanly Defendants engaged in or took part in multiple violations of 18 U.S.C. § 1512 (witness tampering) and 18 U.S.C. § 1503 (obstruction of justice). This include influencing witnesses represented by the firm to offer false testimony or not disclose facts during depositions, preparing and serving fraudulent pleadings and discovery, and otherwise engaging in fraudulent acts in furtherance of the scheme described in this complaint. Information about additional instances of witness tampering and obstruction of justice effected by the Simmons Hanly Defendants is in the exclusive knowledge or control of the Defendants, and discovery will reveal that information.

227.     The predicate acts of the Simmons Hanly Defendants were related in that they shared the same or similar purposes, results, participants, victims, methods of commission, and were otherwise interrelated by distinguishing characteristics and were not isolated events, but rather regular and integral steps in furtherance of the Simmons Hanly Defendants' scheme to defraud J-M Manufacturing.

228.     The predicate acts of the Simons Hanly Defendants also were continuous in that they have occurred on a regular basis since at least 2019, affected numerous civil lawsuits and, on information and belief, remain ongoing in cases against J-M Manufacturing and others.

229.     There is a significant threat – and J-M Manufacturing fully expects – that the pattern of racketeering activity of the Defendants will continue in to the future. This is because Simmons Hanly has active asbestos lawsuits, including ones against J-M Manufacturing, and continues to file asbestos lawsuits.

230.     The Simmons Hanly Defendants predicate acts of mail fraud, wire fraud, witness tampering, and obstruction of justice constitute a pattern of racketeering for purposes of 18 U.S.C. §§ 1961(5) and 1962(c).

231.    By reason of the Simmons Hanly Defendants' violation of 18 U.S.C. § 1962(c), J-M Manufacturing has been injured in its business and/or property in an amount to be proven at trial.

232.    Specifically, the Simmons Hanly Defendants' violation of 18 U.S.C. § 1962(c) has proximately caused J-M Manufacturing to expend substantial money and resources to defend claims based on false information and enter and/or satisfy settlements or judgements that were inflated due to the Defendants' pattern of racketeering activity.

233.    By reason of this violation of 18 U.S.C. § 1962(c), J-M Manufacturing is entitled to treble damages, attorney fees, costs, and interest on all of the foregoing.

## COUNT II

### Violations of the Racketeered Influenced Corrupt Organizations Act (18 U.S.C. § 1962(d))

234.    J-M Manufacturing incorporates the preceding paragraphs as if fully set forth herein.

235.    Beginning in or before 2019, and continuing through the date of this complaint, the Simmons Hanly Defendants knowingly and unlawfully conspired and agreed with each other to conduct the affairs of the enterprises described above through a pattern racketeering activity that involved mail fraud, wire fraud, witness tampering, and obstruction of justice.

236.    At all relevant times, each conspirator knew of and participated in this scheme through specific overt acts intended to further its objective of defrauding J-M Manufacturing.  For example, and as described in more detail above, the Simmons Hanly Defendants orchestrated and implemented a fraudulent scheme to offer perjured testimony, suppress evidence of exposure to the products of bankrupt companies, make misrepresentations of fact, file baseless claims in an attempt to extract settlements, and silence anyone who attempted to expose the firm's fraud.

237. The Simmons Hanly Defendants knew about and agreed to the commissions of two or more predicate acts as part of the RICO conspiracy.

238. The Simmons Hanly Defendants conspired to unlawfully extract settlement payments and verdicts from J-M Manufacturing and otherwise cause the company to spend money.

239. By reason of the Simmons Hanly Defendants' violation of 18 U.S.C. § 1962(c), J-M Manufacturing has been injured in its business and/or property in an amount to be proven at trial.

240. By reason of the Simmons Hanly Defendants' violation of 18 U.S.C. § 1962(d), J-M Manufacturing is entitled to treble damages, attorney fees, costs, and interest on all of them.

## COUNT III

### Common Law Fraud

241. J-M Manufacturing incorporates the preceding paragraphs as if fully set forth herein.

242. During the course of their racketeering activity, the Simmons Hanly Defendants made repeated and knowing false statements of fact with the intent to induce J-M Manufacturing to spend money on sham litigation and enter into settlements.

243. In many of the cases infected by the Simmons Hanly Defendants' fraud and false statements, the Defendants have induced J-M Manufacturing to settle. For example, the Defendants induced J-M Manufacturing to settle *Bretado*, *Yates*, *Montgomery*, *Boyance*, *Azevedo*, and *Perkins*, which are discussed in this complaint.

244. In the course of those cases, the Simmons Hanly Defendants had a duty as part of discovery obligations and court rules not to make or cause to be made false statements, and to truthfully answer discovery requests.

245. The Simmons Hanly Defendants made or caused to be made material, important, and knowing misrepresentations of fact in those cases.

246. The Simmons Hanly Defendants made or caused to be made material, important, and knowing omissions of fact in those cases.

247. As an example, the Simmons Hanly Defendants omitted or caused the omission of information about the CertainTeed/DBMP bankruptcy claim of Perkins despite being required to disclose it in response to discovery requests in *Perkins*.

248. J-M Manufacturing did not know the facts about the CertainTeed/DBMP bankruptcy claim when it entered into a settlement in *Perkins* and was induced by the knowing misrepresentations and omissions of the Simmons Hanly Defendants to enter into that settlement to the detriment of J-M Manufacturing.

