**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **J-M MANUFACTURING COMPANY, INC.,** | |
| Plaintiff, | Case No. 1:24-cv-03853 |
| v. | Judge Robert W. Gettleman |
| **SIMMONS HANLY CONROY, LLP, NICOHLAS ANGELIDES, PERRY BROWDER, AMY GARRETT, BENJAMIN GOLDSTEIN, SUVIR DHAR, CRYSTAL FOLEY, DEBORAH ROSENTHAL, STAN JONES, and JOHN AND JANE DOES 1-25,** | **ORAL ARGUMENT REQUESTED** |
| Defendants. | |

**OPPOSITION TO MOTION TO DISMISS**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................ 1

LEGAL STANDARD ......................................................................................... 5

ARGUMENT ...................................................................................................... 5

    I.     Defendants have not established a *Noerr-Pennington* defense............................ 5

          A.     The Complaint plausibly alleges baseless litigation. ................................. 6

          B.     The Complaint plausibly alleges fraudulent litigation. ............................. 7

    II.    The Complaint states plausible claims under RICO. ............................................ 9

          A.     The Complaint adequately alleges a RICO enterprise. .............................. 9

               1.     The Complaint alleges an association-in-fact enterprise. ............... 9

               2.     In the alternative, the Complaint alleges a legal-entity enterprise.12

          B.     The Complaint adequately alleges predicate offenses. ........................... 13

               1.     The Complaint adequately alleges mail fraud and wire fraud. ..... 13

               2.     The Complaint adequately alleges violation of 18 U.S.C. § 1512.17

          C.     Defendants have failed to establish a statute-of-limitations defense. ....... 17

               1.     Defendants cannot prove untimeliness under the discovery rule.. 18

               2.     In the alternative, Defendants are estopped from disputing timeliness. .................................................................................... 22

               3.     Much of this case is indisputably timely under any standard. ...... 23

          D.     The Complaint states a claim for RICO conspiracy. ............................... 24

          E.     The Complaint states plausible claims against the Individual Defendants. .................................................................................................. 25

    III.   The Complaint states plausible claims under Illinois law. ................................... 30

          A.     Illinois law governs, and California's litigation privilege does not apply.30

          B.     The Complaint plausibly alleges common-law fraud (Count III)............. 34

          C.     The Complaint properly alleges unjust enrichment and civil conspiracy. 35

CONCLUSION.................................................................................................. 35

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Barbara's Sales, Inc. v. Intel Corp.*,
  879 N.E.2d 910 (Ill. 2007) ...................................................................31, 32, 33

*Barry Aviation, Inc. v. Land O'Lakes Municipal Airport Comm'n*,
  377 F.3d 682 (7th Cir. 2004) ...............................................................21, 22, 23

*Beverly v. Watson*,
  2017 WL 4339795 (N.D. Ill. 2017) ....................................................................5

*Boyle v. United States*,
  556 U.S. 938 (2009)........................................................................................11, 12

*Cancer Foundation, Inc. v. Cerberus Capital Management, LP*,
  559 F.3d 671 (7th Cir. 2009) .............................................................................22

*Cedric Kushner Promotions, Ltd. v. King*,
  533 U.S. 158 (2001)........................................................................10, 11, 12, 13

*Clark v. City of Braidwood*,
  318 F.3d 764 (7th Cir. 2003) .............................................................................19

*Cleary v. Philip Morris Inc.*,
  656 F.3d 511 (7th Cir. 2011) .............................................................................35

*Continental Vineyard, LLC v. Vinifera Wine Co.*,
  973 F.3d 747 (7th Cir. 2020) .............................................................................31

*Corley v. Rosewood Care Center, Inc.*,
  388 F.3d 990 (7th Cir. 2004) .......................................................................16, 26

*Crichton v. Golden Rule Insurance Co.*,
  576 F.3d 392 (7th Cir. 2009) .............................................................................12

*CSX Transportation, Inc. v. Gilkison*,
  406 F. App'x 723 (4th Cir. 2010) ......................................................................21

*D.C. Court of Appeals v. Feldman*,
  460 U.S. 462 (1983)............................................................................................33

*Domanus v. Locke Lord LLP*,
  847 F.3d 469 (7th Cir. 2017) .......................................................................13, 14

*FTC v. AbbVie Inc.*,
  976 F.3d 327 (3d Cir. 2020)................................................................................6

*Garlock Sealing Technologies, LLC v. Shein*,
    2015 WL 5155362 (W.D.N.C. 2015) ........................................................................16

*Glen Flora Dental Center, Ltd. v. First Eagle Bank*,
    2024 WL 621601 (N.D. Ill. 2024) ........................................................................24

*Goren v. New Vision International, Inc.*,
    156 F.3d 721 (7th Cir. 1998) ........................................................................25

*Greenpoint Tactical Income Fund LLC v. Pettigrew*,
    38 F.4th 555 (7th Cir. 2022) ........................................................................5

*Gunn v. Continental Casualty Co.*,
    968 F.3d 802 (7th Cir. 2020) ........................................................................31

*Hoover v. Ronwin*,
    466 U.S. 558 (1984) ........................................................................33

*Hytera Communications Corp. v. Motorola Solutions, Inc.*,
    623 F. Supp. 3d 857 (N.D. Ill. 2022) ........................................................................5

*Kim v. Kimm*,
    884 F.3d 98 (2d Cir. 2018) ........................................................................15, 16

*Klehr v. A.O. Smith Corp.*,
    521 U.S. 179 (1997) ........................................................................24

*Living Designs, Inc. v. E.I. Dupont*,
    431 F.3d 353 (9th Cir. 2005) ........................................................................16

*Ludlow v. Northwestern University*,
    79 F. Supp. 3d 824 (N.D. Ill. 2015) ........................................................................35

*McCool v. Strata Oil Co.*,
    972 F.2d 1452 (7th Cir. 1992) ........................................................................24

*McCullough v. Suter*,
    757 F.2d 142 (7th Cir. 1985) ........................................................................11, 12

*Mercatus Group, LLC v. Lake Forest Hospital*,
    641 F.3d 834 (7th Cir. 2011) ........................................................................5, 7, 8

*New West, LP v. City of Joliet*,
    491 F.3d 717 (7th Cir. 2007) ........................................................................6, 13

*Petrella v. MGM, Inc.*,
    572 U.S. 663 (2014) ........................................................................24

*Raney v. Allstate Insurance Co.*,
    370 F.3d 1086 (11th Cir. 2004) ...............................................................16

*Ratfield v. U.S. Drug Testing Laboratories, Inc.*,
    2024 WL 640955 (N.D. Ill. 2024) (appeal pending) ...............................11

*Rocha v. Rudd*,
    826 F.3d 905 (7th Cir. 2016) ..................................................................28

*Rubloff Development Group, Inc. v. SuperValu, Inc.*,
    863 F. Supp. 2d 732 (N.D. Ill. 2012) ....................................................6, 8

*Salinas v. United States*,
    522 U.S. 52 (1997)..............................................................................24, 26

*Sanders v. JGWPT Holdings, Inc.*,
    2016 WL 4009941 (N.D. Ill. 2016) .......................................................34

*Sedima, SPRL v. Imrex Co.*,
    473 U.S. 479 (1985)................................................................................25

*Sidney Hillman Health Center v. Abbott Laboratories, Inc.*,
    782 F.3d 922 (7th Cir. 2015) ..............................17, 18, 19, 20, 21, 22

*Snow Ingredients, Inc. v. SnoWizard, Inc.*,
    833 F.3d 512 (5th Cir. 2016) .............................................................15, 16

*Spiegel v. Continental Illinois National Bank*,
    790 F.2d 638 (7th Cir. 1986) .............................................................13, 14

*Stein v. Krislov*,
    999 N.E.2d 345 (Ill. App. 2013) ............................................................34

*Turubchuk v. E.T. Simonds Construction Co.*,
    2017 WL 480738 (N.D. Ill. 2017) .........................................................34

*U.S. Futures Exchange, LLC v. Board of Trade*,
    953 F.3d 955 (7th Cir. 2020) ...................................................................6

*United Food & Commercial Workers v. Walgreen Co.*,
    719 F.3d 849 (7th Cir. 2013) .................................................................9, 10

*United States v. Brown*,
    973 F.3d 667 (7th Cir. 2020) .................................................................9, 12

*United States v. Leahy*,
    464 F.3d 773 (7th Cir. 2006) ..................................................................26

*United States v. Pendergraft*,
   297 F.3d 1198 (11th Cir. 2002) ................................................................16

*United States v. Turner*,
   551 F.3d 657 (7th Cir. 2008) ....................................................26, 27, 28

*Wreglesworth v. Arctco, Inc.*,
   738 N.E.2d 964 (Ill. App. 2000) ..............................................31, 32, 33

**Statutes and rules**

18 U.S.C. § 1512 ..............................................................................................17

18 U.S.C. § 1515 ..............................................................................................17

18 U.S.C. § 1961 ...........................................................................................9, 17

18 U.S.C. § 1962 ...........................................................................9, 10, 24, 25

Fed. R. Civ. P. 8 ...............................................................................................13

Fed. R. Civ. P. 15 .............................................................................................35

## INTRODUCTION

The Simmons Hanly law firm and attorneys in its Asbestos Department have orchestrated a long-running scheme to enrich themselves through fraudulent asbestos litigation, in which plaintiffs and other witnesses represented by Simmons Hanly are coached to give false testimony. These fraudulent suits have cost Plaintiff millions in legal expenses, jury verdicts obtained through misconduct, and settlements extracted by fraud. And Defendants have been tireless in their efforts to conceal their frauds—aided and abetted by unique attributes of asbestos litigation that, lamentably, make it all too easy for plaintiffs' lawyers to commit effective, surreptitious frauds.

In light of these difficulties, Plaintiff might never have uncovered the Simmons Hanly fraud if not for an extraordinary public disclosure from Scott Peebles, one of the Simmons Hanly asbestos partners who litigated asbestos lawsuits against Plaintiff. Peebles tried to blow the whistle internally, but Simmons Hanly higher-ups demanded silence, fired him in retaliation, and even withheld wages "seeking to extort a release of claims … and a confidentiality agreement, designed to conceal and keep secret the unlawful and unethical conduct." Compl. ¶ 174. Rather than take Simmons Hanly's hush money, though, Peebles filed a whistleblower complaint that blew the lid off Simmons Hanly's "intentional suppression" and "falsification of evidence" in asbestos cases. Compl. ¶ 175. The "unlawful and unethical conduct" that Peebles described was part of "a larger pattern and practice that could affect thousands of [Simmons Hanly] clients." Compl. ¶ 175.

