**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| J-M MANUFACTURING COMPANY, INC., <br><br>     Plaintiffs, <br><br>     v. <br><br> SIMMONS HANLY CONROY, LLP, NICHOLAS ANGELIDES, PERRY BROWDER, AMY GARRETT, BENJAMIN GOLDSTEIN, SUVIR DHAR, CRYSTAL FOLEY, DEBORAH ROSENTHAL, STAN JONES, and JOHN AND JANE DOES 1-25, <br><br>     Defendants. | Hon. Robert W. Gettleman <br><br> Civil Action No. 1:24-cv-03853 <br><br> PLAINTIFF'S MOTION TO ALTER OR AMEND JUDGMENT, OR FOR RELIEF FROM JUDGMENT, UNDER FEDERAL RULES OF CIVIL PROCEDURE 59(e) and 60 (b); DECLARATION OF ASHWIN J. RAM AND SUPPORTING EXHIBIT |

**<u>PLAINTIFF'S MOTION TO ALTER OR AMEND JUDGMENT, OR FOR RELIEF
FROM JUDGMENT, UNDER FEDERAL RULES OF CIVIL PROCEDURE 59(e) and
60(b)</u>**

Plaintiff J-M Manufacturing Company, Inc. ("J-MM") files this Motion to Amend the Judgment, or in the alternative for Relief from Judgment (Dkt. 49), following the Court's Order (Dkt. 48) dismissing Counts I and II of the Complaint and declining to exercise supplemental jurisdiction over Counts III and IV. Plaintiff so moves under Rules 59(e) and 60(b) of the Federal Rules of Civil Procedure. Newly discovered evidence, including first-hand evidence shared by "insider" whistleblowers outside of Simmons Hanly Conroy LLP ("SHC"), has revealed critical insights into an enterprise run by a control group of law firms working in unison to: bring fraudulent asbestos lawsuits; coach witnesses on product identification, including through "bounty programs" that reward attorneys for facilitating fabricated product/company claims; defraud asbestos bankruptcy trusts; obstruct justice through the destruction of evidence; and silence enterprise insiders. This pattern of fraud causes harm not only to the companies like J-MM who must defend themselves against these sham lawsuits, but also work to the detriment of: current and future asbestos victims exposed to and harmed by specific asbestos-containing products; plaintiff asbestos law firms outside of the control group; and experts and medical professionals who do not further the control group's playbook. J-MM therefore asks the Court to grant post-judgment relief so that J-MM may further seek leave to file an amended complaint to bring this crucial evidence to light and to clarify the scope, aims, participants, and victims of the relevant RICO enterprise.

## INTRODUCTION

Founded in 1983, J-MM is presently one of the largest plastic pipe manufacturers in the United States with more than 800 employees located in manufacturing facilities across the country. From 1983 to 1988, J-MM distributed as part of its product line, Asbestos-Cement Pipe ("ACP"), a controlled non-consumer product sold only to professionals in the field to meet the requirements of water districts, which mandated the use of ACP for their water delivery needs. By

1

1983, the Occupational Safety and Health Administration ("OSHA") and other governmental organizations had for more than a decade recognized that ACP could be used safely so long as certain precautions were taken not to disturb the asbestos. ACP is considered a safe product because the asbestos is baked into the product and thus is non-friable, which is why for decades J-MM and others who sold ACP were not part of the asbestos litigation wave that spanned from the 1980s through the late 1990s. But when the crushing weight of these lawsuits forced those companies, often called the "Big Dusties," to declare bankruptcy during what has become known as the "Asbestos Bankruptcy Wave," the plaintiff's law firms turned their attention to second and third tier targets that sold other products with non-friable asbestos to bear the brunt of litigation. These companies were targeted for the simple reason that they were the only solvent companies left, not because they were the actual source of unsafe asbestos exposure. That is what led the asbestos plaintiff's bar to J-MM, resulting in the filing of over 6,000 lawsuits since 2000.

