**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| J-M MANUFACTURING COMPANY, INC., | |
| Plaintiffs, | |
| v. | Civil Action No. 1:24-cv-03853 |
| SIMMONS HANLY CONROY, LLP, JOHN SIMMONS, NICHOLAS ANGELIDES, PERRY BROWDER, AMY GARRETT, BENJAMIN GOLDSTEIN, SUVIR DHAR, CRYSTAL FOLEY, DEBORAH ROSENTHAL, STAN JONES, SOKOLOVE LAW, LLC, and JOHN AND JANE DOES 1-25, | Counts I-II: RICO (18 U.S.C. § 1962(c)) Count III: RICO (18 U.S.C. § 1962(d)) Count IV: Common Law Fraud Count V: Unjust Enrichment Count VI: Civil Conspiracy |
| Defendants. | |

## AMENDED COMPLAINT

Plaintiff J-M Manufacturing Company, Inc. ("J-M Manufacturing") brings this action against Simmons Hanly Conroy, LLP ("Simmons Hanly"), John Simmons, Nicholas Angelides, Perry Browder, Amy Garrett, Benjamin Goldstein, Suvir Dhar, Crystal Foley, Deborah Rosenthal, Stan Jones, and John and Jane Does 1-25 ("Individual Defendants" and together with Simmons Hanly the "Simmons Hanly Defendants"), and Sokolove Law, LLC ("Sokolove") (collectively, "Defendants"), for a multi-year pattern of racketeering activity in which they schemed and conspired to refer, file, and prosecute sham lawsuits, pursued baseless claims, and otherwise sought to extract money from J-M Manufacturing through a pattern of fraud, coercion, and the suppression of evidence.

**INTRODUCTION**

1.      As asbestos-related disease fades into the past, it has been replaced by a new malignancy: asbestos litigation.  Courts, commentators, and the United States Department of Justice have all recently highlighted a concerning pattern of misconduct by plaintiff's law firms in asbestos litigation.[1]  This case focuses on the unfortunate perpetuation of that trend by Defendants across many lawsuits at the expense of J-M Manufacturing.

2.      Over the last 20 years, Simmons Hanly and Sokolove and certain respective professionals at these entities have used asbestos litigation to enrich themselves.  Each firm claims to have filed thousands of cases and "recovered" in excess of $9 billion for their clients.  But a recent lawsuit has cast a different light on this "success."  According to a former Simmons Hanly partner (Scott Peebles), the firm has engaged in a pattern of "unlawful, unethical conduct, and fraudulent conduct" to gain the upper hand in asbestos litigation.  This includes the use of false statements of fact, the subornment of perjury, and other acts of moral turpitude, dishonesty, and corruption.  According to Peebles, such conduct "indicates a larger pattern and practice that could affect thousands of [Simmons Hanly] clients."

---

[1] *See, e.g.*, *Garlock Sealing Techs., LLC v. Shein*, No. 3:14-cv-116, 2015 WL 5155362, at *3 (W.D.N.C. Sept. 2, 2015) (stating asbestos litigation misconduct alleged "goes well past the kind of routine litigation activities" in an ordinary case); *In re Garlock Sealing Techs., LLC*, 504 B.R. 71, 86 (Bankr. W.D.N.C. 2014) (observing a "startling pattern of misrepresentation" in asbestos litigation"); *CSX Transp., Inc. v. Gilikison*, No. 5:05CV202, 2012 WL 1598081, at *10 (N.D. W. Va. May 3, 2012) (concluding alleged conduct amounted to a complex fraud scheme that went beyond ordinary litigation activity); Lester Brickman, Civil RICO: An Effective Deterrent to Fraudulent Asbestos Litigation?, 40 Cardozo L. Rec. 2301 (2019); Honorable Peggy L. Ableman, The Garlock Decision Should Be Required Reading for All Trial Court Judges in Asbestos Cases 37 Am. J. Trial Advoc. 479 (2014); Lester Brickman, Fraud and Abuse in Mesothelioma Litigation, 88 Tul. L. Rev. 1072 (2014); Roger Parloff, The $200 Billion Miscarriage of Justice, Fortune, Mar. 4, 2002; U.S. Dep't of Justice, Justice Department Files Statement of Interest Urging Transparency in the Compensation of Asbestos Claims (Dec. 28, 2020).

3.     The pattern of fraud and misconduct extends to the cases that Simmons Hanly has brought against J-M Manufacturing.  Simmons Hanly has filed hundreds of cases against the company, causing it to spend significant sums of money in defense of sham asbestos lawsuits.  As part of this fraudulent pattern or scheme, the firm has used a coordinated, well-developed, and long-running strategy that involves evidence suppression, shifting narratives, and fraud.  But the scale of this fraud extends beyond just J-M Manufacturing.

4.     In reality, Simmons Hanly and Sokolove have operated, and continue to operate, a multi-faceted scheme to defraud that misleads asbestos plaintiffs, state regulators, and asbestos defendants alike.  To prospective and current clients, Sokolove holds itself out as a "national law firm" with a team of experienced attorneys who litigate cases.  This is a sham because in reality Sokolove is a lead generator that farms out asbestos cases to outside attorneys like Simmons Hanly in exchange for a portion of recoveries.  To circumvent state regulations around fee-splitting, Sokolove claims to have a dubious corporate structure whereby these outside attorneys claim to be members of Sokolove Law, LLC, which is run by a non-attorney CEO.  What is clear, however, is that Simmons Hanly has significant overlapping interests with Sokolove, which it has used to its advantage.  For years, Simmons Hanly has used Sokolove as a stalking horse to dominate the asbestos legal market and generate referrals of asbestos cases to Simmons Hanly.  Simmons Hanly monetizes these leads by filing a large volume of cases in a few handpicked jurisdictions and using fraudulent litigation tactics to extract settlements from J-M Manufacturing and others.  Those fraud proceeds are then shared by Simmons Hanly and Sokolove.

5.     The litigation strategy, which was developed by management of Simmons Hanly's Asbestos Department and implemented by the asbestos litigators, centers on a "story" that the firm has developed about J-M Manufacturing.  The "story" includes an implausible, but designed to be

difficult to affirmatively disprove, narrative about the manner in which the firm's clients were purportedly exposed to asbestos in J-M Manufacturing's asbestos-cement pipe, complete with a plan for demonstrating consistent and prolonged exposure. Rarely is the location of the exposure named, so that J-M Manufacturing is further limited in the opportunity to disprove the allegations.

6.     To support the "story," the firm "find[s] the evidence" and "build[s]" its case, with the help of its asbestos case investigators.[2] This is done by reconstructing – or sometimes just fabricating – the client's work history, determining what products are relevant to that work history, and fitting that work history around the "story" for each defendant. As part of this process, and based on information and belief, the firm identifies only solvent companies that may have made, sold, distributed, or supplied an asbestos-containing product at any worksite at which its clients might have worked, naming such companies as defendants in order to extract money from as many companies as possible.

7.     After Simmons Hanly constructs the narrative, it prepares and files the lawsuit in one of a few specific jurisdictions known to be favorable to asbestos plaintiffs. Each lawsuit that the firm files generally accuses more than 20 defendants.

8.     Once the lawsuit is filed, Simmons Hanly employs a very specific strategy in an attempt to maximize recovery. Based on the evidence detailed below, the components of that strategy include (a) offering scripted product identification and exposure testimony; (b) downplaying or denying any evidence of exposure to a product of a bankrupt company; (c) claiming not to have seen product warnings; (d) in certain instances, concealing information about claims filed with asbestos bankruptcy trusts or delaying the filing of those claims until the

---

[2] Simmons Hanly Conroy, Mesothelioma Law Firm, https://www.simmonsfirm.com/ mesothelioma/; Simmons Hanly Conroy, What to Expect When Filing a Mesothelioma Claim, https://www.youtube.com/watch?v=_dmUEVn7ZIk.

tort litigation is concluded; (e) offering vague, unverifiable, or, in some instances, fraudulent details about employers and co-workers to limit the ability to refute product identification and exposure testimony; and (f) obstructing efforts by defendants to obtain evidence that may refute the firm's narrative. Indeed, Simmons Hanly maintains that peddling falsehoods and obstructing efforts to obtain evidence constitutes "quintessentially 'protected conduct'" that is immune from liability.

9. As part of a broader strategy, the firm appears to have made sham filings against numerous defendants, including J-M Manufacturing, in an effort to extract a settlement or to use as a bargaining chip to entice settlement in other matters. The firm knows both the cost of defense and the risk of a runaway verdict in its handpicked forum provide it settlement leverage even for the most dubious lawsuits.

10. Simmons Hanly reportedly goes to great lengths to cover up its fraud and misconduct. As illustrated by the circumstances surrounding the complaint filed by former Simmons Hanly partner Peebles, the firm attempts to silence anyone who may expose its scheme, making retaliatory filings, terminating employees who will not fall in line, and fighting the release of any information that might reveal the fraud.

11. As part of a case review done by J-M Manufacturing, it has found evidence of the scheme and each of these tactics across a number of different lawsuits in many different jurisdictions over a number of years. The evidence includes perjured testimony, falsified sworn statements, untrue discovery responses, asbestos bankruptcy claims that were not disclosed, and sham lawsuits that were dismissed voluntarily as part of a settlement of another firm matter or to avoid exposure of the fraud. In other words, the allegations of the former Simmons Hanly partner

Peebles are not mistaken. This helps explain why, as described below, Simmons Hanly went to great lengths to oppose and prevent the public disclosure of the unredacted *Peebles* complaint.

12. Since 2001, Simmons Hanly has filed more than 430 cases against J-M Manufacturing. J-M Manufacturing has settled more than 75 of those cases based on its evaluation of the "facts" presented by Simmons Hanly. It is now clear that at least some of those "facts" were not facts at all; they were falsehoods peddled by Simmons Hanly. These untrue statements have caused J-M Manufacturing to incur vast sums of litigation fees and expenses defending against fraudulent claims manufactured by the firm. Were it not for the flow of falsehoods about their clients' workplaces and alleged exposure, J-M Manufacturing would have avoided or reduced the sums paid to Simmons Hanly (and Sokolove) and its clients in connection with underlying asbestos lawsuit settlements and judgments.

13. J-M Manufacturing brings this lawsuit to redress the harm caused to it by Defendants and ensure that their scheme does not continue. The conduct at the center of this case "goes well past . . . routine litigation activities." It is not zealous advocacy. It is fraud, and Defendants should be held accountable.

## PARTIES

14. Plaintiff J-M Manufacturing Company, Inc. (previously defined as "J-M Manufacturing") is a Delaware corporation with its principal place of business in Los Angeles, California. The company is one of the largest plastic pipe manufacturers in the United States and has more than 800 employees located in manufacturing facilities across the country. From 1983 to 1988, J-M Manufacturing supplied a limited amount of asbestos-cement pipe ("ACP") to accommodate water districts that mandated or approved its use, until those clients transitioned to PVC pipes. These water districts had determined that ACP could be installed safely so long as the

pipe was installed according to manufacturer and OSHA guidelines, and other organizations regulating its installation.

15.     Defendant Simmons Hanly Conroy, LLP (previously defined as "Simmons Hanly" or the "firm") is an Illinois limited liability company that is based in Alton, Illinois.   The shareholders or partners of Simmons Hanly reside in various states in which the firm has offices, including Illinois, California, New York, Missouri, and Massachusetts.  During the relevant time period, Simmons Hanly maintained an office in Chicago, Illinois, and the firm currently lists 27 lawyers on its website as located in Chicago.

16.     Defendant John Simmons ("Simmons") is a founding partner and chairman of Simmons Hanly and the head of the firm's leadership team.  At relevant times, Simmons was based in the firm's locations in Chicago and Alton, Illinois and was the sole manager of Simmons Hanly Conroy LLC according to its corporate filings with the Illinois Secretary of State.  As described below, Simmons was also the co-manager of SHC Law Group, LLC, which is the managing member of Sokolove Law, LLC.  Simmons is also a partner of Sokolove Law, LLP.

17.     Defendant Nicholas Angelides ("Angelides") is a partner at Simmons Hanly and part of the firm's leadership team.  At relevant times, Angelides was based in the firm's locations in Chicago and Alton, Illinois, and serves as the Chair of the firm's Asbestos Department. According to his Simmons Hanly webpage, Angelides has "directed the legal strategy of all of the firm's asbestos and mesothelioma cases" since 2012.[3]

18.     Defendant Perry Browder ("Browder") is a partner at Simmons Hanly and part of the firm's leadership team.   At relevant times, Browder was based in the firm's locations in

_____

[3] Simmons Hanly Conroy, Nicholas J. Angelides, https://www.simmonsfirm.com/about-us/our-attorneys/nicholas-j-angelides/.

- 7 -

Chicago and Alton, Illinois, and serves as the Head of the firm's Asbestos Department. According to his Simmons Hanly webpage at the time this action was filed, and at all relevant times, Browder "manages the firm's more than 50 asbestos attorneys" and "oversees all asbestos cases to ensure they are handled in an efficient manner that maximizes results."[4] Browder is the President Elect of the Illinois State Bar Association, the same bar association that has declined to investigate the pattern of illegal conduct that may have affected thousands of Simmons Hanly clients.

19.     At the time this action was filed, and at all relevant times, Defendant Amy Garrett ("Garrett") was a partner at Simmons Hanly and the Assistant Managing Partner of the firm. At relevant times, Garrett is based in the firm's locations in Chicago and Alton, Illinois, and is a member of the firm's Asbestos Department.[5] Garrett is referenced in the *Peebles* complaint as the member of Simmons Hanly "upper management" to whom Peebles reported the unethical and unlawful conduct that was occurring in the Asbestos Department. The *Peebles* complaint also identifies Garrett as one of the individuals who summarily fired Peebles.

20.     Defendant Benjamin Goldstein ("Goldstein") is of counsel at Simmons Hanly and a member of the firm's Asbestos Department. Goldstein is based in the firm's office in San Francisco, California, and serves as the firm's West Coast Asbestos Litigation Manager.[6] Goldstein supervised Scott Peebles when Peebles worked at the firm and is identified in the *Peebles* complaint – concerning a pattern of fraud at the firm – as "ROE 1." Goldstein previously

---

[4] Simmons Hanly Conroy, Perry J. Browder, https://www.simmonsfirm.com/about-us/our-attorneys/perry-j-browder/ (visited May 7, 2024).

[5] Simmons Hanly Conroy, Amy E. Garrett, https://www.simmonsfirm.com/about-us/our-attorneys/amy-e-garrett/ (visited May 7, 2024). Following the filing of this action, Garrett transitioned to "of counsel."

[6] Simmons Hanly Conroy, Benjamin Goldstein, https://www.simmonsfirm.com/about-us/our-attorneys/benjamin-goldstein/.

was a shareholder at the firm, but transitioned to "of counsel" after the filing of the *Peebles* complaint.

21.     Defendant Suvir Dhar ("Dhar") is a former Simmons Hanly partner and worked in the firm's Asbestos Department. At relevant times, Dhar was based in the firm's office in Alton, Illinois. Dhar admitted that Simmons Hanly filed a complaint against J-M Manufacturing knowing it contained false information.

22.     Defendant Crystal Foley ("Foley") is a partner at Simmons Hanly and part of the firm's Asbestos Department. Foley is listed in the firm's office in El Segundo, California but resides in and works from Illinois. Foley "oversees the firm's California dockets, or cases that are scheduled for trial in the California courts."[7] On repeated occasions, Foley signed discovery responses that contained false information and transmitted them through interstate commerce in furtherance of the scheme.

23.     Defendant Deborah Rosenthal ("Rosenthal") is a partner at Simmons Hanly and part of the firm's Asbestos Department.[8] Rosenthal is based in the firm's office in San Francisco, California. Rosenthal has been involved in some of the firm's cases involving egregious misconduct and has threatened and sought to intimidate lawyers working on J-M Manufacturing cases to prevent the firm's fraud from being exposed.

24.     Defendant Stan Jones ("Jones") is or was an asbestos case investigator at Simmons Hanly. Jones is or was based in the firm's office in Alton, Illinois. Jones was assigned to or

---

[7] Simmons Hanly Conroy, Crystal Foley, https://www.simmonsfirm.com/about-us/our-attorneys/crystal-foley/.

[8] Simmons Hanly Conroy, Deborah Rosenthal, https://www.simmonsfirm.com/about-us/our-attorneys/deborah-rosenthal/.

involved in the cases that Peebles alleged were fraudulent, and was the first person that Peebles sought to depose to prove his allegations against the firm.

25.     John and Jane Does 1-25 are individuals who were part of the scheme described in this complaint who either are current or former employees of Simmons Hanly or Sokolove, or worked with Defendants to effectuate the scheme.  Since much of the evidence about the scheme is in the exclusive knowledge or control of the Defendants, these individuals are currently unknown to J-M Manufacturing.  Discovery will reveal the identity of these individuals.

26.     Defendant Sokolove Law, LLC ("Sokolove") is a Delaware limited liability company that is based in Chestnut Hill, Massachusetts.  Sokolove's managing member is SHC Law Group LLC located in Alton, Illinois.  SHC Law Group LLC is an Illinois LLC with two managers, John Simmons and Valere (Laurence) Nassif, who are the founding partner and managing partner, respectively, at Simmons Hanly.  Sokolove's Managing Attorney – and sole attorney – is Ricky LeBlanc, who is also a partner at Simmons Hanly based in Alton, Illinois.

## JURISDICTION AND VENUE

27.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States, specifically, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) and (d).

28.     This Court has supplemental jurisdiction over the pendent state-law claims pursuant to 28 U.S.C. § 1367(a) because they are so related to the RICO claims that they form part of the same case or controversy.  The claims are all based on the same underlying facts and involve all of the same parties.

29.     Venue is proper and appropriate in this district under 28 U.S.C. §§ 1391(b)-(d). Simmons Hanly is headquartered in Alton, Illinois and maintained an office in Chicago, Illinois at all relevant times, including through at least October 2021.  Pursuant to 28 U.S.C. § 1391(d),

Simmons Hanly and Sokolove reside in this district. Simmons Hanly and Sokolove also conduct significant activities in the district. Simmons Hanly, for example, lists 27 lawyers on its website as located in Chicago. Those lawyers include Defendants John Simmons, Perry Browder (who appears to live in the district), Nicholas Angelides, Amy Garrett, and Ricky LeBlanc (who is also Sokolove's Managing Attorney). Simmons Hanly also markets itself as "Chicago Mesothelioma Lawyer(s)" who have been working in this district for over 20 years. Sokolove similarly claims that it maintains offices in Alton, Illinois and Chicago, Illinois, and markets that "[w]ith over 45 years of experiences, our Chicago mesothelioma lawyers can fight for the justice you deserve."[9]

30.     In addition to a presence in the district, a substantial part of the events or omissions giving rise to the claims occurred here, including (a) the provision of false or perjured deposition testimony and preparation of false discovery responses in this district; (b) preparing and sending filings and correspondence to and from this district related to Simmons Hanly's attempt to cover up the allegations in the *Peebles* complaint; and (c) directing correspondence, discovery, deposition testimony, emails, and pleadings in furtherance of the scheme to lawyers representing J-M Manufacturing, or lawyers representing the company's co-defendants, who maintain an office in the district, including those involved in the *Perkins*, *Morgan*, and *Yates* lawsuits (described below). A substantial part of the events or omissions giving rise to the claims in this case also occurred in this district because Simmons Hanly directed its scheme at J-M Manufacturing's co-defendants in the district, including in *Swiger* (described below). In addition, and based on

---

[9] Simmons Hanly Conroy, Chicago Mesothelioma Lawyer,
https://www.simmonsfirm.com/mesothelioma/lawyer/illinois-mesothelioma-lawyer/chicago/;
Sokolove Law, Chicago Mesothelioma Lawyer,
https://www.sokolovelaw.com/locations/illinois/chicago/mesothelioma/.

information and belief, Browder resides in this district and engaged in decision-making, oversight, and predicate acts in this district.

31.    Each of the Defendants is subject to personal jurisdiction in Illinois.  Simmons Hanly is a citizen of Illinois based on its principal place of business and its status as an Illinois limited liability company with shareholders based in Illinois.  Sokolove's managing member, SHC Law Group LLC, is an Illinois limited liability company based in Alton, Illinois.

32.    Certain of the Individual Defendants are citizens of Illinois because they reside in Illinois, which include, based on J-M Manufacturing's research, John Simmons, Nicholas Angelides, Perry Browder, Amy Garrett, Crystal Foley, and Stan Jones.  These Individual Defendants and Suvir Dhar also worked out of offices in Illinois during the relevant time and engaged in a majority of the conduct that forms the basis of the claims while in Illinois, including, among other things, (a) devising the scheme described in this complaint; (b) preparing and filing sham complaints; (c) preparing, serving, or receiving fraudulent discovery responses; (d) preparing witnesses who offered perjured testimony or soliciting perjured testimony from witnesses during depositions; (e) negotiating settlement agreements with J-M Manufacturing; (f) developing a strategy related to asbestos bankruptcy trust claims and preparing and filing asbestos bankruptcy trust claims; and (g) engaging in communication by email, phone, and the mail in furtherance of the scheme.

33.    All Defendants, including the Individual Defendants who are based in the firm's California offices and located in California – Goldstein and Rosenthal – as well as Sokolove, are subject to personal jurisdiction because they purposefully availed themselves of doing business in Illinois and took substantial actions in furtherance of the scheme in Illinois.  This includes (a) coordinating among Sokolove and Simmons Hanly lawyers in Illinois – including, in particular,

John Simmons and Ricky LeBlanc – to generate leads and refer asbestos plaintiffs to Simmons Hanly in Illinois; (b) working with case team members based in Illinois – including, in particular, Foley and Angelides – to develop the "story" to be used in each case that was subject to the fraud scheme; (c) sending pleadings, discovery responses, and correspondence containing false information or in furtherance of the scheme to Illinois and working with case team members in Illinois to prepare such documents and correspondence; (d) extracting settlement payments through the use of the fraudulent scheme to be paid to Simmons Hanly in Illinois; and (e) working with members of firm management in Illinois to further the scheme and to cover up the scheme.

## BACKGROUND

34.   This case centers on a multi-faceted fraud scheme designed and implemented by Defendants.  The scheme was deployed over a course of years, including in asbestos lawsuits referred by Sokolove and brought by Simmons Hanly against J-M Manufacturing to extract settlements and obtain jury verdicts or otherwise force J-M Manufacturing to spend money on litigation.

35.   The scheme was disguised as aggressive litigation tactics that could not be understood in the context of any single lawsuit against J-M Manufacturing.  The scheme could only be detected and understood once (a) former Simmons Hanly partner Scott Peebles filed a lawsuit against the firm and exposed that the firm was engaged in a pattern of fraud and misconduct in asbestos litigation, and (b) J-M Manufacturing investigated the alleged pattern of fraud and misconduct after learning of the *Peebles* complaint.

