# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| J-M MANUFACTURING COMPANY, INC., | |
| Plaintiff, | |
| vs. | Case No. 1:24-cv-03853 |
| SIMMONS HANLY CONROY, LLP, JOHN SIMMONS, NICHOLAS ANGELIDES, PERRY BROWDER, AMY GARRETT, BENJAMIN GOLDSTEIN, SUVIR DHAR, CRYSTAL FOLEY, DEBORAH ROSENTHAL, STAN JONES, SOKOLOVE LAW, LLC, and JOHN AND JANE DOES 1-25, | Judge Robert W. Gettleman<br><br>**ORAL ARGUMENT REQUESTED** |
| Defendants. | |

**PLAINTIFF J-M MANUFACTURING COMPANY, INC.'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ..................................................................................................................1

LEGAL STANDARD ............................................................................................................4

ARGUMENT .........................................................................................................................4

I.     DEFENDANTS HAVE NOT ESTABLISHED A *NOERR-PENNINGTON* DEFENSE. ..............................................................................................................4

      A.     The Amended Complaint Plausibly Alleges Objectively Baseless Litigation. ................................................................................................5

      B.     The Amended Complaint Plausibly Alleges Material Misrepresentations That Tainted Judicial Proceedings. ..............................8

II.     THE AMENDED COMPLAINT STATES PLAUSIBLE CLAIMS UNDER RICO. ....................................................................................................................9

      A.     The Amended Complaint Adequately Alleges a RICO Enterprise. ...........9

           1.     Individual Defendants Participated in the Operation or Management of the SHC Enterprise (Count I). .............................10

           2.     The Amended Complaint Alleges a Distinct Association-in-Fact Enterprise (Count II). ...........................................................11

      B.     The Amended Complaint Adequately Alleges Predicate Racketeering Activity. ...................................................................................................17

           1.     Mail and Wire Fraud Are Adequately Alleged, And There is No Categorical "Litigation" Exception to These Crimes. .............17

           2.     The Amended Complaint Adequately Pleads a Pattern of Racketeering Activity ..................................................................19

      C.     The Amended Complaint States a Claim for RICO Conspiracy. ..............23

III.     DEFENDANTS HAVE NOT ESTABLISHED A STATUTE-OF-LIMITATIONS DEFENSE. ........................................................................................24

      A.     The Discovery Rule Precludes Dismissal. .................................................24

      B.     Equitable Estoppel Bars Defendants' Timeliness Defense. ......................27

      C.     The Separate-Accrual Doctrine Independently Preserves J-MM's

i

   Claims. ...................................................................................27

IV.  THE AMENDED COMPLAINT STATES PLAUSIBLE STATE-LAW
   CLAIMS. ...................................................................................28

  A.  Supplemental Jurisdiction Exists. .............................................28

  B.  Litigation Privilege Does Not Bar J-MM's State-Law Claims.................28

    1.  Illinois Law Governs Under the Most-Significant-Contacts
      Analysis, and Defendants Have Waived Any Illinois Privilege
      Argument. ...................................................................29

    2.  Even If It Applied, California's Privilege Would Not Bar J-
      MM's Claims. ...............................................................30

  C.  The Amended Complaint Plausibly Alleges Common-Law Fraud. ..........31

  D.  The Amended Complaint Properly Alleges Unjust Enrichment and
    Civil Conspiracy. ...................................................................33

CONCLUSION...................................................................................34

108594331v1

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Action Apartment Ass'n, Inc. v. City of Santa Monica*,
  41 Cal.4th 1232 (2007) ...................................................................................31

*Anchorbank, FSB v. Hofer*,
  649 F.3d 610 (7th Cir. 2011) .............................................................................4

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)........................................................................................2, 4

*Barry Aviation Inc. v. Land O'Lakes Municipal Airport Comm'n*,
  377 F.3d 682 (7th Cir. 2004) ...........................................................................27

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007)...........................................................................................4

*Bible v. United Student Aid Funds, Inc.*,
  799 F.3d 633 (7th Cir. 2015) ...........................................................10, 12, 13, 15

*Boyle v. United States*,
  556 U.S. 938 (2009)...................................................................................12, 15

*Cedric Kushner Promotions, Ltd. v. King*,
  533 U.S. 158 (2001)......................................................................................2, 10

*City of Evanston v. Connelly*,
  392 N.E.2d 211 (Ill. App. 1979) ......................................................................33

*In re ClassicStar Mare Lease Litig.*,
  727 F.3d 473 (6th Cir. 2013) ...........................................................................14

*Cleary v. Philip Morris Inc.*,
  656 F.3d 511 (7th Cir. 2011) ...........................................................................34

*Continental Vineyard, LLC v. Vinifera Wine Co.*,
  973 F.3d 747 (7th Cir. 2020) ...........................................................................29

*Corley v. Rosewood Care Center, Inc.*,
  142 F.3d 1041 (7th Cir. 1998) ...................................................................19, 23

*Deck v. Engineered Laminates*,
  349 F.3d 1253 (10th Cir. 2003) .......................................................................18

iii

*Domanus v. Locke Lord LLP*,
    847 F.3d 469 (7th Cir. 2017) ...................................................................................18

*Ed & F Man Biofuels Ltd. v. MV FASE*,
    728 F. Supp. 2d 862 (S.D. Tex. 2010) ......................................................................33

*Edelson PC v. Bandas Firm PC*,
    2018 WL 723287 (N.D. Ill. Feb. 6, 2018) ................................................................33

*Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*,
    831 F.3d 815 (7th Cir. 2016) ...................................................................................22

*Ford Motor Co. v. Knight Law Group*,
    2025 WL 3306280 (C.D. Cal. Nov. 2025).................................................................16

Foster v. Schock, *2016 WL 1555650, at* 2 (N.D. Ill. Apr. 18, 2016)............................................32

*Glen Flora Dental Center v. First Eagle Bank*,
    2024 WL 621601 (N.D. Ill. Feb. 14, 2024) ..............................................................28

*Goren v. New Vision Int'l, Inc.*,
    156 F.3d 721 (7th Cir. 1998) ...................................................................................11

*Int'l Star Registry of Ill. v. RGIFTS Limited*,
    2025 WL 2766304 (N.D. Ill. Sept. 26, 2025) .............................................................5

*J-M Manufacturing Company, Inc. v. The Gori Law Firm, et al., 26-cv-00094*
    (S.D. Ill.) .................................................................................................................17

*Kim v. Kimm*,
    884 F.3d 98 (2d Cir. 2018)................................................................................17, 18

*Kimmel v. Goland*,
    51 Cal.3d 202 (1990) ..............................................................................................31

*Living Designs, Inc. v. E.I. DuPont de Nemours & Co.*,
    431 F.3d 353 (9th Cir. 2005) ...................................................................................18

*McClure v. Owens Corning Fiberglas Corp.*,
    720 N.E.2d 242 (1999).............................................................................................35

*McCool v. Strata Oil Co.*,
    972 F.2d 1452 (7th Cir. 1992) .................................................................................28

*MCM Partners, Inc. v. Andrews-Bartlett & Assocs.*,
    62 F.3d 967 (7th Cir. 1995) ...............................................................................11, 12

*Menzies v. Seyfarth Shaw LLP*,
    197 F. Supp. 3d 1076 (N.D. Ill. 2016) .....................................................................12

iv

*Menzies v. Seyfarth Shaw LLP,*
    943 F.3d 328 (7th Cir. 2019) ................................................................................9, 12, 13

*Mercatus Group, LLC v. Lake Forest Hospital,*
    641 F.3d 834 (7th Cir. 2011) ...................................................................................5, 8, 9

*Navient Sols., LLC v. Law Offices of Jeffrey Lohman,*
    2020 WL 1867939 (E.D.Va. Apr. 14, 2020) .........................................................5

*Neder v. United States,*
    527 U.S. 1 (1999) ....................................................................................................20

*New West, L.P. v. City of Joliet,*
    491 F.3d 717 (7th Cir. 2007) ................................................................................7

*Peterson v. Village of Downers Grove,*
    103 F. Supp. 3d 918 (N.D. Ill. 2015) ...................................................................30

*Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.,*
    508 U.S. 49 (1993) ...............................................................................................5, 6, 7

*Rackemann v. LISNR, Inc.,*
    2018 WL 4574342 (S.D. Ind. Sept. 24, 2018) ....................................................5

*Rao v. BP Prods. N. Am., Inc.,*
    589 F.3d 389 (7th Cir. 2009) ................................................................................14

*Ratfield v. USDTL,*
    2024 WL 640955 (N.D. Ill. Feb. 15, 2024) .......................................................13, 14

*Reves v. Ernst & Young,*
    507 U.S. 170 (1993) ..............................................................................................10, 11

*Rusheen v. Cohen,*
    37 Cal.4th 1048 (2006) .........................................................................................31

*Salinas v. United States,*
    522 U.S. 52 (1997) ................................................................................................20, 24

*Schmuck v. United States,*
    489 U.S. 705 (1989) ..............................................................................................21

*Sedima, S.P.R.L. v. Imrex Co.,*
    473 U.S. 479 (1985) ..............................................................................................9

*Sidney Hillman Health Center of Rochester v. Abbott Laboratories, Inc.,*
    782 F.3d 922 (7th Cir. 2015) ...............................................................................24, 25, 26, 27

*Silberg v. Anderson,*
    50 Cal.3d 205 (1990) ......................................................................................................31

*Snow Ingredients, Inc. v. SnoWizard, Inc.,*
    833 F.3d 512 (5th Cir. 2016) ..........................................................................................19

*Spiegel v. Continental Illinois National Bank,*
    790 F.2d 638 (7th Cir. 1986) ..........................................................................................18