249. The Simmons Hanly Defendants have misrepresented and fraudulently concealed facts in the cases discussed in this complaint and other cases with the intent that J-M Manufacturing, other tort defendants, courts, and juries rely and act upon them.

250. The Simmons Hanly Defendants misrepresented and fraudulently concealed facts in the cases discussed in this complaint and other cases with the intent to deceive and defraud J-M Manufacturing, other tort defendants, courts, and juries.

251. As more fully set forth above, J-M Manufacturing had a right to rely upon, and acted in reasonable and/or justifiable reliance upon, the fraudulent misrepresentations and nondisclosures of the Simmons Hanly Defendants.

252. As a proximate result of the Simmons Hanly Defendants' fraudulent misrepresentations and nondisclosures, J-M Manufacturing suffered compensatory damages in an

as yet undetermined amount to be proven at trial, which exceeds $75,000, exclusive of interests and costs.

253.     J-M Manufacturing's reliance on the misrepresentations and nondisclosures of the Simmons Hanly Defendants was a substantial factor in causing J-M Manufacturing's harm.

## COUNT IV

### Unjust Enrichment

254.     J-M Manufacturing incorporates the preceding paragraphs as if fully set forth herein.

255.     The Simmons Hanly Defendants unjustly received a benefit from J-M Manufacturing through the fraudulent and unlawful activity described in this complaint.  That benefit came in the form of a percentage of inflated or unjustified settlements with and other recoveries from J-M Manufacturing.

256.     The Simmons Hanly Defendants have unjustly retained that benefit to the detriment of J-M Manufacturing.

257.     The retention of the benefit that J-M Manufacturing conferred on the Simmons Hanly Defendants as a result of their unjust conduct violates fundamental principles of justice, equity, and good conscience.

258.     The Simmons Hanly Defendants are aware of and appreciate the benefits bestowed on them by J-M Manufacturing.

259.     The Simmons Hanly Defendants should be compelled to disgorge to J-M Manufacturing all unlawful and inequitable proceeds they received from J-M Manufacturing.

**COUNT V**

**Civil Conspiracy**

260.    J-M Manufacturing incorporates the preceding paragraphs as if fully set forth herein.

261.    As particularly described above, the Simmons Hanly Defendants had a meeting of the minds on a common object to be accomplished and an agreement to commit wrongful acts to that end.  Specifically, the Simmons Hanly Defendants knowingly and unlawfully conspired and agreed with each other to commit numerous unlawful acts related to asbestos litigation against J-M Manufacturing.

262.    The Simmons Hanly Defendants committed various unlawful and wrongful acts as more particularly described above to extract settlement payments and other recoveries from J-M Manufacturing and otherwise cause the company to spend money.

263.    The Simmons Hanly Defendants were aware of each other's plans to commit the wrongful acts described in this complaint.

264.    Consistent with their agreement, the Simmons Hanly Defendants intended that the wrongful acts be committed.

265.    As a proximate result of the conspirators' civil conspiracy, J-M Manufacturing suffered compensatory damages in an amount to be proven at trial, which exceeds $75,000, exclusive of interests and costs.

**PRAYER FOR RELIEF**

J-M Manufacturing requests that the Court enter judgment in its favor and against the Defendants, each of them jointly and severally, to include:

a.    Compensatory damages in an amount to be determined at trial.

b.       Trebled damages attributable to the RICO claims, as permitted by 18 U.S.C. § 1964.

c.       Punitive damages on the damages attributable to the common law fraud and common law conspiracy claims.

d.       Disgorgement to the benefit of J-M Manufacturing of the benefits received by the Simmons Hanly Defendants unjustly.

e.       Attorney's fees, costs, and pre- and post-judgment interest.

f.       An injunction prohibiting the Defendants from continuing to perpetrate their fraudulent scheme against J-M Manufacturing.

g.       Such other relief as justice may require.

In connection with the requested relief, J-M Manufacturing demands a jury trial on all issues so triable.

Dated:  May 10, 2024                        Respectfully Submitted,


                                            */s/ Ashwin J. Ram*
                                            Ashwin J. Ram (ARDC No. 6286478)
                                            John J. Byron (*Application for Admission Forthcoming*)
                                            Steptoe LLP
                                            227 West Monroe, Suite 4700
                                            Chicago, IL 60606
                                            Telephone:  (213) 439-9443
                                            aram@steptoe.com
                                            jbyron@steptoe.com

                                            Andrew Adams (*PHV Application Forthcoming*)
                                            Steptoe LLP
                                            1114 Avenue of the Americas
                                            New York, NY 10036
                                            Telephone:  (212) 506-3900
                                            acadams@steptoe.com

                                            Sonja Arndt (*PHV Application Forthcoming*)
                                            Steptoe LLP
                                            One Market Plaza
                                            Steuart Tower, Suite 1070
                                            San Francisco, CA 94105

Telephone:  (415) 365-6700
sarndtjohnson@steptoe.com

Frank Fletcher (*PHV Application Forthcoming*)
General Counsel
J-M Manufacturing Company, Inc. d/b/a JM Eagle
5200 W. Century Boulevard
Los Angeles, CA 90045

*Counsel for J-M Manufacturing Company, Inc.*