After fiercely litigating against Peebles, including seeking a preliminary injunction and even filing a cross-complaint, Simmons Hanly ultimately settled with Peebles and swore him to secrecy. But Plaintiff learned of his lawsuit, found that the central fraudulent case underlying his whistleblowing was a suit against Plaintiff (*Bretado*), and uncovered a pattern of fraud permeating Simmons Hanly's other suits against Plaintiff. Plaintiff therefore filed this litigation to redress and end Simmons Hanly's pattern of racketeering activity in asbestos suits.

A.     Asbestos litigation is tailor-made for the sort of fraudulent scheme that Simmons Hanly executed.  An asbestos plaintiff presents with mesothelioma or another disease caused by exposure to airborne asbestos fibers.  Compl. ¶ 40.  These diseases have a typical latency period of between 20 and 30 years.  Compl. ¶¶ 40, 61.  Thus, by the time the disease manifests, memories have faded and employment records have long since been lost or discarded.  Compl. ¶ 61.  Since it is known that the plaintiff's illness was likely caused by exposure to airborne asbestos fibers and also known what companies have manufactured or distributed products containing asbestos, asbestos litigation—which proceeds on principles of apportionment and strict liability—usually focuses on whether and to what extent the plaintiff was exposed, decades before, to airborne asbestos fibers from the products of a given defendant.   And, in sharp contrast to, say, automobile accidents, medical malpractice, or wrongful termination suits, the defendant generally has no way of knowing whether it could have caused a given plaintiff's injury or not.

Crucially, the principal U.S. manufacturers and distributors of products containing asbestos in friable (easily crumbled) form were driven into bankruptcy by the mass asbestos litigation of the late 20th and early 21st centuries.  Compl. ¶¶ 51-53.  Since asbestos becomes dangerous when it is crumbled into the air and inhaled, those companies and their ubiquitous friable-asbestos products have been far and away the main source of asbestos exposure (which, again, is why they went bankrupt).  Compl. ¶¶ 35-37.  But, because the primary responsible parties are bankrupt, asbestos litigators have turned since 2005 to solvent companies that sold products with asbestos in non-friable (locked-in) form, meaning that the fibers would not have become airborne and dangerous absent extraordinary negligence or willful disregard of warnings.  Compl. ¶¶ 52-55.  These are the companies with the least likelihood of having actually caused asbestos-related illness.  But they are also the companies that still have money, so they are the ones that get sued.

**B.**     Plaintiff is one such company.  From 1983 to 1988, Plaintiff sold asbestos-cement pipe (ACP) as a transitional product to water districts that had yet to transition to Plaintiff's primary product, asbestos-free plastic pipe.  Compl. ¶¶ 41-45.  The risks of asbestos were well understood by that time, and safety measures were pervasive.  Compl. ¶¶ 35-40.  The asbestos in ACP is encapsulated (locked in), limiting any airborne release to levels well below OSHA limits, in contrast to friable asbestos, which is readily crumbled by hand and released into the air.  Compl. ¶ 46.  With ACP, higher exposure levels only occur if the pipe is cut with an unventilated power saw.  Compl. ¶ 46.  But OSHA regulations and other workplace standards prohibited using such tools on ACP without major precautions.  Compl. ¶ 49.  And ACP, which Plaintiff sold only to experienced contractors, not the general public, is designed so that cutting is usually unnecessary.  Compl. ¶¶ 47-49.  Finally, Plaintiff's ACP bore warnings highlighting the danger of asbestos exposure and directing not to "use power saws to cut this pipe."  Compl. ¶¶ 48-49, 160-61.

Simmons Hanly has filed *hundreds* of asbestos cases against Plaintiff.  Compl. ¶ 3.

**C.**     Peebles was a partner at Simmons Hanly.  Compl. ¶ 2.  But he threatened to expose the Asbestos Department's fraudulent practices after being instructed to engage in the scheme.  Compl. ¶ 172.  His supervisor "instructed" him to keep the scheme under wraps, and then, when he refused, retaliated "by falsely characterizing him as insubordinate and calling his 'judgment' into question to senior members of the firm."  Compl. ¶ 172.  Peebles then turned to another top-level partner.  Compl. ¶ 174.  Rather than investigate his concerns, however, she fired him.  Compl. ¶ 174.  The firm then withheld Peebles' wages "seeking to extort a release of claims … and a confidentiality agreement" that Peebles understood was "designed to conceal and keep secret the unlawful and unethical conduct."  Compl. ¶ 174.

Peebles sued Simmons Hanly for the retaliatory termination. Compl. ¶ 174. In his filings, he explained how the firm engaged in "unlawful, unethical conduct, and fraudulent conduct," including "intentional suppression" and "falsification of evidence," of such scope that it "indicates a larger pattern and practice that could affect thousands of [Simmons Hanly] clients"—meaning it could infect thousands of Simmons Hanly lawsuits. Compl. ¶¶ 2, 175. In the end, following scorched-earth litigation from Simmons Hanly that included a cross-complaint and an injunction motion, the firm gave Peebles a settlement that silenced him with a confidentiality obligation. Compl. ¶ 176. Plaintiff did not learn of the *Peebles* case until after it was settled. Compl. ¶ 177.

Plaintiff knew that Peebles had worked on Simmons Hanly cases against Plaintiff. Compl. ¶ 177. But the filings in *Peebles* were heavily redacted. Compl. ¶ 177. Plaintiff sought an unredacted copy from the court, but the court did not have an unredacted copy. Compl. ¶ 178-79. The court did, however, unseal the case number of the primary underlying case referenced in the *Peebles* complaint—and it was a case against Plaintiff. Compl. ¶¶ 33, 95, 179. Plaintiff then sought the unredacted complaint from Simmons Hanly through discovery in another asbestos case. Compl. ¶ 180. The judge there denied the discovery request, reasoning that the *Peebles* case was not directly relevant to the case before him. Compl. ¶ 181. But he added that "[t]his is a very serious matter" and that he "hop[ed]" that Simmons Hanly had "retained counsel" because the court's ruling "does nothing to get [the] firm passed a very, very serious allegation being made against it." Compl. ¶ 181.[1]

---

[1] Defendants ask this Court to credit Peebles' assertion, made *after* he took Defendants' settlement and confidentiality agreement, that Plaintiff "mischaracteriz[ed]" his lawsuit and was not "the 'victim' of even one 'fraudulent case.'" Mot. 8-9. This self-serving and unsupported claim has zero credibility. In any case, the Court cannot resolve fact disputes at this stage or rely on judicially noticeable documents for the truth of their contents—as Defendants concede. Dkt. 25 at 5-6.

4

Re-examining Simmons Hanly lawsuits in light of Peebles' revelations, Plaintiff uncovered a pattern of misconduct that included fraudulent testimony about the extent and manner of purported exposure to Plaintiff's ACP. Plaintiff then filed this suit under RICO and Illinois law.

For the reasons that follow, the motion to dismiss should be denied.

## LEGAL STANDARD

A complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." *Greenpoint Tactical Income Fund LLC v. Pettigrew*, 38 F.4th 555, 561 (7th Cir. 2022). The allegations "must be sufficient to 'state a claim to relief that is plausible on its face.'" *Id.* "A complaint presents plausible claims when it 'allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* On a motion to dismiss, the Court must "construe the complaint in the light most favorable to the plaintiff, accept all well-pleaded facts as true, and draw all reasonable inferences in the plaintiff's favor." *Id.*

## ARGUMENT

## I. Defendants have not established a *Noerr-Pennington* defense.

The law governing the *Noerr-Pennington* defense is undisputed: Litigation is unprotected and actionable if it is *sham* litigation, meaning that *either* (a) the suit was objectively and subjectively baseless; *or* (b) the party made knowing and material misrepresentations. *See Mercatus Group, LLC v. Lake Forest Hospital*, 641 F.3d 834, 842 (7th Cir. 2011); Mot. 11-12. The sole question, then, is whether the Complaint, taken as true, plausibly alleges that Defendants engaged in either baseless or fraudulent litigation against Plaintiff. It plausibly alleges both.[2]

_____

[2] "Other courts in this District have found that the *Noerr-Pennington* issue is inappropriate for resolution at the motion to dismiss stage, especially when the plaintiff included allegations that the petitioning activity amounted to a sham." *Hytera Communications Corp. v. Motorola Solutions, Inc.*, 623 F. Supp. 3d 857, 875-76 (N.D. Ill. 2022) (collecting cases); *see, e.g.*, *Beverly v. Watson*, 2017 WL 4339795, at *13 (N.D. Ill. 2017) (sham exception "is generally a question of fact").

5

### A.     The Complaint plausibly alleges baseless litigation.

A lawsuit is an unprotected sham if it is both objectively and subjectively baseless.  *See U.S. Futures Exchange, LLC v. Board of Trade*, 953 F.3d 955, 963 (7th Cir. 2020).  "An objectively reasonable lawsuit is one 'reasonably calculated to elicit a favorable outcome.'"  *Id.*

In this context, "a successful, winning petition proves its own reasonableness." *Id.* at 966. Defendants won one of the suits discussed in the Complaint (*Morgan*), so it was not "baseless" in the relevant sense (as discussed below, though, it falls within the misrepresentation exception).