On May 10, 2024, J-MM brought suit against SHC and certain of its professionals (collectively, the "Defendants"), alleging they had engaged in a pattern of racketeering activity, in violation 18 U.S.C. §§ 1962(c) and (d) of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). J-MM filed this action after launching an investigation based on a whistleblower complaint filed by former SHC partner, Scott Peebles, who publicly called out SHC's pattern of "unlawful and unethical conduct," to include "intentional suppression" and "falsification of evidence" in asbestos cases, which "could affect thousands of [SHC] clients." Compl. ¶ 175. In light of Peebles' revelations, Plaintiff re-examined its previous cases with SHC and uncovered a pattern of misconduct that included false statements and the concealment of evidence in furtherance of the scheme, leading to the filing of J-MM's Complaint. Compl. ¶¶ 7-10.

On March 18, 2025, the Court granted Defendants' Motion to Dismiss the Complaint for failure to state a claim. Dkt. 23, 48. The Court dismissed Counts I and II on the ground that the Complaint failed to adequately allege a RICO enterprise, whether as an association-in-fact or legal entity, and declined to exercise supplemental jurisdiction over Counts III and IV. Dkt. 48 at 11-19. Although J-MM requested leave to amend in its opposition to the motion to dismiss in the event of dismissal, Dkt. 31 at 41, and notwithstanding SHC publicly touting that the suit was dismissed with prejudice, the Court did not address the request or analyze whether the counts should be dismissed with or without prejudice. Dkt. 48 at 20. At the same time, the Court did not find that the defects were impossible to cure such that amendment would be futile. *Id.* The Court entered judgment dismissing the case on the same day. Dkt. 49.

By this motion, J-MM respectfully seeks post-judgment relief under Rules 59(e) and 60(b) of the Federal Rules of Civil Procedure so that it may seek leave to amend the Complaint. Where, as here, judgment is entered at the same time as the complaint is dismissed, Rule 15 governs the review of a motion for post-judgment relief. *Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Indiana*, 786 F.3d 510, 521 (7th Cir. 2015). Under the liberal amendment standard, the Court should grant relief unless it concludes to a certainty that amendment would be futile. For the reasons stated below, the Court should grant relief because, far from being futile, an amended complaint would cure the pleading defect identified by the Court.

Leave to amend is particularly warranted here because the proposed amendments stem in large part from newly discovered information that came to light after the Complaint was filed. Most significantly, additional and confidential whistleblowers have identified other law firms, including the Gori Law Firm ("Gori"), the Sokolove Law Firm ("Sokolove"), Law Firm C, and Law Firm D, who coordinate with SHC in an association-in-fact enterprise (collectively, the

3

"Control Group of Asbestos Firms (CGAFs)" or the "CGAF Enterprise"). Everyone in the enterprise has a role to play, and they all work toward the same goal of extracting settlements and bankruptcy trust payouts through a pattern of unlawful conduct, including racketeering activity. Comply. ¶ 72. Firms like Sokolove and Law Firm C focus on advertising, funneling their referrals to SHC and Gori in exchange for a portion of case settlements. *See* Ashwin Ram Declaration ("Ram Decl.") at ¶ 4. The members of the enterprise then capitalize on these referrals using the "playbook" to bring fraudulent lawsuits against solvent companies, and then later filing bankruptcy trust claims against insolvent companies; with the two exposure claims (*i.e.*, litigation versus bankruptcy) often directly contradicting one another. Compl. ¶ 71.