36.   As part of that investigation, J-M Manufacturing reviewed historical cases involving Simmons Hanly to identify and evaluate potential patterns of fraud and misconduct.  The company discovered that the scheme described by Peebles was used across a number of Simmons

Hanly cases filed against the company. The company also discovered that the primary case discussed as fraudulent by Peebles in his complaint was a case against J-M Manufacturing.

37.     Additionally, the full scope of Sokolove's role in the scheme came to light when another firm filed a lawsuit against Sokolove and exposed that it had very few practicing lawyers, engaged in deceptive advertising, and actually served as a lead generator for Simmons Hanly and other similarly situated firms with problematic reputations. J-M Manufacturing investigated further and discovered additional details concerning the interdependent relationship between Sokolove and Simmons Hanly, which has enabled Simmons Hanly to perpetuate the scheme.

38.     To understand the full extent of the scheme implemented by Defendants, the manner in which it operated, and why it worked, it is important to understand the history of asbestos and asbestos litigation, J-M Manufacturing's limited role in supplying asbestos-containing products, and the frauds that have been uncovered in asbestos litigation brought by other members of the plaintiff's bar.

### A.     History of Asbestos Usage in the United States

39.     Asbestos was once considered a "miracle mineral." This naturally occurring silicate has a number of favorable characteristics that led to its widespread use. It is resistant to fire, heat, and corrosion. It is strong, durable, and flexible with fibers than can be woven into cloth. And it is inexpensive because of its abundant quantities.

40.     The versatility of asbestos led to its use in a number of different products in a variety of industries. Asbestos was used in insulation, roofing, flooring, ceilings, brake and boiler linings, wire insulation, gaskets, ship building, and household products like stove pads, ironing board covers, and hairdryers. Moreover, everyone is exposed to asbestos in the natural environment, where it can be found in the air and water at varying ambient levels, depending on geography, such that everyone likely has millions or billions of asbestos fibers in their bodies.

41.     The use of asbestos peaked in 1973, and it was nearly impossible not to be exposed to at least some product containing asbestos.  The most significant form of exposure came by way of friable asbestos or asbestos-containing material that can be crumbled, pulverized, or reduced to powder by human pressure and released in the air.

42.     In 1970, Congress passed the Occupational Safety Health Act (OSHA), which led to regulations that required the use of safety precautions in the workplace to reduce occupational exposure to asbestos.

43.     Labor unions followed the lead of OSHA and required union workplaces to follow strict safety standards to mitigate the potential harm of asbestos.

44.     Once it became common knowledge that asbestos exposure can be harmful, the use of asbestos dropped significantly and continued to drop for the next three decades.  But asbestos-related diseases, which have an average latency period of approximately 30 years, continued to manifest many years after the exposure that caused the disease.

**B.     J-M Manufacturing's Limited History Selling Asbestos-Cement Pipe**

45.     J-M Manufacturing is not in the business of manufacturing asbestos products.  It manufactures plastic pipe, including polyvinyl chloride ("PVC") and high-density polyethylene pipe.

46.     For a limited period of time, J-M Manufacturing supplied ACP as a transitional product until water districts started to utilize PVC pipe.  This occurred from 1983 to 1988, long after the implementation of OSHA regulations and union requirements that imposed strict safety standards to limit workplace exposure to asbestos, including regulations on the safe manufacture and installation of ACP.

47.    By the time J-M Manufacturing started supplying ACP, ACP had been manufactured and installed by other companies for decades.  These companies included Johns-Manville, CAPCO, CertainTeed, and Flintkote, as well as manufacturers in Mexico.

48.    ACP was not available to the general public or in a hardware store, and only experienced contractors worked with ACP.  The pipe was installed in an outdoor environment and was designed to snap together, making cutting either unnecessary or very minimal on any job site.  Any cut of ACP introduced the possibility of leakage, which was costly to locate and repair when the pipe was underground.

49.    A market for ACP persisted because it performed to the standard required by municipalities and water districts, was impervious to acids in soils, was corrosion-resistant, and could be worked with safely if handled in accordance with OSHA standards.  Even today, thousands of miles of ACP carry safe and clean drinking water to many Americans.

50.    The asbestos in ACP is encapsulated, which means that it was modified by a bonding agent, coating, binder, or other material that limit any airborne release to levels well below OSHA-allowed exposure limits.  Higher levels of exposure only occur if the pipe is cut with an unventilated power saw or drilled into using a power drill.

51.    ACP, however, is specifically designed and manufactured so that it does not need to be cut or drilled.  The pipe is joined by coupling systems so that the pipe sections fit together to form a seal without cutting.

52.    On the rare occasions that ACP needed to be cut, J-M Manufacturing's warning on the pipe specifically stated "not" to "use power saws to cut th[e] pipe."  This was reinforced in the company's manufacturing data safety sheets and installation guide.

53.     J-M Manufacturing advised end users to cut the pipe using a snap cutter or a wheel cutter, which limited any exposure to asbestos while cutting the product, and produced a cleaner cut.  OSHA regulations and other workplace safety standards prohibited cutting ACP with an unventilated power saw without significant safety precautions.

54.     Despite the limited duration of J-M Manufacturing's sale of ACP and the limited circumstances under which an individual could have been exposed to asbestos in ACP, J-M Manufacturing has been the target of more than 6,000 asbestos lawsuits since 2000.  One of the most prolific filers of these asbestos lawsuits – which ordinarily involve individuals who have an asbestos-related disease, such as mesothelioma – is Simmons Hanly.  Why J-M Manufacturing became a target of meritless asbestos lawsuits becomes clear upon an examination of the history and dynamics of asbestos litigation.

### C.     A Primer on Asbestos Litigation

55.     Mass asbestos litigation began in earnest in the 1970s after the Fifth Circuit upheld a strict liability asbestos product liability verdict.  Asbestos litigation grew into what the Supreme Court has called an "elephantine mass," led to the bankruptcies of some of the country's most prominent companies, and developed into a Petri dish for fraud.

### 1.     The Various Waves in Asbestos Litigation

56.     The initial asbestos lawsuits were focused on companies that manufactured or distributed friable asbestos products — a group of companies that has come to be known as the "Big Dusties."  The first target was Johns-Manville, which was the largest producer of asbestos-containing products in the United States.  By the early 1980s, Johns-Manville was facing 16,000 asbestos claims, mostly related to insulation products, and made the surprising decision to file for bankruptcy, which halted litigation against the company.  When the company filed for bankruptcy, there was not a single asbestos claim against the company related to the installation of ACP in the

field that could be identified. Nor was there any known lawsuit against any ACP manufacturer related to the installation of ACP in the field.

57. The plaintiff's law firms then turned their attention to other friable asbestos manufacturers and distributors, including boilermaker Babcock & Wilcox, insulation maker Owens Corning, and chemical giant W.R. Grace. The potential exposure scenarios for plaintiff claims underlying these lawsuits was nearly infinite because of the ubiquity of exposure to friable asbestos. The recovery that could be obtained in these cases also was significant. The crush of claims that these companies faced led to a wave of bankruptcy filings that crested in the early 2000s and involved nearly all of the friable asbestos manufacturers and distributors.

58. With the most obvious asbestos defendants out of the picture as a result of bankruptcy, plaintiff's law firms turned to second- and third-tier defendants to bear the brunt of litigation. These companies were not sued because it was likely that their products were the cause of the plaintiffs' asbestos-related disease, but because they were solvent. Plaintiff's lawyers saw this as a natural evolution of asbestos litigation, whereas defense lawyers saw this as a "search for the solvent bystander."

59. As part of this post-bankruptcy wave of asbestos litigation, plaintiff's law firms, including Simmons Hanly, started to file lawsuits against J-M Manufacturing, and other manufacturers and suppliers of ACP. The complaints filed in these cases typically expanded the number of companies named as co-defendants in an obvious attempt to use a lawsuit to go hunting for a case against a solvent defendant.

## 2. The Bankruptcy Trusts

60. As part of the bankruptcy proceedings that started with Johns-Manville, the bankruptcy courts approved the creation of asbestos personal injury bankruptcy trusts. These bankruptcy trusts assume all of the debtor's asbestos-related liabilities and are funded through the

contribution of debtor assets to the trusts for investment and management. The purpose of the bankruptcy trusts is to provide compensation to present and future claimants for harm caused by exposure to asbestos for which a particular company is responsible.[10]

61.     The fox is guarding the proverbial hen house of these trusts. The trusts are privately managed and operated with little to no judicial or federal oversight. The trusts generally consist of one or more trustees, a trust advisory committee, and a future claims representative. Leading plaintiff's law firms with the largest quantum of asbestos plaintiffs populate the trust advisory committees, write the trust distribution procedures, and appoint the future claims representative and trustees.

62.     The trust distribution procedures include sections related to the intake and evaluation of claims, payment processes, and audit programs. These procedures also set out whether and when claims information will be made publicly available.

63.     The trust distribution procedures are typically written to limit transparency into the trust and facilitate quick payment of trust claims with limited oversight. Information about claimants typically is only available when a claimant consents or a court issues a subpoena requiring disclosure.

64.     The bankruptcy trusts make available a second avenue of compensation for asbestos plaintiffs. Asbestos plaintiffs can pursue compensation in both tort litigation and through bankruptcy trust claims.

---

[10] The U.S. Government Accountability Office has issued a report that provides detailed information about the role and administration of asbestos trusts and explains the significant role of the plaintiff's law firms in their operation and management. U.S. Gov't Accountability Office, Asbestos Injury Compensation: The Role and Administration of Asbestos Trusts (Sept. 2011).

### 3.    Opportunity to Commit Fraud

65.    The parallel sources of compensation – tort and trust – create an environment that facilitates fraud.  Asbestos litigation focuses on exposure events that occurred 30 or 40 years in the past.  Because records are discarded and memories fade, it is difficult to refute the testimony of witnesses about exposure in asbestos litigation.

66.    As part of the tort litigation, asbestos plaintiffs rarely mention the names of bankrupt companies as a source of potential exposure.[11]  They, instead, focus testimony and evidentiary development on solvent defendants.  By focusing on solvent companies and minimizing the role of bankrupt ones, an asbestos plaintiff's law firm can maximize recovery by avoiding apportionment of liability to an insolvent entity.

67.    At the same time, the rules around the bankruptcy trusts provide an asbestos plaintiff's law firm with an avenue to delay the filing of claims or to make claims against a trust under the veil of confidentiality beyond which defendants have limited, if any, ability to see unless they can take discovery in lawsuits like this one.

68.    The opportunities for fraud related to asbestos bankruptcy trusts and in the underlying asbestos lawsuits are well documented.  A former Deputy Assistant Attorney General of the Department of Justice's Civil Division has recognized that "[i]t has become increasingly common for claimants' counsel to seek duplicative recoveries from multiple sources by misrepresenting the asbestos products to which claimants were exposed."[12]  The academic community has also documented the potential for, and occurrence of, fraud in asbestos lawsuits.

---

[11] *See, e.g.*, U.S. Chamber of Commerce for Legal Reform, The Asbestos Over-Naming and Trust Transparency Problem: A Philadelphia Case Study (Mar. 2024); RAND Corp., Bankruptcy Trusts Complicated the Outcomes of Asbestos Lawsuits.

[12] U.S. Dep't of Justice, Justice Department Files Statement of Interest Urging Transparency in the Compensation of Asbestos Claims (Dec. 28, 2020).

Appendix A to this complaint contains a selection of relevant literature about fraud in asbestos litigation.

### D.     Past Instances of Fraud in Asbestos Litigation

69.     In the past, certain plaintiff's law firms have found it too difficult to resist the temptation to commit fraud.  There have been a handful of high-profile cases arising from their misconduct.

70.     The first such case was filed by G-I Holdings, which was a successor to a manufacturer of insulating cement named GAF Corporation.[13]  In connection with that case, G-I Holdings learned that the law firm Baron & Budd had created a twenty-page "witness preparation" memorandum – the "Baron & Budd Memo" – that set forth specific instructions to clients as to the answers to give during a deposition, including answers about the products to which they were exposed, the products to which they were not exposed (products of bankrupt companies), and the absence of warning labels.[14]  The memorandum assured clients that the defense lawyers deposing them would have no way of knowing what products they had actually used, inferring that they could not be challenged regardless of how false their exposure claims were.

71.     The second case was filed by CSX Transportation ("CSX").  As part of that case, CSX discovered that a plaintiff's law firm and doctor had engaged in a pattern and practice of unlawful conduct in connection with asbestos litigation in an attempt to enrich themselves.[15]  The unlawful scheme included bribing transportation union officials to obtain clients, generating claimants through mass screenings and fraudulent x-ray readings, and filing mass lawsuits against

---

[13] *G-I Holdings, Inc. v. Baron & Budd*, 179 F. Supp. 2d 233 (S.D.N.Y. 2001).

[14] A copy of the Baron & Budd Memo is attached as Exhibit A.

[15] Third Amended Complaint, *CSX Transp., Inc. v. Peirce*, No. 2:05-cv-202, 2011 WL 9698685 (N.D. W. Va. Oct. 19, 2011).

CSX in an effort to force the settlement of thousands of bogus claims. The unlawful scheme was exposed when CSX successfully convinced the West Virginia courts to issue a case management order that required the claimants to certify in writing that their claims "are well-founded in fact" and required the production of evidence related to their claimed exposure and asbestos-related disease. In response to this order, the plaintiff's law firms moved to dismiss all but two (2) of the approximately 1,400 claims to which the case management order applied. These claims were dismissed with prejudice, lending support that these claims were fraudulent. After that dismissal, CSX filed a lawsuit against the plaintiff's law firm and doctor for RICO violations, which led to a multi-million dollar verdict.

72. The third and fourth cases were respectively filed by Garlock Sealing Technologies, LLC ("Garlock") and John Crane, Inc. ("JCI").[16] In connection with these lawsuits and with the help of a bankruptcy court in North Carolina, Garlock and JCI uncovered evidence that a series of plaintiff's law firms had engaged in an ongoing scheme to defraud the companies by concealing material evidence of their clients' exposures to asbestos-containing products of companies that had gone bankrupt. As part of the ensuing litigation, the principal of one of the plaintiff's law firms admitted that it was his regular practice to delay filing trust claims until after the personal injury cases against solvent entities were settled. Garlock also presented evidence that the plaintiff's law firms presented conflicting work histories and perjured testimony to conceal

---

[16] *Garlock Sealing Techs., LLC v. Shein*, No. 3:14-cv-137, 2015 WL 5155362 (W.D.N.C. Sep. 2, 2015); *Garlock Sealing Techs., LLC, v. Waters & Kraus, LLP*, No. 3:14-cv-00130, 2015 WL 1022291 (W.D.N.C. Mar. 9, 2015); *Garlock Sealing Techs., LLC v. Simon Greenstone Panatier Bartlett*, No. 3:14-cv-00116, 2015 WL 5148732 (W.D.N.C., Sep. 2, 2015); *Garlock Sealing Techs., LLC v. Belluck & Fox, LLP*, No. 3:14-cv-118, 2015 WL 1022279 (W.D.N.C. Mar. 9, 2015); Complaint, *John Crane, Inc. v. Shein Law Ctr., Ltd.*, No. 1:16-cv-5913, 2016 WL 3251230 (N.D. Ill. June 6, 2016); Complaint, *John Crane, Inc. v. Simon Greenstone Panatier Bartlett*, No. 1:16-cv-5918, 2016 WL 3251232 (N.D. Ill. June 6, 2016).

exposure to products of bankrupt companies. On top of that, Garlock found instances in which the plaintiff's law firm submitted bankruptcy trust claims that the law firm failed to disclose in tort litigation.

73.     These cases highlight the historical *modus operandi* of plaintiff's law firms engaged in fraud and misconduct in connection with underlying asbestos lawsuits.

## THE FRAUDULENT SCHEME

74.     Simmons Hanly is one of the most prolific asbestos litigation law firms in the country. It has represented more than 8,000 asbestos claimants and recovered more than $10.7 billion in asbestos litigation.[17] Based on information and belief, those recoveries have netted the firm more than $3 billion. Asbestos litigation is big business for Simmons Hanly.

75.     Sokolove purports to be another prolific asbestos litigation law firm in its own right. Sokolove claims that it has handled more than 9,200 asbestos and mesothelioma cases and recovered more than $10.1 billion for clients nationwide over the past 45 years, including $5.3 billion in mesothelioma cases alone.[18]

76.     At all relevant times, Simmons Hanly and Sokolove have operated, and continue to operate, a multi-faceted scheme to defraud that misleads asbestos plaintiffs, state regulators, and asbestos defendants alike. The scheme begins by deceiving the very people the firms claim to represent. To prospective and current clients, Sokolove advertises itself as a "national law firm" whose "mesothelioma lawyers have extensive experience representing clients in all 50 states" and

---

[17] Simmons Hanly Conroy, Mesothelioma Law Firm, https://www.simmonsfirm.com/ mesothelioma/.
[18] Sokolove Law, Client Reviews, https://www.sokolovelaw.com/about-us/client-reviews/; Sokolove Law, Choosing a Lawyer, https://www.sokolovelaw.com/mesothelioma/legal/mesothelioma-lawyer/.

"can handle every step of the legal process" on the client's behalf.[19]  This is a sham because in reality Sokolove is a lead generator that refers asbestos cases to other law firms like Simmons Hanly in exchange for referral fees ("referral attorneys" or "outside attorneys").  Next, in order to circumvent state regulations against fee-splitting with out-of-state and non-attorneys, Sokolove adopted a corporate structure whereby its referral attorneys are nominal members of Sokolove Law LLC.  In reality, however, Sokolove has significant overlapping interests with Simmons Hanly, both in terms of ownership and control.  Through this interdependent relationship, Simmons Hanly has used Sokolove as a stalking horse to dominate the asbestos legal market and guarantee a steady inventory of asbestos cases to fuel Simmons Hanly's pattern of fraudulent litigation against companies like J-M Manufacturing.

### A.     Fraud Against Asbestos Plaintiffs

77.     On its website, Sokolove advertises itself as a "national law firm" whose "mesothelioma lawyers have extensive experience representing clients in all 50 states."[20]  The website repeatedly touts the firm's geographic reach, stating "At Sokolove Law, our attorneys are able to help clients in all 50 states."  Under the heading "Sokolove Law Offices & Personal Injury Attorneys Nationwide," the website lists all 50 states plus Washington, D.C.[21]  Elsewhere, the website states: "Sokolove Law is a nationally recognized law firm with offices and licensed attorneys in almost every state."[22]  The website recounts that under the leadership of its CEO Michael Skoler, "Sokolove Law has transformed from a local, New England law office into one

---

[19] Sokolove Law, Our Locations, https://www.sokolovelaw.com/locations/.
[20] *Id.*
[21] *Id.*
[22] Sokolove Law, Verdicts & Settlements,
https://www.sokolovelaw.com/mesothelioma/legal/mesothelioma-settlement/.

of the nation's largest personal injury law firms, now with offices in 42 states."[23]  In the footer of each page on the website, Sokolove states: "We have locations **nationwide** to serve you today." Beneath that text is a list of approximately 38 purported offices in various cities and states, each with the heading "Sokolove Law" followed by the city and state, like the sample row below.[24]

| **Sokolove Law – Sugar City, ID**<br>1908 North 2190 East,<br>Sugar City, ID 83448 | **Sokolove Law – Alton, IL**<br>One Court Street,<br>Alton, IL 62002 | **Sokolove Law – Chicago, IL**<br>47 West Polk Street, Suite 311,<br>Chicago, IL 60605 |
|---|---|---|

78.     On its website, Sokolove advertises that the firm's attorneys will work on client matters.  "At Sokolove Law, our attorneys can handle every step of the legal process on your behalf, from finding evidence to filing your claim."[25]  The firm claims its attorneys are deeply invested in cases, stating: "At Sokolove Law, our mesothelioma attorneys are completely invested in every case, building a meaningful relationship with each client."[26]  The firm claims "experienced mesothelioma attorneys at **Sokolove Law will handle every step of the legal process** for you" (emphasis in original).[27]  The firm promises: "We provide a team of attorneys, paralegals, and case managers to clients at no upfront cost."[28]  It even offers: "Our attorneys are often able to travel to our clients at a convenient location of their choosing – or even meet up virtually instead."[29] Tellingly, the only lawyer referenced by name is Ricky A. LeBlanc.  Sokolove's website states: "Ricky A. LeBlanc is the Managing Attorney at Sokolove Law.  As Managing Attorney, Ricky is

---

[23] Sokolove Law, Michael Skoler, https://www.sokolovelaw.com/about-us/michael-j-skoler/.
[24] Sokolove Law, Our Locations, https://www.sokolovelaw.com/locations/.
[25] *Id.*
[26] Sokolove Law, Selecting a Law Firm,
https://www.sokolovelaw.com/mesothelioma/legal/mesothelioma-law-firm/.
[27] Sokolove Law, Choosing a Lawyer,
https://www.sokolovelaw.com/mesothelioma/legal/mesothelioma-lawyer/.
[28] Sokolove Law, About Sokolove Law, https://www.sokolovelaw.com/about-us/.
[29] Sokolove Law, Our Locations, https://www.sokolovelaw.com/locations/.

responsible for all communications with prospective clients and, along with his team of paralegals and case managers, review all potential cases."[30] His website biography states that "Ricky directs the asbestos practice" and "personally reviews each potential mesothelioma claim that comes through the firm to determine whether the victim may be eligible for compensation."[31]

79.     On its website, Sokolove advertises that the firm's attorneys have achieved favorable results for its clients.  The firm claims, "Our mesothelioma attorneys have successfully secured results for families in all 50 states, securing billions nationwide."[32]  It claims, "Our attorneys can identify all of the companies that may be responsible for your illness and pursue a mesothelioma settlement from each of them."[33]  The firm states, "We've helped thousands of families across the country access mesothelioma settlements while providing them with guidance and support throughout the entire legal process."[34]  Sokolove attributes its ability to win settlements to the firm's specific reputation and strengths, stating: "With a history of notable verdicts and settlements, the quality of our firm's work speaks for itself, oftentimes making companies more inclined to settle than face our team in court."[35]  In response to the frequently-asked-question ("FAQ") "Can I still get an asbestos settlement if I don't know how I was exposed?" the website states: "In many cases, yes. . . . Few firms can match our decades of experience and vast collection of resources."[36]  The website further states: "At Sokolove Law,

---

[30] Sokolove Law, Why Choose Us?, https://www.sokolovelaw.com/about-us/should-i-call-sokolove-law/.
[31] Sokolove Law, Ricky A. LeBlanc, https://www.sokolovelaw.com/about-us/ricky-leblanc/.
[32] Sokolove Law, Verdicts & Settlements,
https://www.sokolovelaw.com/mesothelioma/legal/mesothelioma-settlement/.
[33] *Id.*
[34] *Id.*
[35] *Id.*
[36] *Id.*

we've been recognized for our excellence in asbestos litigation and always aim to get the largest mesothelioma settlement possible for our clients."[37]  For example, Sokolove touts an $8.26 million verdict in favor of a Louisiana mechanic named "Joe" who was exposed to asbestos-containing brakes while working at Ford Motor Company, stating "Once our attorneys presented all of the evidence we'd gathered at trial, the jury deliberated for only 1 hour before awarding Joe and his family $8.26 million."[38]

80.     Unfortunately for Sokolove's clients, the foregoing representations on the firm's website are false and misleading.  In reality, Sokolove does not have offices and attorneys nationwide, but instead operates as a marketing firm that refers virtually all of the leads it generates to a network of outside attorneys in exchange for referral fees – that is, a percentage of any recovery.  However, these truths are buried in the literal fine print of Sokolove's website.  One must scroll to the bottom of the webpage and click on the fine print "Disclaimer," to be brought to a new page, which states: "While this firm maintains joint responsibility, most cases of this type are referred to other attorneys for principle [sic] responsibility."[39]  On the same page, Sokolove adds the disclaimer "Ricky LeBlanc admitted in MA only," followed by a list of names and addresses of purported LLC members of Sokolove who, based on online research, are all independent attorneys.  Each of these attorneys are registered with their respective state bars under their own firm's name, not Sokolove.  And when one compares this outside attorney list with Sokolove's advertised list of purported nationwide offices, it is evident that Sokolove's purported offices actually correspond to the offices of these outside attorneys.  In short, Sokolove is passing off these outside law offices as its own.  For instance, although Sokolove claims to have an office

---

[37] *Id.*

[38] *Id.*

[39] Sokolove Law, Disclaimers, https://www.sokolovelaw.com/disclaimers/.

located at One Court Street, Alton, Illinois 62002, an online search reveals that this is actually the address for the Alton office of Simmons Hanly.  Likewise, although Sokolove claims to have an office located at 455 Market Street, Suite 1270, San Francisco, California 94105, an online search reveals that this is actually the address for the San Francisco office of Simmons Hanly.