*Tocco v. Richman Greer Pro. Ass'n,*
    553 F. App'x 473 (6th Cir. 2013) ...................................................................................33

*U.S. Futures Exchange, LLC v. Board of Trade of City of Chicago,*
    953 F.3d 955 (7th Cir. 2020) ............................................................................................5

*United Food & Commercial Workers Unions v. Walgreen Co.,*
    719 F.3d 849 (7th Cir. 2013) ..........................................................................................15

*United States v. Turkette,*
    452 U.S. 576 (1981) ........................................................................................................15

*United States v. Turner,*
    551 F.3d 657 (7th Cir. 2008) ..............................................................................17, 21, 22

*Valley Forge Ins. Co. v. Colello,*
    1990 WL 77816 (N.D. Ill. May 12, 1990) .....................................................................32

*Venture Assocs. Corp. v. Zenith Data Sys. Corp.,*
    987 F.2d 429 (7th Cir. 1993) ..........................................................................................26

*Wreglesworth v. Arctco, Inc.,*
    738 N.E.2d 964 (Ill. App. 2000) ...............................................................................29, 30

**Statutes**

18 U.S.C. § 1341 .......................................................................................................17, 18

18 U.S.C. § 1343 .......................................................................................................17, 18

18 U.S.C. § 1513 ..............................................................................................................22

18 U.S.C. § 1513(e) .........................................................................................................22

18 U.S.C. § 1621 ..............................................................................................................33

18 U.S.C. § 1961(1) .........................................................................................................22

18 U.S.C. § 1961(1)(B) ...................................................................................................17

18 U.S.C. § 1962(c) ................................................................................................10, 24

18 U.S.C. § 1962(d) ...............................................................................................20, 24

28 U.S.C. § 1367(a) ....................................................................................................29

Cal. Civ. Code § 47(b) ..........................................................................................29, 31

Cal. Civ. Code § 47(b)(2) ...........................................................................................31

Fed. R. Civ. P. 9(b) ...............................................................................4, 19, 23, 32

Fed. R. Civ. P. 11(b)(1) ...............................................................................................33

Fed. R. Civ. P. 12(b)(6) ............................................................................................3, 4

Fed. R. Civ. P. 26(g) ...................................................................................................33

**Rules**

ABA Code, Rule 1.5 ....................................................................................................15

**Other Authorities**

Restatement (Second) of Conflict of Laws § 145 .......................................................29

Restatement (Second) of Torts § 540 (1977) ........................................................33, 34

## INTRODUCTION

For over a decade, Defendant Simmons Hanly Conroy, LLP ("SHC") and its attorneys have operated a systematic scheme to defraud Plaintiff J-M Manufacturing Company, Inc. ("J-MM") through fabricated asbestos litigation and related claims. The Amended Complaint details, with specificity, how Defendants developed and implemented a coordinated "fraud playbook" that coached claimants to give scripted, false testimony about exposure to J-MM's asbestos-containing cement pipe ("ACP"); suppressed evidence that these claimants were actually exposed to other companies' products; concealed inconsistent bankruptcy trust filings; filed objectively meritless lawsuits in plaintiff-friendly jurisdictions designed to coerce settlements; and then silenced anyone—including their own partners—who threatened to expose the fraud. Am. Compl. ¶¶ 1-13, 74-200.[1]

This case is not about aggressive-but-legitimate advocacy; it is about a felonious organization that runs roughshod over the legal system. The Amended Complaint alleges a criminal enterprise built on perjured testimony, manufactured evidence, and suppressed records—conduct that former SHC partner Scott Peebles exposed when he sued the firm for wrongful termination after being fired for threatening to report these practices. Am. Compl. ¶¶ 110, 208-212. Defendants point to statements by Peebles, made while negotiating a settlement with SHC, minimizing the scope of his allegations. Mot. 8. But those self-serving, post-hoc characterizations—made by a party with every incentive to downplay the fraud to resolve his own dispute—cannot override J-MM's independently investigated and well-pleaded factual

---

[1] All citations to "Am. Compl." refer to the First Amended Complaint filed November 11, 2025 (Dkt. 63). All citations to "Mot." refer to Defendants' Memorandum in Support of Motion to Dismiss the First Amended Complaint (Dkt. 80). All citations to "Dkt." refer to the docket in this action, Case No. 24-cv-3853 (N.D. Ill.). Internal citations for quotations are omitted.

108594331v1

allegations, which the Court must accept as true at this stage. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Following the Peebles revelations, J-MM conducted its own independent investigation that corroborated the scheme across multiple cases, revealing a pattern of fraud that could not have been detected from any single lawsuit. Am. Compl. ¶¶ 35-36.

This Court previously dismissed J-MM's original complaint on a single, narrow ground: the RICO enterprise element. The Court determined that J-MM's original enterprise theory improperly named SHC as both a RICO "person" and the enterprise and that the association-in-fact theory relied on "sparse and conclusory" allegations about unnamed entities in a "hub-and-spoke" structure lacking a connecting "rim." Dkt. 48 at 14-19. The Court did *not* reach Defendants' *Noerr-Pennington* defense, their challenges to the predicate acts, their statute-of-limitations arguments, or the merits of J-MM's state-law claims. *Id.* at 8, 20.

The Amended Complaint cures both enterprise deficiencies. In Count I, SHC is now designated solely as the enterprise, and only the Individual Defendants are named as RICO "persons"—precisely the configuration the Supreme Court approved in *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163 (2001). In Count II, J-MM has added Defendant Sokolove Law, LLC ("Sokolove") and its principal, Defendant John Simmons, with detailed allegations establishing that Sokolove and SHC operate as economically interdependent arms of a unified fraud operation—sharing ownership through SHC Law Group LLC, sharing office space and personnel, and operating under the common direction of John Simmons. Am. Compl. ¶¶ 74-114. This is not the vague "hub-and-spoke" the Court previously rejected. It is a well-pleaded association of institutional actors united by common ownership, common leadership, and a common purpose.

Defendants' Motion asks this Court to dismiss the Amended Complaint on six grounds,

none of which warrants dismissal. Their *Noerr-Pennington* argument fails because the Amended Complaint plausibly alleges both objectively baseless litigation and material misrepresentations that tainted judicial proceedings. Their enterprise arguments fail because the Amended Complaint has cured the specific defects this Court identified. Their predicate-acts arguments rely on a categorical litigation "carve-out" that no binding authority supports. Their arguments as to the individual defendants rely on nonexistent legal requirements to diminish each actor's misconduct. Their statute-of-limitations arguments are both premature and contrary to precedent. And their state-law arguments depend on California's litigation privilege, which does not apply because Illinois law governs.

Defendants' approach to this motion itself reveals the weakness of their position. Rather than confining their arguments to the four corners of the Amended Complaint—as the Rule 12(b)(6) standard requires—Defendants filed a separate Request for Judicial Notice (Dkt. 83) seeking to introduce eighteen extrinsic exhibits, including hearing transcripts and third-party litigation materials, in an attempt to litigate disputed factual questions. J-MM has separately objected to this effort. But the fact that Defendants felt compelled to go beyond the pleadings underscores that the Amended Complaint, taken on its own terms and with all reasonable inferences drawn in J-MM's favor, states plausible claims for relief.

Stripped to its core, Defendants' position is that a law firm and its lead-generation partner—coordinating case recruitment, sharing revenue, and operating as a single economic unit—can fabricate evidence, suborn perjury, suppress records, and silence whistleblowers to extract millions from an American manufacturer that employs over a thousand workers in 22 plants across 15 states—yet face no civil liability so long as they commit their fraud under the banner of advocacy. That cannot be the law. RICO was enacted precisely to dismantle this kind of enterprise-

108594331v1

level criminal conduct, and neither *Noerr-Pennington* nor any litigation privilege can shield Defendants from accountability.

The Motion should be denied.

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Iqbal*, 556 U.S. at 678. The court must accept all well-pleaded facts as true, draw all reasonable inferences in favor of the plaintiff, and view the complaint in the light most favorable to the plaintiff. *Id.* at 679.

Because J-MM's RICO claims sound in fraud, they are subject to Rule 9(b)'s heightened pleading standard, which requires the plaintiff to state with particularity the circumstances constituting fraud—the "who, what, when, where, and how." *Anchorbank, FSB v. Hofer*, 649 F.3d 610, 615 (7th Cir. 2011). Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally. Fed. R. Civ. P. 9(b).

## ARGUMENT

## I.   DEFENDANTS HAVE NOT ESTABLISHED A *NOERR-PENNINGTON* DEFENSE.

Defendants invoke the *Noerr-Pennington* doctrine as a threshold bar, arguing that all of J-MM's claims are based on constitutionally protected petitioning activity. Mot. 10-17. This argument fails for two independent reasons: the Amended Complaint plausibly alleges that Defendants' litigation was objectively baseless, and it plausibly alleges that Defendants procured judicial outcomes through material misrepresentations. Either prong independently defeats the

108594331v1

defense at the pleading stage.

The *Noerr-Pennington* doctrine immunizes genuine petitioning activity from civil liability. But that immunity does not extend to "sham" litigation—i.e., litigation that is (1) objectively baseless, meaning no reasonable litigant could realistically expect success on the merits, *or* (2) a misrepresentation or other illegal conduct. *Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60-61 (1993) ("*PRE*"); *Mercatus Group, LLC v. Lake Forest Hospital*, 641 F.3d 834, 842-43 (7th Cir. 2011). Defendants incorrectly suggest that the exception only applies if the litigation is *both* baseless *and* involves fraud. Mot. 12-13. Not so. These are distinct inquiries; either suffices to strip *Noerr-Pennington* protection. *Mercatus*, 641 F.3d at 842; *see also U.S. Futures Exchange, LLC v. Board of Trade of City of Chicago*, 953 F.3d 955, 960 & n.6 (7th Cir. 2020) (stating that "[e]xceptions exist for petitions who present fraudulent misrepresentation *or* bring sham lawsuits," which are "two specific kinds of conduct" that render *Noerr-Pennington* immunity unavailable) (emphasis added).