Six other lawsuits ended in settlement, and Defendants contend that these are likewise immune "successful" litigations because Plaintiff chose to settle.  Mot. 12.  This argument fails. Decisions that deem settled lawsuits to be "successful" under *Noerr-Pennington* do so only when the defendant settles "for a substantial payment."  *New West, LP v. City of Joliet*, 491 F.3d 717, 722 (7th Cir. 2007); *see Rubloff Development Group, Inc. v. SuperValu, Inc.*, 863 F. Supp. 2d 732 (N.D. Ill. 2012) ("Rubloff paid $200,000 and made significant concessions … to settle the suits."). Here, the Complaint does not say how much the lawsuits settled for, and the reasonable inference is that they were settled for "reasons independent of the merits of [the] claims, including especially the cost of litigating."  *FTC v. AbbVie Inc.*, 976 F.3d 327, 368 (3d Cir. 2020) (quotation marks omitted) (finding settled lawsuit objectively baseless); *see, e.g.*, Compl. ¶ 77 (Defendants seek to "pressure [asbestos] defendants to settle regardless of the merits of any particular lawsuit"); ¶ 170 (Defendants "ha[ve] routinely named [Plaintiff] in lawsuits that [they] know[] are baseless for settlement leverage" and "use[] these [baseless] lawsuits as bargaining chips as part of global settlements"); ¶ 171 (Defendants are highly willing to voluntarily dismiss sham lawsuits to entice settlement of other lawsuits against the same target).

Finally, Defendants voluntarily dismissed three lawsuits, meaning that those suits were not successful under any definition.  *See* Mot. 12-14.  Defendants argue that the Complaint does not

show "that the suits were dismissed because they were baseless." Mot. 13. But the question is not why the suits were dismissed, but whether the suits were objectively and subjectively baseless. While dismissal alone may not prove that a suit was baseless, the reasonable inference from the allegations that the suits were based on lies and were abandoned in the face of contrary evidence is that they were indeed baseless. *See* Compl. ¶¶ 107-14, 125-42.[3]

### B. The Complaint plausibly alleges fraudulent litigation.

"[A]lthough successful petitioning activity may not, as a general matter, be deemed a sham, the fraud exception can remove that immunity if success is achieved by means of intentional falsehoods." *Mercatus*, 641 F.3d at 843. Immunity is lost under this exception "if the misrepresentation (1) was intentionally made, with knowledge of its falsity; and (2) was material, in the sense that it actually altered the outcome of the proceeding." *Id.*

Defendants wisely decline to dispute the first element. But they argue that their willful misrepresentations were not "material." Mot. 14. The argument fails.

First, Defendants urge that the six cases that settled and the three that they voluntarily dismissed "did not allegedly involve any substantive judicial ruling adverse to [Plaintiff], let alone one based on any alleged misrepresentations." *Id.* But a lie need not affect a "substantive judicial ruling" to be "material, in the sense that it actually altered the outcome of the proceeding," which is all that *Mercatus* requires. 641 F.3d at 843. Settlement is as much an "outcome" as a verdict is, and the reasonable (indeed, undisputed) inference is that lies increasing the potential strength of claims against Plaintiff—such as lies about the fact and extent of exposure to Plaintiff's products

---

[3] Defendants note that Plaintiff did not defeat the suits *at the pleading stage*. Mot. 13. But a demurrer tests *legal* sufficiency, not the *truth* of factual allegations (i.e., "probable cause"). Nor does it help Defendants to note that the plaintiffs died from asbestos exposure. *Id.* The key question—and situs of the fraud—was whether the cause was exposure *to Plaintiff's products*.

versus the countless other, more plausible sources of asbestos exposure—would increase Plaintiff's litigation risk and cost and thereby increase the nuisance value of settlement. In short, Defendants' misrepresentations in their suits against Plaintiff "threaten[ed] the fair and impartial functioning" of the courts (*Mercatus*, 461 F.3d at 844), requiring Plaintiff to incur substantial legal costs to disprove the false claims and force Defendants to abandon the suits.

And if an affected court order is necessary, then the reasonable (and, in fact, true) inference from the Complaint is that the suits involved interlocutory substantive rulings adverse to Plaintiff as a result of Defendants' fundamental falsehoods, and also that settled cases included dismissal orders that were products of the fraudulently obtained settlements.[4]

The last case, *Morgan*, ended with a verdict. Defendants' sole argument is that Plaintiff "cites no factual misrepresentations made to the court in that case that could have infected the court's rulings, and alleges no facts from which such an inference would be reasonable." Mot. 14. That is false: The Complaint quotes testimony from *Morgan* that is consistent with and reasonably

---

[4] Defendants cite no case holding that misrepresentations have *Noerr-Pennington* immunity if they are material to a settlement rather than "a judicial ruling." Mot. 14. *Cheminor Drugs, Ltd. v. Ethyl Corp.* and *Baltimore Scrap Corp. v. David J. Joseph Co.* happened to be cases where the outcome was a determination by the tribunal, but they do not say that the fraud exception is inapplicable to other outcomes. 168 F.3d 119, 120, 123-27 (3d Cir. 1999) ("preliminary determinations" by tribunal); 237 F.3d 394, 396-98, 403 (4th Cir. 2001) (deceptive statements to judge not material where judge explained that he saw through the deception and then ruled for the other side). If *Rubloff* can be read to support Defendants, then it rests on an overreading of *Mercatus*, which makes clear that the fundamental "materiality" question is whether the fraud "deprive[s] the litigation of its legitimacy." 641 F.3d at 843. Misrepresentation of facts material to the outcome does that whether the outcome is a settlement or a verdict. Indeed, since most cases settle rather than going to a verdict, Defendants' contrived settlement carve-out would give fraudster attorneys a massive loophole—immunity in every case that settles pre-trial. Yet "the fraud exception *closes* a sizable loophole." *Mercatus*, 641 F.3d at 843 (emphasis added). The point is that, "although successful petitioning activity may not, as a general matter, be deemed a sham, the fraud exception can remove that immunity if success is achieved by means of intentional falsehoods." *Id.* Defendants can hardly contend that the settlements were "successful" outcomes and then contend that the fraud exception does not apply to settlements.

8

inferred to be part of Defendants' fraudulent scheme and that goes directly to the material issues in asbestos litigation (e.g., whether and to what extent the worker was exposed to Plaintiff's products as opposed to the myriad other sources of asbestos exposure).  Compl. ¶¶ 153-66.

## II.   The Complaint states plausible claims under RICO.

### A.   The Complaint adequately alleges a RICO enterprise.

RICO makes it "unlawful for any person employed by or associated with any enterprise engaged in … interstate … commerce, to conduct or participate … in the conduct of such enterprise's affairs through a pattern of racketeering activity."  18 U.S.C. § 1962(c).  Thus, "a plaintiff must identify an 'enterprise.'"  *United Food & Commercial Workers v. Walgreen Co.*, 719 F.3d 849, 853 (7th Cir. 2013).  A RICO enterprise can be either a legal entity or an unincorporated "association-in-fact."  *See* 18 U.S.C. § 1961(4).  "The Supreme Court has held on multiple occasions that this definition is to be interpreted broadly."  *United Food*, 719 F.3d at 853.

Here, the Complaint identifies *two* RICO enterprises: "the law firm enterprise and the association-in-fact enterprise."  Compl. ¶ 219; *see id.* ¶ 73 ("The RICO enterprise is a corporate entity and an association-in-fact enterprise"); *id.* ¶¶ 215-19, 222.  Both are adequately alleged.

### 1.  The Complaint alleges an association-in-fact enterprise.

"An association-in-fact includes any 'group of persons associated together for a common purpose of engaging in a course of conduct.'"  *United States v. Brown*, 973 F.3d 667, 682 (7th Cir. 2020) (quoting *Boyle v. United States*, 556 U.S. 938, 946 (2009)).  "The Supreme Court reads this definition broadly": It requires no "structural features beyond 'a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose.'"  *Id.* (quoting *Boyle*, 556 U.S. at 946).

The Complaint alleges "an association-in-fact enterprise that consists of the firm, the various professionals working in and with the Asbestos Department, including the individual

9

Defendants and John and Jane Does 1-25, certain asbestos litigation plaintiffs, other witnesses represented by Simmons Hanly, and law firms that serve as co-counsel." Compl. ¶ 73. This description fits easily within the Supreme Court's "broad[]" definition. As described throughout the Complaint, the persons forming the association-in-fact enterprise associated and coordinated together with the shared purpose of litigating against Plaintiff and others. Compl. ¶¶ 1-12, 31-240.

Defendants contend that the association-in-fact enterprise flunks RICO's "distinctness" requirement. Mot. 16-18. "Section 1962(c) requires a plaintiff to identify a 'person'—i.e., the defendant—that is distinct from the RICO enterprise." *United Food*, 719 F.3d at 843. Thus, "to establish liability under § 1962(c) one must allege and prove the existence of two distinct entities: 1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001).

The enterprise in the Complaint satisfies this requirement. The "person[s]—i.e., the defendant[s]"—are the Simmons Hanly law firm (a legal entity) and individuals in the firm's Asbestos Department. Compl. p. 1, ¶¶ 14-22. The "enterprise" is the unincorporated "association-in-fact enterprise that consists of the firm, the various professionals working in and with the Asbestos Department, including the individual Defendants and John and Jane Does 1-25, certain asbestos litigation plaintiffs, other witnesses represented by Simmons Hanly, and law firms that serve as co-counsel." Compl. ¶ 73. So Defendants are *members* of the association-in-fact, which will virtually always be true with a RICO association-in-fact (e.g., a labor union or street gang). But Defendants are not *equivalent to* or *coextensive with* the association-in-fact.

The Complaint has thus identified "an 'enterprise' that is not simply the same 'person' referred to by a different name" and "defendants [who] conducted or participated in the conduct of the *enterprise's* affairs, not just their *own* affairs." *Kushner*, 553 U..S. at 161, 163 (quotation

10

marks omitted).  There is "nothing in the statute that requires more 'separateness' than that."  *Id.* at 163.  "The only important thing is that [the enterprise] be either formally (as when there is incorporation) or practically (*as when there are other people besides the [defendant] working in the organization*) separable from the [defendant]."  *McCullough v. Suter*, 757 F.2d 142, 144 (7th Cir. 1985) (emphasis added) (cited with approval by *Kushner*, 533 U.S. at 163) (defendant was sufficiently distinct from his unincorporated sole proprietorship because he "had several people working for him; this made his company an enterprise, and not just a one-man band").