The new whistleblowers highlight how the bankruptcy trust claims and tort lawsuits carried out by the enterprise are permeated with fraud. For example, SHC abuses the bankruptcy trust proceedings by having asbestos plaintiffs indiscriminately sign a compilation of affidavits claiming exposure to the products of a broad swath of bankrupt companies without first investigating the plaintiff's exposure history (and completely divorced from the reality of any actual potential exposures). Ram Decl. at ¶ 6. Next the CGAF Enterprise coaches plaintiffs in litigation to not claim exposure to products of bankrupt companies, even though the plaintiff signs dozens of affidavits claiming such exposure, and instead has the plaintiff only identify products of solvent companies in their depositions, interrogatories, and complaints (the "bankruptcy trust shell game"). *E.g.*, Compl. ¶¶ 62, 71, 103, 121-22, 127, 135; *see also* Ram Decl. at ¶ 6. Gori even maintained a "bounty system" to coordinate targets with the other enterprise law firms. Under the "bounty system," bonuses were paid to "depo attorneys" (deposition attorneys) and others when these individuals successfully coached asbestos plaintiffs to testify that they were exposed to the products of solvent companies on a specified target list. Ram Decl. at ¶ 7.

Finally, the members of the enterprise go to great lengths to keep their scheme under the radar. J-MM previously alleged how SHC retaliated against Peebles for threatening to expose the fraud. Compl. ¶¶ 9, 172-176. But another whistleblower has revealed yet another method by which the group silences anyone who could expose the scheme: members of the CGAF Enterprise have entered into "no-poach" and similar agreements, whereby the member firms inform each other of certain employees seeking employment at another member firm, resulting in the immediate termination of the employee. Ram Decl. at ¶ 8. By impeding their employees' mobility, the firms increase their economic control over the employees, ensuring their silence. On top of this, since the filing of the Complaint, J-MM has learned from another whistleblower that members of the enterprise exert significant control over bankruptcy trusts and have used that control to setup the systematic destruction of all records of resolved bankruptcy claims older than one year. *Id.* at ¶ 9. While these measures have been cloaked in the guise of "privacy" concerns, they are a transparent and coordinated effort to cover up the bankruptcy trust shell game, while also shining light on how CGAF Enterprise players obtain preferential treatment and favored payouts in connection with bankruptcy trusts to the detriment of other current and future claimants.

More broadly, the CGAF Enterprise allows participating firms and individuals to consolidate power. The cooperative referral system among these dominant firms ensures their control in the market for asbestos lawsuits and ability to secure the most lucrative payouts, whether through extracting settlements through sham lawsuits (with attendant kickbacks) or through fraudulent bankruptcy trust claims. And the concerted efforts to maintain secrecy allows the enterprise to continue its pattern of fraudulent activity, and continue to reap ill-gotten gains, without detection until now. To borrow from cooperative game theory, every firm in the enterprise

5

is incentivized to participate in the coalition because the collective payoffs are better than if each firm proceeded on its own or outside of the group.

In sum, an amended complaint based on the newly discovered evidence will plausibly allege that SHC and other law firms took part in an association-in-fact enterprise – *i.e.*, that they function as a unit to advance their common goal of extracting settlements and payouts through a pattern of unlawful conduct. Moreover, an amended complaint will adequately allege a law firm enterprise, namely, that certain SHC professionals took part in the firm's affairs by engaging in a pattern of fraudulent conduct. Because amendment would not be futile as to either theory of enterprise, J-MM respectfully requests that the Court amend or grant relief from judgement.

## LEGAL STANDARD

"When a district court has entered a final judgment of dismissal, the plaintiff cannot amend under Rule 15(a) unless the judgment is modified, either by the district court under Rule 59(e) or 60(b), or on appeal." *Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Indiana*, 786 F.3d 510, 521 (7th Cir. 2015). "A motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment." Fed. R. Civ. P. 59(e). A motion for relief from judgment must be made within a reasonable time. Fed. R. Civ. P. 60(c)(1). Although relief under Rules 59(e) and 60(b) is ordinarily reserved for the exceptional case, *Foster v. DeLuca*, 545 F.3d 582, 584 (7th Cir. 2008), this demanding standard does not apply where, as here, "judgment was entered at the same time the case was first dismissed." *Runnion*, 786 F.3d at 521. "When the district court has taken the unusual step of entering judgment at the same time it dismisses the complaint, the court need not find other extraordinary circumstances and must still apply the liberal standard for amending pleadings under Rule 15(a)(2)." *Id.* (citing *Foster*, 545 F.3d at 584–85 (noting that district courts "routinely do not terminate a case at the same time that they grant a