81.    Other evidence similarly exposes Sokolove's true nature.  Hidden in a corner of Sokolove's website – tucked under the heading "Our Firm," and behind a link named "For Lawyers" – Sokolove provides a trove of information to outside attorneys seeking to retain Sokolove's marketing services.  There, Sokolove openly admits that it is "the nation's #1 plaintiff case generation firm," with "extensive experience managing lead generation and case qualification – so you can focus on what is most important to you: litigation."[40]

82.    Sokolove touts that "We have invested heavily in the infrastructure and resources necessary to consistently execute successful campaigns," so that it can refer "cases that carefully matched to your firm's specialization," "[c]ases that are generated through customized marketing campaigns," and "[c]ases that are screened, vetted, and ready to litigate."[41]  Sokolove boasts that it "wields tremendous national buying power resulting in extraordinary pricing," and that its "marketing approach is multi-faceted, reaching targeted audiences through a combination of websites, search engine optimization, pay-per-click advertising, online display and mobile advertising, national and local television, radio and print advertising, direct mail, public relations and more."[42]

---

[40] Sokolove Law, The Sokolove Law Solution, https://www.sokolovelaw.com/for-lawyers/.
[41] *Id.*
[42] Sokolove Law, Legal Marketing, https://www.sokolovelaw.com/for-lawyers/what-we-do/marketing/.

83.     Once a lead is generated, Sokolove advertises that it handles the process of "converting leads to clients" by offering "24/7 coverage of inbound leads," "[c]ustomized intake based on strict co-counsel criteria," and "[c]lient sign-up using [co-counsel's] client retainer and your medical authorization form."[43]  Sokolove seeks to attract "co-counsel" to use its marketing services with the following pitch: "Focus your time and resources on litigating cases, while Sokolove Law takes on the upfront administrative work associated with marketing, client screening, and qualifying leads."[44]  According to Sokolove, "[t]here are dozens of unique campaigns marketed annually," the firm has generated over $2.7 billion in attorney fees, and Sokolove makes and receives "almost 600,000 calls and 30,000 emails to and from potential clients annually."[45]

84.     In response to the FAQ, "We don't have the kind of money it takes to work with Sokolove Law," the website posts a video, in which CEO Michael Skoler states, among other things, "We're very flexible in fee sharing arrangements.  We're very flexible in advertising funding arrangements. . . . We're looking for long-term relationships."[46]  The foregoing statements lay bare the reality that Sokolove does not litigate its own cases.

85.     Additionally, under the heading "Successful Partnerships," Sokolove's website lists several law firms whom it calls "co-counsel," stating: "For more than 45 years Sokolove Law has provided marketing expertise to law firms seeking timely, high-quality cases to expand their

---

[43] Sokolove Law, Service Operations, https://www.sokolovelaw.com/for-lawyers/what-we-do/service/.

[44] Sokolove Law, Legal Marketing, https://www.sokolovelaw.com/for-lawyers/what-we-do/marketing/.

[45] Sokolove Law, The Sokolove Law Solution, https://www.sokolovelaw.com/for-lawyers/.

[46] Sokolove Law, Don't Think Your Firm Has the Money to Work with Sokolove Law?, https://www.sokolovelaw.com/for-lawyers/what-we-do/video-faq/we-dont-have-the-money-to-work-with-sokolove-law/.

practices."  At the top of that list is Simmons Hanly Conroy, next to the tag line: "John Simmons has leveraged our national media footprint for over a decade."[47]  Through a link on that page, one is brought to another page featuring a private Youtube video with the tag line: "John Simmons talks about leveraging the Sokolove Law advantage."[48]

86.     Finally, based on the foregoing, and on information and belief, because Simmons Hanly and other firms are the attorneys actually litigating the asbestos cases, Sokolove is falsely passing off these outside firms' settlements and verdicts as though Sokolove achieved them.  For example, the $8.26 million verdict in favor of a Louisiana mechanic at the Ford Motor Company named "Joe," which Sokolove touts on its website, was actually a case litigated by Simmons Hanly attorneys.[49]  Similarly, Sokolove is falsely passing off client reviews as though Sokolove provided the legal services, when in fact Simmons Hanly provided the services.  To provide just one example among many, both Sokolove and Simmons Hanly post on their respective websites client reviews from the same person, shown below.

<u>Sokolove Website</u>[50]



"Hiring Sokolove Law was one of the best decisions we've made. They're an extremely knowledgeable firm, and they legitimately care. We never felt alone."
– **Constance**, Wife of a U.S. Veteran with Mesothelioma

---

[47] Sokolove Law, Successful Partnerships, https://www.sokolovelaw.com/for-lawyers/successful-partnerships/.
[48] Sokolove Law, Simmons Hanly Conroy, https://www.sokolovelaw.com/for-lawyers/successful-partnerships/the-simmons-firm-on-leveraging-the-sokolove-law-advantage/ .
[49] Simmons Hanly Conroy, NOLA Jury Awards $8.26 Million Mesothelioma Verdict to Former Mechanic against Ford Motor Company, https://www.simmonsfirm.com/news/item/8-26-million-mesothelioma-verdict/ (June 30, 2021).
[50] Sokolove Law, Selecting a Law Firm, https://www.sokolovelaw.com/mesothelioma/legal/mesothelioma-law-firm/.

<u>Simmons Hanly Website</u>[51]



"When we called Simmons Hanly Conroy, it was amazingly efficient. They said, 'We know what to do for you and how to file your claim — and we'll be there for you every step of the way.' They made that promise to us, and they kept it."
– **Connie**, Wife of a U.S. Army Veteran with Mesothelioma

### B. Fraud Against State Regulators

87.     Sokolove paints yet a different picture for state regulators.  Although Sokolove's website discloses in the fine print that the firm refers most of its cases to other attorneys who use separate retainers and enjoy fee-sharing arrangements, Sokolove is well aware that fee-splitting could potentially run afoul of state laws.   Accordingly, Sokolove asserts in the very same disclaimer – in seemingly contradictory fashion – that these referral attorneys are actually "members" of Sokolove Law LLC (or Sokolove Law LLP if they are in California).[52]  In the "For Lawyers" section of its website, Sokolove asserts: "[O]ur firm has LLC member partners in almost every state in order to ensure full compliance with state-specific conduct rules."[53]

88.     However, based on information and belief, as well as Sokolove's corporate filings described below, these outside attorneys are "members" in name only and serve merely as a fig leaf to hide or minimize scrutiny into potential violations of state rules governing fee-splitting with out-of-state attorneys and non-attorneys.   As previously stated, with the exception of Ricky LeBlanc, all of the so-called LLC/LLP members listed in the web disclaimer are outside attorneys or firms who are registered with their respective state bars under their own firm's name, not

---

[51] Simmons Hanly Conroy, Mesothelioma Law Firm, https://www.simmonsfirm.com/mesothelioma/.
[52] Sokolove Law, Disclaimers, https://www.sokolovelaw.com/disclaimers/.
[53] Sokolove Law, Legal Compliance of State Laws, https://www.sokolovelaw.com/for-lawyers/what-we-do/compliance/.

Sokolove. As explained below, none of the so-called LLC/LLP members (save SHC Law Group LLC and Ricky LeBlanc) are listed anywhere in Sokolove Law, LLC's state corporate filings, and the only authorized signatory for Sokolove Law, LLC is a non-lawyer, Michael Skoler.

89. Sokolove Law, LLC's corporate filings are vague and deceptive about the entity's composition. Sokolove uses the name "Sokolove Law, LLC" as its primary entity, as listed on both of its websites, found at sokolovelaw.com and mesolawyer.sokolovelaw.com. Sokolove Law, LLC was incorporated in Delaware and, at all relevant times, has been registered in Massachusetts as a foreign limited liability company with a principal office located at 1330 Boylston Street, Suite 400, Chestnut Hill, Massachusetts 02467. Since at least 2017, its Annual Reports filed in Massachusetts assert that the general character of the business is "TO ENGAGE IN THE PRACTICE OF LAW, CONDUCT ALL TYPES OF BUSINESS INCIDENT THERETO, AND CONDUCT SUCH OTHER BUSINESS AS MAY LAWFULLY BE CONDUCTED BY LIMITED LIABILITY COMPANIES PURSUANT TO APPLICABLE LAW," and represent that "RICKY A LEBLANC PC . . . IS THE ONLY MEMBER OR MANAGER OF THE FIRM WHO WILL PRACTICE LAW IN MASSACHUSETTS." The Annual Reports identify no names under "Manager," and the sole person authorized to execute any recordable instrument is Sokolove's non-lawyer CEO, Michael Skoler.[54]

90. In turn, "Ricky A LeBlanc, P.C." is registered as a professional corporation that practices law at 1330 Boylston Street, Suite 400, Chestnut Hill, Massachusetts (Sokolove's headquarters), and whose sole shareholder is Ricky A. LeBlanc. In addition to being identified

---

[54] Sokolove Law, Michael Skoler, https://www.sokolovelaw.com/about-us/michael-j-skoler/.

throughout Sokolove's websites as its Managing Attorney, Ricky A. LeBlanc is also a partner at Simmons Hanly located in its office in Alton, Illinois.[55]

91.     Sokolove Law, LLC's filings in Massachusetts (where Sokolove is headquartered) are conspicuously inconsistent from its filings in other states.  As stated above, in its corporate filings in Massachusetts, Sokolove Law, LLC does not disclose any managers.  By contrast, in its corporate disclosures in numerous other states,[56] Sokolove Law, LLC affirms that its sole LLC Manager is SHC Law Group, LLC.  According to its filings with the Illinois Secretary of State, SHC Law Group LLC is an Illinois LLC with two managers, John Simmons and Valere Nassif, both of whom are partners at Simmons Hanly.

92.     Sokolove also appears to use the name "Sokolove Law, LLP," which is identified in its Certificate of Registration with Massachusetts as a Delaware Limited Liability Partnership. In the aforementioned web disclaimer, Sokolove claims that it operates as an LLP only in California, Michigan, Tennessee, and Virginia.  However, the list of LLP members on Sokolove's web disclaimer does not reference any members in Michigan, Tennessee or Virginia.  Rather, the sole LLP members listed are Goldstein Law Offices (located at Simmons Hanly's San Francisco office), Ricky LeBlanc (located in Massachusetts and Illinois), and SHC Law Group, LLC (located in Illinois).[57]   Based on information and belief, Goldstein Law Offices refers to Benjamin Goldstein, who was a partner at Simmons Hanly at all relevant times.

93.     Sokolove Law, LLP's corporate filings are similarly vague and deceptive about its composition.  For example, in its 2023 Annual Report filed in Delaware, signed by Ricky LeBlanc,

---

[55] Simmons Hanly Conroy, Ricky A. LeBlanc, https://www.simmonsfirm.com/about-us/our-attorneys/ricky-leblanc/.
[56] Namely, Connecticut, Florida, Idaho, Illinois, Kentucky, Louisiana, Minnesota, Mississippi, Montana, Nevada, New Hampshire, Pennsylvania, Rhode Island, Texas, Vermont, Washington.
[57] Sokolove Law, Disclaimers, https://www.sokolovelaw.com/disclaimers/.

Sokolove Law, LLP claimed to have only 2 partners total. In its 2022 Annual Report filed in Delaware, signed by Ricky LeBlanc, Sokolove Law, LLP claimed to have 3 partners. Meanwhile, from approximately 2022 to 2025, Sokolove Law, LLP's Annual Reports filed with Massachusetts have been signed by John Simmons as "Partner," designate Simmons as the sole person authorized to execute any recordable instrument, and list the same principal office located at 1330 Boylston Street, Suite 400, Chestnut Hill, Massachusetts 02467. Before that, from at least 2017 through 2021, the Annual Reports filed with Massachusetts were signed by Michael Angelides as "Partner" and list Michael Angelides as the sole person authorized to execute any recordable instrument. However, neither John Simmons nor Michael Angelides were listed as LLP members in Sokolove's web disclaimer. Once again, Sokolove's public advertising does not match its disclosures to state regulators.

94. Moreover, every Annual Report that Sokolove Law, LLP has filed with Massachusetts states that James A. Sokolove is the only member of the firm who will practice law in Massachusetts. Given that James A. Sokolove retired in approximately 2013,[58] this implies that Sokolove Law, LLP has not had any practicing attorneys in Massachusetts since then. Moreover, searches on the website of the Massachusetts Board of Bar Overseers indicate that neither Michael Skoler, John Simmons, nor Michael Angelides is authorized to practice law in Massachusetts. In sum, neither Sokolove's website nor its corporate filings tell a consistent story about its makeup. Regardless, what is clear is that the LLP has very few practicing attorneys, whomever they may be.

---

[58] Sokolove Law, James "Jim" Sokolove, https://www.sokolovelaw.com/about-us/james-sokolove/.

95.     Given the foregoing, and on information and belief, Sokolove's purported LLC/LLP members are not true members of the law firm; otherwise Sokolove would not need to obtain separate retainers from clients and enter into fee sharing arrangements with these "co-counsel."  Nor would Sokolove call them "co-counsel" in the first place.  Moreover, given its paucity of real working attorneys, Sokolove cannot and does not maintain joint responsibility in any meaningful sense over the thousands of cases it farms out across the country.

### C.     Fraud Against Asbestos Defendants

96.     For more than a decade, Simmons Hanly and Sokolove have shared an interdependent relationship in which Sokolove generates and refers its asbestos plaintiff leads to Simmons Hanly, in exchange for a percentage of the recoveries, often obtained through fraudulent litigation.  But the connections between the firms goes deeper than referrals.  As previously noted, Sokolove's sole licensed attorney, Ricky LeBlanc, who "directs the asbestos practice" at Sokolove and is also "responsible for the overall risk management of the firm,"[59] is also a partner at Simmons Hanly.  Moreover, in Sokolove Law, LLP's recent filings in Massachusetts, its authorized signer and General Partner is listed as John Simmons, the founding partner of Simmons Hanly.  On the disclaimer in its website (and in its corporate disclosures filed in multiple states), Sokolove states that SHC Law Group, LLC is a member of Sokolove Law, LLC and Sokolove Law, LLP, and that five attorneys at Simmons Hanly are individually members of Sokolove Law, LLC.  According to its filings with the Illinois Secretary of State, SHC Law Group LLC is a domestic LLC with two managers, John Simmons and Valere Nassif.  Additionally, Sokolove claims to have two offices in Alton, Illinois and San Francisco, California, respectively, both of which are actually offices of

---

[59] Sokolove Law, Management Team, https://www.sokolovelaw.com/for-lawyers/who-we-are/management-team/.

Simmons Hanly.[60]  Conversely, on its website, Simmons Hanly claims to have an office in Boston, Massachusetts, which is actually the Sokolove headquarters.[61]  While the details of the financial connections between the firms remain to be explored in discovery, there is ample evidence that Simmons Hanly is deeply engaged in the affairs of Sokolove, and vice versa, and that both firms operate under the leadership of John Simmons.

97.  The relationship and cooperation between Sokolove and Simmons Hanly culminates in the scheme to defraud the tort defendants against whom Simmons Hanly litigates. Defendants have developed and implemented a fraudulent *modus operandi* – the "Simmons Hanly Fraud Playbook" – that crosses all objective legal and ethical boundaries.  Based on J-M Manufacturing's investigation and for the reasons described below, J-M Manufacturing reasonably believes that this scheme involves a coordinated and well-developed scheme to offer perjured testimony, suppress evidence of exposure to the products of bankrupt companies, make misrepresentations of fact about the existence of bankruptcy trust claims, file baseless claims in an attempt to extract settlements, and silence anyone who attempts to expose the firm's fraud.

98.  The symbiosis between Simmons Hanly and Sokolove is a crucial aspect of the scheme to defraud litigation defendants.  By tapping into its access and influence with Sokolove – the #1 lead generator in the country – Simmons Hanly has expanded its market dominance and fraudulent scheme beyond what it could otherwise achieve.  Specifically, Simmons Hanly has secured its continued ability to reach and capture the ever-dwindling pool of asbestos plaintiffs, converting Sokolove's leads into a steady and broad inventory of Simmons Hanly cases used to exert maximum settlement leverage on litigation defendants.  Based on information and belief,

---

[60] Sokolove Law, Our Locations, https://www.sokolovelaw.com/locations/.
[61] Simmons Hanly Conroy, Our Boston, MA Office, https://www.simmonsfirm.com/about-us/our-offices/boston/.

Sokolove's referrals led to many if not all of the lawsuits described in detail below. This volume-based pressure is a key component of the scheme, as it has emboldened and enabled Simmons Hanly to engage in fraudulent litigation tactics with the expectation that tort defendants will settle the vast majority of cases and therefore not remain in a position to detect the fraud. And Sokolove has been similarly invested in this scheme, not only because it stands to reap a large percentage of the recoveries (*i.e.*, fraud proceeds), but because Sokolove appears to have overlapping financial interests with Simmons Hanly in any event.

99.     The scheme begins with the intake process, when Simmons Hanly identifies a potential asbestos plaintiff, typically because the person was referred from Sokolove. As discussed above, Sokolove partners with Simmons Hanly in marketing "campaigns" to "target the right potential clients" and to "use [its] buying power and deep marketing expertise" to generate high quality leads for Simmons Hanly.[62] Sokolove's "intake team carefully screens each new lead, with a goal of referring only those potential clients that meet [the] firm's specific criteria."[63] On its website, Sokolove touts Simmons Hanly first among its "Successful Partnerships," noting that "John Simmons has leveraged our national media footprint for over a decade."[64] Based on information and belief, Sokolove receives as much as 50% of every recovery, whether in the tort system or the trust system, resulting from each case referred to Simmons Hanly. Given their belief

---

[62] Sokolove Law, Sokolove Law Campaigns, https://www.sokolovelaw.com/for-lawyers/what-we-do/.

[63] *Id.*

[64] Sokolove Law, Successful Partnerships, https://www.sokolovelaw.com/for-lawyers/successful-partnerships/.

that "[a]verage settlements for mesothelioma range from $1 Million to $1.4 Million," Sokolove and Simmons Hanly stand to gain substantial profit from every referral to Simmons Hanly.[65]

100.    Next, the case teams that are part of Simmons Hanly's Asbestos Department are the means by which Defendants implement the scheme.[66]  These professionals know "what is needed" and "do all the work" necessary to effectuate the modus operandi of the fraud and misconduct.[67]  The asbestos case investigators, including Stan Jones, and other members of the team "build" the cases by "find[ing] the evidence" to support the "story" about each defendant, while the medical professionals develop evidence about the asbestos plaintiffs' injuries.[68]

101.    As part of building the case, the case team purports to reconstruct the plaintiff's work history and consults an "internal warehouse of evidence" in search of solvent companies and products that have any relevance to the type of work done by the plaintiff to generate a list of defendants.[69]  The team makes the list of solvent companies as large as possible, commonly

---

[65] Sokolove Law, Verdicts & Settlements, https://www.sokolovelaw.com/mesothelioma/legal/mesothelioma-settlement.

[66] Simmons Hanly Conroy, Mesothelioma Law Firm, https://www.simmonsfirm.com/mesothelioma/ (describing the case teams).

[67] Simmons Hanly Conroy, What to Expect When Filing a Mesothelioma Claim, https://www.youtube.com/watch?v=_dmUEVn7ZIk.

[68] *Id.*; Simmons Hanly Conroy, Mesothelioma Law Firm, https://www.simmonsfirm.com/mesothelioma/.

[69] Simmons Hanly Conroy, Mesothelioma Settlements & Verdicts, https://www.simmonsfirm.com/mesothelioma/settlements/; Simmons Hanly Conroy, Asbestos Companies, https://www.simmonsfirm.com/mesothelioma/asbestos-exposure/companies/; Simmons Hanly Conroy, Asbestos Products, https://www.simmonsfirm.com/mesothelioma/asbestos-exposure/products/; Simmons Hanly Conroy, Asbestos Occupations, https://www.simmonsfirm.com/mesothelioma/asbestos-exposure/occupations/.

identifying nearly 70 companies as defendants.[70]  Simmons Hanly appears to name all solvent entities whose names crop up in a plaintiff's work history as defendants in its asbestos cases regardless of whether there is any evidence of exposure to the defendant's asbestos-containing product.  As stated on the firm's website, a lack of information about exposure is not a problem; the firm will just "[i]dentfy the asbestos-containing products [the plaintiff] *may* have been exposed to" and seek to "[h]old the manufacturers of these products accountable."[71]

102.    The lawyers, with the help of the paralegals and in some cases local counsel, prepare and file a lawsuit based on the "evidence" often fabricated by the case investigators and others and develop "plans on how to move forward."[72]  The lawsuit is filed in a plaintiff-friendly "court system that avoids any potential complications and awards the most compensation possible."[73]  Based on information and belief, the firm files in these handpicked jurisdictions because it knows that it can engage in misconduct and the court is unlikely to sanction the firm or reign it in.  The firm also concentrates filings in these jurisdictions because it knows that the large volume of cases against defendants like J-M Manufacturing not only increases the amount of money they must spend defending the cases, but also multiplies the risk of a runaway verdict in a plaintiff-friendly forum, thereby increasing the pressure on the defendants to settle regardless of the merits of any particular lawsuit.