Invoking *Noerr-Pennington*—an affirmative defense—on a motion to dismiss is disfavored. *Int'l Star Registry of Ill. v. RGIFTS Limited*, 2025 WL 2766304, *6 (N.D. Ill. Sept. 26, 2025); *accord Rackemann v. LISNR, Inc.,* 2018 WL 4574342, *6 (S.D. Ind. Sept. 24, 2018). That is "particularly" the case "where the sham litigation exception may be involved." *Navient Sols., LLC v. Law Offices of Jeffrey Lohman*, 2020 WL 1867939, *4 (E.D.Va. Apr. 14, 2020); *accord Int'l Star Registry*, 2025 WL 2766304, *6. As such, the Court should reject Defendants' "premature" attempt to adjudicate the issue on the pleadings alone. *Id.*; *cf. Mercatus*, 641 F.3d at 849 (relying on the evidentiary "record" to determine the applicability of *Noerr-Pennington* on appeal from summary judgment).

A.    The Amended Complaint Plausibly Alleges Objectively Baseless Litigation.

Under the first prong of the *PRE* test, litigation is objectively baseless if "no reasonable

litigant could realistically expect success on the merits." *PRE*, 508 U.S. at 60. The Amended Complaint alleges precisely that. Defendants filed more than 430 cases against J-MM, many built on fabricated evidence. Am. Compl. ¶¶ 2, 34. The Amended Complaint identifies at least three specific cases that clearly meet the no-reasonable-litigant standard:

*Carranza* (Am. Compl. ¶¶ 132-139): Defendants filed a complaint against J-MM that alleged a story of exposure that Defendants knew to be false. After forcing J-MM to defend the case for a year-and-a-half at great expense, Defendants voluntarily dismissed the suit with prejudice, as part of a deal resulting in the dismissal of approximately 15 cases.

*Yates* (Am. Compl. ¶¶ 150-157): Defendants filed a lawsuit alleging that plaintiff was exposed to pre-existing J-MM ACP while working at TT Technologies. The CEO of TT Technologies subsequently testified that his company never engaged in any of the activities alleged in the complaint. In the face of this evidence showing that the allegations were a complete fabrication, Defendants voluntarily dismissed the complaint.

*Montgomery* (Am. Compl. ¶¶ 158-166): Defendants filed this case predicated on wholly false allegations against J-MM. First, Defendants claimed that the plaintiff was exposed to J-MM ACP decades before it was ever sold. Then, Defendants falsely claimed that the plaintiff used J-MM ACP pipe while working at a construction company—a lie that was exposed by evidence from both the company and the Social Security Administration. Defendants later abandoned the case and dismissed it with prejudice.

Defendants abandoned each of these cases after J-MM challenged the evidence—a hallmark of objectively baseless litigation. *See PRE*, 508 U.S. at 60 (sham inquiry turns on objective baselessness). Defendants argue that these cases had factual bases because the claimants had mesothelioma and "alleged asbestos exposure at a time and in a location" where J-MM pipe

108594331v1

existed. Mot. 13. This vague statement elides the fact that the allegations of exposure in each of these three cases were entirely baseless and false. Am. Compl. ¶¶ 112-119. That Defendants abandoned these fraudulent claims underscores, rather than undermines, the sham nature of the filings. This pattern of filing lawsuits that no reasonable litigant would pursue prevents Defendants from using *Noerr-Pennington* as a shield.

But Defendants are also wrong to assert that settlements or favorable jury verdicts conclusively establish merit. Mot. 13-14. To be sure, the Seventh Circuit has opined that a settlement for "a substantial payment" must not have been sham because it shows that the settlement was successful. *New West, L.P. v. City of Joliet*, 491 F.3d 717, 722 (7th Cir. 2007). But *New West* does not say that the existence of any settlement necessarily means that the lawsuit was not frivolous. The Amended Complaint alleges that the relevant settlements were driven by litigation costs and the threat of mass trials, not by the merits—exactly the leverage that a pattern of sham filings is designed to generate. Am. Compl. ¶¶ 4, 9, 34, 98, 209, 221. Indeed, the Amended Complaint explains in detail how asbestos litigation has driven many American companies into bankruptcy, a perfect illustration of why a firm might be forced to settle in the face of a wave of sham litigation. *Id.* ¶¶ 56-64. At a minimum, determining what a particular settlement says about the merits of the underlying litigation is factual question unsuitable for resolution on a motion to dismiss.

The same is true for *Morgan*, which Defendants state reached a verdict adverse to J-MM. Mot. 29. A jury verdict obtained through fabricated evidence and perjured testimony does not establish that the litigation was meritorious—it establishes that the fraud worked. The *PRE* test asks whether "no reasonable litigant could realistically expect success on the merits," 508 U.S. at 60, but a litigant who manufactures evidence and coaches false testimony is not "realistically

expect[ing] success"—it is engineering success through fraud. A verdict won through perjury is a sham, not a defense against it.

B.    The Amended Complaint Plausibly Alleges Material Misrepresentations That Tainted Judicial Proceedings.

Litigation procured through fraud is similarly unshielded by the *Noerr-Pennington* doctrine. *Mercatus*, 641 F.3d at 843. Under this second, independent prong, the relevant question is whether Defendants obtained judicial outcomes through intentional, material misrepresentations—*i.e.*, misrepresentations that could have altered the outcome. *Id.* Defendants do not dispute that J-MM has alleged intentional misrepresentation—indeed, the Amended Complaint is rife with specific allegations of perjury, scripted testimony, and false statements. Am. Compl. ¶¶ 122-129, 132-138, 146, 150-152, 155, 162-165. Instead, Defendants argue only that these knowing falsehoods were not "material" because they did not result in "substantive judicial rulings adverse to J-MM." Mot. 15.

Defendants are wrong on both the facts and the law. For one, J-MM has plausibly alleged that the jury verdict in *Morgan* was tainted by the same fraudulent playbook, including scripted testimony and suppressed evidence. Am. Compl. ¶¶ 174-177, 182-185. That verdict surely counts as a substantive ruling; Defendants cannot seriously contend that defrauding a jury is more deserving of *Noerr-Pennington* protection than defrauding a judicial officer. Thus, even if there was a requirement that Defendants' fraud resulted in a substantive ruling, the *Morgan* verdict surely qualifies.

But contrary to Defendants' argument, a fraud need not produce a "substantive judicial ruling" to be material. Mot. 15. The Seventh Circuit has never limited the fraud exception to cases resulting in judicial rulings, and with good reason: adopting Defendants' rule would create an enormous loophole, immunizing a litigant who manufactures false evidence to extract a

8

settlement—as long as the fraud succeeds in inducing settlement before the court rules. The Seventh Circuit itself has confirmed that the fraud exception is distinct from the sham-litigation exception and does not require a judicial ruling. *Mercatus*, 641 F.3d at 843. Here, Defendants' fraud was also material in cases that resulted in settlements—fraudulently induced settlements. Absent the manufactured testimony and suppressed evidence, J-MM has plausibly alleged that it would not have been forced to settle cases or incur the defense costs that Defendants' scheme was designed to extract. Am. Compl. ¶¶ 9-12. When a fraudster induces ill-gotten litigation outcomes—whether through a judgment or a settlement coerced by manufactured evidence—the *Noerr-Pennington* doctrine offers no shelter. At the pleading stage, J-MM need only plausibly allege that Defendants' misrepresentations could have affected the results of the lawsuits—and it has.

Thus, because Defendants' actions involved both wholly baseless claims and outright fraud, the *Noerr-Pennington* doctrine does not bar J-MM's suit.

## II. <u>THE AMENDED COMPLAINT STATES PLAUSIBLE CLAIMS UNDER RICO.</u>

Defendants are also wrong to argue that J-MM has not stated plausible claims under the civil RICO statute. To the contrary, RICO was designed to reach exactly the kind of conduct alleged here. Congress enacted RICO with "expansive language," authorizing suits against "legitimate," even "respected businesses" that exploit their organizational structure to perpetrate fraud. *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497-98 (1985). Even law firms in otherwise good standing can be proper RICO defendants. *Menzies v. Seyfarth Shaw LLP*, 943 F.3d 328, 336 (7th Cir. 2019).

### A. <u>The Amended Complaint Adequately Alleges a RICO Enterprise.</u>

To state a claim under Section 1962(c), a plaintiff must allege (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Bible v. United Student Aid Funds,*

108594331v1

*Inc.*, 799 F.3d 633, 655 (7th Cir. 2015). Contrary to Defendants' arguments, J-MM has alleged each of these requirements plausibly and particularly.

### 1. Individual Defendants Participated in the Operation or Management of the SHC Enterprise (Count I).

Count I alleges that the Individual Defendants—not SHC—are the RICO "persons" who conducted the affairs of SHC (the enterprise) through a pattern of racketeering activity. Am. Compl. ¶¶ 236-246. This allegation corrects the defect this Court identified in the original complaint, where J-MM named both SHC and its employees as RICO "persons." *See* Dkt. 48 at 10-11. Under the revised structure of Count I, SHC is the enterprise only, and the Individual Defendants are the sole RICO persons. The Supreme Court endorsed this precise configuration in *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163 (2001), where the Court held that a corporate employee (the "person") may be liable for conducting the affairs of the corporation (the "enterprise") through racketeering. Defendants appear to concede that this amendment rectifies the basis of this Court's prior dismissal of Count I. *See* Mot. 16.