Defendants insist that "the sole alleged enterprise is nothing more than the law firm and its employees."  Mot. 16.  As just shown, though, that is not at all what the Complaint says.  So Defendants argue that the allegations about the involvement of plaintiffs and witnesses represented by Simmons Hanly are too "sparse and conclusory."  Mot. 17.  Not so.  *See* Compl. ¶¶ 29, 83-84, 109-13, 118-20, 137-40, 152-55, 162-66, 195-96, 205-07, 225-26.  Defendants urge that the Complaint "pleads no facts that, if true, establish anything other than a valid relationship between Simmons Hanly and co-counsel, clients, and witnesses." Mot. 17.  That is false but also irrelevant: RICO is fully applicable to a "legitimate 'enterprise'" (i.e., one in which non-defendant participants' relationships are "valid" but the defendants hijack the enterprise for unlawful ends). *Kushner*, 533 U.S. at 164; *see also* Compl. ¶ 73 n.17 ("No asbestos plaintiff or claimant is being sued for liability in this complaint.  Based on information and belief, these individuals have been exploited by the Simmons Hanly Defendants to effectuate the scheme.").

Defendants' "valid relationship" point is a misreading of *Ratfield v. U.S. Drug Testing Laboratories, Inc.*, 2024 WL 640955, at *3 (N.D. Ill. 2024) (appeal pending).  The point there was that USDTL and CLS were in an arm's-length "commercial relationship" (manufacturer and delivery service) rather than coordinating to form an "enterprise" with a shared purpose (as *Boyle*

11

demands), *not* that entities with "valid" relationships can never be part of an enterprise. *See also Crichton v. Golden Rule Insurance Co.*, 576 F.3d 392, 400 (7th Cir. 2009) ("garden-variety marketing arrangement" between two firms is not an enterprise). A plaintiff or witness and the law firm that represents him have much more than an arm's-length commercial relationship; attorney ethics *require* a shared purpose between attorney and client. And attorneys and firms acting as co-counsel to Simmons Hanly would likewise have a shared purpose, not a mere commercial relationship. (Again, it is immaterial whether represented individuals and co-counsel participated in wrongdoing or sought to pursue asbestos claims lawfully, for RICO applies equally to illegitimate enterprises and to legitimate ones that are hijacked. *See Kushner*, 533 U.S. at 164.)

Finally, Defendants insist that represented individuals would have participated in just one case each and were thus "conducting their own affairs—not the affairs of the alleged enterprise." Mot. 17-18. But they undisputedly shared the purpose of the rest of the enterprise (winning the case), and a litigation has "longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle*, 556 U.S. at 946. Moreover, Defendants do not address the allegation that co-counsel are part of the enterprise, but the natural inference is that a firm that brings hundreds of suits would often use the same co-counsel across numerous suits. Compl. ¶¶ 11, 77, 200, 217.

"An association-in-fact includes any 'group of persons associated together for a common purpose of engaging in a course of conduct.'" *Brown*, 973 F.3d at 682. That requirement is met. *See also McCullough*, 757 F.2d at 144 ("if the [defendant] has employees or associates, the enterprise is distinct from him").

### 2.   In the alternative, the Complaint alleges a legal-entity enterprise.

The Complaint also alleges, in the alternative, that "Simmons Hanly is a business enterprise, and the individual Defendants willing[ly] and knowingly conducted and participated in the firm's affairs through a pattern of racketeering activity that affected interstate commerce."

12

Compl. ¶ 216; *see* Fed. R. Civ. P. 8(d)(2)-(3) (alternative or inconsistent claims are proper). As against the Individual Defendants, this is undisputedly an adequate allegation of a distinct RICO enterprise, for "the statute requires no more than the formal legal distinction between 'person' and 'enterprise' (namely, incorporation) that is present here." *Kushner*, 533 U.S. at 165.

**B.    The Complaint adequately alleges predicate offenses.**

**1.  The Complaint adequately alleges mail fraud and wire fraud.**

Defendants do not deny that mail fraud and wire fraud are RICO predicates or that the Complaint adequately alleges the elements of those federal offenses with respect to Simmons Hanly. Instead, Defendants demand blanket immunity, positing an atextual, policy-driven carve-out for "ordinary litigation activity." Mot. 18-22. Defendants' bid for immunity fails.

**a.**    It is undisputed that the relevant statutes says nothing about a litigation carve-out. Nor is there even an implicit statutory or constitutional basis for a carve-out that would sweep broader than the *Noerr-Pennington* doctrine. After all, *Noerr-Pennington* is the rule that the Supreme Court crafted, based on considerations of congressional intent and the First Amendment, to safeguard the right to petition the government through litigation. *See New West*, 491 F.3d at 722. Absent support for a broader carve-out in the text of a particular statute (and there is none here), there is no basis for grafting *another* doctrine of litigation immunity atop *Noerr-Pennington*.

**b.**    No binding authority supports Defendants' position. Defendants claim no support from the Supreme Court. This is unsurprising, since the Court has *already* addressed Defendants' concerns through *Noerr-Pennington* doctrine and has no reason to create a second doctrine to fill the same role. Nor do Defendants find support in *Spiegel v. Continental Illinois National Bank*, 790 F.2d 638 (7th Cir. 1986), or *Domanus v. Locke Lord LLP*, 847 F.3d 469 (7th Cir. 2017).

In *Domanus*, the Seventh Circuit found that "the complaints support only an inference that [the lawyer defendants] misrepresented their failure to observe the alleged ethical restrictions" in

13

representing the plaintiff. 847 F.3d at 480. The Seventh Circuit said that the "path to relief based on these allegations is not through RICO." *Id.* at 483. But it reached that conclusion because the ethics violations were not RICO predicates, not because an unwritten carve-out gives lawyers RICO immunity. *See id.* at 479-80 (complaint failed to allege that lawyers knew of "fraudulent activity that had occurred years before they were engaged"). *Domanus* says nothing about mail or wire fraud, and it conspicuously fails to cite the out-of-Circuit cases that Defendants invoke.

In *Spiegel*, the Seventh Circuit held that two letters from Continental's attorney to Spiegel's were not mail fraud. *See* 790 F.2d at 646-49. Spiegel's attorney was "aware of all of the facts" that the letters failed to disclose; the letters disclosed that Continental had deducted funds from Spiegel's trust account to cover its legal expenses; and Continental had filed a motion regarding the deduction in Illinois state court, meaning that the state court could fully protect Spiegel if the deduction was improper. *See id.* In short, as in *Domanus*, the defendant simply had not committed any RICO predicate: "Continental's alleged conduct … was not fraudulent." *Id.* at 649.

The Seventh Circuit therefore declined to "address the alternate grounds advanced by the district court that Congress did not intend the mail fraud statute to reach 'correspondence between attorneys … concerning an issue in pending litigation.'" *Id.* at 649 n.11. Of course, if the Seventh Circuit had embraced that proposition, then its lengthy analysis would not have been necessary.

**c.**     Defendants' invocation of out-of-Circuit rulings is likewise unavailing. Defendants pretend that "myriad courts have held" that "ordinary litigation activity—even if baseless, fraudulent, or malicious—cannot constitute the predicate acts of mail or wire fraud." Mot. 19. Actually, though, the Second Circuit in Defendants' main cited case concluded: "We *decline* to reach the issue of whether all RICO actions based on litigation activity are categorically meritless. We conclude *only* that where, as here, a plaintiff alleges that a defendant engaged in a *single*

14

frivolous, fraudulent, or baseless lawsuit, such litigation activity *alone* cannot constitute a viable RICO predicate act." *Kim v. Kimm*, 884 F.3d 98, 105 (2d Cir. 2018) (emphases added).[5]

As the Complaint here describes, Defendants' scheme spanned dozens or hundreds of lawsuits. Far from being foreclosed by *Kim*, this case raises the very issue that *Kim* expressly declined to reach. Nor does the "in the absence of corruption" language assist Defendants, for the case that *Kim* cited makes clear that criminal mail and wire fraud *are* "corruption" in the relevant sense. *See Snow Ingredients, Inc. v. SnoWizard, Inc.*, 833 F.3d 512, 525 (5th Cir. 2016).

Another of Defendants' cited cases further undercuts their argument. In *Deck v. Engineered Laminates*, the Tenth Circuit *reversed* the dismissal of civil RICO claims where the plaintiff "allege[d] as predicate acts that Defendants committed mail and wire fraud by using the United States mail and [wire] transmissions to submit settlement offers and exchange a fraudulent settlement agreement." 349 F.3d 1253, 1257 (10th Cir. 2003). The Tenth Circuit rejected *extortion* as a predicate act on the ground that "meritless litigation is not extortion." *Id.* at 1258. But it did *not* extend that reasoning to other RICO predicates like mail and wire fraud, as Defendants would have this Court do. Rather, it *revived* the mail and wire fraud allegations.

---

[5] The Second Circuit thus declined to reject an earlier decision that allowed RICO claims against a law firm where the defendants "used litigation to carry out their scheme" by "buying consumer debt, initiating actions against the debtors and improperly serving them, and then filing fraudulent documents in state court to obtain default judgments." *Kim*, 884 F.3d at 105.

Defendants' other out-of-Circuit citations also do them no good: While some note that fraud requires "intent to deceive" (which is alleged here),[6] none endorses a categorical rule that litigation-related acts cannot be mail or wire fraud.[7]

Finally, other courts, including the Ninth Circuit, have squarely *rejected* Defendants' very argument.  *See, e.g.*, *Living Designs, Inc. v. E.I. Dupont*, 431 F.3d 353, 364-65 (9th Cir. 2005) (rejecting immunity for RICO claims based on litigation and nothing that RICO itself "provides that conduct relating to prior litigation may constitute racketeering activity"); *Garlock Sealing Technologies, LLC v. Shein*, 2015 WL 5155362, at *3 (W.D.N.C. 2015) (same in asbestos case).

    **d.**    Ultimately, the question before the Court is whether the Seventh Circuit would extend out-of-Circuit cases like *Kim* to immunize multi-suit schemes like the one at issue here. The Seventh Circuit would not do so.  *Kim* openly based the carve-out it created on "policy arguments": fears of excessive "satellite litigation," erosion of "the principles undergirding the doctrines of res judicata and collateral estoppel," and a chilling effect on "the well-established public policy goal of maintaining open access to the courts."  884 F.3d at 104.  But unelected

---

[6] "[T]o defraud" means "wronging one in his property rights by dishonest methods or schemes" and "usually signif[ies] the deprivation of something of value by trick, deceit, chicane or overreaching."  *Corley v. Rosewood Care Center, Inc.*, 388 F.3d 990, 1005 (7th Cir. 2004).