defendant's motion to dismiss"); *Bausch v. Stryker Corp.*, 630 F.3d 546, 562 (7th Cir. 2010) (applying Rule 15 standard in reviewing post-judgment denial of Rule 59(e) motion). This is exemplified in the Supreme Court's decision in *Foman v. Davis*, 371 U.S. 178 (1962), where the Court likewise "applied the liberal amendment policy of Rule 15(a)(2) to the post-judgment motion for relief." *Runnion*, 786 F.3d at 521 (citing *Foman*, 371 U.S. at 182).

"Ordinarily, [] a plaintiff whose original complaint has been dismissed under Rule 12(b)(6) should be given at least one opportunity to try to amend her complaint before the entire action is dismissed." *Runnion*, 786 F.3d at 519 (collecting cases). In the absence of "undue delay, bad faith or dilatory motive on the part of the movant, *repeated failure* to cure deficiencies by *amendments previously allowed*, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be 'freely given.'" *Foman v. Davis*, 371 U.S. 178, 182 (1962) (emphasis added). "That leave be 'freely given' is especially advisable when such permission is sought after the dismissal of the first complaint. Unless it is *certain* from the face of the complaint that any amendment would be futile or otherwise unwarranted, the district court should grant leave to amend after granting a motion to dismiss." *Barry Aviation Inc. v. Land O'Lakes Mun. Airport Comm'n*, 377 F.3d 682, 687 (7th Cir. 2004) (emphasis added); *see also Rohler v. TRW, Inc.*, 576 F.2d 1260, 1266 (7th Cir. 1978) ("The permission to amend a complaint should be refused only if it appears to a certainty that the plaintiff cannot state a claim upon which relief can be granted."); *Bausch*, 630 F.3d at 562 ("Rule 15 ordinarily requires that leave to amend be granted at least once when there is a potentially curable problem with the complaint or other pleading."); 5A Charles Allen Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (2d ed. 1990) (explaining that the liberal amendment policy

"requires that plaintiff be given every opportunity to cure a formal defect in his pleading" even if "the court doubts that plaintiff will be able to overcome the defects in his initial pleading").

## ARGUMENT

The Court dismissed the RICO counts based on its conclusion that J-MM had failed to adequately allege a RICO enterprise. (Dkt. 48 at 11-19.) The Complaint identified two RICO enterprises, pled in the alternative: "the law firm enterprise and the association-in-fact enterprise." Compl. ¶ 219; *see id.* ¶ 73 ("The RICO enterprise is a corporate entity and an association-in-fact enterprise"); *id.* ¶¶ 215-19, 222. For the reasons explained below, J-MM is prepared to file an amended complaint that cures the defects identified by the Court with respect to both theories of RICO enterprise. Because these proposed amendments are not futile, the Court should either amend the judgment to state that dismissal is without prejudice, or vacate the judgment, so that J-MM may have an opportunity to seek leave to amend.

**I.      An amended complaint will cure any pleading defects with respect to the association-in-fact enterprise allegations.**

The Complaint originally alleged "an association-in-fact enterprise that consists of the [SHC] firm, the various professionals working in and with the Asbestos Department, including the individual Defendants and John and Jane Does 1-25, certain asbestos litigation plaintiffs, other witnesses represented by [SHC], and law firms that serve as co-counsel." Compl. ¶ 73. However, the Court concluded that the Complaint failed to adequately allege that the non-SHC entities – *i.e.*, plaintiffs, witnesses, other law firms – are part of the association-in-fact enterprise. Dkt. 48 at 16. The Court noted that the "allegations as to these unnamed persons or entities are sparse and conclusory," and determined that there were insufficient allegations showing that the plaintiffs, witnesses, and other law firms "functioned with" SHC as a "continuing unit" under a "common purpose." *Id.* at 16-17. For example, the Court stated that "there are no allegations that the

8

witnesses or clients or unnamed local counsel in each case are in communication with those in the other cases or are even aware that other[s] are part of the enterprise," or that they "acted in their discrete litigation to benefit others in the other litigations." *Id.* at 18 (quotations omitted).