---

[70] Simmons Hanly Conroy, Mesothelioma Settlements & Verdicts, https://www.simmonsfirm.com/mesothelioma/settlements/.

[71] *Id.* (emphasis added).

[72] Simmons Hanly Conroy, What to Expect When Filing a Mesothelioma Claim, https://www.youtube.com/watch?v=_dmUEVn7ZIk.

[73] Simmons Hanly Conroy, Mesothelioma Settlements & Verdicts, https://www.simmonsfirm.com/mesothelioma/settlements/.

103.    After the Simmons Hanly case team files the lawsuit, it sets about extracting settlements from as many defendants as possible and pursuing claims from asbestos trusts.[74]  In the words of the firm, the case team "targets all potential sources of compensation."[75]  The goal is to "maximize . . . total results" and get money in the door as "quickly" as possible.[76]  The firm prides itself on being "one of the fastest asbestos law firms in the country" in extracting money from the process.[77]

104.    As is apparent from the chronology of many of its cases, part of the firm's strategy is to maximize the recovery by the artful timing of filings and by concealing evidence of trust claims or exposure to products of bankrupt companies in order to avoid an apportionment of liability to bankrupt companies.  The "mesothelioma [trust] fund claims are handled separately from [the] lawsuit against solvent (non-bankrupt) defendants" and include the involvement of the firm's bankruptcy lawyers that are part of the Asbestos Department.[78]  The firm knows that the trust process involves little transparency and offers streamlined access to compensation, with members of the firm being part of more than 20 trust advisory committees.[79]

105.    As exposed in the *Peebles* complaint, the firm's litigation strategy involves fraud, perjury, and other misconduct.  Based on information and belief, the fraud and misconduct often

---

[74] *Id.*

[75] Simmons Hanly Conroy, Asbestos Trust Funds, https://www.simmonsfirm.com/mesothelioma/asbestos-trust-funds/.

[76] Simmons Hanly Conroy, Mesothelioma Settlements & Verdicts, https://www.simmonsfirm.com/mesothelioma/settlements/.

[77] *Id.*

[78] Simmons Hanly Conroy, Asbestos Trust Funds, https://www.simmonsfirm.com/mesothelioma/asbestos-trust-funds/.

[79] Simmons Hanly Conroy, Lisa Nathanson Busch, https://www.simmonsfirm.com/about-us/our-attorneys/lisa-nathanson-busch/.

include plans about what to say and not say at depositions, strategies for responding to discovery without revealing information that could lead to discovery that the plaintiff was not exposed to a defendant's product, and strategies about what to say about asbestos trust claims. Based on information and belief, the lawyers also determine what discovery to resist, the timing of litigation activities like the plaintiff's deposition to ensure that adverse evidence cannot be developed, and when to use entirely baseless asbestos lawsuits as bargaining chips to extract a settlement. All of these tactics are designed to prop up their false exposure narrative and maximize the perceived value of the case in order to extract a settlement from J-M Manufacturing and other defendants.

106.    Defendants have been very successful implementing this strategy, extracting settlements in "most" of its cases while obtaining payouts from a number of different asbestos trusts.[80] Part of the reason for their success is that it is difficult to affirmatively disprove the narrative about exposure, the firm's clients are highly sympathetic plaintiffs, and the firm has filed its cases in "state court[s] that [are] likely to provide . . . the most compensation."[81]

107.    The primary objective of the scheme is to secure the most compensation possible for clients and the firms (Simmons Hanly and Sokolove) regardless of whether that requires fraud and misconduct. The scheme has various facets, which Defendants carry out through various means.

108.    First, Defendants coach and instruct the asbestos plaintiff to specifically identify asbestos-containing products corresponding to one or more named defendants in the underlying

---

[80] Simmons Hanly Conroy, Mesothelioma Settlements & Verdicts, https://www.simmonsfirm.com/mesothelioma/settlements/; Simmons Hanly Conroy, Asbestos Trust Funds, https://www.simmonsfirm.com/mesothelioma/asbestos-trust-funds/.

[81] Simmons Hanly Conroy, Mesothelioma Claims, https://www.simmonsfirm.com/mesothelioma/claims/.

asbestos lawsuit. In Simmons Hanly's words, the outcome of a settlement (and jury verdict) depend on "the strength of [the] evidence" showing which asbestos products the asbestos plaintiff was exposed to and the "number of companies sued."[82] That "evidence," which almost always comes by way of deposition of a single witness represented by the firm, relates to events that occurred approximately 30 to 40 years ago so it is extremely difficult to affirmatively disprove. Based on information and belief and supported by the cases discussed below, Defendants work together to ensure that the deposition testimony follows closely to a script that includes specific details about asbestos-containing products and how asbestos exposure supposedly occurred, even though these same witnesses recall virtually no other details related to the exposure.

109. Second, Defendants know that it is important to present facts that show actual exposure to asbestos in the tort defendants' products and for product identification witnesses to claim that the exposure occurred frequently and over a long period of time. Based on information and belief and supported by the cases discussed below, Defendants work together to craft a narrative about how the exposure occurred, stressing that it occurred on "hundreds" of occasions.

110. Third, Defendants know that it is important to deny the existence of visible warnings on the asbestos-containing products. Based on information and belief and supported by the cases discussed below, Defendants work together to ensure that there is no evidence about warnings on the asbestos-containing products.

111. Fourth, Defendants know that it is important to limit the provision of facts that may give the tort defendants the opportunity to disprove the "story." Based on information and belief and supported by the cases discussed below, Defendants work together to craft vague details about

---

[82] Simmons Hanly Conroy, Mesothelioma Settlements & Verdicts, https://www.simmonsfirm.com/mesothelioma/settlements/.

work history, job sites, and co-workers that in many instances are false. Based on information and belief and supported by the cases discussed below, Defendants also work together to resist discovery efforts that might frustrate the story.

112. Fifth, Defendants know that it is important to suppress any evidence in the tort suit about exposure to asbestos-containing products of bankrupt companies. Based on information and belief and as discussed below, Defendants work together to conceal information about certain product exposures at depositions and in written discovery. Based on information and belief and as discussed below, Defendants also work together to hide the details of bankruptcy trust claims filed by the plaintiff.

113. Sixth, Defendants know that the firm's asbestos plaintiffs are highly sympathetic and that the jurisdictions in which they file their cases will ease the path to trial. Based on information and belief, and supported by the scores of Simmons Hanly's voluntary dismissals, Defendants assert baseless claims to name as many tort defendants as possible in the lawsuit and to extract settlements from as many solvent defendants as possible. Defendants often use these claims as bargaining chips to secure a settlement in other asbestos lawsuits brought by Simmons Hanly.

114. Seventh, Defendants know that it is important to protect the secrecy of the Simmons Hanly Fraud Playbook. Based on information and belief and supported by the dismissals in the cases discussed below, Defendants work together to dismiss bogus asbestos lawsuits when they are so infected by misconduct that they may expose the scheme. Based on information and belief and supported by the circumstances surrounding the *Peebles* complaint, Defendants work together to stop any efforts to make public the details of the Simmons Hanly Fraud Playbook and address firm employees who do not fall in line.

### D. The Simmons Hanly Fraud Playbook at Work in Litigation Against J-M Manufacturing

115.    For the first two decades of its existence, J-M Manufacturing was not mentioned in asbestos lawsuits related to ACP in the field.  The same was true of other suppliers of ACP, as it was highly improbable that ACP – with its encapsulated asbestos – led to a significant amount of asbestos-related disease and much more likely that asbestos-related disease was the result of exposure to products containing friable asbestos or unknown causes.

116.    That changed following the bankruptcy wave in asbestos litigation in the 2000s. Simmons Hanly soon turned its focus on J-M Manufacturing and started to file asbestos lawsuits against the company.

117.    In connection with its litigation against J-M Manufacturing, Simmons Hanly developed and refined a "story" about exposure to asbestos in the company's ACP that was repeatable.  The "story" that has been offered in case after case is that the asbestos plaintiff or decedent was exposed to asbestos in the ACP at nonspecific locations and job sites when the pipe was specifically cut with a power saw or drilled with a power drill.  That exposure invariably occurred – according to the bogus claims – on "hundreds" of occasions.[83]

118.    The *Peebles* complaint – which arose from the corrupt handling of a case against J-M Manufacturing – revealed that the telling of this "story" relies on perjured testimony, false statements, and other acts of moral turpitude, dishonesty, and corruption.  The *Peebles* case also highlighted how the firm's fraudulent conduct – the Simmons Hanly Fraud Playbook – was likely part of "a larger pattern and practice" potentially affecting thousands of Simmons Hanly clients.

---

[83] This "story" is told regardless of whether the case is alleged as a primary exposure or a so-called take-home exposure case.  The cases based on alleged take-home exposure generally include additional inconceivable allegations about how the asbestos made its way to the asbestos plaintiff or decedent's home and how the exposure repeatedly occurred.

119.    A sampling of recent case files (cases resolved within the last five years) filed against J-M Manufacturing by Simmons Hanly confirms Peebles' allegations.  As described below, the fraudulent scheme has manifested in numerous lawsuits against J-M Manufacturing intended to deprive J-M Manufacturing of money by means of false or fraudulent pretenses and representations.  The scheme involves a pattern of illegal activity, including conduct in violation of 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud).  The following cases illustrate some examples of how the scheme operated in particular cases.

## 1.    *Sebastian Bretado v. 3M Company et al.*

120.    The asbestos lawsuit at the center of the *Peebles* case is *Bretado v. 3M Company* in which J-M Manufacturing was a defendant along with 27 other separate defendant entities. Simmons Hanly filed the *Bretado* complaint on October 15, 2018.  Angelides and Foley were listed as attorneys of record.  The complaint alleged that Bretado's mesothelioma was caused by working with ACP as a day laborer doing "line drainage" for several landscaping employers in the 1980s.  The complaint alleged that Bretado had been exposed to asbestos in J-M Manufacturing's ACP while working for Oak Ridge Landscaping.

121.    Foley first noticed the deposition of Bretado about a month after the complaint was filed.  The deposition went forward in January 2019, a little over two-and-half months after the lawsuit was filed and before the defendants had any opportunity to meaningfully conduct discovery into Bretado's allegations.[84]  This was done in an apparent attempt to lock in favorable testimony

---

[84] The deposition occurred over the course of seven days (January 9-10, 2019, January 16-18, 2019, January 31, 2019, and February 1, 2019), and lawyers participated in person and by telephone.  Lawyers based in Texas appeared telephonically on January 16-17, 2019, and a lawyer from Wisconsin appeared telephonically on January 18, 2019.  Based on information and belief, the transcript was distributed to lawyers representing a defendant in Milwaukee, Wisconsin.  Stan Jones participated in the deposition and assisted with translation.

from Bretado at a time when the tort defendants did not have adequate means and information with which to cross-examine him.

122.     Bretado offered the sole product identification in the case.  At his deposition, Bretado offered very specific testimony about the ACP he was supposedly exposed to while working as a landscaper from 1979 to 1989, despite being unable to provide nearly any other details about the circumstances of his employment.  For example, Bretado testified that he used ACP that was labeled "Johns-Manville transite" until 1982.  Bretado then testified that in 1982 (which happened to be the year that Johns-Manville filed for bankruptcy), he started to work with ACP that was labeled "J-M transite" and worked with that ACP until 1989.  Bretado also implausibly testified that he recalled seeing the names of ACP distributors, such as Grinnell, written on delivery trucks at his work sites and at other locations, even though he failed to recall the location of those worksites.

123.     During the deposition, the Simmons Hanly lawyer conducting the examination "helped" Bretado answer product identification by first showing him pictures that contained the label of the ACP ahead of the identification of the ACP and by suggesting answers.  In other words, the attorney used the same kind of suggestive identification techniques that law enforcement today are forbidden to use.  For Johns-Manville, J-M Manufacturing, and CertainTeed, the lawyer first showed Bretado a picture that included each company's label and then asked him if he recalled working with that pipe and to confirm that the label was the one he remembered.  When Bretado had trouble reading the company's name on the CertainTeed ACP in the picture he was shown, the Simmons Hanly lawyer suggested the answer by asking "Is it CertainTeed" pipe?

124.     When not being shown pictures of the ACP, Bretado referred to Johns-Manville as "Johns Medville" on at least four occasions and as "John Mable" on at least one occasion.

Recognizing the importance of the testimony for the product identification issue, the Simmons Hanly lawyer corrected Bretado, stating "[w]e will get it right. It's Johns Manville."

125. Bretado also followed the narrative on asbestos exposure related to ACP. He specifically recalled that he would cut the pipe with a power saw and drill pipe with a power drill. The Simmons Hanly lawyer helped this testimony by showing Bretado pictures of power saws to lock in testimony about the types of saws Bretado purportedly used.

126. Despite being able to provide a remarkable level of detail about the ACP he supposedly used, who supposedly supplied it, and how he was supposedly exposed to asbestos from it, Bretado recalled virtually no other detail about the landscaping work he performed. Bretado, for example, testified that he could not recall a single specific location where he worked with ACP, the full name of any co-workers, or the name of any customer for whom he did landscaping work.

127. Bretado did provide the names of three employers – Oak Ridge Landscaping and two individuals – that he claimed he worked for that used ACP in their landscaping businesses. Though Bretado provided no real detail about those employers, J-M Manufacturing was able to track them down. The two employers who were individuals were deceased; but their immediate family members who were deposed in June 2019 testified that those individuals did not even run landscaping businesses, let alone landscaping businesses that would use ACP. The principal of the third employer – Oak Ridge Landscaping – testified in June 2019 that his company never used ACP and that he had no recollection of Bretado. These witnesses, in other words, confirmed that Bretado had provided false testimony.

128. The false testimony that Bretado provided was reinforced by the Simmons Hanly lawyers as part of written discovery. On or about January 30, 2019, Angelides and Foley caused

to be served responses to J-M Manufacturing's form interrogatories and separate special interrogatories stating that Bretado worked with J-M Manufacturing ACP and was exposed to asbestos from that ACP while working with the employers that Bretado identified at his deposition. On June 14, 2019, Angelides and Foley caused to be served responses to J-M Manufacturing's supplemental interrogatories and made the same statements.

129.    As set out in the *Peebles* complaint and confirmed above, the *Bretado* case was infected by perjury and false statements.  In addition to Peebles and Foley, Angelides and Goldstein actively facilitated the application of the Simmons Hanly Fraud Playbook to fabricate Bretado's allegations against J-M Manufacturing or were part of the attempt to cover up the misconduct described in the *Peebles* complaint.

130.    J-M Manufacturing spent significant sums to mount a defense to that case and counter the product identification and exposure testimony.  Given the uncertainty of litigation, and as a result of the material misrepresentations Simmons Hanly lawyers made or elicited, the company ultimately settled the case in August 2019 and made a settlement payment in or around September 2019.  Browder was one of the primary Simmons Hanly lawyers involved in the settlement and sent and signed the settlement paperwork on or about August 22, 2019.

131.    The settlement was done before J-M Manufacturing learned of the *Peebles* complaint.  That complaint suggests that the lawsuit was a sham and that Simmons Hanly caused J-M Manufacturing to unnecessarily spend money to defend and settle the lawsuit.

### 2.    *Reyna Carranza v. 3M Company et al.*

132.    On or about November 7, 2018, Simmons Hanly filed the *Carranza* complaint against J-M Manufacturing and approximately 25 other defendants.  Foley was listed among the attorneys of record and Dhar was involved in the case as counsel from Simmons Hanly.  The

complaint alleged that Carranza's mesothelioma was caused by his exposure to asbestos in J-M Manufacturing's ACP while working for Indelcor from approximately 1983 to 1988.

133.     The alleged exposure in the complaint was false.  At his deposition, the owner of Indelcor testified that the company *did not exist* until the mid-1990s.  J-M Manufacturing also learned that Indelcor's owner had spoken with Dhar on the day that the initial complaint was filed and informed Dhar that the allegations about Indelcor in the complaint were not accurate.  Dhar reportedly stated that Simmons Hanly *already* knew that, meaning that the firm knew the complaint against J-M Manufacturing was not based in fact and filed it anyway.

134.     During the litigation, the sole product identification witness was Carranza's brother, who was also represented by Simmons Hanly.  Dhar presented Carranza's brother for deposition and conducted an examination of him.  That deposition was in person and by telephone and occurred over the course of six days, including June 6, 2019, June 7, 2019, June 11, 2019, June 12, 2019, June 13, 2019, and November 13, 2019.  Stan Jones attended the deposition for Simmons Hanly's initial examination of Carranza's brother and helped with translation.

135.     The deposition followed a familiar pattern.  Carranza's brother testified that Carranza worked under the table installing sewer ACP at "hundreds" of locations throughout Southern California and claimed that the pipe said "J-M Transite" (despite being unable to write or spell the word "Transite").  But Carranza's brother could not remember the specific location or address of any of that work, the full names of any of the "hundreds" of employers involved, or the names of other co-workers.  When confronted with his brother's Social Security records showing non-construction related work in the time frame relevant to J-M Manufacturing, the witness claimed his brother's Social Security number had been stolen and that his brother never worked at

the listed jobs. The brother also claimed that Carranza dropped out of high school to perform the relevant construction work with him.

136. Carranza's brother also testified that Carranza was exposed to asbestos in the ACP because Carranza cut ACP "hundreds" of times using a power saw. According to Carranza's brother, there were no warnings on any ACP.

137. J-M Manufacturing was able to obtain Carranza's high school and immigration records, at significant time and expense. These records showed that Carranza was in high school and/or working at the non-construction jobs listed in his Social Security records in the 1980s, rather than installing underground ACP with his brother. J-M Manufacturing also discovered that ACP was not even approved for use in sewer systems in Southern California in the 1980s.

138. Both before and after the deposition of Carranza's brother, Simmons Hanly continued to promote in written discovery the narrative about Carranza's exposure that had been described by Carranza's brother. The firm did this in at least five interrogatory responses that Foley signed and caused to be served on or about April 8, 2019, June 19, 2019, November 21, 2019, and February 5, 2020. The false narrative was also repeated in a summary judgment brief filed and served by Rosenthal and Peebles on November 26, 2019.

139. On March 27, 2020, after forcing J-M Manufacturing to litigate for approximately a year and a half at great expense, Simmons Hanly voluntarily dismissed the case with prejudice, as part of a deal resulting in the dismissal of approximately 15 cases. Foley signed and emailed the request for dismissal on that date, copying Goldstein. Foley and Goldstein participated in discussions with J-M Manufacturing's counsel regarding the dismissal. By the time of the dismissal, J-M Manufacturing had spent a significant sum defending against the allegations in the case.

### 3.  *Dennis Perkins v. A.W. Chesterton et al.*

140.    On or about November 18, 2019, Simmons Hanly filed the *Perkins* complaint against J-M Manufacturing, CertainTeed, and approximately 22 other defendants in Illinois state court in Madison County.  The complaint alleged that Perkin's wife died of mesothelioma as a result of secondary exposure to asbestos that Perkins had carried home from his various jobs.

141.    On or about January 23, 2020, CertainTeed/DBMP filed for bankruptcy.

142.    On or about August 19, 2020, Perkins was deposed in the Illinois case by video conference with participants located in Illinois and North Carolina.  At least one of the participants was located in Chicago for that deposition.  During the deposition, Perkins testified about how he was purportedly exposed to asbestos that he brought home and that made his wife sick.  He testified that he was exposed to asbestos when replacing pipe for the City of Barre in the 1980s.  Perkins could not recall the name of the pipe he removed, but supposedly recalled clearly that the new pipe he installed was labeled "J-M Transite," had a waffle print, and was delivered by E.J. Prescott.  Perkins testified that he cut that ACP with a gas powered saw on "[a] lot" of occasions.

143.    Perkins was asked if he installed any other type of pipe while working for the City of Barre.  Despite naming CertainTeed in his complaint, Perkins denied being familiar with CertainTeed or its ACP, or ACP made by other bankrupt ACP manufacturers, such as CAPCO and Flintkote.  By this time, of course, CertainTeed/DBMP had already filed bankruptcy.

144.    On July 15, 2021, the *Perkins* case was refiled in Vermont state court based on a jurisdictional defect in Illinois.  Since CertainTeed/DBMP had previously filed bankruptcy, the Vermont complaint did not name CertainTeed/DBMP.

145.    On August 24, 2022, Simmons Hanly filed a proof of claim on behalf of Perkins's wife in the CertainTeed/DBMP bankruptcy case.  In the proof of claim, the Simmons Hanly

attorney declared under the penalty of perjury that the decedent had mesothelioma and had a claim against CertainTeed/DBMP. In other words, Simmons Hanly asserted in a sworn filing that the decedent's mesothelioma was caused in part by CertainTeed, which would have been the result of her exposure to asbestos in CertainTeed asbestos-containing products.

146.    Subsequently, in written and signed discovery responses in the Vermont *Perkins* case, Simmons Hanly affirmatively concealed the proof of claim that it had caused to be filed in the CertainTeed/DBMP bankruptcy case or the attendant claimed exposure to asbestos in CertainTeed asbestos-containing products. On November 10, 2022, for example, Simmons Hanly responded to requests for production of documents, interrogatories, and requests for admission on behalf of Perkins. In response to the requests for admissions, Simmons Hanly, through admissions and denials, claimed that (a) the only other "claim[s]" filed "with any court or entity other than the instant matter for the injuries alleged in the Complaint" were the claims contained in the Illinois state court complaint and (b) no claim had been filed in any bankruptcy trust related to the alleged injury. Both assertions were misleading and false, omitting the material fact of the proof of claim filed with the CertainTeed trust.

147.    In response to the interrogatories and document requests, Simmons Hanly continued its misdirection. In the interrogatories, for example, J-M Manufacturing asked Perkins to describe all exposures to asbestos-containing products to which the decedent was exposed, *regardless if alleged in the complaint*. In its responses, Simmons Hanly did not identify CertainTeed, despite having a proof of claim on file based on purported exposure to asbestos in CertainTeed asbestos-containing products. Simmons Hanly, instead, referred J-M Manufacturing to the Perkins' deposition testimony, where Perkins denied exposure to asbestos in CertainTeed asbestos-containing products. Simmons Hanly also failed to disclose the CertainTeed proof of

claim in response to interrogatories that asked Perkins to identify (a) any asbestos bankruptcy trusts from which Perkins was or may be entitled to receive compensation but had not yet filed a claim or (b) all claims for payment of any type submitted to any claims processing entity, trust, bankruptcy trust, or claim facility with respect to the claimed injury. The proof of claim was responsive to one of these interrogatories, and Simmons Hanly failed to disclose it in both responses.

148.    Simmons Hanly's discovery responses, which were transmitted by email across state lines, concealed the proof of claim that Simmons Hanly and Perkins had filed in the CertainTeed/DBMP bankruptcy. This, in itself, was fraud, which was compounded by the inconsistent positions that Simmons Hanly and Perkins took in the asbestos litigation and the CertainTeed bankruptcy.