Instead, Defendants raise a new argument: that the Individual Defendants cannot satisfy the "operation or management" test articulated in *Reves v. Ernst & Young*, 507 U.S. 170 (1993). Under *Reves*, liability extends to anyone who "participate[s], directly or indirectly, in the conduct of such enterprise's affairs." 507 U.S. at 185. This test "is not limited to those with primary responsibility for the enterprise's affairs" but reaches anyone who "participate[s] in the operation or management of the enterprise itself." *Id.* at 183. Under Seventh Circuit precedent, "lower rung participants in the enterprise who are under the direction of upper management" satisfy the *Reves* standard. *MCM Partners, Inc. v. Andrews-Bartlett & Assocs.*, 62 F.3d 967, 978 (7th Cir. 1995).

In claiming that the Individual Defendants' misconduct constitutes mere "legal services," Defendants fundamentally mischaracterize the Amended Complaint's allegations. Mot. 15-17. The

Amended Complaint alleges that the Individual Defendants fall into two categories, each of which satisfies *Reves*:

**Upper management who directed the scheme.** Defendant John Simmons is the founding partner, chairman, and head of SHC's leadership team—the person who set the firm's strategic direction and exercised ultimate authority over its affairs. Am. Compl. ¶ 16. Defendants Angelides and Browder are partners on the firm's leadership team who developed and implemented the fraud playbook. Am. Compl. ¶¶ 17-18, 204-210. Defendants Garrett and Goldstein were managers who oversaw the firm's asbestos litigation—and who terminated Scott Peebles in an effort to prevent the fraud from coming to light. Am. Compl. ¶¶ 19-20, 211-214.

**Line attorneys who implemented management's directives.** Defendants Foley, Dhar, Rosenthal, and Jones were attorneys and investigators in SHC's Asbestos Department who carried out the fraud playbook by coaching witnesses, preparing scripted testimony, filing fraudulent complaints, and conducting depositions using manufactured evidence—all at the direction and under the supervision of the firm's leadership. Am. Compl. ¶¶ 21-24, 215-217.

This is not a case where outside professionals provided independent advice to an enterprise. *Cf. Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 728 (7th Cir. 1998) (outside accountant's independent services did not constitute operation of enterprise). Every Individual Defendant worked within SHC's chain of command, carrying out the firm's fraudulent litigation strategy. Under *MCM Partners*, even the lower-rung participants satisfy *Reves* because they operated under the direction of SHC's upper management and implemented the enterprise's core fraudulent mission. 62 F.3d at 978. Defendants' argument on this score has no merit.

  2. *The Amended Complaint Alleges a Distinct Association-in-Fact Enterprise (Count II).*

Count II alleges an association-in-fact enterprise consisting of SHC, Sokolove Law, the

Individual Defendants, and John/Jane Does 1-25. Am. Compl. ¶¶ 247-250. An association-in-fact enterprise must have "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit the associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009). The Supreme Court has instructed that the association-in-fact requirement should be construed broadly and need not have a formal structure. *Id.* at 948. In *Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 655-57 (7th Cir. 2015), the Seventh Circuit held that a student loan servicer and a guaranty agency together constituted an association-in-fact enterprise because they worked together pursuant to coordinated policies, shared financial incentives, and pursued a common goal of extracting maximum fees. According to the Court, it was enough that the entities pursued a "common purpose," were "intimately involved" in each other's activities, and functioned as a coordinated unit. *Id.* at 656-57. Similarly, in *Menzies v. Seyfarth Shaw LLP*, 197 F. Supp. 3d 1076, 1094-95 (N.D. Ill. 2016), this District held that a law firm and its affiliated companies constituted an association-in-fact enterprise based on shared ownership, economic interdependence, and a common purpose. The *Menzies* court emphasized that under the "broad structural requirement," it is enough that "Defendants joined together to enrich themselves and further the common interest of the group as a whole." *Id.* at 1093-4.

This Court previously held that J-MM's original association-in-fact theory failed because the non-SHC members were unnamed and the allegations were "sparse and conclusory," describing a "hub-and-spoke" structure without a "rim." Dkt. 48 at 16-18. The Amended Complaint cures both deficiencies by adding Sokolove Law LLC and John Simmons as named defendants, with detailed allegations establishing that SHC and Sokolove are not merely hub and spoke but are institutionally intertwined components of a single fraud enterprise.

**Sokolove and SHC are economically interdependent, not independent contractors.**
The Amended Complaint alleges that SHC and Sokolove share common ownership through SHC
Law Group LLC, a holding company controlled by John Simmons. Am. Compl. ¶¶ 74-76, 96-99.
They share physical office space and personnel—including Ricky LeBlanc, who simultaneously
serves both organizations. Am. Compl. ¶ 96. They operate under the common leadership of John
Simmons, who is both the chairman of SHC and the controlling force behind Sokolove. Am.
Compl. ¶ 16. And they serve complementary functions in the alleged scheme: Sokolove serves as
the front end, generating leads through advertising that the Amended Complaint alleges is false
and deceptive (Am. Compl. ¶¶ 77-91), while SHC serves as the back end, converting those leads
into fraudulent lawsuits. Am. Compl. ¶¶ 101-114.

This degree of interconnection far exceeds what the Seventh Circuit requires for an
association-in-fact enterprise. Indeed, the SHC-Sokolove relationship alleged in the Amended
Complaint is *more* interconnected than the entities in *Bible* and *Menzies*. SHC and Sokolove do
not merely have a contractual or arms-length referral arrangement. They share an owner (John
Simmons, through SHC Law Group LLC), share office space and personnel, and jointly execute
complementary roles in the same scheme. Am. Compl. ¶¶ 74-76, 96-100. This is economic
interdependence at its most concrete.

**The association-in-fact enterprise is distinct from the RICO "persons."** Citing this
Court's prior decision in *Ratfield v. USDTL*, 2024 WL 640955 (N.D. Ill. Feb. 15, 2024),
Defendants argue that Amended Complaint alleges "no distinction" between "the members of the
enterprise and the Individual Defendants." Mot. 18. Defendants misread *Ratfield.* In that case, the
plaintiffs identified a drug-testing company and two of the company's officers "as the RICO
persons" and alleged that together "they were the RICO enterprise." *Id.* 2024 WL 640955, *3. This

Court held that "in an association-in-fact enterprise a defendant corporation cannot be distinct from its officers." *Id.* In other words, an association-in-fact that consists *only* of one company and that company's officers fails the "distinctness" test. The *Ratfield* plaintiffs attempted to cure the error by identifying participants outside the corporation, but this Court found the allegations linking those outside entities "sparse and conclusory." *Id.*

No such problem exists here. The RICO "persons" include SHC, Sokolove, and all Individual Defendants, and the association-in-fact encompasses all defendants, including the two companies and all natural persons. Am. Compl. ¶¶ 247-249. This association-in-fact satisfies the distinctness problem for the simple fact that it includes two entities. *See In re ClassicStar Mare Lease Litig.*, 727 F.3d 473, 493 (6th Cir. 2013) (holding that defining the association-in-fact to include an additional entity with a "separate corporate existence" is "alone" enough to satisfy distinctness). Moreover, the allegations regarding SHC and Sokolove's participation are detailed, specific, and plausible: the Amended Complaint devotes some 25 paragraphs to detailed allegations of the corporate interconnections between Sokolove and SHC—including shared ownership through SHC Law Group LLC, shared office space, shared personnel, and common leadership. Am. Compl. ¶¶ 74-103. Moreover, contrary to Defendants' suggestion, this case is nothing like *Rao v. BP Prods. N. Am., Inc.*, 589 F.3d 389, 400 (7th Cir. 2009). That case is distinguishable because it involved disconnected actors with no organizational structure and no shared objectives beyond the individual frauds—nothing like the shared ownership, common leadership, and complementary operational roles alleged here. Am. Compl. ¶¶ 74-76, 96, 101-103.

**The association-in-fact enterprise has a common purpose distinct from the predicate acts.** Defendants also argue that the SHC-Sokolove relationship is merely a "standard commercial relationship" permitted under ABA Model Rule 1.5. Mot. 20. While a standard business

relationship may be insufficient to establish an association-in-fact, *see United Food & Commercial Workers Unions v. Walgreen Co.*, 719 F.3d 849, 854 (7th Cir. 2013), the relationship alleged here is anything but standard—and compliance with fee-sharing rules does not immunize a business relationship from RICO liability when that relationship is used to facilitate fraud. Standard referral arrangements do not involve shared corporate ownership, shared office space, shared personnel, and common leadership under a single individual. Am. Compl. ¶¶ 74-76, 96, 101-103. Where entities share common ownership, pursue a common purpose, and execute complementary functions in a fraudulent scheme, they constitute an association-in-fact enterprise. *Bible*, 799 F.3d at 656-57; *see Boyle*, 556 U.S. at 946 (association-in-fact enterprise requires only "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit the associates to pursue the enterprise's purpose").

Defendants argue that the enterprise's common purpose must be "separate from the predicate acts themselves"—in other words, that the purpose cannot only collapse into fraud. Mot. 21. But the Supreme Court has recognized that an enterprise whose members use criminal means to pursue an economic objective has a common purpose separate from the predicate acts. *Boyle*, 556 U.S. at 946-47; *United States v. Turkette*, 452 U.S. 576, 583 (1981). The Seventh Circuit applied the same principle in *Bible*, where the enterprise's purpose was making money through a student-loan business and the fraud was the method of operation. 799 F.3d at 651. Under this rubric, Defendants' claim that the enterprise's purpose is to commit fraud mischaracterizes the allegations in the Amended Complaint. The enterprise's purpose is *economic*: to generate revenue by attracting asbestos claimants through advertising and lead generation, prosecuting claims against companies like J-MM to generate contingency-fee income, and maintaining SHC's dominant market position in asbestos plaintiffs' litigation. Am. Compl. ¶¶ 1-2, 74-76, 101-103.