[7] *E.g.*, *Snow Ingredients*, 833 F.3d at 524 (obstruction and witness tampering "require not merely delay but corrupt activity by the bad actor"); *id.* at 525 (no RICO violation where "the bad acts of the defendant attorneys did not satisfy the criminal standards for mail or wire fraud and rose only to the level of violations of counsels' professional responsibility obligations"); *Raney v. Allstate Insurance Co.*, 370 F.3d 1086, 1087 (11th Cir. 2004) ("the filing of a lawsuit may not state a claim for *extortion* under the federal RICO statutes" (emphasis added)); *id.* at 1088 n.2 ("Raney does not allege any intent to deceive him, and he therefore cannot establish mail fraud as a predicate act for his RICO claims."); *United States v. Pendergraft*, 297 F.3d 1198, 1208-09 (11th Cir. 2002) (false litigation documents were not mail fraud because "there was no intent to deceive"); *Raney*, 370 F.3d at 1088 ("we held in *Pendergraft* that, absent an intent to deceive the victim, the 'mailing of litigation documents, even perjurious ones, did not violate the mail-fraud statute'").

judges have no prerogative to make policy judgments, and they certainly have no basis to make policy-based exceptions to federal statutes that have no support in the text enacted by Congress.

Nor are the policy arguments valid in any event. There is no basis to fear that excessive satellite litigation under RICO will overwhelm the courts, given that nothing of the sort has yet occurred and that the courts have ample tools for weeding out and deterring frivolous lawsuits. And doctrines of finality like res judicata and collateral estoppel are already well-defined—but, notably, Defendants here do not contend that those doctrines pose an actual impediment to Plaintiff's claims. Finally, the Supreme Court has already created the *Noerr-Pennington* doctrine to safeguard the "policy goal of maintaining open access to the courts." There is no basis in law or policy for immunizing sham litigation that *Noerr-Pennington* does not protect.

**e.** Finally, Defendants say that the charges against them "are nothing more than routine evidentiary disputes." Mot. 22. This is wishful thinking and an absurd characterization of the Complaint, which describes in painstaking detail how Defendants followed an established playbook of fraud in case after case after case. Compl. ¶¶ 1-12, 31-240.

### 2. The Complaint adequately alleges violation of 18 U.S.C. § 1512.

In the alternative, the Complaint adequately alleges violation of another RICO predicate, 18 U.S.C. § 1512. *See* 18 U.S.C. § 1961(1) (list of RICO predicates). Section 1512(c) makes it a felony to "corruptly … influence … any official proceeding, or attempt[] to do so." Bankruptcy proceedings are "official proceedings," and "corruptly" includes knowingly false statements made with improper purpose. 18 U.S.C. § 1515(a)(1), (a)(6), (b). The Complaint plausibly alleges that Defendants submitted false claims to asbestos bankruptcy trusts. Compl. ¶¶ 64, 71, 78-81.

### C. Defendants have failed to establish a statute-of-limitations defense.

As the Seventh Circuit explained in reversing the pleading-stage dismissal of another civil RICO suit, "[d]ismissing a complaint as untimely at the pleading stage is an unusual step, since a

17

complaint need not anticipate and overcome affirmative defenses, such as the statute of limitations. Further, these defenses typically turn on facts not before the court at that stage in the proceedings." *Sidney Hillman Health Center v. Abbott Laboratories, Inc.*, 782 F.3d 922, 928 (7th Cir. 2015) (citations omitted). Thus, the "irregular" approach of applying the statute of limitations at this stage "is appropriate only where the allegations of the complaint itself set forth everything necessary to satisfy the affirmative defense." *Id.* (quotation marks omitted). "As long as there is a conceivable set of facts, consistent with the complaint, that would defeat a statute-of-limitations defense, questions of timeliness are left for summary judgment (or ultimately trial), at which point the district court may determine compliance with the statute of limitations based on a more complete factual record." *Id.*

Defendants assert that Plaintiff's RICO claims are barred by the applicable four-year statute of limitations. *See* Mot. 28-31. But a discovery rule governs the timeliness of RICO claims, and Defendants cannot possibly show at this stage that there is no "conceivable set of facts" under which the claims are timely under the discovery rule. To the contrary, though a complaint need not anticipate affirmative defenses like timeliness, the Complaint here describes how Plaintiff discovered its claims following the filing of the *Peebles* complaint, less than four years before the filing of the Complaint here. Defendants' concealment of their scheme separately estops them from seeking dismissal on timeliness grounds. And a timeliness-based dismissal prior to discovery would be especially senseless here, since it is undisputed that some alleged injuries occurred within the four-year period before the filing, so those claims are inarguably timely. The Court should await "a more complete factual record." *Sidney Hillman*, 782 F.3d at 928.

### 1. Defendants cannot prove untimeliness under the discovery rule.

a. The limitations period for civil RICO claims is subject to "an 'injury discovery' rule 'starting the clock when a plaintiff knew or should have known of his injury.'" *Sidney*

*Hillman*, 782 F.3d at 926.  Here, Plaintiff was injured when Defendants' fraudulent scheme forced Plaintiff to make payments (e.g., legal costs and settlement payments).  Compl. ¶ 12.  Thus, unless Defendants can prove that Plaintiff knew or should have known of its injuries from the fraud before May 10, 2020 (four years before the Complaint was filed), their statute-of-limitations defense fails.

Defendants cannot possibly carry that burden at the pleading stage.  To the contrary, the Complaint makes clear that Plaintiff discovered its injuries as a result of the *Peebles* lawsuit. Compl. ¶¶ 32-33, 93, 104, 172-74, 177-81.  The *Peebles* suit was filed on May 12, 2020, less than four years before Plaintiff filed this suit.  And Plaintiff did not learn of *Peebles* until "in or after October 2021."  Compl. ¶ 177.  At this stage, the Court must take these factual allegations as true. *See also Clark v. City of Braidwood*, 318 F.3d 764, 767 (7th Cir. 2003) (because "a plaintiff is not required to negative an affirmative defense, such as the statute of limitations, in his complaint," court could not rule out doctrines like the discovery rule and equitable tolling at the pleading stage).

Nor does anything in the Complaint suggest (much less prove) that a reasonable person in Plaintiff's position would have discovered the injuries earlier.  Again, quite the contrary.  "The scheme was disguised as aggressive litigation tactics and could not be understood in the context of any single lawsuit."  Compl. ¶ 32.  And Defendants worked hard to prevent exposure, as by firing Peebles and opposing Plaintiff's attempts to investigate Peebles' claims.  Compl. ¶ 172-81.

**b.**      Defendants' timeliness arguments are, if anything, far weaker than in *Sidney Hillman*, where the Seventh Circuit reversed the pleading-stage dismissal of a civil RICO claim as time-barred.  *See id.* at 926-30.  The plaintiffs there, a group of benefit funds, claimed that Abbott engaged in racketeering by illegally marketing off-label use of a drug from 1998 to 2012.  *Id.* at 924.  The plaintiffs were injured throughout that period every time they made payments to reimburse prescriptions caused by the illegal marketing.  *Id.* at 925-26.  The district court

19

"concluded that the statute of limitations for the RICO claim began to run in 1998, when the funds initially reimbursed a prescription for off-label use of [the drug]." *Id.* On appeal, though, the plaintiffs "emphasize[d] that the basis of their claims is that they were harmed by increased costs due to Abbott's illegal[] marketing of [the drug], not merely by reimbursing off-label prescriptions, which are common and permissible. … Thus, the funds argue[d], it [wa]s not clear at [the pleading stage] that a reasonable third-party purchaser would have had any reason to discover Abbott's illegal marketing scheme based simply on reimbursing off-label prescriptions." *Id.* at 926-27.

The Seventh Circuit agreed, holding that "the district court erred by dismissing this case based on the statute of limitations without giving the parties an opportunity for discovery into when a reasonable benefit fund should have known about its injuries from off-label marketing." *Id.* at 928. At the pleading stage, it was "unclear when the funds actually became aware that they were paying for off-label use." *Id.* And "there [wa]s insufficient information to decide whether a reasonable third-party purchaser should have discovered that it had paid more for off-label uses than it otherwise would have had to because of an illegal marketing scheme." *Id.*

**c.** *Sidney Hillman* controls this case. There, it was "unclear when the funds actually became aware that they were paying for off-label use." *Id.* Here, the Complaint clearly alleges that Plaintiff became aware that it was making payments for Defendants' fraudulent scheme less than four years before filing this suit. There, there was "insufficient information to decide whether a reasonable third-party purchaser should have discovered that it had paid more for off-label uses than it otherwise would have had to because of an illegal marketing scheme." *Id.* Here, there is no basis factual basis on which to decide that a reasonable asbestos defendant should have discovered that it had paid more than it otherwise would have had to because of an illegal fraudulent litigation scheme. *Sidney Hillman* thus makes clear that the Court cannot "dismiss[]

20

this case based on the statute of limitations without giving the parties an opportunity for discovery into when a reasonable [asbestos defendant] should have known about its injuries from [fraudulent asbestos litigation]."  *Id.* at 928.