As an initial matter, the Court's concern with victims and witnesses can be readily cured in an amended complaint. J-MM heeds the Court's skepticism that these victims and witnesses took part in the enterprise to benefit others beyond their own lawsuit. Dkt. 48 at 18. Indeed, J-MM declined to name these individuals as defendants in the Complaint because it believed that they likely had been exploited by the CGAFs. Compl. ¶ 73 n. 17. Accordingly, J-MM does not intend to assert in an amended complaint that the victims and witnesses are part of the association-in-fact enterprise. This is also due to newly discovered evidence that has brought into sharper focus the nature of the association-in-fact enterprise. New whistleblowers have come forward and provided information that allows J-MM to name additional law firms that are part of an association-in-fact enterprise with SHC, and additional whistleblowers are expected based on the filing of this motion. Specifically, an amended complaint would allege that SHC was part of an association-in-fact enterprise with Gori, Sokolove, Law Firm C, and Law Firm D (collectively part of the CGAF Enterprise), which functions as a continuing unit to promote their common goals of bringing sham asbestos litigation and manipulating bankruptcy trust claims to their collective benefit. An amended complaint would flesh out the contours of this enterprise with particularity, including as described here.

### A. The CGAF Enterprise shares the same playbook.

At the core of the CGAF Enterprise, the members share the same "playbook" as outlined in the original Complaint, whereby the firms scheme to elicit false testimony, initially suppress evidence of exposure to bankrupt company products, file baseless lawsuits, and silence anyone

who might attempt to expose the fraud. For example, Gori maintained a stable of "depo attorneys" who were divorced from other aspects of discovery and litigation, thus they would not have had knowledge of what products plaintiffs may or may not have been exposed to. Ram Decl. at ¶ 7. The sole purpose of the "depo attorneys" was to coach clients to ensure they provided deposition testimony that implicated solvent defendants from a specific list, provided by Gori. *Id*. To incentivize the depo attorneys to target solvent companies, Gori paid "depo attorneys" a commission or so-called "bounties" to make up for the relatively low salaries paid by the firm. *Id*. Under Gori's "bounty system," it paid "depo attorneys" a percentage bonus of settlement proceeds for getting asbestos plaintiffs to name targeted solvent companies. *Id*. These targeted companies, known from a "bounty list" set by the firm, included J-MM, 3M Company, Caterpillar and several other U.S. companies (referred to as "bounty-defendants"). *Id*. Gori also provided weekly trainings to depo attorneys to drill into them the deposition testimony to implicate the "bounty-defendants," including relevant exposure years, exposure scenarios most difficult to disprove, and "easy" defendants who were unlikely to attend depositions or vigorously cross-examine. *Id*.

### B. The CGAF Enterprise has a manipulated referral system.

Moreover, an amended complaint would explain how the members of the CGAF Enterprise act as a unit to consolidate their power and maximize the profits of their fraudulent scheme. One way in which the members protect and promote one another is by serving as preferred referral sources for one another. For years, certain members of the group, including Sokolove and Law Firm C, have engaged in mass advertising and doctor-attorney partnerships where Sokolove provides "donations" to medical facilities in exchange for patient referrals. Ram Decl. at ¶ 4. The advertising and "donations" are paid for by the CGAFs. *Id*. In exchange for paying for the advertising and "donations," Sokolove refers asbestos plaintiffs to the CGAFs. The CGAFs later

10

provide Sokolove a fee for the referral. *Id*. A whistleblower has also had communications with medical facilities who affirmed that they only refer patients to the CGAFs, in exchange for "donation amounts" in excess of $100,000. *Id.* The pact between SHC, Gori, Sokolove, and other CGAFs is also apparent on the websites of Sokolove and Gori. Sokolove advertises on its website that they have won over $9.8 billion for their clients, an amount substantially similar to SHC's claimed winnings.[1] The Gori website highlights that it receives referrals from other law firms; as disclosed by a whistleblower, Sokolove is one of Gori's referral sources.[2] *Id.*