149.    On or about August 10, 2023, J-M Manufacturing settled the Vermont *Perkins* case. Browder was the primary Simmons Hanly attorney involved in the settlement and sent and signed the settlement paperwork on or about August 31, 2023. At the time of the settlement, Simmons Hanly had not disclosed the CertainTeed bankruptcy claim and the decedent's exposure to CertainTeed asbestos-containing products. Knowledge of these truths would have materially affected J-M Manufacturing's decision to enter this settlement.

### 4.    *Robert Yates and Maria Yates v. Basco Drywall & Painting Co. et al.*

150.    On or about May 20, 2019, Simmons Hanly filed the *Yates* complaint against J-M Manufacturing at approximately 16 other defendants in California state court. Foley, Goldstein, and Rosenthal were all attorneys of record involved in the case, and both the initial complaint and the amended complaint – which was filed on June 24, 2020 – were signed by Foley. The complaint alleged that Yates's mesothelioma was caused by his exposure to asbestos while working as a pipe

worker from approximately 1998 to 2008 for TT Technologies at "[v]arious locations throughout California."

151.    On June 13, 2019, Foley, Rosenthal, and Goldstein provided responses to the defendants' standard interrogatories, which were signed by Foley.  The interrogatory responses claimed that Yates was exposed to asbestos from ACP while working at TT Technologies from approximately 1998 to 2008.  Specifically, the responses claimed that Yates "worked throughout the State of California in the pipe bursting field, a process by which existing underground pipe is burst and new pipe is simultaneously pulled in behind the pipe bursting tool."  According to the interrogatory responses, Yates was responsible for digging an entry pit and removing the first few feet of existing pipe to place the pipe bursting tool.  The interrogatory responses also claimed that Yates worked with and cut various types and brands of pipe including J-M Transite pipe.  This narrative about exposure was repeated in subsequent interrogatory responses from Foley, Rosenthal, and Goldstein served on August 28, 2020 and April 19, 2021.

152.    On June 26, 2019, J-M Manufacturing filed a demurrer to plaintiff's complaint. The basis for the demurrer was that the complaint did not identify any facts showing that Yates worked with or around an asbestos-containing product supplied by J-M Manufacturing.  J-M Manufacturing noted that the complaint listed Yates' work at TT Technologies from 1998 through 2008 as the source of exposure and did not refer to J-M Manufacturing.  J-M Manufacturing did not supply any ACP from 1998 to 2008; the company had stopped supplying ACP a decade earlier.

153.    Before filing the demurrer, counsel for J-M Manufacturing conferred with Rosenthal at Simmons Hanly.  Rosenthal claimed that the proposed demurrer was a "bad faith demurrer," stated that J-M Manufacturing was "needlessly wasting the resources of the court and of the plaintiffs," and stated that if the demurrer was filed, she would file for sanctions against J-M

Manufacturing's lawyer. Rosenthal's attempt at intimidation was both unwarranted and unfounded.

154. The evidence that came to light in the course of discovery made clear that there was no basis for Simmons Hanly to claim that Yates was exposed to asbestos in J-M Manufacturing ACP approximately 10 years after J-M Manufacturing stopped selling that pipe. On May 13, 2021, J-M Manufacturing deposed the President and CEO of TT Technologies. This witness testified that the company did not burst any asbestos-containing material, including pipe, and did not let anyone operate any type of power saw in a pipe bursting line. Nor did the company dig any pits. The witness also testified that he had no evidence suggesting that Yates ever encountered ACP while working at TT Technologies. In other words, the witness refuted almost everything that Simmons Hanly had represented about Yates' exposure to ACP.

155. Product exposure information was not the only untrue information that Simmons Hanly provided to J-M Manufacturing. On August 28, 2020, Foley, Rosenthal, and Goldstein provided a response to standard interrogatories, which again were signed by Foley. In that response, Simmons Hanly stated that no autopsy had been performed on Yates after he passed away.

156. The interrogatory response related to the autopsy was false. On or around September 29, 2021, the defendants obtained records that demonstrated that not only had an autopsy of Yates been performed, Simmons Hanly had paid for it.

157. On October 14, 2021, Simmons Hanly voluntarily dismissed the *Yates* case, confirming that the case against J-M Manufacturing was baseless. The dismissal request was signed and sent by Foley on October 12, 2021.

- 55 -

### 5. *Bernice Montgomery v. Caterpillar et al.*

158.     On or about January 11, 2021, Simmons Hanly filed the *Montgomery* complaint against J-M Manufacturing and approximately 14 other defendants in California state court.  Foley, Goldstein, and Angelides were attorneys of record involved in the case.  The complaint, which was signed by Foley, alleged that the decedent's mesothelioma had been caused by his exposure to asbestos while working as an operating engineer from 1968 to 1990 for "various employers" at "various jobsites."

159.     On March 12, 2021, Foley, Goldstein, and Angelides served responses to standard interrogatories, which were signed by Foley.  The responses asserted that Montgomery worked with and cut J-M Manufacturing-branded ACP while working for Clark & Jack Lambert, Inc. from approximately 1968 to 1974 and Camozzi Excavating, Inc. from approximately 1974 to 1980.  These statements could not possibly be true because J-M Manufacturing did not sell ACP until 1983.

160.     The responses also stated that Montgomery worked with and cut J-M Manufacturing-branded ACP while working with a series of construction companies, including Burke Construction Co., from approximately 1980 to 1995.  Simmons Hanly reinforced these answers, including the inaccuracies about ACP before 1983, in another response to interrogatories signed by Foley and served on April 19, 2021.

161.     On October 5, 2021 and November 10, 2021, Simmons Hanly proceeded with the deposition of the sole production identification witness in the case – Steve Burke – over the objection of J-M Manufacturing's attorneys.  At the time, J-M Manufacturing was waiting for Social Security records for Montgomery and believed the deposition should not be scheduled until those were produced.  The product identification witness was represented by Simmons Hanly.  The

deposition was conducted over video conference technology and was attended by lawyers in Illinois and California.

162.     The product identification witness testified that he worked with Montgomery at Burke Construction from 1981 to 1987.  That witness claimed that Montgomery was exposed to asbestos contained in "J-M Transite" ACP, which was "[r]ough" and had a honeycomb look, and the exposure occurred when Montgomery cut the pipe with a power saw.  However, the witness admitted that he had been provided photos of transite pipe by Simmons Hanly before his deposition.

163.     J-M Manufacturing obtained Montgomery's Social Security records after the Burke deposition.  Those records showed that Montgomery did not work at Burke Construction from 1981 through 1987.  They showed that Montgomery worked at the company in 1981 and then again in the 1990s.  At a deposition, the president of Burke Construction (not Steve Burke) confirmed the dates of employment in Montgomery's Social Security records.  He also testified that there were no records suggesting that Montgomery ever worked with J-M Manufacturing ACP while employed at Burke Construction or that Burke Construction ever worked with J-M Manufacturing ACP for that matter.

164.     Despite the information contained in the Social Security records and the testimony of the president of Burke Construction, Simmons Hanly persisted in claiming that Montgomery worked at Burke Construction during the period in which J-M Manufacturing supplied ACP.  On or about August 25, 2022, Foley, Goldstein, and Angelides served responses to interrogatories, signed by Foley, which listed Montgomery as working at Burke Construction from 1980 to 1995.

165.     In the context of the case, J-M Manufacturing also sought discovery around the *Peebles* complaint because many of the same lawyers working on *Montgomery* worked on the

cases described in the *Peebles* complaint. Simmons Hanly vigorously resisted these discovery requests, with Rosenthal claiming in a January 24, 2022 letter that the requests were in "bad faith" and made with "nefarious intent" and again threatening to seek sanctions.

166. After J-M Manufacturing filed a motion for summary judgment, Simmons Hanly decided to abandon the case and voluntarily dismissed it with prejudice. The *Montgomery* case that Simmons Hanly now has dismissed caused J-M Manufacturing to spend a significant sum of money to defend against the bogus allegations.

### E. More Examples of the Simmons Hanly Playbook Deployed in Furtherance of the Scheme

167. The cases described above highlight the elements of the Simmons Hanly Fraud Playbook. In the context of any one case and in the heat of litigation, the pattern remains hidden under the veil of aggressive litigation or careless lawyering. But the number of times the elements of the firm's scheme have arisen in its cases against J-M Manufacturing, coupled with the *Peebles* complaint, demonstrate that Simmons Hanly has a well-developed plan to extract money from J-M Manufacturing through a long-running pattern and practice of fraud (*i.e.*, the Simmons Hanly Fraud Playbook).

168. This section shows how pervasive and persistent the different aspects of the scheme have been in Simmons Hanly's litigation against J-M Manufacturing, the Individual Defendants' repeated touch points to the scheme, and why this case is not just about ordinary litigation but about a pattern of racketeering activity.

169. The cases described in detail above were not isolated incidents. In case after case, Simmons Hanly has put forward the same "story" and used the same tactics as part of the Simmons

Hanly Fraud Playbook. The pattern described by Peebles in his lawsuit against the firm is undeniable.

### 1. Scripted Product Identification Testimony

170. In asbestos litigation, the product identification and exposure evidence are the most important for a case against a defendant. Without evidence connecting the plaintiff or decedent to an asbestos-containing product of the defendant, there is no case against the defendant.

171. Plaintiff's law firms like Simmons Hanly are uniquely positioned to control product identification and exposure evidence because their client's testimony, and testimony of other witnesses with a relationship with Simmons Hanly, is with rare exception, the primary, and the only, evidence that purportedly connects the plaintiff or decedent to the asbestos-containing products of the tort defendants.

172. Defendants recognize the importance of product identification and exposure evidence. Simmons Hanly recognizes on its website that a defendant's willingness to settle depends on the strength of the product identification and exposure evidence:

> The time it takes to settle a mesothelioma case **depends on many factors**, like your lawyer's negotiation skills and the strength of the evidence showing which asbestos products you were exposed to.

173. The Simmons Hanly case team works with product identification witnesses to ensure that they offer strong product identification testimony. This includes "refreshing" the witnesses' memory either before the deposition or at the deposition with a picture of the product to facilitate the identification. For example, at the product identification witness depositions in *Bretado* (January 9, 2019), *Boyance* (February 26, 2020), *Montgomery* (October 5, 2021 & November 10, 2021), and *Azevedo* (May 14, 2020), the witness was shown a picture of J-M Manufacturing's ACP either at or before the deposition to facilitate the product identification.

- 59 -

With that picture, the witness could just testify about product characteristics by just looking at the picture as opposed to having an actual memory of the ACP.

174.     Of the cases that were part of J-M Manufacturing's investigation, the product identification witness provided remarkably consistent identifications of J-M Manufacturing's ACP.  To distinguish J-M Manufacturing's ACP from historic Johns-Manville pipe, the witnesses made sure to emphasize "transite" and "J-M":

| *Bretado* (January 9, 2019) | *Carranza* (June 7, 2019) | *Perkins* (August 19, 2019) |
|---|---|---|
| Q.  [W]hat is familiar to you?<br><br>A.  The name.<br><br>Q.  The name?  What – what are the letters of the name there?<br><br>A.  J-M transite pipe | Q.  Do you remember what numbers and letters you saw?<br><br>A.  The letters said, "J-M Transite." | Q.  What do you recall about the writing?<br><br>A.  It was in red and it said J-M Transite Pipe. |
| *Swiger* (July 17, 2019) | *Montgomery* (October 5, 2021) | *Morgan* (May 2, 2018) |
| Q.  Did you see any writing or stenciling on the pipe itself?"<br><br>A.  "J&M Transite Pipe."<br><br>Q.  Anything else on the pipe?<br><br>A.  No. Nothing – I mean, it would say J&M and say Transite several times down the pipe. | Q.  Was there any writing or stenciling on the pipe?<br><br>A.  Yes.<br><br>Q.  Please tell us.<br><br>A.  "J-M Transite" is what I remember. | Q.  Do you recall who manufactured the asbestos cement pipe?<br><br>A.  CertainTeed and later J-M Transite.<br><br>Q.  Is that J, dash, M Transite?<br><br>A.  Yes.  That's what was stenciled at least on the pipe, J-M. |

| Azevedo (May 14, 2020) | Boyance (February 26, 2020) | Noll (April 17, 2013) |
|---|---|---|
| Q. Okay. Now, sir, specifically with the transite pipe, do you recall any brand name or manufacturer name of the pipe?<br><br>A. J.M.<br><br>. . .<br><br>Q. So you do you specifically recall your working with J.M. transite pipe?<br><br>A. Yes. Sir.<br><br>Q. Sir, how is it that you recall that it was J.M. transite pipe?<br><br>A. It was printed on the outside.<br><br>Q. Okay. What was?<br><br>A. J.M. | Boyance described photograph as "J-M Transite pipe, Ring-Tite water pipe."<br><br>Q. Yeah, I was going to ask you to describe what's on there, but more importantly, is that a familiar name to you and designation?<br><br>A. It is. | Q. And with respect to these jobs for Hallett, what brand pipe was used, if you recall?<br><br>A. It was J-M.<br><br>Q. And how do you know that?<br><br>A. It was stamped on the pipe with black ink.<br><br>Q. Was there anything else stamped on the pipe?<br><br>A. Not to my knowledge. Not that I recall at this time. |

175.    The witnesses also had surprisingly clear memories about the color, texture, look, and characteristics of the ACP:

| Bretado (January 9, 2019) | Carranza (June 6, 2019) | Perkins (August 19, 2019) |
|---|---|---|
| Q. Okay. And can you describe the asbestos cement pipe? What did it look like, the color? | Q. Do you remember the diameter of these pipes? | Q. Do you recall any differences in the cement pipe that you were installing and cutting in 1979 than the cement pipe you installed as a |

A. It looked, like, gray color.

Q. Okay. And how long was the pipe?

A. Ten and other longer than ten.

. . . .

Q. From 1979-1989 what diameter sizes of asbestos cement pipe would you generally use?

A. The most common one was 4 and up, 4, 6, 8, 10, 12.

A.· Thickness, it was 6, 8, 10.· And some of them were 4 inches.

Q. And when you say the "thickness," you're talking about the diameter or the size of the hole of the pipe

A.· Yes

Q. How long were the pipes that J-M Transite made?

A. 10 feet, more or less

Q. What color was the J-M transite pipe?

A. It was like gray.

Q. When you carried the pipe, what did the outside of the pipe feel like?

A. It's not smooth. It's like – it's rough

light equipment operator or heavy equipment operator?

A. Yes. The latter part of my years there, the pipe looked like – between '83 to '85 it looked like a waffle. It wasn't a real smooth pipe. It was a – like a waffle print around it.

. . . .

Q. What was the color of the waffle print cement pipe?

A. What was the color of the waffle print? The whole pipe was gray.

. . . .

Q. For the waffle print cement pipe, what was the diameter of the pipe you used?

A. The diameter of the pipe we used?

Q. Yeah, in reference to that waffle print on that pipe.

A. Whatever it took for the sewer pipe. 6 to 10 inches. Somewhere between 6 to 10 inches.

. . . .

Q. What was the length of that pipe?

A. 13 feet.

| *Swiger*<br>**(July 17, 2019)** | *Montgomery*<br>**(October 5, 2021)** | *Morgan*<br>**(May 2, 2018)** |
|---|---|---|
| Q.  Describe to me what you recall – what was the size of this Transite pipe?  The – the length of the pipe?<br><br>A.  It was 13-foot sticks. 13 foot joints.<br><br>Q.  Okay.  Diameter, did it range, or was there only one?<br><br>A.  No.  It would range from 4-inch – 4-inch through 12-inch . . . .<br><br>Q.  What color was the pipe?<br><br>A.  It's kind of a dirty brown.  Most usually a – kind of a – between a dirty brown and an off-white.  And it would be – depending on what type of pipe it would be, if it was classified as rough barrel, on the outside of it would be like a waffle-type pattern and stuff.<br><br>Q.  Would this pipe, these links of pipe, would they all be 13 feet, or were there shorter lengths as well?<br><br>A.  Sometimes there were shorter lengths. | Q.  Could you describe what this Transite pipe looked like in the 1980s, from 1981 to 1987?<br><br>A.  It was kind of blue flakey kind of a honeycomb look.<br><br>Q.  Honeycomb look?<br><br>A.  Uh-huh.<br><br>Q.  When you – when you rubbed your hand across it, how did it feel?<br><br>A.  Rough.<br><br>Q.  And how long was it?<br><br>A.  Typical, 13-foot sections. | Q.  What color was the J-M Transite pipe?<br><br>A.  Gray.<br><br>Q.  How long was the J-M Transite pipe?<br><br>A.  Ten feet.<br><br>Q.  What was the diameter of the J-M Transite pipe?<br><br>A.  On my sites 4 to 6 inches.<br><br>Q.  Was there a design on the J-M Transite pipe?<br><br>A.  I remember it being a rough texture.  I can't remember exact design.<br><br>Q.  What did the inside feel like?<br><br>A.  Smooth. |

| *Azevedo*<br>**(May 14, 2020)** | *Boyance*<br>**(February 26, 2020)** | *Noll*<br>**(April 17, 2013)** |
|---|---|---|
| Q. Okay. Sir, can you describe the J.M. transite pipe?<br><br>A. It is grayish, rough on the outside, smooth on the inside, 6 inch diameter, 13 feet long.<br><br>. . .<br><br>Q. Sir, do you know what the J.M. transite pipe was to be use for in terms of what was to flow through the pipe?<br><br>A. Sewerage. | Q. Let's talk about your work or working with cement asbestos pipe. Can you describe what the color of the pipe is that you recall being cement asbestos?<br><br>A. It was maybe an off white or sort of a gray.<br><br>Q. And can you describe the texture on the outside?<br><br>A. The texture on the outside was rough.<br><br>Q. And what about on the inside?<br><br>A. It was smooth, smooth on the inside.<br><br>. . . .<br><br>Q. Okay. What lengths of pipe did they arrive at your jobsite?<br><br>A. I remember ten footers and thirteen footers.<br><br>Q. Okay. And what diameter size was the pipe you typically work with?<br><br>A. The minimum we used for the fire protection that was approved was four inch, and then we would use four, six and eight with the standards. We would get into ten inch. | Q. And do you recall ever seeing -- well, can you describe the pipe for me? What did it look like?<br><br>A. It was -- it was gray. It was rough outside and the inside was smooth. It was kind of a grit, you know, the texture on the outside<br><br>Q. Okay. Did it differ in any way from what you recall the CertainTeed pipe looked like?<br><br>A. They were close but I think the outside was a little bit rougher on J-M.<br><br>. . . .<br><br>Q. Do you recall what lengths the pipes came in?<br><br>A. 13 feet, around. |

176.     The consistency with which these witnesses testified over many different years in many different jurisdictions with many different Simmons Hanly lawyers involved yields the ineluctable inference of a coordinated product identification testimony strategy without regard for the actual facts of usage or exposure.  After all, the testimony of these witnesses is about ACP that they supposedly encountered 30 to 40 years ago and is nearly uniform.  This can only be explained by what Peebles observed:  coached and perjured testimony.

### 2.     Scripted Exposure Story

177.     The exposure narrative is just as important as the product identification testimony. As discussed above, Simmons Hanly has developed a "story" about how its asbestos plaintiffs or the decedents were exposed to the asbestos in J-M Manufacturing's ACP and the frequency of that exposure.  That story – which involves assertions about cutting the pipe with power tools "hundreds" of times – appeared over and over in the cases J-M Manufacturing reviewed:

| *Bretado*<br>**(January 9 & 16, 2019)** | *Carranza*<br>**(June 6, 2019)** | *Perkins*<br>**(August 19, 2019)** |
|---|---|---|
| Q.  Yeah.  Can you recall and/or estimate how many times a month or week you worked with asbestos cement pipe over that ten years?<br><br>A.  Yes.  Yes.  I worked – we worked all the time doing line drainage with asbestos cement pipe.<br><br>. . . .<br><br>Q.  What did you use to cut asbestos cement pipe from 1979 to 1989?<br><br>A.  A whole line chop saw. | Q. Can you give us an estimate of the total number of times your brother would have cut J-M  transite pipe?<br><br>A.  Yes.<br><br>Q.  How many times?<br><br>A.  Hundreds of times.<br><br>. . . .<br><br>Q.  What tools did you and your brother use to cut J-M transite pipe?<br><br>A.  We would use an electric saw. No. a gasoline-powered | Q.  Okay. And can you -- you mentioned something about cutting.  Would you ever personally have to cut any of the new pipe?<br><br>A.  Yes.<br><br>Q.  Okay.  And how did you go about doing that?<br><br>A.  We had a gas powered saw that would cut pipe.<br><br>. . . .<br><br>Q.  Dennis, do you have an estimate as to the number of 13-foot lengths J-M transite |

| | | |
|---|---|---|
| . . . . | saw. And electrical as well. Depending on the thickness. | pipe sections that you installed for the City of Barre between '83 and '85? |
| Q. Okay. What tool did you use to cut the holes, perforate the pipe? | . . . . | A. I'd probably say 3- to 400 pieces. |
| A. I would use the chop saw and the drills. | Q. Okay. Elias, when you and your brother used the electric or the gasoline saw to cut J-M transite pipe, can you describe to us what the working conditions were like? | Q. Can you estimate for me the percentage of those 3- to 400 pieces of pipe you had to cut? |
| Q. And drills? | A. It was – there was a lot of dust – | Q. Can I have the answer, please, Dennis? |
| A. Yes, yes, the drills. | Q. Could you see – | A. 80 percent. |
| . . . . | A. from the pipe. From the pipe that we were cutting. | |
| Q. What kind of tool did you use to cut the asbestos cement pipe for Oakridge? | Q. Could you see that dust in the air? | |
| A. Saws, disk saws. | A. Everybody could see it. Even from far away. | |
| Q. And was that a power saw or a handsaw? | | |
| A. Electric. Motor, engine, yes. | | |
| Q. And was it electric or gas or something else? | | |
| A. Gas. | | |
| . . . . | | |
| Q. Was the drill also a gas-powered drill? | | |
| A. Drill to make the holes on the pipes was electric. | | |
| ***Swiger*** **(July 17, 2019)** | ***Montgomery*** **(October 5, 2021 & November 10, 2021)** | ***Morgan*** **(May 2, 2018)** |
| Q. Okay. Now, for the fitting purpose, what tool or | Q. [Sharing picture] Is this a true and accurate representation of the cutting you saw at the work site | Q. During this time period do you have a specific recollection of the plumbers |

tools would you use to cut the pipe?

A. We used what was called a cutoff saw. It's like a chainsaw, has a circular blade out on the end of it and you would . . .

Q. And do you remember the name or manufacturer of the cut-off saw?

A. I think it was a Stihl, but I'm not really 100 percent sure.

. . . .

Q. But let me ask you this. You just – when I asked you about just making – I'm – I'm asking you about a small category – just making cuts to fit on new pipe between '82 and '89, you said at least one cut every time.