15

The fraud (fabricating evidence, coaching perjury) was the *means* by which the enterprise pursued that economic purpose—not the purpose itself.

Having argued that the enterprise's purpose is *purely* fraudulent, Defendants switch tacks and argue that J-MM has not alleged that the purpose was fraudulent *enough*. Mot. 19-20. This about-face, which relies on *Ford Motor Co. v. Knight Law Group*, 2025 WL 3306280 (C.D. Cal. Nov. 2025), is not well-taken. That case—a decision from the Central District of California that is not binding on this Court—involved a law firm accused of inflating attorneys' fees awards in product-liability litigation. Mot. 20-21. But in *Ford*, the fees-related fraud was *ancillary* to the underlying litigation—the lawsuits themselves were based on real product defects and real injuries. For that reason, the California court concluded that the plaintiffs had not alleged the defendant law firm had a common racketeering purpose. Here, the fraud alleged is not ancillary to the litigation. The Amended Complaint alleges that Defendants manufactured the entire factual basis for their claims against J-MM—fabricated exposure testimony, suppressed contrary evidence, and filed cases that had no legitimate basis. Am. Compl. ¶¶ 115-166. This is a fundamentally different situation from one where legitimate litigation is tainted by peripheral misconduct.

Finally, Defendants argue that J-MM "failed to live up to" what it promised the Court by not including allegations about additional law firms, no-poach agreements, or a bounty system. Mot. 9. This argument conflates the question of what J-MM *investigated* with what it could *allege in good faith* under Rule 11 *in this case*.[2] That J-MM exercised judgment in pleading only those allegations supported by its investigation—rather than leveling broader charges all in one case— reflects responsible lawyering, not inadequate pleading. The sufficiency of the Amended

---

[2] On January 28, 2026, J-MM filed a separate action against the Gori Law Firm and others in the Southern District of Illinois alleging RICO and state-law claims. *See J-M Manufacturing Company, Inc. v. The Gori Law Firm, et al.*, 26-cv-00094 (S.D. Ill.).

Complaint is measured by what it *does* allege, not by what Defendants expected it to allege.

      B.      <u>The Amended Complaint Adequately Alleges Predicate Racketeering Activity.</u>

          *1.*    *Mail and Wire Fraud Are Adequately Alleged, And There is No Categorical "Litigation" Exception to These Crimes.*

The statutory definition of "racketeering activity" includes numerous offenses, including mail fraud under 18 U.S.C. § 1341 and wire fraud under 18 U.S.C. § 1343. 18 U.S.C. § 1961(1)(B). Under the Seventh Circuit's framework, a mailing or wire communication need not itself contain a fraudulent misrepresentation; it is sufficient that the mailing or wire communication was "incident to an essential part of the scheme" or "a step in the plot." *United States v. Turner*, 551 F.3d 657, 665 (7th Cir. 2008). The Amended Complaint identifies specific conduct that constitutes both mail and wire fraud committed in furtherance of Defendants' scheme—including the filing and service of fraudulent complaints, deposition notices, discovery responses, and settlement communications through the mails and wires. Am. Compl. ¶¶ 228-232.

Relying primarily on *Kim v. Kimm*, 884 F.3d 98 (2d Cir. 2018), Defendants suggest that mail or wire fraud committed in the context of a lawsuit can never constitute a RICO predicate act. Mot. 22-24. In that case, the Second Circuit held that—for reasons of "compelling public policy" rather than statutory text—"a single frivolous, fraudulent, or baseless lawsuit… cannot alone constitute a viable RICO predicate act." *Kim*, 884 F.3d at 104-105.

Defendants' argument fails for multiple reasons. First, nothing in the RICO statute remotely suggests that violations of 18 U.S.C. § 1341 and § 1343 do not qualify as "racketeering activity" when they are committed in the context of litigation. Nor does any binding Seventh Circuit authority support such a non-textual litigation carve-out. Defendants cite *Domanus v. Locke Lord LLP*, 847 F.3d 469 (7th Cir. 2017), and *Spiegel v. Continental Illinois National Bank*, 790 F.2d 638 (7th Cir. 1986), but neither case supports a categorical exception untethered from

108594331v1

the statutory text. In *Domanus*, the Seventh Circuit dismissed RICO claims based on attorneys' professional ethics violations—not fraud—holding that ethics violations do not automatically constitute racketeering activity. 847 F.3d at 475-76. In *Spiegel*, the court found no actual fraud because the alleged misrepresentations were true. 790 F.2d at 644. Neither case holds that wire or mail fraud perpetrated in litigation can never constitute a RICO predicate.

Indeed, other circuits have squarely held that litigation fraud may constitute a RICO predicate act. The Ninth Circuit in *Living Designs, Inc. v. E.I. DuPont de Nemours & Co.*, 431 F.3d 353, 364 (9th Cir. 2005), rejected the argument that litigation activities cannot be RICO predicates. The Tenth Circuit in *Deck v. Engineered Laminates*, 349 F.3d 1253, 1258-59 (10th Cir. 2003), reversed a district court's dismissal of RICO claims predicated on mail and wire fraud committed in a litigation context, confirming that such claims are cognizable under RICO.

But even if this Court were to follow the Second Circuit's decision in *Kim*, it does not support Defendants' position. The *Kim* court's full holding was that "in the absence of corruption, litigation activity generally does not supply the basis to allege RICO predicate acts" in a *single-suit* context. 884 F.3d at 104-05. The court expressly declined to reach the question whether a *multi-suit* fraud scheme could supply RICO predicates. *Id.* And *Kim* recognized a "corruption" exception, holding that its rule did not apply where the predicate acts involved actual "corruption"—*i.e.*, criminal activity. *Id.* The Fifth Circuit in *Snow Ingredients, Inc. v. SnoWizard, Inc.*, 833 F.3d 512, 524 (5th Cir. 2016), similarly held that litigation-related conduct that *does not* rise to the level of criminal activity cannot serve as RICO predicates—confirming, by negative implication, that litigation conduct that *does* constitute criminal activity is not immunized.

The Amended Complaint alleges precisely the kind of repeated criminal activity that falls outside of *Kim*'s supposed statutory "carve-out." J-MM does not allege that Defendants engaged

in aggressive-but-legitimate litigation tactics in a single case. J-MM alleges a systematic, multi-case scheme involving perjured testimony, false statements, and fabricated claims designed to extract money through fraud—the very definition of mail and wire fraud. Am. Compl. ¶¶ 115-200. A federal prosecutor could surely charge these acts as mail fraud or wire fraud. Accordingly, under any standard, Defendants' categorical immunity argument fails.

>    2.    *The Amended Complaint Adequately Pleads a Pattern of Racketeering Activity*

Defendants briefly assert that the Amended Complaint fails to allege specific false statements with sufficient particularity. Mot. 24-25. But the Amended Complaint identifies, for each exemplar case, the specific false testimony that was elicited, the evidence that was suppressed, and the discovery responses that were deceptive—including the dates, parties, jurisdictions, and the substance of the false representations. Am. Compl. ¶¶ 115-200. These allegations plainly satisfy Rule 9(b)'s requirement of "who, what, when, where, and how." Moreover, where, as here, the plaintiff "lacks access to all facts necessary to detail" each defendant's internal role before discovery, Rule 9(b)'s particularity requirement is relaxed. *Corley v. Rosewood Care Center, Inc.*, 142 F.3d 1041, 1050-51 (7th Cir. 1998).

Defendants also suggest that J-MM's own contemporaneous investigation of the evidence undermines materiality—that is, because J-MM questioned the testimony, the misrepresentations could not have influenced the proceedings. Mot. 27. This conflates suspicion with proof. Materiality requires only that the falsehood have "a natural tendency to influence" the decision. *Neder v. United States*, 527 U.S. 1, 16 (1999). Fabricated testimony and suppressed evidence plainly have that tendency—indeed, that is why defendants manufactured them. That J-MM developed counterevidence in some cases shows diligence, not that the fraud was harmless. In many cases, J-MM settled despite its suspicions, precisely because the manufactured evidence was

difficult to disprove without access to facts Defendants concealed. Am. Compl. ¶¶ 4, 9, 12.

Defendants also argue that the Amended Complaint fails to allege at least two predicate acts by each Individual Defendant. Mot. 26-28. As an initial matter, that objection has no application to Count III, which alleges RICO conspiracy under § 1962(d). Under *Salinas v. United States*, a conspiracy defendant need not personally commit or agree to commit any predicate acts. 522 U.S. 52, 65 (1997). It is enough that the defendant adopted the goal of furthering the criminal enterprise. *Id.* Defendants do not argue that any of the Individual Defendants fall under that low bar.

But Defendants' argument is also wrong regarding Counts I and II, because the Amended Complaint more than sufficiently alleges at least two predicate acts for each Individual Defendant:

**John Simmons.** As the founding partner, chairman, and head of SHC's leadership team, Simmons exercised ultimate authority over SHC's affairs and directed the overall strategy of the enterprise, including its fraudulent litigation practices. Am. Compl. ¶¶ 16, 204. Defendants claim that Simmons had no direct or indirect involvement in any asbestos case. Mot. 28. But a defendant can be guilty of fraud even if he did not personally make the fraudulent statement himself. As the Seventh Circuit has explained, it is enough if a defendant, with the intent to defraud, participated in a scheme to defraud in which a wire or mail was used. *Turner*, 551 F.3d at 666. Simmons did not only participate in the fraudulent scheme at SHC—he directed it. He also directed Sokolove's operations and its false advertising campaigns (Am. Compl. ¶¶ 74-76)—the front end of the scheme that generated the manufactured claims.