Defendants say that Plaintiff "was injured when it was first forced to incur attorneys' fees to fend off baseless cases and induced to settle other cases" and thus "was harmed as early as 2013. Mot. 29 (quotation marks omitted).  Under the discovery rule, though, "[i]t is not the date on which the wrong that injures the plaintiff occurs, but the date—often the same, but sometimes later—on which the plaintiff discovers that he has been injured."  *Sidney Hillman*, 782 F.3d at 928.  Of course, Plaintiff knew that it was making payments when it made them.  Similarly, the funds in *Sidney Hillman* knew that they were making reimbursement payments when they made them.  In both cases, though, the payments appeared at the time to be not *injuries* but legitimate business expenses caused by lawful activity (litigation activity or drug marketing activity).  Thus, in both cases, the plaintiffs could not discover that their apparently legitimate payments were actually *injuries* until discovering their illegal causes.  *See id.* at 926-27 ("the basis of [the funds'] claims is that they were harmed by increased costs due to Abbott's illegal[] marketing of Depakote, not merely by reimbursing off-label prescriptions, which are common and permissible"); *Barry Aviation, Inc. v. Land O'Lakes Municipal Airport Comm'n*, 377 F.3d 682, 688-89 (7th Cir. 2004) (limitations period began when plaintiff should have discovered that its disappointing business results were "the product of fraudulent misrepresentations by the defendants"); *CSX*

*Transportation, Inc. v. Gilkison*, 406 F. App'x 723, 729-30 (4th Cir. 2010) (applying these principles to reverse statute-of-limitations dismissal in asbestos RICO case).[8]

> **d.** In a footnote, Defendants say that Plaintiff's general counsel spoke "in 2021" of unusual patterns and unbelievable facts in Defendants' asbestos lawsuits and "later" criticized defense counsel for not being prepared for Defendants' practices. Mot. 30 n.13. Defendants do not explain why they view the referenced statements as relevant to the limitations issue. After all, they concededly occurred well within the four-year period preceding this lawsuit and *after* Plaintiff learned of the *Peebles* complaint "in or after October 2021." Compl. ¶ 177. In any event, the references lack the context that discovery may provide and cannot satisfy the "no-conceivable-set-of-facts" standard that applies to limitations defenses at the pleading stage. *See Sidney Hillman*, 782 F.3d at 928. Nor can a statement, made in 2023 with reference to *a different asbestos law firm*, that fraud in asbestos "has been known for about 25 years" prove that Plaintiff knew or should have known of *Defendants'* specific frauds before the *Peebles* complaint. If Defendants wish to argue the contrary, that argument must await factual development through discovery, "at which point the district court may determine compliance with the statute of limitations based on a more complete factual record." *Sidney Hillman*, 782 F.3d at 928.

### 2. In the alternative, Defendants are estopped from disputing timeliness.

"Equitable estoppel suspends the running of the statute of limitations during any period in which the defendant took active steps to prevent the plaintiff from suing." *Barry Aviation*, 377 F.3d at 689. "Among those steps can be the defendants' concealing evidence from the plaintiff

---

[8] Of course, plaintiffs do not need to know that defendants caused their injury as part of a "pattern of racketeering activity" or committed "a RICO violation." Mot. 29. But they do need to "discover[] that they had been *injured by the defendants*." *Cancer Foundation, Inc. v. Cerberus Capital Management, LP*, 559 F.3d 671, 674 (7th Cir. 2009) (emphasis added).

that he needed in order to determine that he had a claim." *Id.* The Complaint describes Defendants' concealment efforts in detail. *E.g.*, Compl. ¶ 9 (describing how Simmons Hanly "goes to great lengths to cover up its fraud and misconduct"); ¶ 30 (Individual Defendants sought "to further the scheme and cover up the scheme"); ¶¶ 103, 127, 135 (signing interrogatory responses affirming false witness testimony); ¶¶ 121-22 (serving interrogatory responses that concealed inconsistent bankruptcy claim); ¶ 129 (improperly threatening Plaintiff with a sanctions motion); ¶¶ 104, 172-74 (firing Peebles to keep him quiet); ¶¶ 176-81 (concealing information about the *Peebles* suit from Plaintiff).

### 3. Much of this case is indisputably timely under any standard.

Even assuming arguendo that aspects of Plaintiff's claims arising from events before May 2020 are untimely, many of the alleged injuries (such as payments of litigation costs and settlements) occurred *after* then and therefore cannot be untimely. *E.g.*, Compl. ¶¶ 117-24 (deposition, false discovery responses, and settlement in *Perkins*); ¶¶ 125-27, 130-33 (amended complaint, deposition, false interrogatory responses, and autopsy records in *Yates*); ¶¶ 134-42 (entirety of *Montgomery*). Given the enormous volume of Defendants' suits against Plaintiff, Plaintiff anticipates that discovery will reveal additional injuries that occurred after May 2020.

Defendants seek to avoid this conclusion by urging a "first predicate" rule, according to which *all* injuries caused by Defendants' fraudulent scheme became time-barred in 2017, four years after the *first* such injury occurred in 2013—even though many injuries caused by the ongoing scheme did not occur until *after* 2017. Mot. 28-31. On this theory, Defendants could commit mail frauds against Plaintiff *tomorrow* and any RICO claim would *already* be time-barred.

Defendants' argument is frivolous, and none of their cited cases supports it. The Seventh Circuit applies "a 'separate accrual' rule in civil RICO cases, under which the commission of a separable, new predicate act within a 4-year limitations period permits a plaintiff to recover for the

additional damages caused by that act." *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 190 (1997); *see McCool v. Strata Oil Co.*, 972 F.2d 1452, 1465-66 & n.10 (7th Cir. 1992) ("Under a separate accrual rule, a new cause of action accrues only when there is a new instance of wrongful conduct *and* a new injury."); *see also Petrella v. MGM, Inc.*, 572 U.S. 663, 671 (2014) (under "separate-accrual rule" in copyright, "each infringing act starts a new limitations period"). Though part of the same overarching *scheme*, Defendants' many acts of fraud across different lawsuits plainly were "separable, new predicate act[s]" (or "new instance[s] of wrongful conduct") each of which gave rise to a new four-year limitations period to sue *over the damages caused by that act*.

In short, "old acts cannot cut short the statute of limitations on new acts that cause new injuries within the limitations period. That's the separate accrual rule." *Glen Flora Dental Center, Ltd. v. First Eagle Bank*, 2024 WL 621601, at *24 (N.D. Ill. 2024). Part of Defendants' stratagem is to deceive the Court about the distinction between the separate accrual rule (which is the law) and the last predicate rule (which is not). *Glen Flora* (another civil RICO case) explains the distinction and rejects Defendants' precise argument. *Id.* at *23-25. As *Glen Flora* explains, "[e]ach act of [fraud] was a new wrongful act, creating a new injury. Each time a hand goes into the cookie jar, there is a new act and a new injury"—and a new limitations period. *Id.* at *24.

### D. The Complaint states a claim for RICO conspiracy.

Defendants' sole argument against the Complaint's conspiracy claim (Count II) is that the claim fails because the Complaint fails to plead any underlying violation of § 1962(c) in Count I. *See* Mot. 28. Count I survives as shown above, so Defendants' sole argument on Count II fails. And even if Count I were dismissed, Defendants' sole argument would fail because the failure of a § 1962(c) claim does *not* imply the failure of a § 1962(d) claim based on the same facts. *See Salinas v. United States*, 522 U.S. 52, 55, 61-65 (1997) (affirming § 1962(d) conviction despite

24

§ 1962(c) acquittal); *Goren v. New Vision International, Inc.*, 156 F.3d 721, 731 (7th Cir. 1998). Defendants offer no other challenge to Count II, so that count must proceed in any event.

### E. The Complaint states plausible claims against the Individual Defendants.

For each of the Individual Defendants, Defendants argue that the Individual Defendant should be dismissed because the Complaint fails to adequately allege that he or she committed two predicate acts of mail fraud or wire fraud. Mot. 23-27.[9] The argument fails on several grounds.

**1. Section 1962(c).** Although some district court rulings assume that a § 1962(c) claim must allege that each individual defendant personally committed two predicates, Plaintiff is unaware of appellate authority for that point, and the statutory text says otherwise: "It shall be unlawful for any person employed by or associated with any enterprise engaged in … interstate … commerce, to conduct *or participate, directly or indirectly, in the conduct* of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c) (emphasis added). Thus, it suffices to show that the enterprise's affairs were conducted *by someone* through a pattern of racketeering and that each individual defendant participated in that directly or indirectly. Defendants do not deny that each individual *participated* in the pattern, but just that each individual personally *committed* two predicates. Since there is no such requirement, their argument fails.[10]

**2. Section 1962(d).** Similarly, it is established that a RICO conspiracy claim under § 1962(d) does not require that each individual committed two predicates, or even that he or she

---

[9] Two predicate acts are necessary but not sufficient for a "pattern of racketeering activity," but the only aspect of the "pattern" requirement that Defendants challenge is the two-acts requirement.

[10] The statutory text also requires that RICO "be liberally construed to effectuate its remedial purposes"—chief among them its private right of action—which further counsels against "the narrow readings offered by" Defendants. *Sedima, SPRL v. Imrex Co.*, 473 U.S. 479, 498 (1985).

agreed to personally commit any predicates. *Salinas v. United States*, 522 U.S. 52, 63 (1997). Thus, if Defendants intend to challenge Count II with this argument, it fails as a matter of law.

      **3.**      **The allegations.**  Assuming arguendo that the Complaint must plead two acts of fraud by each Individual Defendant, it does so with all the specificity required by Rule 9(b).

      The crimes of mail fraud and wire fraud have parallel elements, differing only in that one entails use of the mail and the other entails use of interstate electronic communications. *United States v. Leahy*, 464 F.3d 773, 786 (7th Cir. 2006). "Cases construing one are equally applicable to the other." *Id.* "The requisite elements of these offenses, therefore, are three: (1) a scheme to defraud; (2) an intent to defraud; and (3) use of [mail or wires] in furtherance of the scheme." *Id.*

      "The words 'to defraud' in the mail fraud context mean 'wronging one in his property rights by dishonest methods or schemes' and 'usually signify the deprivation of something of value by trick, deceit, chicane or overreaching.'" *Corley v. Rosewood Care Center, Inc.*, 388 F.3d 990, 1005 (7th Cir. 2004). "Intent to defraud requires a willful act by the defendant with the specific intent to deceive or cheat, usually for the purpose of getting financial gain." *Id.*

      The third element is broadly construed. *First*, "[t]he use of the mail or wire need not be an indispensable part of the fraud to satisfy the 'in furtherance of' element of the offense; it need only 'be incident to an essential part of the scheme … or a step in [the] plot.'" *United States v. Turner*, 551 F.3d 657, 666 (7th Cir. 2008). *Second*, "[t]he defendant himself need not personally cause the mailing or use of the wire; it is enough that the use of mail or wire 'will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended.'" *Id. Third*, "[t]he mailing or use of the wires need not itself contain false or fraudulent material; a 'routine or innocent' mailing or use of the wire can supply this element of the offense, as long as the use of the mail or wire is part of the execution of the scheme." *Id.*

*Turner* illustrates how these propositions apply. Turner was convicted of wire fraud "for his part in a fraudulent scheme by which three janitors … worked only a small fraction of their required 40 hours per week but falsified their attendance logs and collected their full salaries." *Id.* at 659. Turner was a high-level supervisor, and his role in the scheme was to give the janitors "cover" (such as by admonishing mid-level supervisors not to supervise the janitors too closely) and to warn the janitors when others grew suspicious. *Id.* at 660-61. None of that involved mail or wires. Rather, "the wire transmission was the direct deposit of [two of the janitors'] inflated paychecks," though Turner neither sent nor received those wires, and the wires would have been precisely the same if the janitors had actually worked their 40 hours. *Id.* at 666-67.