As outlined in J-MM's Complaint, this also feeds into the larger asbestos bankruptcy trust shell game. One whistleblower who received a client file from SHC, was shocked to find over two dozen signed affidavits claiming exposure to companies with asbestos bankruptcy trusts even though SHC only had the client file for less than a month. Ram Decl. at ¶ 6. Upon investigation, it would have been impossible for this former SHC client to have been exposed to many, if not any, of the products that were reflected in the affidavits since the client's only alleged exposure source was a single construction project site. *Id.* This whistleblower learned that SHC would only take on the client if the victim plaintiff signed a "book of affidavits" targeting known bankruptcy trusts. *Id*. SHC would then proceed with litigation against solvent companies, and later file the bankruptcy trust claims, often in direct conflict with previous discovery responses. The whistleblower also disclosed that the CGAFs, like SHC, manipulate the trust claims review process to their benefit through their membership in creditors' committees and advisory boards, which exercise significant control over a multitude of trusts, effectively select the Trustee, and amend trust rules to the benefit of SHC and other CGAFs' trust claims. Ram Decl. at ¶ 10. This is done through the CGAFs obtaining preferential treatment for their bankruptcy claims, and channeling

---

[1] The Sokolove Law Firm, https://mesolawyer.sokolovelaw.com/about-us/, accessed on April 14, 2025.
[2] The Gori Law Firm, https://www.gorilaw.com/referrals/, accessed on April 14, 2025.

their claims through a highly favorable "individual" review process, which routinely results in payouts up to ten times larger than payouts under the "expedited" review process, which is the path that non- CGAFs were more often relegated to use without preferential treatment. *Id.*

As highlighted above, the members of the CGAF Enterprise each play their defined role in the coalition to the benefit of all involved participants. In exchange for referring the bulk of their asbestos cases to firms within the group, the referring firms receive monetary benefits. Meanwhile, the CGAF Enterprise tort litigators maximize profits through the "playbook" of eliciting false testimony to focus on solvent companies while knowingly concealing the claims and supporting affidavits used to target the bankruptcy trusts.

**C.      The CGAF Enterprise colludes to conceal its unlawful activities**

Finally, an amended complaint will expose the ways in which the CGAFs collude to shield the CGAF Enterprise from competition and scrutiny. For instance, members of the CGAF Enterprise, including SHC, Gori, and Law Firm C, have had an unlawful "no-poach" agreement with each other, ensuring a certain level of departing attorneys cannot be hired by any other colluding firm. Ram Decl. at ¶ 8. If any firm learns that an employee has given notice or attempted to seek employment at one of the other control group firms, they share this information with each other and terminate the employee. *Id.* By limiting their employment mobility, these CGAFs ensure that attorneys cannot easily depart without severely limiting their employment options. This serves the firms' common interests, not only by conferring unfair economic leverage, but also because an employee that is afraid or unable to leave their firm is less likely to divulge the enterprise's secrets, whether with competitors or regulators.

But the concealment does not end there. Since the filing of the Complaint, J-MM learned that numerous asbestos bankruptcy trusts have issued Notices of Record Destruction with

12

commencement dates as soon as April 15, 2025. *See* Ex. 1, *see also* Ram Decl. at ¶ 9. Many of the notices state that the trusts will be destroying records for any claims resolved within the past year, making it significantly harder for J-MM and others to prove fraud as J-MM did in its original complaint. *See* Ex. 1. According to a whistleblower, members of the CGAF Enterprise exercise significant control over these bankruptcy trusts and were the driving force for the destruction of these incriminating records. Ram Decl. at ¶ 9.