A. Yes, sir.

Q. and you did that at least once a week?

A. Most usually, yeah. It would average out to like once a week.

Q. Okay. So with that knowledge, can you estimate how many cuts are we talking about?

A. Throughout the whole time period, I mean, it would have been a few hundred.

. . . .

during the 1980s of the Transite pipe you described?

A. Yes, it was also not on the stand, sometimes it was just on the – it was either cut sometimes in the ditch, if that was possible, or it would also be sometimes cut on the spoil.

. . . .

Q. And you mentioned, when Burke Construction employees would cut transite pipe, they would use a power saw –

A. Yes.

Q. – is that right?

A. Yes.

. . . .

Q. When Burke construction employees would use the power saw to cut transite pipe, during the 1981 to 1987 time period, do you recall seeing dusty conditions in the air?

A. Yes.

cutting the asbestos cement pipe?

A. Yes.

Q. Can you please described how the plumbers cut the asbestos cement pipe?

A. They would either use a gas or electric saw and it created dust?

. . .

Q. Hold up. From 1979 through 1985 while working for Spriggs & Company at the two or three projects a year where the asbestos cement pipe was cut, how many cuts did you observe at each project?

A. 20 to 50, depending on the project.

| | | |
|---|---|---|
| Q. With regard to that Transite pipe that you worked on, I think between December '82 until the late '80s or early '90s, can you estimate for me how many times you had to manipulate that pipe in any way?<br><br>A. Altogether, it was probably thousands. | | |
| *Azevedo*<br>*(May 14, 2020)* | *Boyance*<br>*(February 26, 2020)* | *Noll*<br>*(April 17, 2013)* |
| Q. Can you describe the cutting tool or tools that you used to cut the J.M. transite sewer pipe?<br><br>A. Used a saw with a carborundum blade I think they call it.<br><br>Q. Can you describe the conditions in the air when you would use a saw with the carborundum blade to cut through the J.M. transite sewer pipe?<br><br>A. Very thick dust.<br><br>. . .<br><br>Q. And, sir, this saw -- how is the power?<br><br>A. It was -- it was a gas saw.<br><br>. . . .<br><br>Q. Now, sir, on these 5 to 6 jobs between '84 to '87, did | Q. Let me show you what I have marked as Exhibit 6 and if you take a look at it and then hold it up to the video.<br><br>Q. Is that a familiar photograph to you?<br><br>A. It is.<br><br>Q. And what is it depict – what does it depict?<br><br>A. It depicts a carborundum cutoff saw cutting the pipe, and over here is a rasp for machining the end, the end of the pipe.· And this looks like a lot of dust coming off of the blade that's cutting the pipe.<br><br>. . . .<br><br>Q.· Over this ten-year period of time that we are talking about, did -- how many times do you estimate you cut pipe with a carborundum saw like in Exhibit 6? | Q. And how did you cut that pipe?<br><br>A. We cut it with an electric saw. And there would be cloud of asbestos dust, you know.<br><br>. . .<br><br>Q. Right. And while you were working these jobs, these jobs for Hallett, what did you – what did you use to cut the pipe?<br><br>A. We used electric saw.<br><br>Q. And when you say electric saw, is this like a Skil Saw?<br><br>A. Yes.<br><br>. . . .<br><br>Q. Okay. Regarding those eight projects that you worked with J-M asbestos cement pipe with Dennis Hallett, on average how many |

| | | |
|---|---|---|
| these vary in times of length, length of time? | A. Every job, at least for a final cut or whatever, every job would require this to be done. | cuts would you make during a project installing that pipe? |
| A. Yes, sir.  Yes, sir, they did. | | A.  During the whole project? |
| Q.  Do you recall the shortest job that you worked with the J.M. transite sewer pipe? | Q.  Well, you said you have done hundreds of jobs.· Did you do this hundreds of times or is this – | Q.  Uh-huh. |
| | | A.  It would be hundreds. |
| A.  Two weeks. | A. Hundreds of times. | Q.  Okay. And I'm just talking about on one project, how many -- |
| Q.  And, sir, do you recall the longest job? | . . . . | A.  Oh, on one project? |
| A.  Four weeks. | Q. Okay.· And how many times in the 1970s·time period we are talking about did you actually rasp and machine the ends of cement asbestos pipe? | A. Probably 50 or more. |
| Q.  Sir, whether it be a 2 week sir or up to a 4 week job, can you gives us an idea without you guessing how often that you cut and, you know, filed the ends of the J.M. transite sewer pipe at a job? | | |
| | A. Hundreds of times. | |
| | . . . . | |
| A.  Each day. | Q. Okay. Yeah. Do you have an estimate of how many times you worked with cement asbestos pipe and was labeled such as in Exhibit 14? | |
| Q.  Okay. | | |
| A.  10 times. | | |
| Q.  That does answer my followup question.  On an average day, is it your testimony that you cut and rasped and filed the J.M. transite sewer pipe 10 times? | A. Hundreds of times. | |
| A.  Yes. | | |

178.    Again, the consistency of the narrative across cases lends proof to the allegations in the *Peebles* complaint about perjured testimony and the subornment of perjury.

179. At the time of all this supposed cutting of ACP with power tools, there were strict workplace regulations for over approximately a decade that required significant safety precautions related to cutting ACP.

180. Because cutting ACP in the field with power tools in the years that J-M Manufacturing supplied ACP was exceedingly rare or non-existent, it is not credible that asbestos plaintiff after asbestos plaintiff represented by Simmons Hanly did not follow OSHA and other workplace regulations and was exposed to the asbestos in J-M Manufacturing's ACP in the exact same way.

181. In addition, J-M Manufacturing had express warnings on its ACP that cautioned not to cut the ACP with a power saw, and the literature that J-M Manufacturing provided with the ACP contained similar warnings. J-M Manufacturing had no reason or incentive to refrain from giving such warnings or to allow the illegal handling of ACP.

### 3. Scripted Denials about Warning Labels

182. Simmons Hanly understands that the warnings on the J-M Manufacturing ACP could support affirmative defenses against their cases. Accordingly, based on information and belief, the Simmons Hanly case team coached and instructed asbestos plaintiffs and other product identification witnesses to testify that they never saw any warnings labels on asbestos products. The following cases illustrate this practice:

| *Bretado*<br>(January 16, 2019) | *Carranza*<br>(June 6, 2019) | *Perkins*<br>(August 19, 2019) |
|---|---|---|
| Q. Did you ever see the word "asbestos" on any—printed on any asbestos cement pipe? | Q. At any point on the J-M Transit pipe between 1984 and 1989, did you ever see a warning on the pipe warning you of the dangers of asbestos? | Q. And I can go ahead and read it. Am I correct that Defense Exhibit 3 reads: Caution. Do not use power saws to cut this pipe. Breathing dust created by improper work practices may |

| | | |
|---|---|---|
| A. I never saw any label of warning that it was dangerous.<br><br>. . . .<br><br>Q. I'm not sure I asked you about this during Oakridge. During your entire time when you worked at Oakridge, did you ever see any warning or labels on any asbestos cement pipe?<br><br>A. No. | A. No. Never.<br><br>Q. Did you ever see a skull and crossbones?<br><br>A. No. If I had seen it, that means there's a danger. My brother and I would have stopped. | cause serious bodily harm. When cutting, machining, or tamping, refer to the recommended work practice guide furnished to your employer. Did I read that correctly?<br><br>A. Yes.<br><br>Q. Did you ever see this warning on any piece of asbestos cement pipe or cement pipe -- well, strike that. Did you ever see this warning on any piece of J -- J-M Manufacturing Company, Inc. asbestos cement pipe?<br><br>A. No.<br><br>. . . .<br><br>Q. Counsel for J-M showed you a warning that they claim was on that pipe. Just to be clear, you never saw that warning on any piece of transite pipe you ever worked with for the City of Barre, is that correct?<br><br>A. I never seen that warning on any of the pipe. |
| ***Swiger***<br>**(July 17, 2019)** | ***Morgan***<br>**(May 2, 2018)** | ***Azevedo***<br>**(March 3, 2020)** |
| Q. Was there any – to your recollection on the pipe, both the JM and the CertainTeed, were there ever any warnings on that pipe?<br><br>A. Not that I remember, no. It was just the – the wording, | Q. Did you ever see any warnings about the dangers of asbestos on the CertainTeed pipe?<br><br>A. No. | Q. Was there any warning on the pipe?<br><br>A. No. |

| | | |
|---|---|---|
| the "Transite," the "JM Transite Pipe" and "CertainTeed." I never seen no warnings or anything on there. | Q. Did you ever see any warnings about the dangers of asbestos on the J-M Transite pipe?<br><br>A. No.<br><br>Q. Did you ever receive any warnings about the dangers of asbestos from the J-M employees?<br><br>A. No. | |
| ***Boyance***<br>**(February 26, 2020)** | ***Noll***<br>**(April 17, 2013)** | |
| Q. Did any distributor that you mentioned of cements asbestos pipe ever warn you that the dust was potentially hazardous to your health?<br><br>A. Definitely not. I wouldn't have ordered it or I wouldn't have installed it or I wouldn't have machined it. I wouldn't have had anybody working for me either.<br><br>. . . .<br><br>Q. Did any distributor or manufacturer of J-M Transite pipe ever warn you in writing or --<br><br>A. Never warned.<br><br>Q. -- about the potential health hazards of working with it?<br><br>A. That's correct. Never. | Q. Do you recall ever seeing any warnings on the pipe?<br><br>A. I don't recall seeing warnings. | |

4. **Vague and Deceptive Testimony and Discovery Responses to Avoid Discovery That Might Frustrate the "Story"**

183. Another common pattern in Simmons Hanly cases is for the product identification and exposure witnesses represented by the firm to provide vague or incorrect details about employers, job locations, and co-workers. This makes it difficult, if not impossible, for J-M Manufacturing to affirmatively disprove Simmons Hanly's narrative. At the very least, J-M Manufacturing ordinarily has to hire an investigator to look into the asbestos plaintiff or decedent's work history. This also creates a question of fact that is unlikely to be resolved on summary judgment, exposing J-M Manufacturing to the costs and hazards of continued litigation

184. On a number of occasions, J-M Manufacturing has discovered that the information provided by Simmons Hanly and the Simmons Hanly represented witness was fabricated. This was true in at least *Bretado*, *Carranza*, *Yates*, and *Montgomery*.

185. Regardless of the case, however, the Simmons Hanly product identification and exposure witness has testified in ways designed to make it extremely difficult to test the narrative that the firm has crafted and laid out in discovery:

| *Bretado* (January 16, 2019) | *Carranza* (June 6-7, 2019) | *Perkins* (August 19, 2019) |
|---|---|---|
| Q. [D]o you recall any locations at which you did any landscaping work, whether by address or the major cross – cross streets or anything like that that we could identify where the job was?<br><br>A. No, I don't remember.<br><br>. . . . | Q. The construction work you and your brother performed together; was that residential, commercial, or industrial construction work?<br><br>A. It's industrial, commercial.· Everything. And residences too.<br><br>. . . .<br><br>Q.· Do you remember beginning in 1984 or '85 who | Q. Do you recall any of the addresses where any of the waffle print cement pipe was installed during your tenure at the City of Barre?<br><br>A. I don't remember.<br><br>Q. Do you recall any specific landmarks or locations that would help pinpoint where the work took place? |

Q.  Okay.  Do you know the addresses of any of the locations where you did drainage work for Oakridge?

A.  No, I don't remember.

. . . .

Q.  All right.  Can you recall any locations at which you did drainage work for Dean Hensley?

A.  No, honestly, no.

. . .

Q.  Do you recall the names of any of the private owners that you did this drainage work for?

A.  No.

Q.  Do you recall the names of any contractors or parties that may have hired Hensley to do the drainage work?

A.  No, I don't remember.

. . . .

Q.  Do you recall any names of any coworkers by first and last name at Hensley?

A.  Names that – the names I remember, but not the last names –

. . . .

Q.  Do you recall any locations at which you worked for Mr. Tatoshician?

you and your brother worked for?

A.·  We made friends with some men.·  They were Americans.·  Gringos.·  And they gave us a chance to work with them.·  And then they themselves would refer us to other people.·  The name of one of those guys is Gregorio.·  And Rogelio.

Q.  And is the American version of that name Greg and Roger?

A.  Yes.

Q.·  Were Greg and Roger partners?

A.  Yes.·  Yes.

Q.  Do you remember their last names?

A.  I never knew their last names.·  They always paid us cash.

. . . .

Q.  Can you give us an estimate of the total number of jobs that you and your brother worked on between 1984 and 1989 where you used J-M transite pipe?

A.  Hundreds

A.  Hundreds of places we used it.

. . . .

A.  No.

A.  No, I don't remember.

Q.  Do you know any of the names of any contractors or landowners who may have hired Bob Tatoshician to do the drainage work?

A.  No, I don't remember.

Q. Where did you go?

A. To work at a construction.

Q. Where?

A. They're in Orange.

Q. Where in Orange?

A. I had gotten there just that weekend. I didn't even know when the sun came up.

Q. Well, as you lived there, you got to know the city.· Looking back on that time, where did you go?

A. I don't even know where it was they took me.

. . . .

Q.  Okay.  Did you ever, after June of '84, install pipe for anyone other than Roger and Greg?

A.  Yes.

Q.  Who?

A.  Hundreds of persons.

. . . .

Q.  Are there any other sites you can recall by street names or addresses where you know you worked with J-M transite?

A.  Hundreds. Hundreds of them.

Q.  Is there any others by address or street name that come to mind right now?

| | | |
|---|---|---|
| | A. We used to use just as much of J-M and then also the CertainTeed.<br><br>Q. Okay.<br><br>A. It would be difficult to tell you so many, so many, so many. | |
| ***Swiger***<br>**(July 17, 2019)** | ***Morgan***<br>**(May 16, 2018)** | ***Azevedo***<br>**(May 14, 2020)** |
| Q. Okay. If I asked you for specific dates and times of every day that you worked on that pipe, would you be able to give that to me?<br><br>A. No, sir. Not specific dates and times. I mean, just a basic recollection.<br><br>. . . .<br><br>Q. But is there any more detail in regards to the location on the line of each specific weekly job over nine years that you could provide?<br><br>A. No. Just basically ran from outside of Clarksburg to Smithfield on that 47-mile line. Somewhere – somewhere on that 47 mile line. | Q. Okay. Are you able to identify any of the names of any customers or premises for whom Bill Spriggs did any construction work for during the '79 to '85 time period?<br><br>A. I can't remember at this time.<br><br>Q. Can you identify for us any location by address, landmark, or other identifying feature that might help us figure out what specific locations you worked at for Spriggs?<br><br>A. I cannot -- | Q. Okay. Do you recall where you worked with J.M. transite pipe?<br><br>A. Polaroid and others.<br><br>Q. Do you recall which Polaroid?<br><br>A. No, sir. I do not. |
| ***Boyance***<br>**(March 5, 2020)** | ***Noll***<br>**(April 17, 2013)** | ***Montgomery***<br>**(October 5, 2021)** |
| Q. And do you know of any documents that you could provide me that would | Q. Okay. And what's the next job you worked for him on? | Q. Do you know or have any information about any jobsites by name or |

provide any additional information about your alleged work with a J-M ·Manufacturing product?

A. No.  I didn't keep anything over seven years.

. . .

Q. And do you know of any witnesses, other than your two brothers that you've identified, that I can speak to about your alleged work with a J-M Manufacturing product?

A. I don't know of anybody else.

Q. And I couldn't find this, and maybe it's -- it was in the record, and I apologize if it was asked. Are you ever able to estimate the number of times or job sites that you believe you worked with a J-M Manufacturing product?

A. I don't.· I don't recall.

A.  We did a lot of jobs, you know, so I don't recall at this time.

Q.  Okay. When was the next job that you worked on with him that involved AC pipe?

A.  It's the same answer.  I don't recall at this time.

Q.  Okay. When was the last time you worked on an AC pipe job for Hallett?

A.  It's the same.  I don't recall.

Q. You just don't recall?

A. I don't recall at this time.

. . .

Q.  Is Hallett still alive?

A.  I don't know that either.

Q.  Okay. Do you know any -- the names of anyone that you worked with at Hallett who were still living?

A.  No, I don't.

. . . .

Q.  Forgive me if I asked this already. Anyone that you worked with for Hallett that you know is still living?

A.  I don't recall their names.

description or location that [Mr. Montgomery] worked at while an employee of Burke Construction?

A.  No.  Personally, I don't.

### 5. Suppression of Evidence to Asbestos-Containing Products of Bankrupt Companies

186. Another component of Defendants' scheme is to conceal evidence of exposure to asbestos-containing products of bankrupt companies. In at least one case (*Perkins*), Simmons Hanly concealed a proof of claim that it filed in a bankruptcy of another ACP company. J-M Manufacturing suspects that this will be true in other cases but does not have access to that evidence because the identity of bankruptcy trust claimants is typically confidential unless the bankruptcy trust claimant consents to disclosure or the bankruptcy trust receives a subpoena. Put differently, this information is uniquely in the custody and control of Defendants, and J-M Manufacturing expects to obtain additional evidence of Defendants' fraud related to bankruptcy trust claims in the course of discovery in this action.

187. Simmons Hanly cases also rarely contain any information about exposure to asbestos-containing products of bankrupt companies. The absence of details about exposure to friable asbestos products, which were manufactured by now-bankrupt companies, as a contributing cause to the Simmons Hanly plaintiff or decedent's asbestos-related disease defies logic. Based on information and belief, Defendants keep that information concealed to maximize recovery against solvent defendants like J-M Manufacturing.

### 6. Over-Naming and Filing Baseless Claims in Plaintiff-Friendly Jurisdictions to Extract Settlements

188. Simmons Hanly boasts on its website that the typical asbestos lawsuit now names nearly 70 solvent defendants. In the lawsuits that Simmons Hanly has filed against J-M Manufacturing, Simmons Hanly routinely has named more than 20 defendants. The reason that Simmons Hanly casts a wide net is to maximize its potential recovery. Based on both information and belief and J-M Manufacturing's experience in litigation against the firm, the lawsuits name any solvent entity even marginally relevant to the asbestos plaintiff or decedent's work history

regardless of whether the firm has evidence of any exposure to those entities' asbestos-containing products.

189.    In the lawsuits that Simmons Hanly has filed against J-M Manufacturing, the firm has routinely named J-M Manufacturing in lawsuits that it knows are baseless for settlement leverage.  The strategy is simple: name J-M Manufacturing in every possible lawsuit that could be potentially relevant to the company's ACP, file those lawsuits in a few plaintiff-friendly jurisdictions, and rely on the sympathetic nature of its clients and the sheer volume of cases and associated defense costs, to exert as much settlement pressure as possible.  With these baseless lawsuits, the firm (a) attempts to force J-M Manufacturing into a settlement to avoid the risk of an adverse runaway verdict in a jurisdiction in which it knows the company will be treated unfavorably or (b) uses these sham lawsuits as "bargaining chips" to be dismissed or resolved as part of global settlement negotiations.

190.    Since 2019, Simmons Hanly has voluntarily dismissed more than 60 of these sham lawsuits against J-M Manufacturing.   This includes instances in which the firm agreed to voluntarily dismiss lawsuits to entice J-M Manufacturing to settle other Simmons Hanly lawsuits against the company.  The willingness of the firm to so easily dismiss lawsuits highlights the firm's misconduct.

### 7.    Actions to Silence People and Activity That Might Expose the Scheme

191.    An additional aspect of the scheme is to ensure that the scheme is not exposed. Peebles threatened to blow the top off of and expose the Simmons Hanly Fraud Playbook after he was instructed to engage in the scheme as an attorney in the firm's Asbestos Department.

192.    Goldstein did everything he could to keep Peebles quiet.  According to the Peebles complaint, Goldstein "instructed" Peebles not to inform certain members of Simmons Hanly upper management about the Simmons Hanly Fraud Playbook.  When Peebles refused, Peebles alleges

that Goldstein retaliated against him "by falsely characterizing him as insubordinate and calling his 'judgment' into question to senior members of the firm."

193.    Peebles attempted to turn to Garrett to address the retaliation, informing her about the unlawful conduct and the retaliation.  Shortly after that meeting, Garrett and another member of Simmons Hanly's upper management in Illinois flew to San Francisco and fired Peebles without explanation.  After the termination, the firm withheld wages from Peebles "seeking to extort a release of claims . . . and a confidentiality agreement, designed to conceal and keep secret the unlawful and unethical conduct."  This is when Peebles filed his complaint.

194.    The *Peebles* lawsuit was heavily litigated by Simmons Hanly, which filed a demurrer, a cross-complaint, and a motion for a preliminary injunction.  In connection with filings in the lawsuit, Peebles added additional detail around what he had discovered.  According to Peebles, the firm had engaged in "the intentional suppression" and "falsification of evidence." Peebles stated in the lawsuit that the evidence that he uncovered was of "conduct that not only affects himself, his client, and [Simmons Hanly], but conduct that indicates a larger pattern and practice that could affect thousands of [Simmons Hanly] clients."  That "unlawful and unethical conduct," according to Peebles, was of an "offensive and shocking nature."

195.    The firm's fight against Peebles, which was led by a team that consisted of lawyers in Chicago, and its efforts to keep Peebles silent about the details of his complaint, and ultimately, the Simmons Hanly Fraud Playbook, came to an end when the firm settled with Peebles and imposed a confidentiality obligation on him.

196.    Sometime in or after October 2021, J-M Manufacturing learned about the *Peebles* complaint, after the matter had been settled and the case had been dismissed.  Knowing that Peebles had worked on Simmons Hanly matters against J-M Manufacturing, the company sought the case

number of the primary underling lawsuit reference in the complaint and an unredacted version of the complaint.

197.    Almost immediately from learning of the complaint, J-M Manufacturing filed an *ex parte* application to unseal the complaint and track down the case number of the underlying lawsuit discussed in it.  Simmons Hanly fought every effort by J-M Manufacturing to discovery information about the facts underlying the *Peebles* complaint in an attempt to try to keep the details of the firm's "unlawful, unethical, and fraudulent conduct" quiet, including opposing the application to unseal.

198.    The court granted J-M Manufacturing's application in part, unsealing the case number, which is how J-M Manufacturing confirmed the primary underlying asbestos lawsuit discussed in the *Peebles* complaint is *Bretado*.  The court denied the company's request to unseal the complaint itself, however, reasoning that the complaint had not been sealed when filed but rather was filed in redacted form.  This meant the court did not have an unredacted version of the *Peebles* complaint in its case docket that it could unseal.  That decision was affirmed by the Court of Appeals in California in October 2023, in an appeal that also was resisted by Simmons Hanly.

199.    Concerned that the misconduct alleged by Peebles might extend to other Simmons Hanly cases against the company, J-M Manufacturing also sought an unredacted version of the complaint as part of discovery in certain underlying asbestos lawsuits, in particular in *Montgomery*.  Simmons Hanly resisted that effort too, with Rosenthal opposing a motion to compel.