**Nicholas Angelides.** The Amended Complaint alleges that Angelides was a partner and member of SHC's leadership team who helped develop and implement the fraud playbook. Am. Compl. ¶¶ 17, 204-207. He participated in multiple SHC asbestos cases against J-MM, including

cases where fraudulent complaints were filed and false statements were made in response to discovery requests. Am. Compl. ¶¶ 120, 128, 129, 158-159, 164. The complaint identifies specific communications and filings in which Angelides participated. *Id.* Splitting hairs, defendants complain that, on the fraudulent documents, Angelides was only listed "on the signature blocks" and did not provide a wet signature. Mot. 25. But at this stage, J-MM need only plausibly allege a pattern of his participation in a scheme to defraud. That Angelides's name was listed as a signatory to multiple fraudulent documents surely clears that bar.

**Perry Browder.** The Amended Complaint alleges that Browder, as a partner and leadership team member, directed the Asbestos Department's litigation strategy and supervised attorneys who implemented the fraud playbook. Am. Compl. ¶¶ 18, 208-209. Browder communicated about and directed the prosecution of fraudulent claims, including through mailings and wire communications in multiple J-MM cases. Am. Compl. ¶¶ 149, 209. Contrary to Defendants' suggestion, mail fraud does not require that the mailing itself be fraudulent; "innocent mailings—ones that contain no false information" used in a scheme to defraud suffice. *Schmuck v. United States*, 489 U.S. 705, 715 (1989).

**Amy Garrett.** Garrett served as Assistant Managing Partner and oversaw the Asbestos Department. Am. Compl. ¶¶ 19, 204, 211-212. Defendants argue she is not alleged to have used interstate mail or wires in any asbestos litigation against J-MM. Mot. 27. This argument fails for two reasons. First, as a supervisor of the Asbestos Department, Garrett is responsible for fraud committed by attorneys under her direction. *See Turner*, 551 F.3d at 665. Second, Garrett's termination of Peebles for threatening to expose the fraud scheme (Am. Compl. ¶ 211) is itself a RICO predicate act. Retaliation against a person who provides truthful information about federal offenses violates 18 U.S.C. § 1513(e), and § 1513 is an enumerated RICO predicate under 18

U.S.C. § 1961(1).

**Benjamin Goldstein.** Goldstein, of counsel in the Asbestos Department, participated in *Bretado*, *Carranza*, *Yates*, *Montgomery*, and *Morgan*—five separate implementations of the fraud playbook, each generating multiple mail and wire fraud predicate acts. Am. Compl. ¶¶ 20, 150-151, 155, 158-159, 164, 213-215. Defendants complain that the Amended Complaint does not allege that Goldstein personally used the wires. But there is no such requirement; wire fraud requires only that the defendant participated in a scheme in which the wires were used. *Turner*, 551 F.3d at 666. The Amended Complaint's detailed allegations about the wiring of fraudulent documents on which Goldstein was a signatory surely suffice. Am. Compl. ¶ 228.

**Suvir Dhar.** Dhar, a former SHC partner, participated in the *Carranza* case, where he conducted depositions using scripted testimony and the fraud playbook's techniques. Am. Compl. ¶¶ 21, 138-146, 234. Dhar filed or participated in filing the complaint, conducted telephonic depositions over several months through the wires, and transmitted other case-related communications—each a separate predicate act. *Id.* ¶¶ 132, 134, 228. Moreover, these multiple predicate acts continued for over a year—sufficient to show a pattern of racketeering activity, particularly in the larger scheme of the SHC Fraud Playbook. *Cf. Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 831 F.3d 815, 827-28 (7th Cir. 2016) (holding that acts related to a single *quid pro quo* agreement over "at most eight months" do not sufficiently prove continuity).

**Crystal Foley.** Defendants admit that the Amended Complaint alleges that Foley transmitted multiple fraudulent documents, but they nonetheless claim that the allegations lack the required specificity. Not so. J-MM explained with particularity the false statements that Foley made in response to interrogatories in *Bretado* (Am. Compl. ¶ 128), *Carranza* (*id.* ¶ 138), *Yates* (*id.* ¶¶ 150-151, 155), and *Montgomery* (*id.* ¶ 159-160).

**Deborah Rosenthal.** Rosenthal, a partner in the Asbestos Department, participated in multiple J-MM cases by filing motions, discovery responses, and other documents that furthered the scheme and perpetuated false narratives. Am. Compl. ¶¶ 23, 138, 150, 151. Moreover, she was a signatory to multiple fraudulent responses to interrogatories in *Yates*. *Id.* ¶ 151, 155.

**Stan Jones.** Jones was an SHC case investigator who built the factual foundations for SHC's asbestos cases by developing the plaintiffs' false exposure testimony. Am. Compl. ¶¶ 24, 100, 121, 134, 216-217. Contrary to Defendants' argument, the Amended Complaint particularly identified the false testimony that Jones helped develop: the same exposure testimony about J-MM ACP that numerous SHC clients parroted. Moreover, Jones's internal role in fabricating evidence is precisely the type of information within Defendants' exclusive possession, to which J-MM lacks access before discovery. *See Corley*, 142 F.3d at 1051 (Rule 9(b) "must be relaxed where the plaintiff lacks access to all facts necessary to detail" the claim).

**Doe Defendants.** With respect to the John/Jane Does 1-25, J-MM acknowledges that these are placeholder defendants. If the Court is inclined to dismiss the Doe Defendants, J-MM respectfully requests that dismissal be without prejudice, preserving J-MM's right to seek leave to amend when additional individuals are identified through discovery.

C.   The Amended Complaint States a Claim for RICO Conspiracy.

Count III alleges that all Defendants conspired to violate Section 1962(c), in violation of Section 1962(d). Am. Compl. ¶¶ 258-263. As stated above, the conspiracy action requires only that a defendant "adopt the goal of furthering or facilitating the criminal endeavor," and there is no need to show that each defendant committed a predicate act. *Salinas v. United States*, 522 U.S. 52, 65 (1997). The Amended Complaint alleges that all Defendants agreed to participate in the scheme to defraud J-MM through fabricated asbestos litigation and that each Defendant knew the nature and scope of the enterprise and its fraudulent purpose. Am. Compl. ¶¶ 258-263. *Salinas*

23

requires nothing more.

### III. DEFENDANTS HAVE NOT ESTABLISHED A STATUTE-OF-LIMITATIONS DEFENSE.

Defendants argue that J-MM's RICO claims are time-barred because nine of the ten cases at issue resolved before May 10, 2020—four years before J-MM filed its original complaint on May 10, 2024. Mot. 28-31. This Court should decline Defendants' invitation to litigate this inherently factual question at the motion to dismiss stage. According to the Seventh Circuit, dismissal on statute-of-limitations grounds at the pleading stage is "unusual" and "irregular" and should be granted "only when it is apparent from the face of the complaint that the claim is time-barred." *Sidney Hillman Health Center of Rochester v. Abbott Laboratories, Inc.*, 782 F.3d 922, 926 (7th Cir. 2015). "As long as there is a conceivable set of facts, consistent with the complaint, that would defeat a statute-of-limitations defense, questions of timeliness are left for summary judgment (or ultimately trial), at which point the district court may determine compliance with the statute of limitations based on a more complete factual record." *Id.* at 928. Under three applicable doctrines, the Amended Complaint alleges facts that satisfy the statute of limitations.

A.    The Discovery Rule Precludes Dismissal.

Under the RICO statute of limitations, the four-year period begins to run when the plaintiff "knew or should have known of his injury." *Sidney Hillman*, 782 F.3d at 928. What matters is not "the date on which the wrong that injures the plaintiff occurs, but the date…on which the plaintiff discovers that he has been injured." *Id.* Using the facts of *Sidney Hillman* as an example, the key date is not when a hospital has overpaid for a drug, but when the hospital learns that it has overpaid due to an illegal marketing scheme. *Id.* at 928-929.

The Amended Complaint plausibly alleges that J-MM did not and could not have discovered the injuries it suffered from Defendants' RICO scheme until it learned of the Peebles

lawsuit "in or after October 2021." Am. Compl. ¶ 196. The Peebles suit—filed May 12, 2020—was the first public disclosure that a former SHC partner alleged that the firm had engaged in systematic fraud. Am. Compl. ¶¶ 35-36, 118, 196-200. J-MM's original complaint was filed on May 10, 2024—less than four years after the Peebles suit was filed (May 12, 2020) and less than three years after J-MM learned of it (after October 2021). Under the discovery rule, J-MM's claims are timely.

Defendants argue that J-MM should have been on notice earlier because it observed "unusual patterns" in SHC's litigation. Mot. 29-30. But under Seventh Circuit law, awareness of patterns does not amount to knowledge of a RICO violation. *Sidney Hillman*, 782 F.3d at 929. The question is not whether J-MM suspected something was wrong, but whether J-MM knew or should have known of the *RICO injury*—a multi-firm fraudulent enterprise. *Id.* A defendant facing 430 asbestos lawsuits from a single firm might observe certain patterns—consistent testimony, similar factual allegations—without understanding that those patterns reflected a coordinated fraud scheme rather than, for example, genuinely shared exposure experiences. As the Seventh Circuit held in *Sidney Hillman*, this question is factual, not amenable to resolution at the pleading stage. *Id.* at 928-29.