Rejecting Turner's appeal, the Seventh Circuit held that these facts satisfied the "use of the mails [or wires] in furtherance of the scheme" element (the only element that Turner challenged). *Id.* After all, "the direct paycheck deposits at issue here were the main object of the fraudulent scheme, the final step in the completion of the plot." *Id.* at 667. "If a salary fraudulently obtained is 'money or property' for purposes of establishing a traditional mail or wire fraud, then the receipt of that fraudulently obtained salary by means of direct deposit completes the plot and is therefore 'in furtherance of' the fraudulent scheme." *Id.* And the fact "[t]hat some of the fraudulently obtained wages were paid by way of direct deposit supplies the 'use of the wires' element necessary to make this a federal wire fraud." *Id.* at 668.

Under this framework, it is clear that the Complaint alleges with particularity that each Individual Defendant committed at least two acts of mail and/or wire fraud. *First*, the "scheme to defraud" was Defendants' scheme to extract money from Plaintiff through sham lawsuits, and the Complaint describes in painstaking detail numerous fraudulent statements across numerous sham lawsuits, going far beyond the "who, what, when, where, and how: the first paragraph of any

27

newspaper story." *Rocha v. Rudd*, 826 F.3d 905, 911 (7th Cir. 2016). Compl. ¶¶ 1-12, 31-240. *Second*, Defendants' intent is shown by their willful participation in the sham lawsuits.[11] *Third*, as is inevitable in modern litigation, mail and wires were constantly and foreseeably used in furtherance of the scheme, both to transmit fraudulent materials (like false discovery responses) and to obtain "the main object of the fraudulent scheme" by entering into settlements (which is directly analogous to the direct deposits in *Turner*, 551 F.3d at 667-68). More specifically:

- **Angelides** "is the mastermind of the enterprise's strategy in asbestos and mesothelioma litigation" (¶ 74) and "is fairly viewed as the head of the RICO enterprise" (¶ 183). He chairs the Asbestos Department and has "directed the legal strategy of all of the firm's asbestos and mesothelioma cases" since 2012 (¶ 15), including working to "develop the 'story' to be used in each case that was subject to the fraud scheme" (¶¶ 30, 74). And he likely helped cover up the scheme (¶ 188). He litigated cases including *Bretado* and *Montgomery*, including sending fraudulent complaint allegations and discovery responses by wire or mail on at least seven occasions specifically identified in the Complaint (¶¶ 104, 134, 184-85, 201). Defendants' false insistence (at 24) that "[t]he Complaint cites no mailings or wiring in which Angelides allegedly was involved, or when they occurred," simply points up the baselessness of their motion to dismiss.

- **Browder** is "Head of the firm's Asbestos Department"; he "manages the firm's more than 50 asbestos attorneys" and "oversees all asbestos cases," including the ones against Plaintiff (¶¶ 16, 74, 186). He "is effectively Angelides' deputy and a leader within the RICO enterprise, running the day-to-day operations of the enterprise" (¶ 186). His "primary involvement … relates to case settlement and asbestos trust claims," where Defendants "cash-in on their scheme" (¶ 187). He participated in *Bretado*, *Boyance*, *Azevedo*, and *Perkins* (¶¶ 105, 202). He "is involved in the decision making related to sham or meritless cases that are filed against [Plaintiff] and used as bargaining chips to encourage settlement" of other cases (¶ 187). He sent numerous letters in furtherance of the scheme (¶ 202). And he likely helped cover up the scheme by firing Peebles (¶ 184).

- **Dhar** was a Simmons Hanly asbestos partner and "admitted that Simmons Hanly filed a complaint against [Plaintiff] knowing it contained false information" (¶ 19). He participated in devising the scheme; preparing and filing sham complaints; preparing and serving sham discovery responses; preparing witnesses who offered perjured testimony or soliciting perjured testimony; negotiating settlement agreements; and developing strategy related to and filing asbestos trust claims (¶¶ 29, 193-94). He was personally involved in *Carranza*, which he filed despite admitting that the allegations in the

---

[11] Rule 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud," but "intent, knowledge, and other conditions of a person's mind may be alleged generally."

complaint were not accurate (¶¶ 107-09).  He solicited false deposition testimony from Carranza's brother (¶¶ 109-14).

- **Foley** is an asbestos partner and oversees the firm's litigations in California (¶ 20).  She has repeatedly signed and transmitted false discovery responses (¶ 20).  She worked to develop the "story" to be used for each case that was part of the fraud scheme; to send pleadings, discovery responses, and correspondence in furtherance of the scheme; and to extract settlement payments through the scheme (¶ 30).  She filed the *Bretado* complaint, signed and served false discovery responses that made false statements about exposure in *Bretado*, and took Bretado's deposition to lock in fraudulent testimony (¶¶ 95-96, 103).  She also filed *Carranza*, where she again served false discovery responses regarding exposure before ultimately dismissing the sham case (¶¶ 107-14).  She signed the complaints in *Yates*, where she again signed discovery responses that made false statements about exposure, work history, and the decedent's autopsy, before ultimately dismissing the sham case (¶¶ 125-33).  She signed the complaint in *Montgomery*, where she signed discovery responses that made false statements about exposure and work history, before ultimately dismissing the sham case to avoid summary judgment (¶¶ 134-42).  In short, she was responsible for implementing the fraudulent scheme on a day-to-day basis (¶¶ 193-94).  Her role included sending many wires or mailings in furtherance of the scheme, including specified communications with false exposure information, false work history, and false autopsy information (¶¶ 201-02).

- **Garrett** is Assistant Managing Partner of Simmons Hanly and a partner in the Asbestos Department (¶ 17).  She helped to devise the scheme (¶ 29), agreed to participate in it (¶ 189), and is a leader of the fraudulent enterprise, working to ensure that its affairs are not exposed and to work up a bogus "story" about each asbestos defendant, including Plaintiff here (¶ 74).  Peebles reported the unethical and unlawful conduct of the Asbestos Department to her, and she summarily fired him to prevent exposure of the scheme (¶¶ 17, 174, 190).  Garrett further worked to avoid exposure by responding to Peebles' lawsuit and preventing it from moving forward, including by executing declarations that were transmitted by wire in support of the firm's motions against Peebles (¶ 190).  As the Peebles episode shows, Garrett is crucial to the operation of the RICO enterprise, acting as an advisor and serving as the right-hand person to resolve issues and threats to the success and continued operation of the enterprise (¶¶ 189, 202).

- **Goldstein** is a former shareholder and current of counsel in Simmons Hanly's Asbestos Department (¶ 18).  He serves as the firm's West Coast Asbestos Litigation Manager and is in charge of the West Coast asbestos litigators to ensure that they do not upset the operation of the fraud (¶ 191).  He supervised Peebles, whose complaint identifies him as ROE 1 and specifically targets him as knowing about, directing, and taking part in the "unlawful, unethical, and fraudulent" conduct that forms the basis of the fraud scheme (¶¶ 18, 192).  He took substantial actions in furtherance of the scheme including working to develop the "story" to be used in each case subject to the scheme (¶ 30).  As Peebles confirmed, he facilitated the fraud and fabricated allegations against Plaintiff in the *Bretado* case (¶ 104).  He also participated in *Carranza*, *Yates*, *Montgomery*, and *Morgan* and is listed as one of the lawyers responsible for the complaints and discovery responses that contained fraudulent information and were sent by wire or mail (¶¶ 114,

29

125-42, 192, 201-02).  He worked to conceal the scheme in response to Peebles' whistleblowing, including doing everything he could to keep Peebles quiet, instructing Peebles not to inform certain members of firm management about the fraudulent scheme, and retaliating against him by "falsely characterizing him as insubordinate and calling his 'judgment' into question to senior members of the firm" (¶¶ 173, 192).

- **Jones** is or was an asbestos case investigator at Simmons Hanly (¶ 22).  He was involved in the cases that Peebles identified as fraudulent and was the first person that Peebles sought to depose to prove his allegations against the firm (¶ 22).  He participates in the case teams through which the enterprise commits frauds in individual cases and helps to "build" the cases by "find[ing] the evidence" to support the "story" about each defendant and helping to manufacture sham testimony and evidence, including assisting in the coaching of key witnesses (¶¶ 75, 195-96).  He participated in the fraudulent depositions in *Bretado* and *Carranza* and assisted with translation (¶ 96 & n.37, ¶ 109).

- **Rosenthal** is an asbestos partner who has been involved in cases involving egregious misconduct, where she is responsible for implementing the fraudulent scheme on a day-to-day basis and has the most direct involvement in countless predicate acts, and has sought to intimidate Plaintiff to prevent the firm's fraud from being exposed (¶¶ 21, 193-94).  She worked to develop the "story" to be used in cases in the fraud scheme (¶ 30).  She filed a summary judgment brief in *Carranza* based on a false exposure narrative (¶ 113).  She was also involved in *Yates* (¶¶ 125-33, 201), where she made unfounded attempts to protect the scheme by baselessly threatening sanctions against Plaintiff's attorney (¶¶ 129, 194).  She again worked to protect the scheme in *Montgomery*, sending a letter that vigorously resisted Plaintiff's attempt to obtain discovery into the pattern of fraud identified in the *Peebles* complaint (¶¶ 141, 180, 194, 201).

## III. The Complaint states plausible claims under Illinois law.

### A. Illinois law governs, and California's litigation privilege does not apply.

Simmons Hanly is an Illinois LLP with its principal place of business in Illinois.  Compl.