As demonstrated above, an amended complaint will cure the defects in the association-in-fact enterprise allegations identified by the Court. It will show that the members of the CGAF Enterprise acted as a continuing unit by, among other things, sharing the same fraud playbook, prioritizing referrals to each other in exchange for monetary benefits, and engaging in anti-competitive practices to control their employee-attorneys. All of these practices existed for one common purpose: to dominate the market of sham asbestos cases and to maximize profits.

**II.      An amended complaint will cure pleading defects with respect to the legal entity enterprise allegations.**

Post-judgment relief is also proper for the independent reason that amendment of the legal-entity enterprise allegations would not be futile. The Complaint originally alleged, in the alternative, that "[SHC] is a business enterprise, and the individual Defendants willing[ly] and knowingly conducted and participated in the firm's affairs through a pattern of racketeering activity that affected interstate commerce." Compl. ¶ 216; *see* Fed. R. Civ. P. 8(d)(2)-(3) (alternative or inconsistent claims are proper). In dismissing the RICO counts, the Court reasoned that the Complaint lacked factual support for a legal-entity enterprise theory since the "entire Complaint is based on [SHC] being part of an enterprise, rather than the enterprise itself." Dkt. 48 at 14. But both can be true: SHC is part of a larger association-in-fact enterprise, and SHC itself is a legal entity enterprise. Although the Complaint already alleges that SHC was a business

13

enterprise, Compl. ¶¶ 216, 218-219, the pleadings could readily be amended to clarify how the allegations concerning racketeering activities of individual SHC defendants plausibly support both a law firm enterprise as well the broader association-in-fact enterprise augmented here.

The Court also noted that the law firm enterprise theory, as pled, failed the distinctness requirement because SHC was named as both a defendant *i.e.*, a RICO person and RICO enterprise. Dkt. 48 at 15 (quoting *Riverwoods Chappaqua Corp. v. Marine Midland Bank*, 30 F.3d 339, 344 (2d Cir. 1994) (noting "by virtue of the distinctness requirement, a corporate entity may not be both the RICO person and the RICO enterprise"). While the Complaint did attempt to draw this distinction by alleging that "[SHC] is a business enterprise, and the *individual* Defendants willingly and knowingly conducted and participated in the firm's affairs through a pattern of racketeering activity," Compl. ¶ 216, the pleading could easily be amended to clarify the legal-entity enterprise theory that J-MM does not allege that SHC was a RICO person carrying out the affairs of the enterprise. Rather, an amended complaint would state, in the alternative, that certain SHC employees were the "persons," and SHC is the "enterprise" described herein. *See Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 164-65 (2001) (noting RICO statute "requires no more than a formal legal distinction between 'person' and 'enterprise,'" adding legislative history "refers to the need to protect the public from those who would run 'organization[s] in a manner detrimental to the public interest'"). Because amendment would not be futile to address the defects identified by the Court, relief should be granted so that J-MM may seek leave to amend.

## CONCLUSION

For the reasons stated above, J-MM respectfully requests that the Court amend the judgment to state that dismissal is without prejudice, or in the alternative, grant relief from judgment.

14

Dated:   April 15, 2025                              Respectfully Submitted,


                                                     /s/ *Ashwin J. Ram*

                                                     Ashwin J. Ram (ARDC No. 6286478)
                                                     Sonja Arndt (*Admitted PHV*)
                                                     Buchalter PC

                                                     180 North LaSalle Street
                                                     Suite 3300
                                                     Chicago, IL 60601

                                                     1000 Wilshire Boulevard
                                                     Suite 1500
                                                     Los Angeles, CA 90017

                                                     (213) 891-5035
                                                     aram@buchalter.com
                                                     sarndtjohnson@buchalter.com

                                                     Frank Fletcher (*Admitted PHV*)
                                                     General Counsel
                                                     J-M Manufacturing Company, Inc. d/b/a JM Eagle
                                                     5200 W. Century Boulevard
                                                     Los Angeles, CA 90045

                                                     *Counsel for J-M Manufacturing Company, Inc.*

15