200.    The court in *Montgomery* denied the motion to compel based on a finding that the complaint was not directly relevant to the *Montgomery* lawsuit.  But in doing so, the court noted that "[t]his is a very serious matter" and stated that it "hop[ed]" that Simmons Hanly had "retained

counsel" because the court's ruling "does nothing to get [the] firm passed a very, very serious allegation being made against it."

**RACKETEERING ALLEGATIONS**

**A.      The RICO Enterprise**

          **1.      Simmons Hanly Enterprise**

201.    Simmons Hanly is a legal entity that constitutes an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affect interstate commerce. Based on information and belief, while the firm engages in at least some legitimate activity, the scheme carried out by the Asbestos Department and the pattern of racketeering in furtherance of the scheme, constituted a material portion of the firm's business.

202.    At all relevant times, the Simmons Hanly Enterprise was engaged in, and its activities affected, interstate commerce within the meaning of 18 U.S.C. § 1962(c) through the use of mail and interstate wires.

203.    The Individual Defendants operated, managed, and directed the affairs of the Simmons Hanly Enterprise in furtherance of the scheme through a pattern of racketeering activity. They understood that their ability to extract and maximize financial gain from the pursuit of fraudulent claims against J-M Manufacturing and others depended on (i) the fabrication of a story of what asbestos-containing products the asbestos plaintiff was exposed to and how the exposure supposedly occurred; (ii) the denial of the existence of visible warnings on asbestos-containing products; (iii) the concealment of information concerning exposure to products of insolvent companies and the details of bankruptcy trust claims filed by the plaintiff; (iv) the mass filing of cases in a few handpicked friendly jurisdictions to maximize pressure to settle; and (v) the protection of the secrecy of the scheme.

204.   The enterprise is led by members of management of the firm and the Asbestos Department, including Defendants Simmons, Angelides, Browder, and Garrett.[85]  As discussed in more detail below, Simmons is a principal and owner of both Simmons Hanly and Sokolove. Under Simmons' leadership and direction, Angelides is the mastermind of the enterprise's strategy in asbestos and mesothelioma litigation, Browder oversees the operation of the enterprise to ensure that it maximizes results, and Garrett ensures that the enterprise's affairs are not exposed.  The members of the enterprise have worked up a "story" about each asbestos defendant, including a bogus J-M Manufacturing exposure "story," that forms the basis of the scheme.

205.   Nicholas Angelides is the brainchild of "the legal strategy" – the Simmons Hanly Fraud Playbook – that forms the basis of the Simmons Hanly fraud scheme and is the Chair of the Asbestos department.  Simmons and Angelides are fairly viewed as the heads of the RICO enterprise.

206.   Angelides was on the case team in a number of the sample fraud cases discussed in this complaint, including *Bretado* – the primary asbestos lawsuit underlying the *Peebles* complaint – and *Montgomery*.  In those cases, Angelides is listed as one of the lawyers responsible for the complaints and discovery responses that contained fraudulent information that were sent by interstate wire or mail.   Based on information and belief, Angelides and/or Browder were also involved in the termination of Peebles following his reports of unlawful and unethical conduct in the Asbestos Department.

207.   Put simply, Angelides not only knew about, agreed to participate in, and participated in the fraud scheme, he was in whole or in part responsible for developing the

---

[85] Simmons Hanly Conroy, Meet our Asbestos Leadership, https://www.simmonsfirm.com/mesothelioma/lawyer/asbestos-leadership/.

Simmons Hanly Fraud Playbook. Additional evidence of the involvement of Angelides in the fraudulent scheme is in the exclusive knowledge or control of the Defendants and will be revealed as part of discovery.

208.     Perry Browder "manages the firm's more than 50 asbestos attorneys" and "oversees all asbestos cases to ensure they are handled in an efficient manner that maximizes results." Browder is effectively Angelides' deputy and a leader within the RICO enterprise, running the day-to-day operations of the enterprise and overseeing its most lucrative rackets.

209.     Browder's primary involvement with the RICO enterprise relates to case settlement and asbestos trust claims. Browder ensures that the Simmons Hanly Defendants cash-in on their scheme. For example, Browder was involved in, signed, and transmitted paperwork related to the settlements in *Bretado* and *Perkins*. Browder sent many emails and letters in interstate commerce in furtherance of the scheme to extract money from J-M Manufacturing through settlement. Browder also was involved in the decisions about and filings of bankruptcy trust claims in *Perkins* and *Swiger*. And based on information and belief, Browder is involved in the decision making related to sham or meritless cases that are filed against J-M Manufacturing and used as bargaining chips to encourage settlement of other Simmons Hanly asbestos cases.

210.     Based on information and belief and as stated above, Angelides and/or Browder were involved in the termination of Peebles following his reports of unlawful and unethical conduct in the Asbestos Department. Additional evidence of the involvement of Browder in the fraudulent scheme is in the exclusive knowledge or control of the Defendants and will be revealed as part of discovery.

211.     At relevant times, Amy Garrett was the Assistant Managing Partner of the firm and part of the firm's Asbestos Department. Garrett has knowledge of the Simmons Hanly Fraud

Playbook, agreed to participate in the scheme using that playbook, and acted to ensure that the scheme was not exposed. Garrett is crucial to the operation of the RICO enterprise, acting as an advisor and serving as the right-hand person to resolve issues and threats to the success and continued operation of the enterprise.

212. Garrett is identified in the *Peebles* complaint as the member of Simmons Hanly "upper management" to whom Peebles reported the unethical and unlawful conduct that was occurring in the Asbestos Department. After receiving this information, Garrett took part in the effort to silence Peebles, including participating in the termination of Peebles. Garrett also was one of the firm's leaders in responding to Peebles' lawsuit and preventing it from moving forward to avoid exposure of the Simmons Hanly Fraud Playbook. Garrett, for instance, executed declarations that were transmitted across interstate lines and filed with courts on February 23, 2021, April 23, 2021, and June 2, 2021, in support of the firm's motion for injunction, cross-complaint, and motion to stay. Additional evidence of the involvement of Garrett in the fraudulent scheme is in the exclusive knowledge or control of the Defendants and will be revealed as part of discovery.

213. Benjamin Goldstein serves as the firm's West Coast Asbestos Litigation Manager. He is in charge of the firm's West Coast asbestos litigators to ensure these litigators do not upset the operation of the Simmons Hanly Fraud Playbook.

214. Goldstein supervised Peebles when Peebles worked at the firm and is identified in the *Peebles* complaint as "ROE 1." Goldstein was involved in *Bretado*, *Carranza*, *Yates*, *Montgomery*, and *Morgan*, and specifically was targeted by the *Peebles* complaint as knowing about, directing, and taking part in the "unlawful, unethical, and fraudulent" conduct that forms the basis of the Simmons Hanly fraud scheme. Goldstein is among the attorneys of record

responsible for the complaints and discovery responses that contained fraudulent information and that were sent by interstate wire or mail, described below.  In addition to these predicate acts, Goldstein took part in the retaliatory conduct described in the *Peebles* complaint when Peebles sought to reveal the Simmons Hanly Fraud Playbook and expose the scheme.  Additional evidence of the involvement of Goldstein in the fraudulent scheme is in the exclusive knowledge or control of the Defendants and will be revealed as part of discovery.

215.    Suvir Dhar, Crystal Foley, and Deborah Rosenthal were responsible for implementing the strategies of the Simmons Hanly Fraud Playbook on a day-to-day basis.  Their involvement in the scheme includes soliciting perjured testimony (Dhar in *Carranza*); preparing, filing, and serving complaints that contained false information about product exposure or other falsities (*Bretado*, *Carranza*, *Yates*, and *Montgomery*), preparing and signing written discovery responses containing fraudulent information (same cases), and sending threatening letters and emails to facilitate or hide the scheme (Rosenthal in *Yates* and *Montgomery*).  These individuals have the most direct involvement in countless predicate acts over the years in furtherance of the scheme.  Additional evidence of the involvement of Dhar, Foley, and Rosenthal in the fraudulent scheme is in the exclusive knowledge or control of the Defendants and will be revealed as part of discovery.

216.    Stan Jones, based on information and belief, helped manufacture the testimony and "evidence" used in the sham asbestos lawsuit underlying the *Peebles* complaint and assisted in the coaching of Simmons Hanly represented witnesses both before and during key depositions that were transmitted via interstate wires, as described below.

217.    Jones was the first person that Peebles sought to depose to prove his allegations against the firm.  Jones "assisted" the product identification witness in that lawsuit and *Carranza*

deliver false and coached testimony to further the firm's "story." Additional evidence of the involvement of Jones in the fraudulent scheme is in the exclusive knowledge or control of the Defendants and will be revealed as part of discovery.

218. At all relevant times, the Simmons Hanly Enterprise was foreseeably engaged in, and its activities affected, interstate commerce within the meaning of 18 U.S.C. § 1962(c). Defendants are involved in business involving clients in different states, asbestos defendants engaged in interstate commerce, and various state courts' electronic filing systems.

219. Defendants conducted or participated, directly or indirectly, in the conduct, management, or operation of the Simmons Hanly enterprise's affairs through a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5) and in violation of 18 U.S.C. § 1962(c), namely, mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343.

## 2. Association-in-Fact Enterprise

220. In the alternative, Simmons Hanly and the Individual Defendants, together with Sokolove, constitute an association-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c). Each of the Defendants participated in the operation or management of the enterprise. The association-in-fact enterprise is highly structured. Each member has a role to play as described *supra*, and they all work toward the common goal of extracting money through a pattern of unlawful sham litigation, which includes racketeering activity. The enterprise itself is distinct from Simmons Hanly, Sokolove, and each of the Individual Defendants. Defendants worked to operate the association-in-fact enterprise and manage its affairs through a corrupt pattern of fraud.

221. Defendants have associated with one another in the association-in-fact enterprise for the common purpose of reaping financial rewards for themselves through fraudulent conduct in legal marketing and asbestos litigation. Each Defendant played a role and depended on other

members to carry out their respective roles in furtherance of the scheme. As part of the scheme, Sokolove made false and misleading public statements about the nature of the firm and its services in order to reel in prospective clients from all 50 states while avoiding state regulatory oversight. The Simmons Hanly Defendants and Sokolove, under John Simmons' leadership, then worked together to convert prospective clients to asbestos plaintiffs that Simmons Hanly could monetize by filing a large volume of cases, often built on lies, against J-M Manufacturing and others in a few handpicked jurisdictions. As described *supra*, the Individual Defendants each played an integral role in implementing the Simmons Hanly Fraud Playbook and using sham litigation to extract settlements from J-M Manufacturing and others. Those financial rewards were then distributed among the Simmons Hanly Defendants and Sokolove.

222. Defendants shared longstanding relationships. The association-in-fact enterprise was of sufficient longevity, has been in continuous operation for over five years, at least as early as 2017, and threatens to continue into the future. These relationships are described *supra*, and reflect that certain partners of Simmons Hanly, such as John Simmons, Ricky LeBlanc, and Valere (Laurence) Nassif, also have managerial roles at Sokolove and that the two law firms have been financially intertwined for more than five years. On information and belief, Simmons Hanly has an ownership interest in Sokolove and John Simmons has an ownership interest in both. In addition, the two firms have shared a longstanding marketing relationship for over a decade in which Sokolove refers clients to Simmons Hanly in exchange for a large percentage of the recoveries in those cases.

223. At all relevant times, the association-in-fact enterprise was foreseeably engaged in, and its activities affected, interstate commerce within the meaning of 18 U.S.C. § 1962(c).

Defendants are involved in business involving clients in different states, asbestos defendants engaged in interstate commerce, and various state courts' electronic filing systems.

224. Defendants conducted or participated, directly or indirectly, in the conduct, management, or operation of the association-in-fact enterprise's affairs through a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5) and in violation of 18 U.S.C. § 1962(c), namely, mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343.

### B. Pattern of Racketeering Activity

225. As described herein, Defendants' long-running scheme constitutes a pattern of racketeering activity. Defendants engaged in multiple instances of mail and/or wire fraud as part of this pattern. Specifically, Defendants, through the RICO enterprise, knowingly and with intent to defraud, engaged in a scheme to deprive J-M Manufacturing and others of money by means of fraud, including false or fraudulent pretenses, representations, or omissions, knowing that interstate mails and wires would be used to further the scheme. As described herein, Defendants made false and misleading public statements in their advertising to capture thousands of asbestos clients, which Defendants monetized by deluging a few jurisdictions with lawsuits against J-M Manufacturing and others. Following their Playbook, Defendants then made or elicited false and misleading statements to prop up those lawsuits, which induced J-M Manufacturing and similarly situated litigants to incur millions in legal fees and costs defending against and/or settling these lawsuits.

226. In furtherance of the scheme, each Defendant personally and repeatedly transmitted, or caused to be transmitted, by means of wire communication in interstate commerce, writings, signs, signals, pictures, and sounds, and also placed, or caused to be placed, matters and things in any post office or authorized depository, or deposited or caused to be deposited, matters or things to be sent or delivered by a private or commercial interstate carrier, on hundreds or

thousands of occasions. Each individual use of the mails and the wires caused by Defendants in furtherance of the scheme is a separate RICO predicate. In this complaint, J-M Manufacturing focuses on instances of mail and wire fraud that primarily took place from 2019 to present in furtherance of the fraud scheme. But the predicate acts that were part of the scheme date back to before 2019.

227. Given the nationwide scope of the scheme and the nature of modern litigation, Defendants understood the scheme reasonably contemplated and depended on the ubiquitous use of interstate mail and wires, to communicate and conduct business across state lines with other members and associates of the enterprise, with state regulators and bars, with asbestos plaintiff clients, with adverse litigants like J-M Manufacturing around the country, and with courts in various states. To name just a few examples, these interstate mail and wire communications included, but were not limited to emails, video conferencing, telephone calls, electronic filing of court papers or corporate disclosures over the internet, electronic service of discovery and court filings over the internet on lawyers located in various states, and mailings and wires to transmit settlement payments. Many of the mailings and wirings contained false statements (some examples cited below) while others were sent as part of a regular pattern of conducting business essential to effectuate the scheme. Simmons Hanly is headquartered in Illinois and has offices in California, Missouri, Massachusetts, and New York. Sokolove claims to have offices in almost all 50 states as described above. J-M Manufacturing is based in Los Angeles, California and has been one of the primary targets of the scheme in lawsuits all over the country. Other company targets of the scheme are headquartered throughout the country, including in the Northern District of Illinois.

228. The following is a non-exhaustive list of known examples of certain mails and interstate wires sent as part of the scheme:

| DATE | MAIL OR WIRE(S) | CONTENTS |
|---|---|---|
| October 15, 2018 | Wire transmittal of *Bretado* complaint from Foley in Illinois (with Angelides as attorney of record) to California for filing in Superior Court in Los Angeles<br><br>Foley based in Illinois and used electronic service to serve complaint on J-M Manufacturing lawyer in Louisiana | False exposure information |
| November 7, 2018 | Wire transmittal of *Carranza* complaint from Foley and Dhar in Illinois to California for filing by fax in Superior Court in Los Angeles | False work history about work for Indelcor and false exposure information |
| January 16, 2019 | In-Person and telephonic deposition of Sebastian Bretado in California (with Jones present) transmitted by telephone from California to Texas | Perjured/false testimony about exposure to asbestos-containing products |
| January 17, 2019 | In-Person and telephonic deposition of Sebastian Bretado in California (with Jones present) transmitted by telephone from California to Texas | Perjured/false testimony about exposure to asbestos-containing products |
| January 18, 2019 | In-Person and telephonic deposition of Sebastian Bretado in California (with Jones present) transmitted by telephone from California to Wisconsin | Perjured/false testimony about exposure to asbestos-containing products |
| January 30, 2019 | Wire transmittal of two sets of interrogatory responses in *Bretado* from Foley in Illinois (with Angelides as attorney of record) to California for electronic service via File & Serve Xpress (based in Texas) | False exposure information |

| DATE | MAIL OR WIRE(S) | CONTENTS |
|---|---|---|
| April 8, 2019 | Wire transmittal of interrogatory responses in *Carranza* from Foley in Illinois to California for electronic service via File & Serve Xpress | False exposure information |
| May 20, 2019 | Wire transmittal of *Yates* complaint from Foley in Illinois (with Rosenthal and Goldstein as attorneys of record) to California for filing in Superior Court in Alameda<br><br>Foley based in Illinois and used electronic service to serve complaint on Kean Miller LLP in Louisiana and J-M Manufacturing in California | False exposure information |
| June 13, 2019 | Wire transmittal of interrogatory responses in *Yates* from Foley in Illinois (with Rosenthal and Goldstein as attorneys of record) to California for service by U.S. mail | False exposure information |
| June 14, 2019 | Wire transmittal of interrogatory responses in *Bretado* from Foley in Illinois (with Angelides as attorney of record) to California for electronic service via File & Serve Xpress | False exposure information |
| June 19, 2019 | Wire transmittal of two sets of interrogatory responses in *Carranza* from Foley in Illinois to California for electronic service via File & Serve Xpress | False exposure information |
| June 20, 2019 | In-Person and telephonic deposition of Luis Javurek in California with Dhar appearing telephonically from Illinois | Testimony from owner of Indelcor |
| July 17, 2019 | In-Person and telephonic deposition of Swiger in West Virginia transmitted by telephone from West Virginia to Pennsylvania and Texas | Coached testimony |

| DATE | MAIL OR WIRE(S) | CONTENTS |
|---|---|---|
| August 22, 2019 | Letter from Browder in Illinois to J-M Manufacturing lawyer in Louisiana sent by United Parcel Service | Settlement paperwork and requesting stipulation of dismissal paperwork related to *Bretado* |
| November 18, 2019 | Electronic filing and service of complaint by Simmons Hanly in *Perkins* from Illinois to recipients in Missouri and Wisconsin | Inaccurate information re CertainTeed if deposition testimony accurate |
| November 21, 2019 | Wire transmittal of interrogatory responses in *Carranza* from Foley in Illinois to California for electronic service via File & Serve Xpress | False exposure information |
| January/February 2020 | Telephone call between Peebles in California and Garrett in Illinois | Discussion regarding unlawful and unethical conduct |
| February 5, 2020 | Wire transmittal of interrogatory responses in *Carranza* from Foley in Illinois to California for electronic service via File & Serve Xpress | False exposure information |
| February 26, 2020 | In-Person and telephonic deposition of James Boyance in Arizona transmitted by telephone from Arizona to California | Coached testimony |
| March 27, 2020 | E-mail from Foley in Illinois to J-M Manufacturing lawyer (among others) in California attaching request for dismissal with prejudice in *Carranza* | E-mail attaching request for dismissal with prejudice in *Carranza* |
| May 14, 2020 | Videoconference deposition of James Azevedo in *Azevedo* with participants in Illinois (Simmons Hanly), Massachusetts, Georgia, Connecticut, and Rhode Island | Coached testimony |

| DATE | MAIL OR WIRE(S) | CONTENTS |
|---|---|---|
| June 24, 2020 | Wire transmittal of *Yates* first amended complaint from Foley in Illinois (with Rosenthal and Goldstein as attorneys of record) to California for filing in Superior Court in Alameda and electronic service via File & Serve Xpress | False exposure information |
| August 11, 2020 | Wire transmittal of *Bretado* first amended complaint from Foley in Illinois (with Goldstein and Angelides as attorneys of record) to California for filing in Superior Court in Los Angeles and electronic service via File & Serve Xpress | False exposure information |
| August 19, 2020 | Videoconference deposition of Dennis Perkins in *Perkins* with participants in North Carolina and Illinois (including Simmons Hanly) | Inaccurate information re CertainTeed if Illinois complaint and proof of claim accurate |
| August 28, 2020 | Wire transmittal of interrogatory responses in *Yates* from Foley in Illinois (with Rosenthal and Goldstein as attorneys of record) to California for electronic service via File & Serve Xpress | False exposure information<br><br>False information about autopsy |
| January 11, 2021 | Wire transmittal of *Montgomery* complaint from Foley in Illinois (with Goldstein and Angelides as attorneys of record) to California for filing by fax in Superior Court in Los Angeles<br><br>Foley based in Illinois and used electronic service to serve complaint on J-M Manufacturing lawyer in Louisiana (on January 27, 2021) | False exposure information |
| February 23, 2021 | Wire transmittal of Declaration of Amy Garrett in *Peebles* from Garrett in Illinois to California for electronic filing and service to lawyers in California and Illinois | Declaration of Amy Garrett in support of Motion for Leave to File Cross-Complaint in *Peebles* |

| DATE | MAIL OR WIRE(S) | CONTENTS |
|---|---|---|
| March 12, 2021 | Wire transmittal of interrogatory responses in *Montgomery* from Foley in Illinois (with Angelides and Goldstein as attorneys of record) to California for electronic service via File & Serve Xpress | False exposure and work history information |
| April 19, 2021 | Wire transmittal of interrogatory responses in *Montgomery* from Foley in Illinois (with Angelides and Goldstein as attorneys of record) to California for electronic service via File & Serve Xpress | False exposure and work history information |
| April 19, 2021 | Wire transmittal of two sets of interrogatory responses in *Yates* from Foley (with Rosenthal and Goldstein as attorneys of record) to California for electronic service via File & Serve Xpress | False exposure information |
| April 23, 2021 | Wire transmittal of Declaration of Amy Garrett in *Peebles* from Garrett in Illinois to California for electronic filing and service to lawyers in California and Illinois | Declaration of Amy Garrett in support of Motion for Preliminary Injunction in *Peebles* |
| June 2, 2021 | Wire transmittal of Declaration of Amy Garrett in *Peebles* from Garrett in Illinois to California for electronic filing and service to lawyers in California and Illinois | Declaration of Amy Garrett in support of Motion to Stay in *Peebles* |
| October 5, 2021 | Videoconference deposition of Steve Burke in *Montgomery* with participants in Illinois (Simmons Hanly) and California | False exposure and work history information |
| October 12, 2021 | E-mail from Foley in Illinois to J-M Manufacturing lawyer (among others) in California attaching request for dismissal in *Yates* | E-mail attaching request for dismissal in *Yates* |

| DATE | MAIL OR WIRE(S) | CONTENTS |
|---|---|---|
| November 10, 2021 | Videoconference deposition of Steve Burke in *Montgomery* with participants in Illinois (Simmons Hanly) and California | False exposure and work history information |
| February 9, 2022 | Wire transmittal of Annual Report for Sokolove Law, LLP, from John Simmons in Illinois to Massachusetts Secretary of Commonwealth in Massachusetts | Annual report indicating John Simmons as Partner of Sokolove Law, LLP |
| August 3, 2022 | Wire transmittal of Annual Report, Form LLC-50.1 for Sokolove Law, LLC, from Sokolove employee in Massachusetts to Illinois Secretary of State in Illinois | Annual report indicating sole manager is SHC Law Group LLC |
| August 24, 2022 | Proof of claim form related to DBMP LLC (successor to CertainTeed) filed by Simmons Hanly on behalf of Rose Perkins and transmitted by wire from Illinois to Oregon | Inaccurate information re: CertainTeed if deposition and written discovery accurate |
| August 25, 2022 | Wire transmittal of interrogatory responses in *Montgomery* from Foley in Illinois (with Goldstein and Angelides as attorneys of record) to California for electronic service via File & Serve Xpress | False exposure and work history information |
| September 28, 2022 | Letter from Browder in Illinois to J-M Manufacturing lawyer in Louisiana sent by United Parcel Service and e-mail | Settlement paperwork and requesting stipulation of dismissal paperwork related to *Boyance* |
| November 10, 2022 | Wire transmittal of interrogatory responses, responses to requests for admission, and responses to document requests in *Perkins* (Case No. 21-CV-014914 in Vermont), from Simmons Hanly lawyer in Illinois to J-M Manufacturing lawyer in Massachusetts | Concealing proof of claim