Defendants also rely on hearing transcripts from 2021 to 2024 in which J-MM's General Counsel Frank Fletcher made various statements about SHC's litigation practices. Mot. 30; RJN Exs. 11-14. As a threshold matter, J-MM has separately objected to judicial notice of these transcripts. They are not referenced in or central to the Amended Complaint, and Defendants seek to use them to resolve a disputed factual question—when J-MM acquired knowledge of its RICO injury—that cannot be resolved on a motion to dismiss. *See Sidney Hillman*, 782 F.3d at 928; *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993) (if extrinsic

materials are not excluded, conversion to summary judgment is "mandatory").

Even if the Court considers these transcripts, however, Fletcher's statements do not establish knowledge of a RICO scheme. First, recognizing that a litigation adversary's cases follow "patterns"—an inevitable observation when facing 430+ cases from one firm—is not knowledge that those patterns result from coordinated fraud rather than legitimate litigation strategy. Second, Fletcher's reference to "fraud in asbestos litigation" known for "about 25 years" is not a reference to SHC—it is a reference to a *different* plaintiffs' firm in Dallas, Texas. Industry-wide awareness of one firm's fraud does not constitute knowledge of a different firm's RICO enterprise. Indeed, the *Sidney Hillman* Court held that a plaintiff's "similar RICO claim" against another manufacturer did not provide knowledge of the injury from the defendant at bar. *Sidney Hillman*, 782 F.3d at 929. Third, Fletcher's statements were advocacy arguments made in different litigation contexts— not admissions of RICO knowledge. Indeed, the transcripts themselves show that Fletcher was actively *seeking* information about SHC's conduct (for example, pursuing discovery of the Peebles complaint), not that he already possessed the knowledge Defendants attribute to him. Finally, Fletcher's statements span from 2021 through 2024—all well within the four-year limitations period (complaint filed May 10, 2024)—so they do not support Defendants' timeliness argument even on their face. Whether Fletcher's awareness of "patterns" constituted knowledge of a RICO violation is, at best, a factual question inapt for the pleading stage. *Sidney Hillman*, 782 F.3d at 928-29.

Finally, Defendants argue that the SHC-Sokolove relationship has been "publicly known for decades," so J-MM cannot claim lack of knowledge. Mot. 30-31. But knowledge of a business relationship is not knowledge of fraud. The Amended Complaint alleges that the *fraudulent nature* of the SHC-Sokolove relationship—the false advertising, deceptive state filings, and role in

funneling manufactured claims—was concealed. Am. Compl. ¶¶ 77-100. The existence of a publicly visible corporate relationship does not put a plaintiff on notice that the relationship is being used to perpetrate fraud.

B.     Equitable Estoppel Bars Defendants' Timeliness Defense.

Even if the discovery rule did not apply, equitable estoppel independently bars Defendants' statute-of-limitations defense. Under Seventh Circuit law, equitable estoppel applies when a defendant takes "active steps" to prevent a plaintiff from discovering its claims. *Barry Aviation Inc. v. Land O'Lakes Municipal Airport Comm'n*, 377 F.3d 682, 688 (7th Cir. 2004).

The Amended Complaint alleges that Defendants actively concealed their fraud through multiple means: (a) they fired Scott Peebles when he threatened to expose the scheme, Am. Compl. ¶¶ 191-193; (b) they fought to keep the Peebles lawsuit under seal, preventing J-MM from learning the facts, Am. Compl. ¶¶ 195-200; (c) they crafted discovery responses designed to conceal the manufactured nature of their evidence, Am. Compl. ¶¶ 128, 138, 151, 155, 159, 160, 164; and (d) they suppressed evidence of inconsistent bankruptcy trust claims that would have revealed the scheme. Am. Compl. ¶¶ 146-147.

These are precisely the acts of active concealment that give rise to equitable estoppel. Having taken affirmative steps to hide their fraud, Defendants cannot now claim that J-MM should have discovered it sooner.

C.     The Separate-Accrual Doctrine Independently Preserves J-MM's Claims.

Finally, even if the discovery rule or equitable estoppel did not apply, J-MM's suit would still survive under the separate-accrual doctrine. That rule provides that each new predicate act violation starts a new four-year limitations period for a RICO claim, permitting the plaintiff to recover for the additional damages caused by that act. *McCool v. Strata Oil Co*., 972 F.2d 1452, 1465 (7th Cir. 1992); *Glen Flora Dental Center v. First Eagle Bank*, 2024 WL 621601, at *18

27

108594331v1

(N.D. Ill. Feb. 14, 2024) ("[T]he separate-accrual rule remains good law in this Circuit."). Under this doctrine, "[e]ach act of" wire or mail fraud is "a new wrongful act, creating a new injury." *Glen Flora*, 2024 WL 621601, *24.

The Amended Complaint alleges numerous predicate acts occurring after May 10, 2020, including wirings containing false exposure information in *Yates*, *Bretado*, and *Montgomery*. Am. Compl. ¶ 228. Thus, even if this Court were to ignore the discovery rule and equitable estoppel and find the pre-2020 acts time-barred, J-MM's claims would still survive based on the predicate acts dated within the four-year limitations period.

## IV.   THE AMENDED COMPLAINT STATES PLAUSIBLE STATE-LAW CLAIMS.

Defendants argue that J-MM's state-law claims (Counts IV through VI) should be dismissed on three grounds: (1) lack of supplemental jurisdiction, (2) California's litigation privilege, and (3) failure to state claims for fraud, unjust enrichment, and conspiracy. Mot. 31-35. None warrants dismissal.

### A.   Supplemental Jurisdiction Exists.

Defendants argue that if the RICO claims are dismissed, the Court should decline supplemental jurisdiction. Mot. 31. Because the RICO claims should not be dismissed (for the reasons set forth above), this argument is premature. If the Court retains any federal claim, it retains supplemental jurisdiction over the state claims. 28 U.S.C. § 1367(a).

### B.   Litigation Privilege Does Not Bar J-MM's State-Law Claims.

Defendants invoke California's litigation privilege under California Civil Code § 47(b) as a categorical bar to all of J-MM's state-law claims. Mot. 32-33. This argument fails at every step. Illinois law governs the state-law claims, and Defendants have not made—and have thus waived— a claim to any privilege under Illinois law. Even if California law applied (it does not), the California privilege is not without exception, and the conduct alleged here falls within multiple

recognized exceptions. Ultimately, Defendants' privilege argument asks this Court to look past the forest for the trees: this case is not about statements made in litigation—it is about a fraud scheme that *used* litigation as one of its instrumentalities.

        *1.*     *Illinois Law Governs Under the Most-Significant-Contacts Analysis, and Defendants Have Waived Any Illinois Privilege Argument.*

Because this Court sits in Illinois, Illinois's choice-of-law principles apply. *Continental Vineyard, LLC v. Vinifera Wine Co.*, 973 F.3d 747, 751 (7th Cir. 2020). Under Illinois law, the analysis begins with the "most-significant-contacts" test drawn from the Restatement (Second) of Conflict of Laws § 145. *Wreglesworth v. Arctco, Inc.*, 738 N.E.2d 964, 971 (Ill. App. 2000). Under this test, courts should consider: (a) the place where the injury occurred; (b) the place where the conduct causing the injury occurred; (c) the domicile, residence, nationality, place of incorporation, and place of business of the parties; and (d) the place where the relationship between the parties is centered. *Id.* But rather than "merely count[ing] these contacts," Illinois courts also must consider a "more sophisticated 'interests analysis.'" *Id.* That more fulsome analysis requires a "three-step process: 1. Isolate the issue presented; 2. Identify the relevant policies embraced in the laws in conflict; 3. Examine the contact and determine which jurisdiction has a superior interest in having its policy applied." *Id.*

Under this scheme, Illinois law clearly applies. The significant contacts favor Illinois: SHC is based in Illinois, as are many of the individual defendants; the conduct causing the injury was directed from SHC's Illinois offices and manifested through cases filed in Illinois. Am. Compl. ¶¶ 15-16, 31-33, 140. But the more important "interests analysis" points even more forcefully towards applying Illinois law. Defendants—an Illinois law firm and the Illinois lawyers that direct it—want California law to apply, so that they may be shielded by California's litigation privilege. But when the issue is whether Illinois lawyers should be immunized from tortious conduct in

litigation, surely Illinois—and not California—has "a superior interest in having its policy applied." *Wreglesworth*, 738 N.E.2d at 971. California's litigation privilege is designed to protect California's judicial system, not to immunize Illinois attorneys operating a fraud scheme from their Illinois headquarters.

Thus, Illinois law applies, but Defendants make no argument that any privilege under Illinois law immunizes their fraudulent conduct. *See* Mot. 33. Because Defendants' motion raises no such argument, it has been waived and cannot be made for the first time on reply. *See, e.g.*, *Peterson v. Village of Downers Grove*, 103 F. Supp. 3d 918, 925 (N.D. Ill. 2015). If Defendants intended to claim that Illinois privilege extended so far to shield a long-running, elaborate scheme to defraud that ranged well beyond the courtroom—including the deliberate fabrication of evidence, the coaching of perjured testimony, and the suppression of material facts—the time to do so has passed.