¶ 14.  Angelides, the Chair of the Asbestos Department who "directed the legal strategy of all of

the firm's asbestos and mesothelioma cases," is based in the firm's Illinois offices, meaning that

Defendants' scheme is directed from Illinois.  Compl. ¶ 15.  Browder, who is Head of the Asbestos

Department and who "manages the firm's more than 50 asbestos attorneys" and "oversees all

asbestos cases," likewise works from the firm's Illinois offices.  Compl. ¶¶ 16, 29.  So do Garrett,

Foley, Jones, and (when he was with Simmons Hanly) Dhar.  Compl. ¶¶ 17, 19, 20, 22, 29-30.

While Goldstein and Rosenthal are based in San Francisco, they performed all relevant acts for an

Illinois law firm under Illinois-based management.  Simmons Hanly has repeatedly sued Plaintiff

in Illinois, including in *Perkins* (Compl. ¶¶ 115, 117, 218), and its suits filed in other states are likewise orchestrated from the firm's home base in Illinois. Perhaps most crucially, the fraudulent scheme alleged in the Complaint was devised and executed principally in Illinois, with the ill-gotten funds enriching Simmons Hanly in Illinois. Compl. ¶¶ 29-30, 201-02.

Astoundingly, these Illinois-based Defendants in this Illinois federal-court litigation now claim immunity for their Illinois-based scheme under *California law*. Mot. 32-33. They premise their immunity bid on the facts that Plaintiff, a Delaware corporation, is headquartered in California and that several of the suits described in the Complaint were filed in California—though others were filed in other states, including Illinois, and Defendants have filed many other asbestos suits against Plaintiff in Illinois as part of their scheme. Compl. ¶ 218.

Defendants' immunity bid fails: An Illinois law firm and Illinois lawyers cannot orchestrate a fraudulent scheme from Illinois and then claim to be somehow *exempt* from Illinois law.

"The choice-of-law principles of the forum state, Illinois, govern here." *Continental Vineyard, LLC v. Vinifera Wine Co.*, 973 F.3d 747, 752 (7th Cir. 2020). "Illinois follows the most-significant-contacts approach of the Restatement (Second) of Conflict of Laws [§ 145] for tort actions." *Id.* at 758; *see Wreglesworth v. Arctco, Inc.*, 738 N.E.2d 964, 971 (Ill. App. 2000); *Barbara's Sales, Inc. v. Intel Corp.*, 879 N.E.2d 910, 920 (Ill. 2007) ("We have jettisoned the *lex loci delicti* rule—also termed the place-of-the-injury rule"). "[T]he Second Restatement … chooses the law of the state which, 'with respect to that issue, has the most significant relationship to the occurrence and the parties.'" *Gunn v. Continental Casualty Co.*, 968 F.3d 802, 809 (7th Cir. 2020) (quoting Restatement § 145(1)). "If Illinois has the more significant relationship with the occurrence and the parties, the law of Illinois should apply." *Wreglesworth*, 738 N.E.2d at 971.

"Under the Illinois rule, as under section 145, contacts which should be evaluated include: 1. the place where the injury occurred; 2. the place where the conduct causing the injury occurred; 3. the domicile, residence, place of incorporation and place of business of the parties; and 4. the place where the relationship between the parties, if any, is centered." *Id.*

Here, Plaintiff could be said to have suffered its intangible financial injuries in California (where it is headquartered) or Delaware (where it is incorporated)—but there is not a clear "place of injury" as in a typical case of personal injury or injury to tangible property. Restatement § 145 comment e ("in the case of fraud … there may be little reason in logic or persuasiveness to say that one state rather than another is the place of injury"); *id.* comment f ("the place of injury is less significant in the case of fraudulent misrepresentations"). By contrast, the fraudulent scheme that caused the injury was developed in and executed primarily from Illinois, the home state of Simmons Hanly and of the most important Individual Defendants. The third factor cuts both ways but weighs most heavily in favor of Illinois: Plaintiff is incorporated in Delaware and domiciled in California, while Simmons Hanly is both incorporated and domiciled in Illinois and most Individual Defendants are likewise citizens of Illinois (and, presumably, members of the Illinois bar). Finally, there is no "relationship" to speak of between Plaintiff and Defendants (or, if there is one, it is in both California and Illinois). In short, the four factors show contacts with both Illinois and California but weigh more heavily in favor of Illinois.

Additional factors confirm that Illinois law applies. *First*, "Illinois courts have an interest in not being burdened with applying foreign law in the absence of strong policy reasons." *Barbara's Sales*, 879 N.E.2d at 920. *Second*, while California "might prefer to apply its law if it would better protect" California businesses, the opposite is true here, where Illinois defendants seek to invoke a broad immunity that they ascribe to California but not Illinois law. *Id.* at 920-21.

32

*Third*, "it is undoubtedly true that [Illinois] has an interest in regulating [Simmons Hanly and its attorneys], as [their] principal place of business is located there." *Id.* at 921. This factor is especially strong given that Defendants are attorneys, for "[t]he interest of the States in regulating lawyers is especially great": "Few other professions are as close to 'the core of the State's power to protect the public.'" *Hoover v. Ronwin*, 466 U.S. 558, 569 n.18 (1984); *see D.C. Court of Appeals v. Feldman*, 460 U.S. 462, 482 n.16 (1983) ("it is important to note in the context of this case the strength of the state interest in regulating the state bar"); *cf.* Restatement § 145 comment f ("the principal location of the defendant's conduct is the contact that will usually be given the greatest weight in determining the state whose local law determines the rights and liabilities that arise from false advertising").

*Finally*, "California has no interest in extending its laws to noncitizens and to actions that occurred outside of California borders." *Barbara's Sales*, 879 N.E.2d at 921. In other words, while Illinois has an obvious and compelling interest in ensuring that Illinois attorneys working in Illinois at an Illinois law firm do not use their bar licenses to *commit fraud in violation of Illinois law*, California has no interest at all in extending its broad "litigation privilege" to immunize those same attorneys. To the contrary, "the application of [California's] rule would hinder the full realization of the underlying policy in Illinois," which has not chosen to clothe its attorneys with the sweeping immunity from fraud liability that Defendants claim under California law. *Wreglesworth*, 738 N.E.2d at 973.

It follows that "Illinois has the superior interest in having its policy (and law) applied." *Id.* "That conclusion is consistent with 'the modern approach to choice-of-law questions, which places the greatest importance on the forum's public policy.'" *Id.* Defendants' bid for immunity from the common-law fraud claim fails.

### B.     The Complaint plausibly alleges common-law fraud (Count III).

Defendants' cursory challenge to the common-law fraud claim (Mot. 34-35) fails.

*First*, as shown above, the Complaint's fraud allegations easily satisfy Rule 9(b).

*Second*, the Complaint makes clear that Plaintiff detrimentally relied on Defendants' frauds.  It is true that Plaintiff "sought to *disprove*" many of Defendants' false statements.  Mot. 34.  But the whole purpose and effect of the fraudulent scheme was to falsely bolster the apparent strength of the claims that Defendants filed against Plaintiff—e.g., through false testimony and other evidence regarding the fact and degree of exposure to Plaintiff's products, the supposed lack of warnings, etc.—and this forced Plaintiff to pay more to settle or fight the claims than if Defendants had been honest about the weakness of their sham lawsuits.  *E.g.*, Compl. ¶ 11.

*Third*, Illinois law does not support Defendants' proposed rule that any reliance on representations made in litigation is categorically unreasonable.  The whole point of statutes, civil procedure rules, and ethics rules that prohibit deception in litigation—including falsehoods in court filings, depositions, and responses to interrogatories—is to ensure that litigants *can* rely on representations made in litigation.  Unsurprisingly, Defendants cite only cases discussing Michigan and Texas law, which confer a broad privilege for statements in litigation.  But "the privilege appears to be interpreted in Illinois solely as a bar against litigating *defamatory* statements made by an attorney during litigation."  *Sanders v. JGWPT Holdings, Inc.*, 2016 WL 4009941, at *11 (N.D. Ill. 2016) ("The Court will not expand the privilege beyond its common interpretation to protect the Mack Defendants from charges of *fraud*, not defamation." (emphases added)); *see also Turubchuk v. E.T. Simonds Construction Co.*, 2017 WL 480738, at *3 (N.D. Ill. 2017) (same); *Stein v. Krislov*, 999 N.E.2d 345, 356 (Ill. App. 2013) (Illinois litigation privilege applies to defamation and "is necessarily narrow").

**C.      The Complaint properly alleges unjust enrichment and civil conspiracy.**

Defendants seek dismissal of Count IV solely on the ground that California "does not recognize a separate cause of action for unjust enrichment."  Mot. 35.  But Illinois law governs, and "[t]he Illinois Supreme Court appears to recognize unjust enrichment as an independent cause of action."  *Cleary v. Philip Morris Inc.*, 656 F.3d 511, 516 (7th Cir. 2011).

Defendants make the same argument about Count V (civil conspiracy).  Mot. 35.  But the one Illinois case they cite just says that a conspiracy claim fails *if* the underlying cause of action fails.  *Ludlow v. Northwestern University*, 79 F. Supp. 3d 824, 846 (N.D. Ill. 2015).  Because the underlying common-law fraud claim survives, Defendants offer no basis to dismiss Count V.

## CONCLUSION

The Court should deny the motion to dismiss.  If the Court grants the motion, Plaintiff respectfully requests leave to file a first amended complaint to address any perceived deficiency.  *See* Fed. R. Civ. P. 15(a) ("The court should freely give leave when justice so requires.").

Respectfully submitted,

 /s/ Ashwin J. Ram

| | |
|---|---|
| Frank Fletcher<br>General Counsel<br>J-M Manufacturing Company, Inc.<br>d/b/a JM Eagle<br>5200 West Century Boulevard<br>Los Angeles, CA 90045 | Ashwin J. Ram<br>Steptoe LLP<br>227 West Monroe, Suite 4700<br>Chicago, IL 60606<br>(312) 577-1300<br>aram@steptoe.com |
| | Mark C. Savignac<br>Steptoe LLP<br>1330 Connecticut Avenue, NW<br>Washington, DC 20036 |
| October 2, 2024 | msavignac@steptoe.com |

35