Inaccurate exposure information re CertainTeed if Illinois complaint and proof of claim accurate |

| DATE | MAIL OR WIRE(S) | CONTENTS |
|---|---|---|
| January 16, 2023 | Interstate call between Simmons Hanly and J-M Manufacturing lawyer in Massachusetts regarding dismissal with prejudice of *Montgomery* | Discussion regarding dismissal with prejudice of *Montgomery* |
| February 7, 2023 | Wire transmittal of Annual Report for Sokolove Law, LLP, from John Simmons in Illinois to Massachusetts Secretary of Commonwealth in Massachusetts | Annual report indicating John Simmons as Partner of Sokolove Law, LLP |
| March 27, 2023 | E-mail from Goldstein in California to J-M Manufacturing lawyers in Massachusetts and California | Discussion regarding settlement demands in *Azevedo* and *Perkins* |
| July 27, 2023 | Wire transmittal of Annual Report, Form LLC-50.1 for Sokolove Law, LLC, from Sokolove employee in Massachusetts to Illinois Secretary of State in Illinois | Annual report indicating sole manager is SHC Law Group LLC |
| August 28, 2023 | Letter from Browder in Illinois to J-M Manufacturing lawyer in Louisiana sent by United Parcel Service and e-mail | Settlement paperwork and requesting stipulation of dismissal paperwork related to *Azevedo* |
| August 31, 2023 | Letter from Browder in Illinois to J-M Manufacturing lawyer in Louisiana sent by United Parcel Service and e-mail | Settlement paperwork and requesting stipulation of dismissal paperwork related to *Perkins* |
| February 20, 2024 | Wire transmittal of Annual Report for Sokolove Law, LLP, from John Simmons in Illinois to Massachusetts Secretary of Commonwealth in Massachusetts | Annual report indicating John Simmons as Partner of Sokolove Law, LLP |
| July 22, 2024 | Wire transmittal of Annual Report, Form LLC-50.1 for Sokolove Law, LLC, from Sokolove employee in Massachusetts to Illinois Secretary of State in Illinois | Annual report indicating sole manager is SHC Law Group LLC |

229.    The foregoing is not an exhaustive list, but rather provides some known examples of the mails and interstate wires used by Defendants in furtherance of the scheme.  Simmons Hanly has filed hundreds of cases against J-M Manufacturing all over the country that involve other defendants who are across the United States.   As part of these cases, Defendants have sent thousands of mails and interstate wires over many years in furtherance of the fraudulent scheme against J-M Manufacturing and others.   Defendants are in the exclusive possession or have exclusive knowledge of many mails and interstate wires – such as between Sokolove and Simmons Hanly, between or among attorneys in each firm, between firm attorneys and clients, and between firm attorneys or staff and firm agents or local counsel – that were part of the scheme.  Discovery will reveal these additional predicate acts.

230.    In addition, the spreadsheet of 567 emails that Peebles sent to himself and that was attached to the June 2, 2021 Declaration of Amy Garrett identifies many more interstate wires related to the fraudulent scheme.  The identity of the other participants in most of these emails is in the exclusive knowledge or control of the Defendants.  But at least 61 of those emails relate to the implementation of the Simmons Hanly Fraud Playbook in the *Bretado* case, and more than 150 relate to the implementation of the scheme in other contexts, according to the declaration of Garrett.  That declaration and the spreadsheet it attaches are included with and incorporated into this complaint and attached as Exhibit B.

231.    As set forth herein, each Defendant individually committed two or more racketeering acts in furtherance of the enterprise.   In addition to the many individual acts enumerated above, each Defendant was aware that the mails and interstate wires were regularly used to further the scheme.  Each Defendant filed and served, assisted or supervised the filing and serving, and/or was aware that one or more other Defendants were filing and serving, the identified

complaints in furtherance of the scheme. Each Defendant prosecuted, assisted or supervised the prosecuting, and/or was aware that one or more other Defendants were prosecuting the sham lawsuits, including by responding to discovery requests from J-M Manufacturing and others. And each Defendant sent, assisted or supervised the sending, or was aware that one or more other Defendants were sending, communications by mail or e-mail to J-M Manufacturing, the clients, and others regarding the enterprise's lawsuits, settlements, and dismissals. Accordingly, and by way of example, all Simmons Hanly attorneys and staff assigned to a given case are equally responsible for transmitting or causing the transmission of a mail or wire in furtherance of the scheme.

232. Defendants' racketeering activity was repetitive and related. The racketeering acts were committed for a common purpose: to further the scheme to defraud. The racketeering acts were aimed at defrauding the same victims (J-M Manufacturing and other tort defendants); were carried out by the same actors (Defendants); achieved the same results (exacting costs and extracting money); and were implemented through similar methods of the Simmons Hanly Fraud Playbook. The racketeering acts were so ingrained, consistent, and repetitive that they carry the threat of repetition and continued harm in the future against J-M Manufacturing and others. Therefore, the pattern is part of an open-ended and ongoing scheme. Alternatively, the racketeering acts also occurred over a substantial period of time and hence constitute a pattern of activity even if the scheme were not ongoing.

### 4. Defendants' Conduct Goes Well Past Routine Litigation Activity and Is Actionable

233. The misconduct in this case extends well beyond normal litigation conduct. It is a persistent pattern of fraud, deceit, and other unlawful conduct. Because the fraud takes place beneath the surface, has infected multiple cases over the course of several years, and likely affected

more tort defendants other than J-M Manufacturing, the conventional state remedies of sanctions motions or counterclaims are insufficient to address the fraud. Congress therefore empowered private litigants to address these schemes in federal court through the federal RICO statute.

234. This case seeks to hold Defendants accountable for their pattern of fraudulent litigation to obtain financial rewards at the expense of J-M Manufacturing and other similarly situated companies. For years, this unlawful conduct has caused J-M Manufacturing to incur significant legal fees and costs defending against claims that the Defendants knew were propped up by fraud, and Defendants' lies induced J-M Manufacturing into settlements that it would not have entered had it known about the scope and pattern of the Defendants' misconduct. In sum, J-M Manufacturing has been directly and proximately harmed by Defendants' scheme.

235. The misconduct, instead, went well beyond routine litigation activity. Even one the firm's former partners recognized that the firm's "outrageous, unlawful and unethical conduct" over the course of more than three years when he worked at the firm was not "a 'normal part' of the employment relationship." Moreover, Defendants' misconduct did not just impact J-M Manufacturing. It drained resources that could have been used to compensate people with asbestos-related disease, increased the likelihood of, or contributed to, the bankruptcy of a number of U.S. companies, impacting many people's jobs and retirements; and wasted judicial resources.

//

//

//

## CLAIMS FOR RELIEF

### COUNT I

### RICO Violation (18 U.S.C. § 1962(c)) – Simmons Hanly Enterprise
### (Against Individual Defendants)

236. J-M Manufacturing incorporates herein by reference each and every allegation in the foregoing paragraphs.

237. Each Individual Defendant is a "person," as the term is defined in 18 U.S.C. §§ 1961(3) and 1962(c), because each Individual Defendant is capable of holding a legal or beneficial interest in property.

238. Simmons Hanly is an ongoing legal entity enterprise, as the term is defined in 18 U.S.C. § 1961(4). Each Individual Defendant knowingly and willfully conducted and participated, directly or indirectly, in the operation or management of the enterprise's affairs through a "pattern of racketeering activity," as defined in 18 U.S.C. §§ 1961(1), (5).

239. At all times alleged herein, the Simmons Hanly enterprise was engaged in, and its activities affected, interstate commerce. As alleged herein, the enterprise members knowingly filed sham lawsuits across the United States for the purpose of extracting settlement and otherwise obtaining recoveries through a pattern of racketeering activity. The lawsuits specifically mentioned in this complaint alone include lawsuits in Illinois, California, Washington, West Virginia, Massachusetts, and Vermont, and have included defendants from all parts of the United States. The enterprise members have obtained hundreds of millions of dollars in settlement payments, bankruptcy trust payouts, and verdicts against manufacturers and distributors of asbestos-containing products throughout the United States.

240.     The object of the Simmons Hanly Enterprise was to obtain settlements or other recoveries from and cause litigation expense and other loss to J-M Manufacturing and others through a pattern of racketeering activity.

241.     In conducting the affairs of the Simmons Hanly Enterprise, each of the Individual Defendants engaged in multiple acts of racketeering activity, including violations of the federal mail fraud statute (18 U.S.C. § 1341) and the federal wire fraud statute (18 U.S.C. § 1343), by intentionally devising and participating in the scheme to defraud J-M Manufacturing and others out of money or property by means of materially false or fraudulent pretenses or misrepresentations and using or causing the foreseeable use of interstate mails and wires in furtherance of essential parts of the scheme.  Numerous (but not all) predicate acts of mail fraud and wire fraud engaged in by the Individual Defendants are set forth in detail both in this complaint and are included in Exhibit B.  These predicate acts span more than five years and were persistent through the entire time period.

242.     The predicate acts of the Individual Defendants include the interstate transmission by mail and wire of fraudulent discovery and pleadings, perjured testimony, and other communications and documents in furtherance of the objectives of the enterprises.  The predicate acts were related in that they shared the same or similar purposes, results, participants, victims, methods of commission, and were otherwise interrelated by distinguishing characteristics and were not isolated events, but rather regular and integral steps in furtherance of the scheme to defraud J-M Manufacturing.  The predicate acts were continuous in that they have occurred on a regular basis since at least 2019, affected numerous civil lawsuits and, on information and belief, remain ongoing in cases against J-M Manufacturing and others.

243.     The members of the Simmons Hanly Enterprise are likely to continue to engage in racketeering activity in their efforts to profit from the scheme. Simmons Hanly has active asbestos lawsuits, including ones against J-M Manufacturing, and continues to file asbestos lawsuits.

244.     By reason of the Individual Defendants' violation of 18 U.S.C. § 1962(c), J-M Manufacturing has been injured in its business and/or property in an amount to be proven at trial.

245.     Specifically, the Individual Defendants' violation of 18 U.S.C. § 1962(c) has proximately caused J-M Manufacturing to expend substantial money and resources to defend claims based on false information and enter and/or satisfy settlements or judgements that were inflated due to the pattern of racketeering activity.

246.     By reason of its injury from this violation of 18 U.S.C. § 1962(c), J-M Manufacturing is entitled to equitable relief under 18 U.S.C. § 1964(a), as well as treble damages, attorneys' fees, costs, and interest on all of the foregoing under 18 U.S.C. § 1964(c).

## COUNT II

### RICO Violation (18 U.S.C. § 1962(c)) – Association-in-Fact Enterprise
### (Against All Defendants)

247.     J-M Manufacturing incorporates herein by reference each and every allegation in the foregoing paragraphs.

248.     Each Defendant is a "person," as the term is defined in 18 U.S.C. §§ 1961(3) and 1962(c), because each Individual Defendant is capable of holding a legal or beneficial interest in property.

249.     At all relevant times, Defendants constituted an association-in-fact enterprise, as the term is defined 18 U.S.C. § 1961(4). Defendants are a group of individuals and legal entities associated in fact, and willingly and knowingly conducted and participated in that association-in-fact enterprise through a pattern of racketeering activity that affected interstate commerce.

250.     At all times alleged herein, the association-in-fact enterprise was engaged in, and its activities affected, interstate commerce.  As alleged herein, the enterprise members knowingly advertised in multiple states across the country to attract asbestos claimants.  Sokolove then referred those claimants to Simmons Hanly in exchange for a percentage of all recoveries.  The Simmons Hanly Defendants filed sham lawsuits in various states for the purpose of extracting settlement and otherwise obtaining recoveries through a pattern of racketeering activity.  The lawsuits specifically mentioned in this complaint alone include lawsuits in Illinois, California, Washington, West Virginia, Massachusetts, and Vermont, and have included defendants from all parts of the United States.  The enterprise members have obtained hundreds of millions of dollars in settlement payments, bankruptcy trust payouts, and verdicts against manufacturers and distributors of asbestos-containing products throughout the United States.

251.     Defendants associated for the common purpose of reaping financial rewards through fraudulent conduct in legal marketing and asbestos litigation.  Defendants worked together to amass, refer, file, and prosecute hundreds of asbestos claims against J-M Manufacturing and others, and use fraudulent litigation to extract settlements from them.  Each Defendant conducted, or participated in the management or operation of, the enterprise's affairs.

252.     In conducting the affairs of the enterprise, each of the Defendants engaged in multiple acts of racketeering activity, including violations of the federal mail fraud statute (18 U.S.C. § 1341) and the federal wire fraud statute (18 U.S.C. § 1343), by intentionally devising and participating in the scheme to defraud J-M Manufacturing and others out of money or property by means of materially false or fraudulent pretenses or misrepresentations and using or causing the foreseeable use of interstate mails and wires in furtherance of essential parts of the scheme. Numerous (but not all) predicate acts of mail fraud and wire fraud engaged in by the Defendants

are set forth in detail both in this complaint and are included in Exhibit B.  These predicate acts span more than five years and were persistent through the entire time period.

253.    The predicate acts of the Defendants include the interstate transmission by mail and wire of fraudulent discovery and pleadings, perjured testimony, and other communications and documents in furtherance of the objectives of the enterprise.  The predicate acts were related in that they shared the same or similar purposes, results, participants, victims, methods of commission, and were otherwise interrelated by distinguishing characteristics and were not isolated events, but rather regular and integral steps in furtherance of the scheme to defraud J-M Manufacturing.  The predicate acts were continuous in that they have occurred on a regular basis since at least 2019, affected numerous civil lawsuits and, on information and belief, remain ongoing in cases against J-M Manufacturing and others.

254.    The members of the association-in-fact enterprise are likely to continue to engage in racketeering activity in their efforts to profit from the scheme.  Sokolove continues to advertise to prospective claimants and to partner with Simmons Hanly, and Simmons Hanly has active asbestos lawsuits, including ones against J-M Manufacturing, and continues to file asbestos lawsuits.

255.    By reason of Defendants' violation of 18 U.S.C. § 1962(c), J-M Manufacturing has been injured in its business and/or property in an amount to be proven at trial.

256.    Specifically, Defendants' violation of 18 U.S.C. § 1962(c) has proximately caused J-M Manufacturing to expend substantial money and resources to defend claims based on false information and enter and/or satisfy settlements or judgements that were inflated due to the pattern of racketeering activity.

257.    By reason of its injury from this violation of 18 U.S.C. § 1962(c), J-M Manufacturing is entitled to equitable relief under 18 U.S.C. § 1964(a), as well as treble damages, attorneys' fees, costs, and interest on all of the foregoing under 18 U.S.C. § 1964(c).

## COUNT III

### Conspiracy to Violate RICO (18 U.S.C. § 1962(d))
### (Against All Defendants)

258.    J-M Manufacturing incorporates herein by reference each and every allegation in the foregoing paragraphs.

259.    Beginning in or before 2019, and continuing through the date of this complaint, Defendants unlawfully, knowingly and intentionally conspired and agreed together to conduct and participate, directly and/or indirectly, in the conduct of the affairs of each enterprise identified above through a pattern racketeering activity that involved mail fraud and wire fraud, in violation of 18 U.S.C. § 1962(d).

260.    At all relevant times, each Defendant knew about and agreed to facilitate the overall purpose of the scheme, which was to defraud J-M Manufacturing and others through referring, filing, and prosecuting sham asbestos lawsuits to extract settlements or other financial rewards. Defendants knew about and agreed that one or more conspirators would commit at least two predicate acts in furtherance of the scheme.

261.    Defendants conspired to unlawfully extract settlement payments and verdicts from J-M Manufacturing and otherwise cause the company to spend money.

262.    By reason of Defendants' violation of 18 U.S.C. § 1962(c), J-M Manufacturing has been injured in its business and/or property in an amount to be proven at trial.

263.     By reason of its injury from this violation of 18 U.S.C. § 1962(d), J-M Manufacturing is entitled to equitable relief under 18 U.S.C. § 1964(a), as well as treble damages, attorneys' fees, costs, and interest on all of the foregoing under 18 U.S.C. § 1964(c).

## COUNT IV

## Common Law Fraud
### (Against All Defendants)

264.     J-M Manufacturing incorporates herein by reference each and every allegation in the foregoing paragraphs.

265.     In furtherance of their scheme, and during the course of their racketeering activity, Defendants made repeated and knowing false statements of fact with the intent to induce J-M Manufacturing to spend money on sham litigation and enter into settlements.

266.     In many of the cases infected by Defendants' fraud and false statements, Defendants have induced J-M Manufacturing to settle.  For example, Defendants induced J-M Manufacturing to settle *Bretado*, *Yates*, *Montgomery*, *Boyance*, *Azevedo*, and *Perkins*, which are discussed in this complaint.

267.     In the course of those cases, Defendants had a duty as part of discovery obligations and court rules not to make or cause to be made false statements, and to truthfully answer discovery requests.

268.     Defendants made or caused to be made material, important, and knowing misrepresentations of fact in those cases.

269.     Defendants made or caused to be made material, important, and knowing omissions of fact in those cases.

270. As an example, Defendants omitted or caused the omission of information about the CertainTeed/DBMP bankruptcy claim of Perkins despite being required to disclose it in response to discovery requests in *Perkins*.

271. J-M Manufacturing did not know the facts about the CertainTeed/DBMP bankruptcy claim when it entered into a settlement in *Perkins* and was induced by the knowing misrepresentations and omissions of Defendants to enter into that settlement to the detriment of J-M Manufacturing.

272. Defendants have misrepresented and fraudulently concealed facts in the cases discussed in this complaint and other cases with the intent that J-M Manufacturing, other tort defendants, courts, and juries rely and act upon them.

273. Defendants have misrepresented and fraudulently concealed facts in the cases discussed in this complaint and other cases with the intent to deceive and defraud J-M Manufacturing, other tort defendants, courts, and juries.

274. As more fully set forth above, J-M Manufacturing had a right to rely upon, and acted in reasonable and/or justifiable reliance upon, the fraudulent misrepresentations and nondisclosures of Defendants.

275. As a proximate result of Defendants' fraudulent misrepresentations and nondisclosures, J-M Manufacturing suffered compensatory damages in an as yet undetermined amount to be proven at trial, which exceeds $75,000, exclusive of interests and costs.

276. J-M Manufacturing's reliance on the misrepresentations and nondisclosures of Defendants was a substantial factor in causing J-M Manufacturing's harm.

**COUNT V**

**Unjust Enrichment**
**(Against All Defendants)**

277.    J-M Manufacturing incorporates the preceding paragraphs as if fully set forth herein.

278.    Defendants unjustly received a benefit from J-M Manufacturing through the fraudulent and unlawful activity described in this complaint.  That benefit came in the form of a percentage of inflated or unjustified settlements with and other recoveries from J-M Manufacturing.

279.    Defendants have unjustly retained that benefit to the detriment of J-M Manufacturing.

280.    The retention of the benefit that J-M Manufacturing conferred on Defendants as a result of their unjust conduct violates fundamental principles of justice, equity, and good conscience.

281.    Defendants are aware of and appreciate the benefits bestowed on them by J-M Manufacturing.

282.    Defendants should be compelled to disgorge to J-M Manufacturing all unlawful and inequitable proceeds they received from J-M Manufacturing.

**COUNT VI**

**Civil Conspiracy**
**(Against All Defendants)**

283.    J-M Manufacturing incorporates the preceding paragraphs as if fully set forth herein.

284.    As particularly described above, Defendants had a meeting of the minds on a common object to be accomplished and an agreement to commit wrongful acts to that end.

Specifically, Defendants knowingly and unlawfully conspired and agreed with each other to commit numerous unlawful acts related to asbestos litigation against J-M Manufacturing.

285.    Defendants committed various unlawful and wrongful acts as more particularly described above to extract settlement payments and other recoveries from J-M Manufacturing and otherwise cause the company to spend money.

286.    Defendants were aware of each other's plans to commit the wrongful acts described in this complaint.

287.    Consistent with their agreement, Defendants intended that the wrongful acts be committed.

288.    As a proximate result of the conspirators' civil conspiracy, J-M Manufacturing suffered compensatory damages in an amount to be proven at trial, which exceeds $75,000, exclusive of interests and costs.

## PRAYER FOR RELIEF

J-M Manufacturing requests that the Court enter judgment in its favor and against Defendants, each of them jointly and severally, to include:

a.    Compensatory damages in an amount to be determined at trial.

b.    Trebled damages attributable to the RICO claims, as permitted by 18 U.S.C. § 1964.

c.    Punitive damages on the damages attributable to the common law fraud and common law conspiracy claims.

d.    Disgorgement to the benefit of J-M Manufacturing of the benefits received by Defendants unjustly.

e.    Attorney's fees, costs, and pre- and post-judgment interest.

f.    An injunction prohibiting Defendants from continuing to perpetrate their fraudulent scheme against J-M Manufacturing.

g.      Such other relief as justice may require.

In connection with the requested relief, J-M Manufacturing demands a jury trial on all issues so triable.

Dated:  November 11, 2025                    Respectfully Submitted,


                                             /s/ Ashwin J. Ram
                                             Ashwin J. Ram (ARDC No. 6286478)
                                             Buchalter PC
                                             180 North LaSalle Street, Suite 3300
                                             Chicago, IL 60601-2808
                                             Telephone:  (312) 980-5760
                                             aram@buchalter.com

                                             David H. Chao (*Admitted Pro Hac Vice*)
                                             Buchalter PC
                                             1000 Wilshire Boulevard, Suite 1500
                                             Los Angeles, CA 90017-1730
                                             Telephone:  (213) 891-5032
                                             dchao@buchalter.com

                                             Sonja Arndt (*Admitted Pro Hac Vice*)
                                             Buchalter PC
                                             425 Market Street, Suite 2900
                                             San Francisco, CA 94105-2491
                                             Telephone:  (415) 227-0900
                                             sarndtjohnson@buchalter.com

                                             Frank Fletcher (*Admitted Pro Hac Vice*)
                                             General Counsel
                                             J-M Manufacturing Company, Inc. d/b/a JM Eagle
                                             5200 W. Century Boulevard
                                             Los Angeles, CA 90045

                                             *Counsel for J-M Manufacturing Company, Inc.*