2.    *Even If It Applied, California's Privilege Would Not Bar J-MM's Claims.*

But even if California's litigation privilege under Civil Code § 47(b) applied, this Court should still not dismiss J-MM's state-law claims. To be sure, California's litigation privilege has been described as "absolute" in its protection of communicative acts. *See Silberg v. Anderson*, 50 Cal.3d 205, 215-16 (1990). But even an "absolute" privilege has boundaries, and the California Supreme Court itself has carved out significant exceptions that apply directly to the conduct alleged here. While communicative acts are privileged, noncommunicative tortious conduct is not. In *Kimmel v. Goland*, 51 Cal.3d 202, 205 (1990), the Court held that the privilege "does not bar recovery for injuries from tortious conduct regardless of the purpose for which such conduct is undertaken." The Court there held that the illegal recording of telephone conversations—done to gather evidence for anticipated litigation—was noncommunicative conduct outside the privilege, even though the recordings were made for a litigation purpose. *Id.* at 209-13. *Rusheen v. Cohen*,

37 Cal.4th 1048 (2006), refined this framework: the Court held that unless an "independent, noncommunicative, wrongful act" is the gravamen of the action, the privilege applies. *Id.* at 1065. But where the core injury arises from noncommunicative wrongful conduct—such as fabricating evidence, coaching witnesses to give false testimony, and suppressing documents—the privilege does not shield that conduct merely because it was incidentally related to a judicial proceeding. *See id.* at 1058, 1062. Moreover, California Civil Code § 47(b)(2) expressly removes the privilege from "any communication made in furtherance of an act of intentional destruction or alteration of physical evidence." This statutory exception reflects the Legislature's recognition that the privilege cannot protect the corruption of the evidentiary record itself. Nor does Section 47(b) bar criminal prosecution for perjury or subornation of perjury. *See Action Apartment Ass'n, Inc. v. City of Santa Monica*, 41 Cal.4th 1232, 1246 (2007) (recognizing that perjury and subornation of perjury statutes "would be almost without meaning if statements made during the course of litigation were protected" by the privilege).

J-MM's injuries arise from what Defendants *did*: they fabricated exposure evidence, coached witnesses to deliver scripted perjured testimony, suppressed contradictory bankruptcy trust filings, and manufactured the entire factual basis for hundreds of meritless lawsuits. In so doing, Defendants corrupted the evidentiary record and crossed the line from aggressive advocacy to downright criminal conduct. Under the California-law analysis, the gravamen of J-MM's claims is this noncommunicative fraudulent conduct—not any particular litigation statement. Thus, even if California law applied, it would not shield Defendants' fraud.

C.    The Amended Complaint Plausibly Alleges Common-Law Fraud.

Count IV alleges common-law fraud against all Defendants. Am. Compl. ¶¶ 264-276. Defendants argue that Count IV does not satisfy Rule 9(b)'s heightened pleading standard. Mot. 33. Defendants are wrong. Count IV is based on the same fraud allegations that underlie the RICO

31

claims—the fabricated exposure testimony, false discovery responses, coached perjury, and suppressed evidence detailed in the Amended Complaint with specificity. Am. Compl. ¶¶ 120-166. Courts in this District apply a single Rule 9(b) analysis to RICO and common-law fraud claims when they share the same factual predicate. *See Valley Forge Ins. Co. v. Colello*, 1990 WL 77816, *3 (N.D. Ill. May 12, 1990) (common-law fraud claims "have the same factual basis as the RICO claims and [thus] satisfy the requirements of Rule 9(b)"); *Foster v. Schock*, 2016 WL 1555650, *2 (N.D. Ill. Apr. 18, 2016) (applying unified Rule 9(b) analysis). The Amended Complaint identifies, for each exemplar case, the specific false testimony that was elicited, the evidence that was suppressed, the discovery responses that were deceptive, and the dates, parties, and jurisdictions involved. Am. Compl. ¶¶ 120-166, 228. If these allegations satisfy Rule 9(b) for the RICO claims—and they do—they necessarily satisfy Rule 9(b) for Count IV.

Defendants next claim that J-MM has not adequately alleged that it justifiably relied on Defendants' fraudulent misrepresentations. Mot. 34. Not so. J-MM justifiably relied on these representations—including the facially plausible but manufactured exposure narratives—in making litigation decisions, including decisions to settle. Am. Compl. ¶¶ 295-296. And J-MM suffered damages in the form of settlement payments and defense costs. Am. Compl. ¶ 297.

Defendants argue that J-MM cannot have "relied" on representations made by an adversary. Mot. 34. The cases Defendants cite— *Ed & F Man Biofuels Ltd. v. MV FASE*, 728 F. Supp. 2d 862, 868 (S.D. Tex. 2010), *Tocco v. Richman Greer Pro. Ass'n*, 553 F. App'x 473, 475–76 (6th Cir. 2013), *Edelson PC v. Bandas Firm PC*, 2018 WL 723287, *10 (N.D. Ill. Feb. 6, 2018)—involve reliance on an adversary's *negotiating positions* or *legal arguments*. None involves reliance on the *truthfulness of evidence* or *sworn testimony*. There is a categorical difference between relying on an opponent's characterization of the law (unreasonable) and relying

32

on the assumption that an opponent is not fabricating evidence and committing perjury (inherently reasonable). Under Federal Rules of Civil Procedure 11(b)(1) and 26(g), parties certify that their discovery responses are "complete and correct" and that their filings have evidentiary support. Under 18 U.S.C. § 1621, witnesses testify under penalty of perjury. The legal system is built on the assumption that evidence and testimony will be truthful. *See* Restatement (Second) of Torts § 540 (1977) (a party "is justified in relying upon [a representation's] truth, although he might have ascertained [its] falsity . . . had he made an investigation"); *City of Evanston v. Connelly*, 392 N.E.2d 211, 213-14 (Ill. App. 1979) (reliance not unreasonable where declarant had statutory duty of truthfulness, even though relying party could have independently verified the information). J-MM relied on these baseline legal obligations—and Defendants exploited that reliance through their systematic fabrication of evidence, perjured testimony, and suppressed records. Am. Compl. ¶¶ 274-276.

Defendants also suggest that J-MM's awareness of the Baron & Budd scandal—involving a different firm, in a different state, a quarter-century ago—somehow made reliance on SHC's evidence unreasonable. Mot. 34. This proves too much. If awareness that fraud has occurred somewhere in asbestos litigation destroyed the ability to rely on *any* opponent's evidence, no asbestos defendant could ever justifiably rely on any evidence presented by any plaintiffs' firm. The legal system does not work that way. Parties are entitled to assume their opponents are complying with their legal obligations—including the obligation not to fabricate evidence. *See* Restatement (Second) of Torts § 540.

> D.  The Amended Complaint Properly Alleges Unjust Enrichment and Civil Conspiracy.

**Unjust Enrichment (Count V).** The Amended Complaint alleges that Defendants were unjustly enriched by the settlement payments and attorneys' fees they extracted through their

fraudulent scheme. Am. Compl. ¶¶ 277-282. Defendants argue that unjust enrichment is not a standalone cause of action, relying primarily on California authority and *Cleary v. Philip Morris Inc.*, 656 F.3d 511, 517 (7th Cir. 2011). Mot. 35. But *Cleary* expressly stated that it was "not necessary to resolve definitively whether Illinois law recognizes unjust enrichment as an independent cause of action." 656 F.3d at 518. Illinois law, which governs here, does recognize unjust enrichment as a viable cause of action when based on underlying wrongful conduct—as it is here. The elements are: (1) the defendant received a benefit; (2) the benefit was to the plaintiff's detriment; and (3) the defendant's retention of the benefit would be unjust. *Id.* Defendants received settlement payments and contingency fees extracted through manufactured evidence and perjured testimony, at J-MM's expense. Am. Compl. ¶¶ 277-282. Retaining these ill-gotten gains would be unjust.

**Civil Conspiracy (Count VI).** Defendants argue that civil conspiracy is not a standalone cause of action. Mot. 35. They are correct that civil conspiracy is not an independent tort—but that argument misses the point. Civil conspiracy is a mechanism for extending liability when, as here, there is an underlying tortious act. Under Illinois law, the elements are: (1) an agreement; (2) an overt tortious act in furtherance of the agreement; and (3) injury. *See McClure v. Owens Corning Fiberglas Corp.*, 720 N.E.2d 242, 258 (1999). Because J-MM has adequately alleged fraud as the underlying tort, the civil conspiracy claim survives as well. The Amended Complaint identifies the agreement (all Defendants agreed to participate in the fraudulent scheme), the overt tortious acts (the predicate acts detailed throughout), and the resulting injury (settlements and defense costs). Am. Compl. ¶¶ 304-309.

## CONCLUSION

The Amended Complaint alleges, with specificity, that Defendants operated a systematic fraud scheme that corrupted judicial proceedings, extracted millions of dollars from J-MM through

fabricated evidence and perjured testimony, and silenced those who threatened to expose the enterprise. Defendants ask this Court to hold that such conduct is beyond the reach of RICO, the common law, and the courts. If accepted, their arguments would mean that attorneys who weaponize the litigation process to perpetrate fraud face no civil accountability—so long as they commit their crimes under the banner of advocacy. That is not the law. RICO was enacted to reach exactly this kind of conduct, and the Amended Complaint states plausible claims for relief under every applicable standard.

For the foregoing reasons, J-M Manufacturing Company, Inc. respectfully requests that the Court deny Defendants' Motion to Dismiss the First Amended Complaint in its entirety.

In the alternative, if the Court grants the motion in any respect, J-MM respectfully requests leave to file a Second Amended Complaint.


March 9, 2026                                          Respectfully submitted,

                                                       /s/ Ashwin J. Ram
Frank Fletcher                                         Ashwin J. Ram
General Counsel                                        Andrew C. Erskine
J-M Manufacturing Company, Inc.                        Buchalter LLP
d/b/a JM Eagle                                         180 N. LaSalle St., Suite 2300
5200 West Century Boulevard                            Chicago, IL 60601
Los Angeles, CA 90045                                  213-891-5035
                                                       aram@buchalter.com