IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| J-M MANUFACTURING COMPANY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 24 C 3853 |
| | ) | |
| v. | ) | |
| | ) | Judge Robert W. Gettleman |
| SIMMONS HANLY CONROY, LLP, JOHN SIMMONS, NICHOLAS ANGELIDES, PERRY BROWDER, AMY GARRETT, BENJAMIN GOLDSTEIN, SUVIR DHAR, CRYSTAL FOLEY, DEBORAH ROSENTHAL, STAN JONES, SOKOLOVE LAW, LLC, and JOHN AND JANE DOES 1-25, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff J-M Manufacturing Company, Inc. makes industrial pipe. From 1983 to 1988, it sold cement pipe that contained asbestos. It has since been on the receiving end of thousands of complaints filed by law firms that represent plaintiffs with asbestos-related diseases. Fed up with playing defense, plaintiff went on offense and filed its own complaint against one of those firms—Simmons Hanly Conroy, LLP ("Simmons Hanly")—and some of Simmons Hanly's attorneys and staff (collectively, the "individual defendants"). Plaintiff alleged that defendants had engaged in a multi-year pattern of racketeering activity in which they filed sham asbestos-related lawsuits to extract unwarranted settlements from plaintiff. In doing so, plaintiff claimed, Simmons Hanly had, among other things, violated 18 U.S.C. § 1962(c) of the Racketeered Influenced Corrupt Organizations Act ("RICO").

The court dismissed plaintiff's original complaint because plaintiff failed to plausibly plead an enterprise distinct from the RICO person defendants. J-M Mfg. Co., Inc. v. Simmons

Hanly Conroy, LLP, No. 24 C 3853, 2025 WL 843854, at *9 (N.D. Ill. Mar. 18, 2025). The court, though, allowed plaintiff to file an amended complaint, J-M Mfg. Co., Inc. v. Simmons Hanly Conroy, LLP, No. 24 C 3853, 2025 WL 2663224, at *6 (N.D. Ill. Sept. 17, 2025), which it has now done.

In the amended (now operative) complaint, plaintiff has added two named defendants—John Simmons ("Simmons") and Sokolove Law, LLC ("Sokolove")—and asserts six counts: a § 1962(c) RICO claim against the individual defendants based on a "Simmons Hanly Enterprise" (Count I); a § 1962(c) RICO claim against all defendants based on an "Association-in-Fact Enterprise" (Count II); a § 1962(d) RICO claim against all defendants based on their conspiring to commit RICO violations (Count III); a state law claim against all defendants for common law fraud (Count IV); a state law claim against all defendants for unjust enrichment (Count V); and a state law claim against all defendants for civil conspiracy (Count VI).

Defendants have filed two separate motions: (1) a motion to dismiss the complaint in its entirety under Fed. R. Civ. P. 12(b)(6); and (2) a "Special Motion to Strike Counts IV-VI" under California Code of Civil Procedure § 425.16. For the reasons below, the court grants in part and denies in part defendants' motion to dismiss, and denies defendants' special motion to strike.

## BACKGROUND

### Factual Background

Plaintiff alleges the following facts in its amended complaint, which are taken as true in resolving defendants' motion to dismiss. Alam v. Miller Brewing Co., 709 F.3d 662, 665-66 (7th Cir. 2013). Asbestos is a naturally occurring silicate that was once considered a "miracle mineral." Its favorable characteristics—its resistance to fire, heat, and corrosion; its strength,

durability, and flexibility; and its abundance—led to it widespread use in products ranging from insulation, roofing, ceilings, and brakes to stove pads and hairdryers. But that all changed in the 1970s, when it became common knowledge that exposure to asbestos can cause serious diseases—many of which have an average latency period of roughly 30 years.

Plaintiff manufactures plastic pipe, including polyvinyl chloride ("PVC") pipe. From 1983 to 1988, plaintiff sold cement pipe that contained asbestos ("ACP") to accommodate water districts as they transitioned to PVC pipes. Despite asbestos's tarnished reputation, the market for ACP persisted because it performed to governmental standards, was impervious to acids in soils, was corrosion-resistant, and could be worked with safely (if directions were followed). Indeed, "[h]igher levels of exposure" to asbestos from ACP "only occur if the pipe is cut with an unventilated power saw or drilled into using a power drill."

Yet plaintiff has been sued in more than 6,000 asbestos cases since the year 2000—typically by individuals with an asbestos-related disease like mesothelioma. Plaintiff became a "target of meritless asbestos lawsuits" after plaintiffs law firms had driven manufacturers and distributors of "friable asbestos products" (like insulation) out of business. "As part of this post-bankruptcy wave of asbestos litigation," those firms began suing plaintiff.

Law firm defendant Simmons Hanly—"one of the most prolific asbestos litigation law firms in the country," having "represented more than 8,000 asbestos claimants and recovered more than $10.7 billion in asbestos litigation"—has filed more than 430 cases against plaintiff. Defendant John Simmons "is a founding partner and chairman of Simmons Hanly and the head of the firm's leadership team." He "was also the co-manager of SHC Law Group, LLC, which is the managing member of" law firm defendant Sokolove, and he is also a partner of Sokolove.

"Sokolove purports to be another prolific asbestos litigation law firm," "claim[ing] that it has handled more than 9,200 asbestos and mesothelioma cases and recovered more than $10.1 billion for clients nationwide over the past 45 years."

For over a decade, "Simmons Hanly and Sokolove have shared an interdependent relationship in which Sokolove generates and refers its asbestos plaintiff leads to Simmons Hanly, in exchange for a percentage of the recoveries." Simmons Hanly and Sokolove are "deeply engaged" in each other's affairs, with both firms operating under Simmons's leadership. And their relationship has "culminate[d] in the scheme to defraud the tort defendants against whom Simmons Hanly litigates."

Indeed, a recent lawsuit filed by former Simmons Hanly partner (Scott Peebles) alleges that the firm "has engaged in a pattern of 'unlawful, unethical conduct, and fraudulent conduct' to gain the upper hand in asbestos litigation." And in performing a "case review," plaintiff "has found evidence" to corroborate those allegations.

In particular, evidence suggests that defendants have "developed and implemented" the "Simmons Hanly Fraud Playbook"—"a coordinated and well-developed scheme to offer perjured testimony, suppress evidence of exposure to the products of bankrupt companies, make misrepresentations of fact about the existence of bankruptcy trust claims, file baseless claims in an attempt to extract settlements, and silence anyone who attempts to expose the firm's fraud." "The scheme begins with the intake process, when Simmons Hanly identifies a potential asbestos plaintiff, typically because the person was referred from Sokolove." "The asbestos case investigators, including [defendant] Stan Jones, and other members of the team build the cases

by finding the evidence to support the story about each [sued entity], while the medical professionals develop evidence about the asbestos plaintiffs' injuries." (Cleaned up).

"The 'story' that has been offered in case after case is that the asbestos plaintiff or decedent was exposed to asbestos in the ACP at nonspecific locations and job sites when the pipe was specifically cut with a power saw or drilled with a power drill," and that exposure to the asbestos occurred "hundreds" of times. The lawyers then "file a lawsuit based on the 'evidence' often fabricated by the case investigators and others" in "a plaintiff-friendly 'court system that avoids any potential complications and awards the most compensation possible.'" "Based on information and belief, the firm files in these handpicked jurisdictions because it knows that it can engage in misconduct and the court is unlikely to sanction the firm or reign [sic] it in" and because it knows that it will put "pressure on the [sued entities] to settle regardless of the merits of any particular lawsuit."

Simmons Hanly's success stems in part from the fact that "it is difficult to affirmatively disprove the narrative about exposure, the firm's clients are highly sympathetic plaintiffs, and the firm has filed its cases in 'state court[s] that [are] likely to provide . . . the most compensation.'" (alterations by plaintiff). At least five cases against plaintiff that were resolved within the last five years ("Bretado," "Carranza," "Perkins," "Yates," and "Montgomery") exemplify Simmons Hanly's scheme—a scheme which "could only be detected and understood once (a) [Peebles] filed a lawsuit against the firm and exposed that the firm was engaged in a pattern of fraud and misconduct in asbestos litigation, and (b) [plaintiff] investigated the alleged pattern of fraud and misconduct after learning of the *Peebles* complaint."

These five cases, though, "were not isolated incidents." "In case after case, Simmons Hanly has put forward the same 'story' and used the same tactics as part of the Simmons Hanly Fraud Playbook"—tactics which included using scripted product identification testimony, exposure stories, and denials about warning labels; providing vague and deceptive testimony and discovery responses to avoid discovery that might frustrate the story; and suppressing evidence related to asbestos-containing products of bankrupt companies. As for product identification, at the depositions of several product-identification witnesses, "the witness was shown a picture of [plaintiff]'s ACP either at or before the deposition to facilitate the product identification." And the witnesses "provided remarkably consistent identifications of [plaintiff]'s ACP"—including the color, texture, and look of it. This "yields the ineluctable inference of a coordinated product identification testimony strategy without regard for the actual facts of usage or exposure."

As for the exposure story, it involves "assertions about cutting the pipe with power tools 'hundreds' of times." Deposition testimony from several cases shows the "consistency of the narrative across cases," which "lends proof to the allegations in the *Peebles* complaint about perjured testimony and the subornment of perjury." It "is not credible that asbestos plaintiff after asbestos plaintiff . . . did not follow OSHA and other workplace regulations and was exposed to the asbestos in [plaintiff]'s ACP in the exact same way."

As for denials about warning labels, "Simmons Hanly case team coached and instructed asbestos plaintiffs and other product identification witnesses to testify that they never saw any warnings labels on asbestos products." As for vague and deceptive testimony and discovery responses, on many "occasions, [plaintiff] has discovered that the information provided by Simmons Hanly and the Simmons Hanly represented witness was fabricated." Several cases

show that "Simmons Hanly product identification and exposure witness has testified in ways designed to make it extremely difficult to test the narrative that the firm has crafted and laid out in discovery." And as for suppression of evidence, in "at least one case (*Perkins*), Simmons Hanly concealed a proof of claim that it filed in a bankruptcy of another ACP company."

Finally, other tactics that Simmons Hanly uses include over-naming defendants, filing baseless claims in plaintiff-friendly jurisdictions to extract settlements, and silencing people and activity that might expose their scheme.

**<u>Plaintiff's Six Counts</u>**

Based on the above pleaded facts, plaintiff asserts six counts in its complaint. In Count I, plaintiff asserts a RICO claim under 18 U.S.C. § 1962(c) against the "individual defendants." According to plaintiff, each individual defendant is a "person," Simmons Hanly is a "legal entity enterprise" (the "Simmons Hanly Enterprise"), and each individual defendant participated in the operation of the Simmons Hanly Enterprise's "affairs though a 'pattern of racketeering activity,' as defined in 18 U.S.C. §§ 1961(1), (5)."

"In conducting the affairs of the Simmons Hanly Enterprise," the individual defendants engaged in racketeering activity—"including violations of the federal mail fraud statute (18 U.S.C. § 1341) and the federal wire fraud statute (18 U.S.C. § 1343)"—by engaging in a "scheme to defraud [plaintiff] . . . out of money . . . by means of materially false or fraudulent pretenses or misrepresentations and using . . . interstate mails and wires in furtherance of essential parts of the scheme." "The predicate acts of the Individual Defendants include the interstate transmission by mail and wire of fraudulent discovery and pleadings, perjured testimony, and other communications and documents in furtherance of the objectives of the

enterprise[ ]." Plaintiff alleges that defendants have proximately caused plaintiff to "expend substantial money and resources to defend claims based on false information and enter and/or satisfy settlements or judgements that were inflated due to the pattern of racketeering activity."

In Count II, plaintiff asserts a § 1962(c) RICO claim against all defendants based on an "Association-in-Fact Enterprise." According to plaintiff, each defendant is a "person," and defendants constitute an "association-in-fact" enterprise "for the common purpose of reaping financial rewards through fraudulent conduct in legal marketing and asbestos litigation." In particular: the "enterprise members knowingly advertised" across the country to attract claimants; Sokolove then referred plaintiffs to Simmons Hanly for a percentage of any recovery; and the Simmons Hanly Defendants then filed sham lawsuits to extract recoveries and settlements. In conducting the affairs of the enterprise, defendants engaged in the same racketeering activity alleged in Count I, causing plaintiff to "expend substantial money and resources to defend" against false and inflated damages claims.

In Count III, plaintiff alleges a § 1962(d) RICO conspiracy claim based on defendants having "conspired and agreed with each other to conduct" the affairs of the enterprises. And in Counts IV-VI, plaintiff alleges common law fraud, unjust enrichment, and civil conspiracy claims.

## DISCUSSION

Defendants have moved to dismiss all six counts for failure to state a claim under Fed. Rs. Civ. P. 12(b)(6) and 9(b). To survive a motion to dismiss under Rule 12(b)(6), the complaint must provide the defendant with fair notice of a claim's basis and must be facially plausible. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Bell Atl. Corp. v. Twombly, 550

U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678.

For claims involving fraud—including RICO claims based on fraud—the complaint must meet the heightened pleading standard of Rule 9(b). Ratfield v. United States Drug Testing Lab'ys, Inc., No. 23 C 15063, 2024 WL 640955, at *2 (N.D. Ill. Feb. 15, 2024). Rule 9(b) states that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake," and that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). This ordinarily requires a plaintiff to describe "the who, what, when, where, and how of the fraud." Anchorbank, FSB v. Hofer, 649 F.3d 610, 615 (7th Cir. 2011) (cleaned up).

In ruling on a motion to dismiss, the court may "consider, in addition to the allegations set forth in the complaint itself, documents that are attached to the complaint, documents that are central to the complaint and are referred to in it, and information that is properly subject to judicial notice." Williamson v. Curran, 714 F.3d 432, 436 (7th Cir. 2013).

Defendants argue that dismissal is appropriate here for several reasons. The court considers each in turn.

## Noerr-Pennington

Defendants first argue that the claims should be dismissed based on the Noerr-Pennington doctrine. The Noerr-Pennington doctrine provides immunity from liability to those who petition the government. It is derived from the First Amendment's guarantee of "the right of the people . . . to petition the Government for a redress of grievances," BE & K Const. Co. v. N.L.R.B., 536

U.S. 516, 524 (2002), and is named for two antitrust cases—Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127 (1961), and Mine Workers v. Pennington, 381 U.S. 657 (1965)—in which the Court applied "antitrust immunity principles" to shield individuals from antitrust liability for associating together to influence public officials. Id. at 525.

The Court eventually extended the same "antitrust immunity principles" "to situations where groups use courts to advocate their causes and points of view respecting resolution of their business and economic interests vis-á-vis their competitors." Id. (cleaned up) (emphasis removed). In doing so, the Court made clear "that the right to petition extends to all departments of the Government, and that the right of access to the courts is but one aspect of the right of petition." Id. (cleaned up).

Courts now also extend Noerr-Pennington immunity to lawyers representing clients who petition the courts, see Freeman v. Lasky, Haas & Cohler, 410 F.3d 1180, 1185-86 (9th Cir. 2005) (immunizing alleged discovery and settlement misconduct because both were "incidental to" the defense against the lawsuit), and to other actions—including RICO actions—that implicate the right to petition, Int'l Bhd. of Teamsters, Local 734 Health & Welfare Tr. Fund v. Philip Morris Inc., 196 F.3d 818, 826 (7th Cir. 1999).

But Noerr-Pennington immunity is not absolute. It does not extend, for example, to "illegal and reprehensible practices which may corrupt the judicial process." BE & K., 536 U.S. at 525 (cleaned up). Put simply, "genuine petitioning is immune . . ., sham petitioning is not." Id. This is known as the "sham" exception.

"[C]ourts have recognized two specific kinds of conduct that can trigger th[is] sham exception: (1) sham lawsuits; and (2) fraudulent misrepresentations." Mercatus Grp., LLC v. Lake Forest Hosp., 641 F.3d 834, 842 (7th Cir. 2011). As for "sham lawsuits," the lawsuit must be both objectively and subjectively baseless. See Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc., ("PRE"), 508 U.S. 49, 60-61 (1993) (cleaned up). A lawsuit is objectively baseless if "no reasonable litigant could realistically expect success on the merits." Id. at 60. If an objective party could "conclude that the suit is reasonably calculated to elicit a favorable outcome," the sham exception fails. Id. By definition, a winning lawsuit is a "reasonable effort at petitioning for redress and therefore not a sham." Id. at 60 n.5.

Even if the lawsuit is objectively baseless, the court must still "examine the litigant's subjective motivation." U.S. Futures Exch., L.L.C. v. Bd. of Trade of the City of Chi., Inc., 953 F.3d 955, 963 (7th Cir. 2020) (citing PRE, 508 U.S. at 60). A litigation may be a sham, for example, if it is "designed to make the other litigant bear the costs of mounting a defense, even though the suit has no chance of success." Tri-Corp Hous. Inc. v. Bauman, 826 F.3d 446, 450 (7th Cir. 2016).

This two-part test applies even when a party alleges a "pattern" of baseless, repetitive claims. See U.S. Futures Exch., 953 F.3d at 964. In other words, "[e]ven if there is a pattern of 'baseless' petitions, a court can't simply 'discard the first question of the two-part sham inquiry,' and skip to the subjective inquiry." Hytera Commc'ns Corp. Ltd. v. Motorola Sols., Inc., 623 F. Supp. 3d 857, 874 (N.D. Ill. 2022) (quoting U.S. Futures Exch., 953 F.3d at 964).

As for fraudulent misrepresentations, the Supreme Court has noted in dicta that "[m]isrepresentations, condoned in the political arena, are not immunized when used in the

adjudicatory process." California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 513 (1972). And so "fraudulent misrepresentations may render purported petitioning activity a sham." Mercatus, 641 F.3d at 842. But "[n]ot every fraudulent misrepresentation during an adjudicative" proceeding gives rise to liability: "neither inadvertent misrepresentations, nor misrepresentations lacking any ascertainable effect on the proceedings in which they were made, are within the fraud exception's ambit." Id. at 843. Indeed, a "misrepresentation renders an adjudicative proceeding a sham only if the misrepresentation (1) was intentionally made, with knowledge of its falsity; and (2) was material, in the sense that it actually altered the outcome of the proceeding." Id. The upshot is this: Even if the lawsuit is successful, "the fraud exception can remove . . . immunity if success is achieved by means of intentional falsehoods." Id.

There is no dispute here that plaintiff's allegations are based on litigation-related activities that would ordinarily be protected under Noerr-Pennington. Both parties instead grapple over whether the two sham exceptions apply. As for sham lawsuits, defendants argue that plaintiff settled six of the ten cases that plaintiff cites as evidence of defendants' misconduct (Bretado, Perkins, Swiger, Azevedo, Boyance, and Noll), and that a jury found in their client's favor in a seventh case, Morgan—which, they say, is "fatal" to showing any objective baselessness. And, they argue, the remaining three cases (Carranza, Yates, and Montgomery) were voluntarily dismissed—which does not imply objective baselessness—and were not otherwise objectively baseless.

As for fraudulent misrepresentations, defendants argue that neither the six settled cases nor the three voluntarily dismissed cases allegedly involved any "substantive judicial rulings adverse to [plaintiff]"—"let alone any based on alleged misrepresentations"—and that plaintiff

"cites no factual misrepresentations that were made to the court" in the Morgan case "that could have infected the court's rulings."

Plaintiff argues in response that its complaint plausibly alleges both sham exceptions. Plaintiff contends that at least the three voluntarily dismissed cases (Carranza, Yates, and Montgomery) "clearly meet the no-reasonable-litigant standard" (which is underscored by the fact that defendants "abandoned" them), and that obtaining a settlement does not automatically equate to no-baselessness. And as for fraudulent misrepresentations, plaintiff asserts that defendants "do not dispute that J-MM has alleged intentional misrepresentation," and plaintiff further contends that defendants' argument that they were not "material" fails. According to plaintiff, it "plausibly alleged that the jury verdict in *Morgan* was tainted by . . . scripted testimony and suppressed evidence," and that "verdict surely counts as a substantive ruling." And anyway, plaintiff asserts, the "Seventh Circuit has never limited the fraud exception to cases resulting in judicial rulings."

The court finds that plaintiff has pleaded enough here to avoid dismissal. Indeed, "the *Noerr-Pennington* issue is inappropriate for resolution at the motion to dismiss stage, especially when the plaintiff included allegations that the petitioning activity amounted to a sham." Hytera, 623 F. Supp. 3d at 874 (collecting cases). That is the case here.

Take the Carranza case, for example. Plaintiff pleads that Simmons Hanly through its attorney, defendant Foley, sued plaintiff based on Carranza allegedly having been exposed to asbestos in plaintiff's ACP while working for Indelcor in the 1980s. But, plaintiff avers, "[t]he alleged exposure in the complaint was false": Indelcor's owner testified at deposition that the company did not even exist until the mid-90s. Plaintiff further alleges that "Indelcor's owner

had spoken with [defendant] Dhar on the day that the initial complaint was filed and informed Dhar that the allegations about Indelcor in the complaint were not accurate," and that "Dhar reportedly stated that Simmons Hanly *already* knew that, meaning that the firm knew the complaint against [plaintiff] was not based in fact and filed it anyway." (Emphasis in original).

Plaintiff also alleges that Carranza's brother testified at his deposition "that Carranza worked under the table installing sewer ACP at 'hundreds' of locations throughout Southern California and claimed that the pipe said 'J-M Transite,'" but that other evidence showed that "Carranza was in high school and/or working at the non-construction jobs listed in his social security records in the 1980s, rather than installing underground ACP," and that "ACP was not even approved for use in sewer systems in Southern California in the 1980s." Yet, plaintiff alleges, "Simmons Hanly continued to promote in written discovery" and in summary judgment briefing "the narrative about Carranza's exposure that had been described by Carranza's brother." Plaintiff further alleges that after a year and a half of litigating, and after plaintiff "spent a significant sum defending" itself, Simmons Hanly dismissed the case "as part of a deal resulting in the dismissal of approximately 15 cases."

This is sufficient to plead either branch of the sham exception. As for a sham lawsuit, the allegations support the inference that the lawsuit against plaintiff was objectively baseless: Indelcor's owner allegedly told Dhar that the information was inaccurate, Dhar allegedly stated that he knew that it was at the time of filing, and the case was voluntarily dismissed. They also support the inference that it was subjectively baseless: it was filed to force plaintiff to settle. See Tri-Corp Hous., 826 F.3d at 450 (litigation may be a sham if it is "designed to make the other litigant bear the costs of mounting a defense, even though the suit has no chance of

success"); see also B&G Foods N. Am., Inc. v. Embry, 29 F.4th 527, 541 (9th Cir. 2022) (allegations that support an inference that defendants "filed suit because they wanted to improperly pressure B&G into settling" could "support the subjective element").

As for fraudulent misrepresentations, the allegations support an inference that the misrepresentations related to Carranza's alleged exposure were intentionally made, with knowledge of their falsity, and were material. Indeed, the alleged misrepresentations went to "the core of" defendants' case against plaintiff, Mercatus, 641 F.3d at 843 (citations omitted), and had at least some "ascertainable effect on the proceedings in which they were made," id., because it allegedly forced plaintiff to spend significant sums responding to the allegations and the inference is that it forced defendants' to dismiss the case. See Uber Techs., Inc. v. Simon & Simon P.C., No. CV 25-5365, 2026 WL 1284178, at *12 (E.D. Pa. May 11, 2026) (finding that Uber's complaint plausibly pleaded the fraudulent-misrepresentation exception where it alleged that the defendant lawyers "directed the creation of false medical records" and used the records to file lawsuits, explaining that "Uber's extensive allegations suffice to place in dispute whether the alleged misrepresentations 'infect the core' of the underlying claims at this stage.")

"Where, as here, [plaintiff] makes allegations that raise the possibility of the application of the sham exception to the doctrine, the Court cannot resolve the application of the *Noerr-Pennington* doctrine on the face of the complaint." Int'l Star Registry of Illinois, Ltd. v. RGIFTS Ltd., No. 21 CV 6446, 2025 WL 2766304, at *6 (N.D. Ill. Sept. 26, 2025) (cleaned up).

**The RICO Counts I-III**

Defendants argue that plaintiff's RICO claims "suffer from . . . pleading defects that each independently compel dismissal." The court disagrees.

RICO "was an outgrowth of increasing congressional concern over the infiltration of American businesses by organized crime," Intro., 1 Corporate Criminal Liability, 3d § 7:1—including "the infiltration of legitimate businesses," like retail stores, to commit, for example, money laundering or extortion, United States Sentencing Commission Primer on RICO, at 1 (https://www.ussc.gov/sites/default/files/pdf/training/primers/2018_Primer_RICO.pdf).

"Yet despite the law's name and primary thrust, no organized crime connection need be shown to establish a RICO violation." Corporate Criminal Liability, § 7:1. And RICO allows a private plaintiff to file a civil action against legitimate businesses. Menzies v. Seyfarth Shaw LLP, 943 F.3d 328, 336 (7th Cir. 2019). As the Supreme Court has explained: although "private civil actions under the statute are being brought almost solely against [respected businesses], rather than against the archetypal, intimidating mobster," that "is inherent in the statute as written." Semida, S.P.R.L. v. Imrex Co.,473 U.S. 479, 499 (1985). Relevant here, the statute includes: § 1962, which sets forth four prohibited activities; § 1961, which defines terms used in the Act; and § 1964, which provides for civil remedies—including treble damages and attorney fees—for violations of the statute.

As for the four prohibited activities, plaintiff asserts claims under two of them—§§ 1962(c) and (d). The court begins with the 1962(c) claims.

<u>The § 1962(c) Counts</u>

Section 1962(c) "makes it 'unlawful for any person employed by or associated with any enterprise . . . to conduct or participate . . . in the conduct of such enterprise's affairs' through the commission of two or more statutorily defined crimes—which RICO calls 'a pattern of racketeering activity.'" Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 160 (2001)

(quoting 18 U.S.C. § 1962(c)). Section 1962(c) would prohibit, for example, employees of a state DMV from "using the DMV to process fraudulent licenses and registrations for stolen vehicles in exchange for money." USSC Primer on RICO, at 2-3. To establish a § 1962(c) claim, a plaintiff must "eventually prove four elements: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." Bible v. United Student Aid Funds, Inc., 799 F.3d 633, 655 (7th Cir. 2015).

The Enterprise

In dismissing plaintiff's original complaint, the court found that plaintiff had failed to plausibly plead a RICO enterprise. Defendants argue that plaintiff has again failed to do so.

"[A] RICO complaint must identify the enterprise." Stachon v. United Consumers Club, Inc., 229 F.3d 673, 675 (7th Cir. 2000) (citation omitted). Section 1961(4) defines "enterprise" to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). This definition thus contemplates two types of enterprises: (1) formal organizations like corporations; and (2) informal organizations that have no recognized legal status but that can be characterized as "associat[ions] in fact," id.—"which is a polite name for a criminal gang or ring," Emery v. Am. Gen. Fin., Inc., 134 F.3d 1321, 1325 (7th Cir. 1998). The definition of "enterprise" is "to be interpreted broadly." United Food & Com. Workers Unions & Emps. Midwest Health Benefits Fund v. Walgreen Co., 719 F.3d 849, 853 (7th Cir. 2013). For example, the Supreme Court has interpreted an "association-in-fact" enterprise as not needing to "have any structural features beyond 'a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's

purpose.'" Id. (quoting Boyle v. United States, 556 U.S. 938, 944, 946 (2009)). "Such an enterprise," the Supreme Court has said, "is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." Boyle, 556 U.S. at 945-46 (cleaned up).

But the definition "is not limitless": "a plaintiff [must] identify a 'person'—*i.e.*, the defendant—that is distinct from the RICO enterprise." Walgreen, 719 F.3d at 853 (citing Cedric Kushner, 533 U.S. at 161). That is because "[t]he enterprise itself is not liable for RICO violations; rather, the 'persons' who conduct the affairs of the enterprise through a pattern of racketeering activity are liable." In re ClassicStar Mare Lease Litig., 727 F.3d 473, 490 (6th Cir. 2013). So while "[t]he 'person' need not be a natural person," Fitzgerald v. Chrysler Corp., 116 F.3d 225, 226 (7th Cir. 1997), the "person" must be separate and distinct from the enterprise: "Without a difference between the defendant and the 'enterprise' there can be no violation of RICO." Baker v. IBP, Inc., 357 F.3d 685, 692 (7th Cir. 2004). Liability, then, "depends on showing that the defendants conducted or participated in the conduct of the '*enterprise's* affairs', not just their *own* affairs." Cedric Kushner, 533 U.S. at 163 (citation omitted) (emphasis in original). At bottom, the "distinctness doctrine requires a plaintiff to demonstrate that the RICO person is legally separate from the RICO enterprise, while the association-in-fact requirements help ensure that distinctiveness is not achieved by simply tacking on entities to the enterprise which do not in fact operate as a 'continuing unit' or share a 'common purpose.'" Allstate Ins. Co. v. Valley Physical Med. & Rehab., P.C., No. 05-5934, 2009 WL 3245388, at *6 (E.D.N.Y. Sept. 30, 2009) (citation omitted).

In its prior order, this court found that plaintiff had not pleaded a plausible enterprise theory—either its association-in-fact theory or its "alterative" legal-entity theory.[1] As for the "alternative" theory, the court found that plaintiff had named Simmons Hanly as the RICO enterprise and had named both Simmons Hanly and the individual defendants who worked for Simmons Hanly as the RICO "persons." J-M, 2025 WL 843854, at *7. But, the court noted, that arrangement fails distinctness: "a corporate entity may not be both the RICO person and the RICO enterprise," and an "employer and its employees cannot constitute a RICO enterprise." Id. (citations omitted). As for the association theory, the court explained that when "the organization is named as defendant, and the organization associates with its member to form the enterprise 'association-in-fact,' the requisite distinctness does not obtain." Id. (citation omitted). So plaintiff needed to do more than simply tack on entities which do not operate as a continuing unit. But it had failed to do so: it had not plausibly pleaded that non-Simmons Hanly entities—the asbestos plaintiffs, other witnesses, and local counsel—were properly part of that enterprise. Id. at *7-8. Distinctness thus did not obtain. Id. at *9.

Defendants argue here that plaintiff's replacement theories—now separated into in Counts I and II, respectively—fare no better.

Count I - Individual Defendants as the "Persons" and the "Simmons Hanly Enterprise"

Defendants appear to concede that plaintiff has "cure[d]" the prior deficiency in its alternate legal enterprise theory by alleging in Count I that the individual defendants are the "persons" and that "Simmons Hanly Enterprise" is the "legal enterprise." But they contend that plaintiff has simply run into a new "problem": it has failed to "adequately plead" the first

[1] A plaintiff may allege alternative enterprise theories in its complaint.

element of a RICO claim—"that the Individual Defendants (the sole 'persons' in Count I) 'participated in the *operation or management* of the enterprise itself' through the alleged racketeering activity." (Cleaned up) (Emphasis by defendants). According to defendants, "allegations that a defendant . . . performed services for [the RICO] enterprise do not suffice, . . . even if the defendant knew of the enterprise's illicit nature." (Cleaned up). And here, defendants assert, the allegations fail to show that individual defendants "Angelides, Browder, Goldstein, Dhar, Foley, Jones, or Rosenthal were involved in directing the affairs of the alleged enterprise—the firm—*through their alleged racketeering activity*." (Emphasis by defendants).

The court disagrees. Section 1962(c) makes it illegal "to conduct or participate, directly or indirectly, in the conduct of [a RICO] enterprise's affairs." 18 U.S.C. § 1962(c). The Supreme Court has interpreted "'conduct' to require some degree of direction and the word 'participate' to require some part in that direction." Reves v. Ernst & Young, 507 U.S. 170, 179 (1993). According to the Court:

> [T]o "participate, directly or indirectly, in the conduct of such enterprise's affairs," one must have some part in directing those affairs. Of course, the word "participate" makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase "directly or indirectly" makes clear that RICO liability is not limited to those with a formal position in the enterprise, but some part in directing the enterprise's affairs is required. Id. (emphasis removed).

"This interpretation is meant to prevent section 1962(c) from reaching 'complete outsiders' who did not participate 'in the conduct of the '*enterprise*'s affairs'' but rather 'just their *own* affairs.'" Dixon v. Gatzke, 790 F. Supp. 3d 679, 702 (N.D. Ill. 2025) (emphasis in original) (quoting Reves, 507 U.S. at 185).

Synthesizing Reves, the Seventh Circuit has explained that § 1962(c) reaches more than just "upper-level management": "a RICO enterprise may be operated at least by upper management, lower-rung participants in the enterprise who are under the direction of upper management, or others associated with the enterprise who exert control over it, as for example, by bribery." MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc., 62 F.3d 967, 977 (7th Cir. 1995) (cleaned up). "But the law is equally clear that the operation-or-management requirement is not met through the mere provision of professional services to the alleged racketeering enterprise." Muskegan Hotels, LLC v. Patel, 986 F.3d 692, 698 (7th Cir. 2021). So, for example, a "complaint that does no more than allege that a law firm performed legal work for an enterprise fails to state a violation of § 1962(c)." Id. at 699. In other words, "a law firm's provision of legal services for a client—even with knowledge of the client's unlawful activities—does not alone demonstrate operation or management of a racketeering enterprise." Id.

Here, plaintiff alleges that:

- John Simmons is a principal and owner of Simmons Hanly and Sokolove, and he leads the Simmons Hanly Enterprise and, along with Nicholas Angelides, is the "head" of it. "Under Simmons' leadership and direction, Angelides is the mastermind of the enterprise's strategy in asbestos and mesothelioma litigation."
- Nicholas Angelides is "the brainchild of the legal strategy – the Simmons Hanly Fraud Playbook – that forms the basis of the Simmons Hanly fraud scheme and is the Chair of the Asbestos department." (Cleaned up). He, along with Simmons, heads the enterprise, and he was on the case team in several of the cases discussed in the complaint, "including *Bretado* – the primary asbestos lawsuit underlying the *Peebles* complaint – and *Montgomery*." "Angelides is listed as one of the lawyers responsible for the complaints and discovery responses that contained fraudulent information that were sent by interstate wire or mail."
- Perry Browder "manages the firm's more than 50 asbestos attorneys and oversees all asbestos cases to ensure they are handled in an efficient manner that maximizes results." (Cleaned up). He is "effectively Angelides' deputy and a leader within the

RICO enterprise, running the day-to-day operations of the enterprise and overseeing its most lucrative rackets," and he was "involved in, signed, and transmitted paperwork related to the settlements in *Bretado* and *Perkins*."

- Amy Garrett served as Assistant Managing Partner and oversaw the Asbestos Department, "acting as an advisor and serving as the right-hand person to resolve issues and threats to the success and continued operation of the enterprise." She also "took part in the effort to silence Peebles, including participating in" terminating him.
- Benjamin Goldstein is the firm's West Coast Asbestos Litigation Manager, "in charge of the firm's West Coast asbestos litigators to ensure these litigators do not upset the operation of the Simmons Hanly Fraud Playbook." He "is among the attorneys of record responsible for the complaints and discovery responses that contained fraudulent information and that were sent by interstate wire or mail," and he "took part in the retaliatory conduct described in the *Peebles* complaint when Peebles sought to reveal the Simmons Hanly Fraud Playbook and expose the scheme."
- Suvir Dhar is a former Simmons Hanly partner, who was "responsible for implementing the strategies of the Simmons Hanly Fraud Playbook on a day-to-day basis," and who "admitted that Simmons Hanly filed a complaint against [plaintiff] knowing it contained false information," and who "solicit[ed] perjured testimony" in the Carranza case. He participated in filing the complaint, "presented Carranza's brother for deposition and conducted an examination of him" over the course several months in 2019.
- Crystal Foley is a Simmons Hanly partner, who was "responsible for implementing the strategies of the Simmons Hanly Fraud Playbook on a day-to-day basis," and who caused to be served false statements in interrogatories in Bretado, Carranza, Yates, and Montgomery.
- Deborah Rosenthal is a Simmons Hanly partner, who was "responsible for implementing the strategies of the Simmons Hanly Fraud Playbook on a day-to-day basis," and who signed responses to interrogatories with false information in Yates and repeated a false narrative in a summary judgment brief in Carranza.
- Stan Jones "is or was an asbestos case investigator at Simmons Hanly." He helped "build the cases by finding the evidence to support the story about each defendant." (Cleaned up). And he "assisted the product identification witness" in the Carranza lawsuit, to "deliver false and coached testimony to further the firm's story." (Cleaned up).

Plaintiff has thus alleged that the RICO persons are not "mere[ly]" outsiders "provi[ding] professional services to the alleged racketeering enterprise," Muskegan, 986 F.3d at 698—like an outside law firm who knows about its client enterprise's illegal conduct but continues to perform

professional services for it. The RICO persons are instead alleged to have been working inside the enterprise and involved in the underlying fraudulent conduct—either conducting or operating the enterprise as "upper management" who are pushing the fraudulent scheme (Simmons, Angelides, Browder, Garrett, and Goldstein), or as "lower-rung participants" (Dhar, Foley, Rosenthal, and Jones) who are carrying out the scheme "at the direction of upper management." MCM, 62 F.3d at 977; see id. at 979 (determining that the complaint sufficiently pleaded that two contractors inside the alleged enterprise were lower-rung participants in a RICO enterprise); see also United States v. Fowler, 535 F.3d 408, 418 (6th Cir. 2008) (citing MCM, explaining that "our sister circuits have persuasively explained that [having some part in directing the enterprise's affairs] can be accomplished either by making decisions on behalf of the enterprise or by knowingly carrying them out"). The court thus finds that plaintiff has plausibly pleaded the "conduct" and "enterprise" elements for Count I.

Count II - Defendants as the "persons" and an "Association-in-Fact Enterprise"

In Count II, plaintiff alleges an association-in-fact enterprise consisting of Simmons Hanly, Sokolove, and the individual defendants. Citing Ratfield v. United States Drug Testing Lab'ys, Inc., 2024 WL 640955, at *3 (N.D. Ill. Feb. 15, 2024), defendants argue that there is no defendant that is distinct from the enterprise, and that the allegations about "the new participant," Sokolove, "amount to nothing more than 'a standard commercial relationship,' and . . . do not establish that Sokolove was 'conducting the affairs of the alleged enterprise as opposed to [its] own affairs.'" (Bracketing by defendants) (Quoting Ratfield, 2024 WL 640955, at *3).

But on reply, defendants concede that "Sokolove's addition might satisfy the distinctness requirement." The court finds that it does. Again, "where . . . the organization is named as

defendant, and the organization associates with its member to form the enterprise 'association-in-fact,' the requisite distinctness does not obtain." J-M Mfg., 2025 WL 843854, at *7 (citation omitted). "But even where the organization and its affiliates are not sufficiently distinct, there may still be a distinct enterprise when the enterprise includes at least one player that is not part of the defendant organization." Id. (citing ClassicStar, 727 F.3d at 493). By adding Sokolove, plaintiff has added at least one player that is not part of the Simmons Hanly organization, and has thus fixed the distinctness issue.

But plaintiff still must plausibly allege that the enterprise is a "continuing unit" and has a "common purpose." Id. at *8 (citing Boyle, 556 U.S. at 944-45). In doing so, it must plead "more than a run-of-the-mill commercial relationship." Bible, 799 F.3d at 656. The court finds that it has done so.

The complaint alleges that for over a decade "Simmons Hanly and Sokolove have shared an interdependent relationship" in which they "have associated with one another in the association-in-fact enterprise for the common purpose of reaping financial rewards for themselves through fraudulent conduct in legal marketing and asbestos litigation." According to the complaint, Sokolove generates leads through advertising that is allegedly false and deceptive (in exchange for a percentage of any recoveries), while Simmons Hanly converts those leads into fraudulent lawsuits. Simmons Hanly and Sokolove, the complaint goes on, are "deeply engaged" in each other's affairs, with both firms sharing office space and personnel, and both operating under Simmons's leadership (Simmons is the sole manager of Simmons Hanly and co-manager of SHC Law Group, LLC, which is the managing member of Sokolove). Ultimately,

the complaint alleges, the Simmons Hanly-Sokolove relationship has "culminate[d] in the scheme to defraud the tort defendants against whom Simmons Hanly litigates."

"These allegations plausibly plead an enterprise functioning as a continuing unit and involving interpersonal relationships and a common interest." Uber, 2026 WL 1284178, at *22 (cleaned up). Defendants' "characterization of the allegations as mere referral relationships or parallel conduct does not warrant dismissal at this stage." Id. Indeed, in contrast to the enterprise allegations the court found lacking in Ratfield, for instance, the allegations here plead more than "a standard commercial relationship." 2024 WL 640955, at *3. As explained above, the complaint alleges, for example, that Simmons (and at least one other attorney, Ricky LeBlanc) "involved themselves in the affairs of the other," Walgreen, 719 F.3d at 854, and that they shared offices.

In short, "viewing the pleaded facts in the light most favorable to [plaintiff], [the complaint] alleges more than independent actors pursuing their own business interests." Uber, 2026 WL 1284178, at *22.

A Pattern of Racketeering Activity

Defendants next argue that plaintiff has not plausibly pleaded a pattern of racketeering activity. The "precise requirements" of the pattern element have "bedeviled courts." Menzies, 943 F.3d at 336. One requirement is that the plaintiff must allege at least "two predicate acts of racketeering committed within a ten-year time period." Goren v. New Vision Int'l, Inc., 156 F.3d 721, 728 (7th Cir. 1998). "Predicate acts are acts indictable under a specified list of criminal laws, 18 U.S.C. § 1961(1)(B), including mail fraud under 18 U.S.C. § 1341, and wire

fraud under 18 U.S.C. § 1343." Midwest Grinding Co. v. Spitz, 976 F.2d 1016, 1019 (7th Cir. 1992).

Because plaintiff seeks to "plead RICO's pattern element through predicate acts of mail or wire fraud," Rule 9(b)'s heightened pleading requirements apply, and plaintiff must "do more than allege fraud generally." Webb v. Quintairos, Prieto, Wood & Boyer, P.A., No. 24 CV 04082, 2025 WL 843400, at *8 (N.D. Ill. Mar. 18, 2025) (quoting Menzies, 943 F.3d at 338). To that end, "each element necessary to show mail or wire fraud must be alleged with the particularity and specificity required by Rule 9(b)." Drobny v. JP Morgan Chase Bank, NA, 929 F. Supp. 2d 839, 848 (N.D. Ill. 2013). Plaintiff must allege: "(1) the defendants' participation in a scheme to defraud; (2) the defendants' intent to defraud; and (3) the defendants' use of the mail in furtherance of the scheme to defraud." Id.[2]

"The words 'to defraud' in the mail fraud context mean 'wronging one in his property rights by dishonest methods or schemes' and 'usually signify the deprivation of something of value by trick, deceit, chicane or overreaching.'" Id. (citation omitted). As for the use of the mail element, a plaintiff need not show that a defendant himself "personally cause[d] the mailing or use of the wire; it is enough that the use of mail or wire will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended." United States v. Turner, 551 F.3d 657, 666 (7th Cir. 2008) (cleaned up). Any mailing, moreover, "that is incident to an essential part of the scheme satisfies the mailing element, even if the mailing itself contains no false information." Bridge v. Phoenix Bond & Indemnity Co.,

[2] Cases construing the mail-fraud statute are equally applicable to cases involving violations of the wire-fraud statute. United States v. Turner, 551 F.3d 657, 666 n.4 (7th Cir. 2008).

553 U.S. 639, 647 (2008) (cleaned up). And the complaint "must go beyond a showing of fraud and state the time, place and content of the alleged mail and wire communication perpetrating the fraud." Drobny, 929 F. Supp. 2d at 848 (citation omitted). When, as here, the case involves multiple defendants, "the complaint should inform each defendant of the nature of his alleged participation in the fraud." Id. (cleaned up).

Another requirement of the pattern element is that a plaintiff must also allege a pattern that passes the "continuity plus relationship test." Kazazian v. CNA Fin. Corp., No. 24-CV-10843, 2025 WL 3251424, at *5 (N.D. Ill. Nov. 21, 2025). That test looks to whether the "predicate acts [are] related to one another (the relationship prong) and pose a threat of continued criminal activity (the continuity prong)." Midwest Grinding, 976 F.2d at 1022 (emphasis removed).

Defendants argue here that plaintiff has failed to plead a pattern element for two reasons: (1) plaintiff failed to plead with particularity "the alleged fraud, the mailings or wirings they purportedly sent in furtherance of the scheme, or the pattern of racketeering activity in which they allegedly engaged"; and (2) the alleged misconduct—filing meritless cases against plaintiff and using the mail or wires to prosecute them—is not racketeering activity as a matter of law.

Whether Plaintiff has Pleaded the Predicate Acts with Particularity

Although Rule 9(b) requires describing the "who, what, when, where, and how" of the fraud, "the exact level of particularity that is required will necessarily differ based on the facts of the case." AnchorBank, 649 F.3d at 615. The court finds that plaintiff has pleaded enough particularity under the circumstances here as to the individual defendants' participation in the scheme to defraud, their intent to defraud, and their use of the mail in furtherance of the scheme

to defraud—especially given that, as just explained, a defendant need not have personally caused the mailing or use of the wire, Turner, 551 F.3d at 666, and "any mailing that is incident to an essential part of the scheme satisfies the mailing element" even if it contains no false information, Bridge, 553 U.S. at 647 (cleaned up).

As for the scheme to defraud, plaintiff alleges that defendants "have operated, and continue to operate, a multi-faceted scheme to defraud that misleads asbestos plaintiffs, state regulators, and asbestos defendants," like plaintiff. According to the complaint, Sokolove and Simmons Hanly lawyers took actions to further the scheme by: coordinating among themselves (including Simmons and LeBlanc) to generate leads and refer asbestos plaintiffs to Simmons Hanly; working with case team members (including Foley and Angelides) to develop the "story"; sending pleadings, discovery responses, and correspondence containing false information or in furtherance of the scheme; extracting settlement payments through the use of the fraudulent scheme to be paid to Simmons Hanly; and working with firm management to further and cover up the scheme.

As for each individual defendant's role in the scheme, the court has summarized in the legal enterprise theory discussion above the complaint's allegations about each person's role.

Turning to predicate acts, the complaint alleges that defendants "engaged in multiple acts of racketeering activity," including mail and wire fraud, "by intentionally devising and participating in the scheme to defraud" plaintiff by false representations and using interstate "mails and wires." "These predicate acts," plaintiff alleges, "span more than five years," "were persistent through the entire time period," and "include the interstate transmission by mail and wire of fraudulent discovery and pleadings, perjured testimony, and other communications and

documents." These "communications included . . . emails, video conferencing, telephone calls, electronic filing of court papers or corporate disclosures over the internet, electronic service of discovery and court filings over the internet on lawyers located in various states, and mailings and wires to transmit settlement payments." Many "contained false statements . . . while others were sent as part of a regular pattern of conducting business essential to effectuate the scheme." Plaintiff further alleges that the "predicate acts were related in that they shared the same or similar purposes," "were . . . regular and integral steps in furtherance of the scheme to defraud [plaintiff]," and "were continuous in that they have occurred on a regular basis since at least 2019, affected numerous civil lawsuits and, on information and belief, remain ongoing."

Plaintiff provides in the complaint a "non-exhaustive list" of several mailings and wires that it alleges were sent as part of the scheme, many of which relate to the five cases that plaintiff avers illustrate how the scheme operated. In doing so, plaintiff provides the alleged "time, place and content of the alleged mail and wire communication perpetrating the fraud." Drobny, 929 F. Supp. 2d at 848. Below is an excerpt from the list:

| DATE | MAIL OR WIRE(S) | CONTENTS |
|---|---|---|
| October 15, 2018 | Wire transmittal of *Bretado* complaint from Foley in Illinois (with Angelides as attorney of record) to California for filing in Superior Court in Los Angeles<br>Foley based in Illinois and used electronic service to serve complaint on J-M Manufacturing lawyer in Louisiana | False exposure information |
| November 7, 2018 | Wire transmittal of *Carranza* complaint from Foley and Dhar in Illinois to California for filing by fax in Superior Court in Los Angeles | False work history about work for Indelcor and false exposure information |
| January 16, 2019 | In-Person and telephonic deposition of Sebastian Bretado in California (with Jones present) transmitted by telephone from California to Texas | Perjured/false testimony about exposure to asbestos-containing products |

Plaintiff further alleges details from the specific five cases that are connected to these mails and wires. According to the complaint, Simmons Hanly filed the Bretado case in October 2018 (with Angelides and Foley listed as attorneys of record), and a Simmons Hanley lawyer used suggestive identification techniques at Bretado's subsequent deposition in January 2019 (in which Jones participated and assisted with translation) to get him to provide "a remarkable level of detail about the ACP he supposedly used, who supposedly supplied it, and how he was supposedly exposed to asbestos from it." Yet Bretado recalled no other details about the work he performed, other than the names of three employers. But months later, in June 2019, family members of two the employers testified at deposition that those individuals did not even run landscaping businesses, and the principal of the third employer testified that his company never used ACP, thus "confirm[ing] that Bretado had provided false testimony." Angelides and Foley then "caused to be served" discovery responses in January and June 2019, which "reinforced" this false testimony. And plaintiff then settled in August 2019, with Browder having sent and signed the settlement paperwork in August 2019.

As explained above in discussing Noerr-Pennington, plaintiff alleges that Simmons Hanly filed the Carranza case in November 2018 (with Foley as an attorney of record), claiming that Carranza was exposed to asbestos in plaintiff's ACP while working for Indelcor in the 1980s. But this was "false": Indelcor's owner testified that the company did not even exist until the mid-90s. Plaintiff "also learned" that Indelcor's owner informed Dhar that the allegations in the complaint were not accurate on the same day Simmons Hanly filed the complaint, which Dhar and Simmons Hanly already knew. Plaintiff further alleges that Carranza's brother was the sole product identification witness and testified at his deposition that his brother installed

sewer ACP at hundreds of locations, and that the pipe said "J-M Transite," but that other evidence showed that this was false. The deposition occurred over six days split between June and November 2019, with "Jones attend[ing] the deposition for Simmons Hanly's initial examination of Carranza's brother and help[ing] with translation." Yet "Simmons Hanly continued to promote in written discovery" responses (in April, June, November 2019, and February 2020) and in summary judgment briefing (in November 2019) "the narrative about Carranza's exposure that had been described by Carranza's brother." After plaintiff "spent a significant sum defending against the allegations in the case," Simmons Hanly dismissed the case in March 2020.

Plaintiff alleges that Simmons Hanly filed the Perkins case in November 2019, alleging that the plaintiff, CertainTeed, and many other entities were responsible for Perkin's wife's death from mesothelioma as a result of secondary exposure to asbestos that Perkins had carried home from his various jobs. CertainTeed filed for bankruptcy. Perkins was then deposed in August 2020, where he testified that he was not familiar with CertainTeed or its ACP, or ACP made by other bankrupt ACP manufacturers. Simmons Hanly later filed in August 2022, a proof of claim on behalf of Perkins' wife in the CertainTeed/DBMP bankruptcy case, swearing under penalty of perjury that she had a claim against CertainTeed for product exposure. Thereafter, Simmons Hanly sent signed discovery responses in 2022, in which it concealed the proof of claim that Simmons Hanly had filed in the bankruptcy. Plaintiff then settled the Perkins case in 2023—with Browder sending the signed paperwork.

Plaintiff further alleges that Simmons Hanly filed the Yates case against plaintiff in May 2019, with Foley (who signed the initial and amended complaints), Goldstein, and Rosenthal as

attorneys of record, alleging that Yates was exposed to asbestos while employed as a pipe worker for TT Technologies from 1998 to 2008 in California. In June 2019, Foley, Goldstein, and Rosenthal then provided discovery responses (signed by Foley) on separate occasions that claimed that Yates worked in "pipe bursting" and cut J-M Transite pipe. This narrative was repeated in subsequent responses in August 2020 and April 2021. But TT Technologies' CEO refuted this exposure narrative at his deposition in May 2021. Foley, Goldstein, and Rosenthal also provided discovery responses (signed by Foley) in August 2020, which stated that no autopsy had been performed on Yates. Records later obtained in September 2021, however, showed that Simmons Hanly had paid for an autopsy that was performed on Yates. Simmons Hanly thereafter voluntarily dismissed the case in October 2021.

As for the fifth case, finally, plaintiff alleges that Simmons Hanly filed the Montgomery case against plaintiff in January 2021, with Foley (who signed the complaint), Goldstein, and Rosenthal as attorneys of record, alleging that Montgomery was exposed to asbestos while working as an operating engineer from 1968 to 1990 for various employers. Foley, Goldstein, and Angelides served discovery responses (signed by Foley) asserting that Montgomery worked with and cut J-M Manufacturing-branded ACP from 1968 to 1980. But this was false because plaintiff did not sell ACP until 1983. The responses also stated that Montgomery worked with J-M Manufacturing-branded ACP while working for Burke Construction Co. from 1980 to 1995. Simmons Hanly represented Steve Burke, who testified that Montgomery worked for Burke Construction from 1981 to 1987, and that Montgomery was exposed to J-M Transite ACP. But social security records confirmed that Montgomery did not work for Burke Construction from 1981 through 1987 (he worked there in 1981 and then in the 1990s), and the president of Burke

Construction confirmed this at his deposition and further testified that there were no records suggesting that either Burke Construction or Montgomery ever worked with J-M Manufacturing ACP. Steve Burke also admitted that he had been provided photos of transite pipe before his deposition. Foley, Goldstein, and Angelides served discovery responses (signed by Foley), which continued to list Montgomery as working at Burke Construction from 1980 to 1995. Simmons Hanly then voluntarily dismissed the case.

The court finds that plaintiff has pleaded a pattern of racketeering activity with sufficient particularity under the circumstances here.[3]

Whether the Alleged Conduct can be Racketeering Activity

Defendants argue that alleged acts of filing meritless cases against plaintiff and using the mail or wires to prosecute them cannot be racketeering activity as a matter of law. According to defendants, "[m]yriad courts have rejected attempts to cast ordinary litigation activities, even if baseless or malicious, as RICO predicate acts." (Citing Kim v. Kimm., 884 F.3d 98, 104 (2d Cir. 2018)). Plaintiff argues in response that the Seventh Circuit has not so held, and that Kim does not support a categorical bar even if the Seventh Circuit adopted it.

The court agrees with plaintiff. Although Kim sets forth good reasons for generally not allowing litigation activities to constitute RICO predicate acts, neither Kim nor the other cases defendants cite support an "absolute bar." Abbondanza v. Weiss, No. 19-CV-00328, 2022 WL 889099, at *15 (D. Colo. Mar. 24, 2022) ("While case law shows reluctance to expand RICO's coverage to the 'litigation activities' context, there is no absolute bar." (citing Kim)); see also

[3] The court finds, however, that plaintiff has not done so as to the Doe Defendants, and will dismiss them without prejudice.

Garlock Sealing Techs., LLC v. Simon Greenstone Panatier Bartlett, No. 3:14-CV-116, 2015 WL 5148732, at *5 (W.D.N.C. Sept. 2, 2015) ("there exists no broad shield from RICO for attorney advocacy" (cleaned up)).

In Kim, the plaintiff (Kim) owned a restaurant and alleged a RICO violation against the defendants (another restaurant's owner, his wife and business partner, their two attorneys, and an accountant), alleging that the defendants formed an enterprise that conspired to use a trademark infringement litigation as the basis of a scheme to extort $2 million from him. 884 F.3d at 101. The district court dismissed the claim, finding that Kim had not alleged predicate acts constituting a pattern of racketeering activity. Id. at 102. In so doing, the district court found that most of the predicate acts concerned litigation activity—the preparing, signing, and filing of declarations by certain defendants with the knowledge that they contained fraudulent representations—which it held could not constitute RICO predicate acts. Id. The Second Circuit affirmed.

It explained that other "courts have held that '[i]n the absence of corruption,' such litigation activity 'cannot act as a predicate offense for a civil-RICO claim.'" Id. at 104 (citation omitted) (collecting cases). It "agree[d] with the reasoning of these opinions and conclude[d] that allegations of frivolous, fraudulent, or baseless litigation activities—without more—cannot constitute a RICO predicate act." Id. After all, the court explained, allowing parties to allege that litigation activity amounted to RICO predicate acts would spawn complex retaliatory actions, would erode the doctrines of res judicata and collateral estoppel, would chill litigants and lawyers, and would frustrate the goal of maintaining open access to the courts. Id. Yet the court cabined its decision: it expressly "decline[d] to reach the issue of whether all RICO actions

based on litigation activity are categorically meritless," and "conclude[d] only that where . . . a plaintiff alleges that a defendant engaged in a single frivolous, fraudulent, or baseless lawsuit, such litigation activity alone cannot constitute a viable RICO predicate act." Id. at 105.

Plaintiff's action here differs in significant respects to Kim's. For one thing, this action alleges more than just mailings in a single fraudulent lawsuit. Compare id. (dealing with allegations "that a defendant engaged in a single . . . fraudulent . . . lawsuit"); with Uber, 2026 WL 1284178, at *21 ("This is not a case involving a single lawsuit supported by allegedly false filings."); Garlock, 2015 WL 5148732, at *5 (declining to dismiss RICO claim where asbestos-lawyer defendants' alleged conduct included "committing rampant fraud over the course of several years and in numerous venues throughout the country"); and Lemelson v. Wang Labs. Inc., 874 F. Supp. 430, 434 (D. Mass. 1994) (declining to dismiss RICO counterclaim that alleged that the predicate acts were the enterprise's use of mail and wires to further their scheme to extort money through a pattern of litigation and later settlement over fraudulently obtained patents). For another, this action is not between the two parties who were litigating in the underlying lawsuits. So Kim's concerns over having every unsuccessful lawsuit spawn a complex retaliatory RICO action or eroding the res judicata and collateral estoppel doctrines are not implicated here.

This action instead alleges an extensive scheme devised by lawyers and firms to defraud plaintiff through serial lawsuits based on false testimony and concealed information. It thus hews closer to another Second Circuit case—United States v. Eisen, 974 F.2d 246 (2d Cir. 1992).

Eisen involved a RICO criminal case arising from the Eisen law firm's "fraudulent conduct of civil litigation." Eisen, 974 F.2d at 250-51. The defendants there were seven

attorneys, investigators, and office personnel from the Eisen firm, which specialized in filing personal injury suits. Id. at 251. The evidence at trial showed that "the defendants conducted the affairs of the Eisen Firm through a pattern of mail fraud and witness bribery by pursuing counterfeit claims and using false witnesses in personal injury trials." Id. They did this by "pressuring accident witnesses to testify falsely, paying individuals to testify falsely that they had witnessed accidents, paying unfavorable witnesses not to testify, and creating false photographs, documents, and physical evidence of accidents for use before and during trial." Id. The racketeering acts related to the defendants' conduct in 18 fraudulent personal injury lawsuits in which the allegedly injured plaintiff was represented by the Eisen firm. Id. The predicate acts in Eisen thus related to an extensive scheme to defraud the defendants in the personal injury lawsuits commenced by the Eisen Firm.

The predicate acts alleged here, like those alleged in Eisen, relate to an extensive scheme to defraud plaintiff in several lawsuits commenced by Simmons Hanly. And the alleged conduct of the individual defendants here, like that of the Eisen firm defendants, involves having witnesses testify falsely and suppressing evidence. The court is thus not convinced that Second Circuit's decision in Kim—even if it were binding—requires dismissing plaintiff's RICO claims.

In addition, although neither party points to a Seventh Circuit case that is directly on point (and the court has found none), the Seventh Circuit has at least suggested that mail fraud premised largely on charges of perjury could suffice as a RICO predicate act. See Midwest Grinding, 976 F.2d at 1021 ("If Midwest can show that the defendants' lies constituted mail or wire fraud, 18 U.S.C. §§ 1341 and 1343, . . . then those cover-up acts theoretically may serve as predicate acts." (citations omitted)). And the Ninth Circuit has also suggested that RICO suits

can be predicated on fraudulent discovery conduct in prior litigation that induced the plaintiffs to settle the suit for a lower amount than they would have in the absence of the fraud. See Living Designs, Inc. v. E.I. DuPont de Nemours & Co., 431 F.3d 353, 364-65 (9th Cir. 2005) ("Plaintiffs allege that DuPont's RICO liability is predicated on its falsification, destruction, and misrepresentation of evidence. DuPont has not cited any federal case which holds that a party's litigation conduct in a prior case is entitled to absolute immunity and cannot form the basis of a subsequent federal civil RICO claim.").

Defendants are correct that district courts in this circuit have stated that "filing and prosecuting a complaint is not considered mail or wire fraud or a predicate act under RICO," Drobny, 929 F. Supp. 2d at 848 (citation omitted), and that an "alleged scheme of filing lawsuits to enforce an allegedly illegally obtained copyright does not constitute a predicate act of racketeering for purposes of RICO," Harris Custom Builders, Inc. v. Hoffmeyer, No. 90 C 0741, 1994 WL 329962, at *4 (N.D. Ill. July 7, 1994). But these cases did not involve an extensive scheme to defraud the plaintiffs in several lawsuits based on having witnesses testify falsely and suppressing evidence. See Garlock, 2015 WL 5148732, at *5 (rejecting asbestos lawyers' argument "that actions in the litigation context cannot, as a matter of course, serve as predicate acts for RICO," explaining that the alleged conduct of "committing rampant fraud over the course of several years and in numerous venues throughout the country" went "well past the kind of routine litigation activities that [other] courts have found inadequate to state a claim under RICO").

In sum, plaintiff has sufficiently pleaded a pattern of racketeering activity.

Statute of Limitations

Defendants next contend that plaintiff's RICO claims are time-barred. "Dismissing a complaint as untimely at the pleading stage is an unusual step, since a complaint need not anticipate and overcome affirmative defenses, such as the statute of limitations." Sidney Hillman Health Ctr. of Rochester v. Abbott Lab'ys, Inc., 782 F.3d 922, 928 (7th Cir. 2015) (citation omitted). Although a complaint can be dismissed if the plaintiff alleges facts sufficient to establish the defense, doing so is "irregular" and "appropriate only where the allegations of the complaint itself set forth everything necessary to satisfy the affirmative defense." Id. (cleaned up). "As long as there is a conceivable set of facts, consistent with the complaint, that would defeat a statute-of-limitations defense, questions of timeliness are left for summary judgment (or ultimately trial), at which point the district court may determine compliance with the statute of limitations based on a more complete factual record." Id.

There is a four-year statute of limitations for civil RICO claims. Id. at 926. Yet "there remains some ambiguity about the contours of the accrual rules for civil RICO claims." Id. Generally, the claim begins to accrue when the plaintiff knew or should have known about the injury—even if it has not yet discovered the pattern. Id. "It is not the date on which the wrong that injures the plaintiff occurs, but the date—often the same, but sometimes later—on which the plaintiff discovers that he has been injured." Id. at 928 (cleaned up).

The parties agree here that the specific inquiry is whether plaintiff was on notice of its claimed injury by May 10, 2020—four years before plaintiff filed its original complaint on May 10, 2024. Defendants assert that plaintiff "claims it was injured when it was first forced to incur attorneys' fees 'defending against' 'sham' cases and 'induced' to settle other cases." And,

defendants argue, nine of the ten cases that plaintiff "mentions were litigated (and many resolved) well before" May 10, 2020:

- Carranza was filed in 2018 and voluntarily dismissed in March 2020.
- Bretado was settled in August 2019.
- Morgan jury verdict in November 2018.
- Perkins, Yates, Swiger, Azevado, and Boyance were filed in 2019.
- Noll was filed and settled in 2013.[4]

Thus, defendants assert, plaintiff was harmed as early as 2013 when it took the deposition in Noll. And, defendants contend, statements that plaintiff's general counsel made in other litigations about Simmons Hanly's litigation practices confirm that plaintiff knew of the harm. According to defendants, the court can take judicial notice of these transcripts, which show that, for example, plaintiff's counsel "stated in open court in 2021 that 'for as long as I've been part of J-M and looking at our history, all [SHC's] cases follow their same highly unusual patterns . . . the two most notable examples are [*Bretado*, filed in 2018] and Carranza [filed in 2018] . . . and the facts are always unbelievable.'" (Alterations by defendants). Finally, defendants argue, it does not matter that Montgomery was filed in 2021: "later acts in furtherance of a common scheme do not create a 'new' claim." Defendants therefore conclude that the complaint is time-barred.

---

[4] Plaintiff alleges in the complaint where and when some of the underling lawsuits were litigated and resolved. As for venues and dates related to any underlying lawsuits not expressly set forth in the complaint, the parties agree (as does the court) that the court may take judicial notice of public court filings (which defendants have attached to their request for judicial notice) that establish those facts. See Gen. Elec. Cap. Corp. v. Lease Resol. Corp., 128 F.3d 1074, 1081 (7th Cir. 1997) ("The most frequent use of judicial notice of ascertainable facts is in noticing the contents of court records.").

The court disagrees. Although defendants' "arguments may eventually carry considerable weight," they do not show that the complaint's allegations justify taking the "unusual" and "irregular" step of dismissing the complaint based on the statute of limitations. Sidney Hillman, 782 F.3d at 927-28. Defendants rely primarily on when the underlying lawsuits were filed or settled. But "[t]he fact that an underlying asbestos suit was filed or settled, without more, does not establish as a matter of law that the separate gravamen of RICO fraud should have been known by that event alone." CSX Transp., Inc. v. Gilkison, 406 F. App'x 723, 730 (4th Cir. 2010) (reversing dismissal of RICO claim against law firm and lawyers based on filing fraudulent asbestos cases against the plaintiff). Rather, what matters is whether "the facts pled on the face of the complaint" show that plaintiff "knew or should have known that the underlying asbestos lawsuits were *fraudulently* filed when they were filed." Id. (emphasis in original).

Based on the complaint here, plaintiff's knowledge of the falsity of statements from Perkins, Yates, and Montgomery would have come after May 10, 2020. It does appear that plaintiff at least suspected before May 10, 2020, that the relevant deposition-witness statements in Bretado and Carranza were false. But that does not necessarily mean that it should have known that the falsehood was part of a fraudulent scheme. Likewise, although the other named cases may have put plaintiff on notice of a pattern of consistent product identifications and exposure stories, this, too, does not establish that plaintiff should have been aware of a fraudulent scheme. In fact, plaintiff alleges in the complaint that defendants' "scheme could only be detected and understood once . . . former Simmons Hanly partner Scott Peebles filed a lawsuit"

(which was filed after May 10, 2020) "against the firm and exposed that the firm was engaged in a pattern of fraud and misconduct in asbestos litigation."

Also, the court rejects defendants' request to take judicial notice of transcripts in which plaintiff's counsel discussed Simmons Hanly's practices. A court may take judicial notice of a fact "that is both 'not subject to reasonable dispute' and either 1) 'generally known within the territorial jurisdiction of the trial court' or 2) 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.'" Gen. Elec., 128 F.3d at 1081 (quoting Fed. R. Evid. 201(b)). Notice is generally "not for the truth of the matters asserted in the document." Glob. Relief v. New York Times Co., No. 01-8821, 2002 WL 31045394, at *5 (N.D. Ill. Sept. 11, 2002) (citing Gen. Elec., 128 F.3d at 1081 n.6).

Recognizing this, defendants argue that they are not asking "the Court to accept the *truth* of" counsel's statements, but to instead simply take notice of the fact that the statements were made—"which demonstrate" plaintiff's "awareness of the very conduct underlying its RICO claims." (Emphasis by defendants). Although defendants' argument may help it avoid a hearsay objection down the road, it offers them none here. That is because defendants are effectively asking the court to take notice not only of the fact that the statements were made, but of defendants' interpretation of those statements. This the court cannot do. See Ohio Valley Env't Coal. v. Aracoma Coal Co., 556 F.3d 177, 216 (4th Cir. 2009) (declining to take judicial notice of permit decisions because the party seeking notice sought not just notice of the existence of the decisions but "notice of its own interpretation of the contents of those documents"); United States v. S. California Edison Co., 300 F. Supp. 2d 964, 974 (E.D. Cal. 2004) ("A court may not take judicial notice of one party's opinion of how a matter of public record should be

interpreted.”). Because the interpretation of the statements are subject to reasonable dispute, and because the court must view inferences in plaintiff’s favor at this stage, the court declines to take judicial notice of the transcripts and will not consider them here.

In brief, “[a]t this stage, there is insufficient information to decide when a reasonable [company in plaintiff’s shoes] should have discovered that it had paid more for [settlements and to defend lawsuits] than it otherwise would have had to because of an illegal [fraudulent] scheme.” Sidney Hillman, 782 F.3d at 928 (reversing district court’s dismissal of RICO lawsuit based on statute of limitations); see CSX Transp., 406 F. App’x at 730 (same).

Section 1962(d)

Section 1962(d) makes it “unlawful for any person to conspire to violate” subsection (c). 18 U.S.C. § 1962(d). Defendants argue that the court should dismiss plaintiff’s § 1962(d) conspiracy claim because plaintiff’s § 1962(c) claims fail. But because the court has found otherwise, it denies the motion to dismiss the conspiracy claim.

**The Remaining State Law Counts IV-VI**

Defendants also contend that plaintiff’s state law claims—for fraud, unjust enrichment, and conspiracy—fail. As for dismissal, defendants first argue that the court should apply California law here and find that California’s “litigation privilege” under California Code of Civil Procedure § 47 immunizes all of the alleged conduct. Relatedly, and as explained above, defendants have also separately filed a “Special Motion to Strike Counts IV-VI” under California Code of Civil Procedure § 425.16—California’s “anti-SLAPP statute”—which also relies at least in part on § 47. Section 47 is an affirmative defense. See Sherako v. US Foods, Inc., No. 15 C 8485, 2016 WL 1435719, at *2 (N.D. Ill. Apr. 12, 2016) (“The [California] litigation privilege is

an affirmative defense."). Plaintiff argues: that neither California's litigation privilege nor its anti-SLAPP statute applies here because Illinois—not California—law governs this case; that defendants have waived any argument that Illinois' litigation privilege applies; and that the anti-SLAPP statute does not apply in federal court.

Choice of Law

Both parties agree that Illinois's choice-of-law principles apply,[5] that a choice of law analysis is necessary here because California's anti-SLAPP statute and litigation privilege are more protective than Illinois', that Illinois follows the most-significant-contacts approach of the Restatement (Second) of Conflict of Laws for tort actions, and that under that approach, courts consider: the place where the injury occurred; the place where the conduct causing the injury occurred; the domicile, residence, place of incorporation, and place of business of the parties; the place where the relationship between the parties is centered; and the interests and policies of potentially concerned states as they relate to the transaction.

The court further notes that generally, "under Illinois law, the law of the state where the injury occurred applies unless another state has a more significant relationship to the occurrence and parties." Ventura v. Home Servicing of Am., No. 95 C 2515, 1996 WL 172291, at *7 (N.D. Ill. Apr. 11, 1996) (cleaned up). And "[s]ometimes it is appropriate to apply the law of more than one jurisdiction, the procedure known in conflicts-speak as 'depecage.'" Spinozzi v. ITT Sheraton Corp., 174 F.3d 842, 848 (7th Cir. 1999). Dépeçage (French for "dismemberment") "refers to the process of cutting up a case into individual issues, each subject to a separate

5 See McCoy v. Iberdrola Renewables, Inc., 760 F.3d 674, 684 (7th Cir. 2014) ("Federal courts hearing state law claims under diversity or supplemental jurisdiction apply the forum state's choice of law rules to select the applicable state substantive law.").

choice-of-law analysis." Intercon Sols., Inc. v. Basel Action Network, 969 F. Supp. 2d 1026, 1035 & n.2 (N.D. Ill. 2013) (citation omitted). It typically applies when "the issues to which the different laws are applied are separable . . . rather than parts of an integrated liability standard." Spinozzi, 174 F.3d at 848.

Here, the court finds that California law should apply to the both underlying claims and defendants' asserted privilege defenses. For starters, plaintiff alleges that its principal place of business is in California. As a result, California is the place where the injury—financial loss from paying settlements and judgments—occurred.

Moving to the other factors, plaintiff further alleges: that Simmons Hanly is an LLC that is based in Illinois and that its shareholders reside in various states in which the firm has offices, including Illinois, California, New York, Missouri, and Massachusetts; that Simmons, Angelides, Browder, Garrett, Dhar, Foley, and Jones are in Illinois; that Goldstein and Rosenthal are in California; and that Sokolove is a Delaware LLC based in Massachusetts. Because the parties are located in California, Illinois, and elsewhere, the domicile factor is a wash.

As for the remaining factors, plaintiff alleges that the fraudulent scheme was orchestrated from Simmons Hanly's Illinois offices and that attorneys prepared the fraudulent filings and correspondence in Illinois. But defendants persuasively counter: that six of the ten specific cases on which plaintiff relies and four of the five on which plaintiff provides specific details were litigated in California; that three of the others were not litigated in either California or Illinois; and that the last one was initially filed in Illinois but then refiled in Vermont. The court finds that the factors of where the conduct causing the injury occurred and where the center of the parties' relationship is located, are either neutral or favor California.

Finally, the court finds that California has a stronger interest over the claims and defenses than Illinois. California has an interest in protecting its own citizen—plaintiff here—from alleged fraud. At the same time, the majority of the cases here were filed in California and plaintiff concedes that "California's litigation privilege is designed to protect California's judicial system." What's more, both California and Illinois have an interest in protecting an attorney's litigation-related conduct while practicing within their respective states. California's protection happens to be stronger. The court agrees with defendants, moreover, that even though filings and communications are alleged to have been prepared in Illinois, they "related to ongoing litigation venued most predominantly in California where they were subject to California law and California's Professional Rules of Conduct." In the end, it makes sense here to apply California law to both the alleged fraud claim and the privilege defense thereto. The court will therefore apply California law.

Defendants' "Special Motion to Strike" under California's Anti-SLAPP Statute

SLAPP stands for "strategic lawsuit against public participation." "The idea behind anti-SLAPP laws is to protect against lawsuits brought primarily to chill the exercise of speech and petition rights and to encourage continued participation in matters of public significance." Gopher Media LLC v. Melone, 154 F.4th 696, 710 (9th Cir. 2025) (Bress, J., concurring) (cleaned up). "To combat such litigation, California allows defendants to file anti-SLAPP motions"—which are "special motion[s] to strike." Id. (citing Cal. Civ. Proc. Code § 425.16(b)(1)). "The aim" of these special motions "is to decrease the 'chilling effect' of certain kinds of libel litigation and other speech-restrictive litigation by making it easier to dismiss

defamation suits at an early stage of the litigation." La Liberte v. Reid, 966 F.3d 79, 85 (2d Cir. 2020) (cleaned up) (analyzing § 425.16(b)(1)).

An anti-SLAPP motion under § 425.16(b)(1) involves two steps. See Braun v. Day, No. 23-CV-16856, 2025 WL 662081, at *3 (N.D. Ill. Feb. 28, 2025) (analyzing § 425.16(b)(1)). First, the moving party must make a threshold showing that the challenged claims "aris[e] from any act of [that party] in furtherance of [its] right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue." Cal. Civ. Proc. Code § 425.16(b)(1); see also Braun, 2025 WL 662081, at *3. Second, if the moving party meets its threshold burden, "the burden shifts to the nonmoving party to establish a 'probability' that the plaintiff will prevail on her claims." Braun, 2025 WL 662081, at *3 (quoting § 425.16(b)(1)). In determining whether the nonmoving party has done so, "the court shall consider the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based." Cal. Civ. Proc. Code § 425.16(b)(2).

Defendants argue here that both steps are satisfied: (1) defendants' purported acts at issue "constitute quintessentially 'protected conduct'" because they all relate to litigation conduct and "*all* litigation conduct . . . is absolutely protected" (emphasis by defendants); and (2) plaintiff cannot establish a probability of success because California's litigation privilege bars its claims, because plaintiff cannot plausibly plead reasonable reliance for fraud, and because unjust enrichment and civil conspiracy are not standalone claims. Plaintiff responds, arguing that defendants' anti-SLAPP motion cannot be applied in federal court because California's anti-SLAPP statute conflicts with Federal Rules 12 and 56, since the statute requires the nonmoving

party to establish a "probability" that it will prevail. Because this is a higher standard, plaintiff argues, the federal rules control and preempt California's anti-SLAPP law.

The court agrees with plaintiff. After California enacted its anti-SLAPP statute, the Ninth Circuit held that the statute applied in federal court. United States ex rel. Newsham v. Lockheed Missiles & Space Co., 190 F.3d 963, 970-73 (9th Cir. 1999). In doing so, the court recognized that under Supreme Court precedent, "[i]n the absence of a 'direct collision' between a state enactment and the Federal Rules, [the court] must make the 'typical, relatively unguided *Erie* choice'" as to whether to apply a state statute in federal court. Id. at 973 (quoting Hanna v. Plumer, 380 U.S. 460, 471 (1965)). The court ultimately concluded that there was "no 'direct collision'" between the statute and Rules 8, 12, and 56, and that the "twin purposes of . . . *Erie*" favored its application. Id.

"In the more than two decades since," the Ninth Circuit "ha[s] examined this holding numerous times, weeding out specific provisions of the law that ran afoul of the *Erie* doctrine and fine-tuning [its] application of those provisions that remained." CoreCivic, Inc. v. Candide Grp., LLC, 46 F.4th 1136, 1140 (9th Cir. 2022). In Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress, 890 F.3d 828, 833 (9th Cir. 2018), for example, the Ninth Circuit held that, "to prevent the collision of California state procedural rules with federal procedural rules," special motions to strike challenging the legal sufficiency of complaints should be evaluated under the Rule 12(b)(6) standard. In other words, the Ninth Circuit has had to rewrite the anti-SLAPP statute to avoid "collisions" with the federal rules.

So it is perhaps unsurprising that Newsham has received robust criticism from judges on the Ninth Circuit, and has even "been the subject of a failed en banc call, which sought to

overrule it . . . based at least in part on the Supreme Court's decision in [*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010)]." CoreCivic, 46 F.4th at 1141 n.4. In Shady Grove, the Supreme Court held in a 4-4-1 decision, that a New York law limiting class actions could not apply in federal court because it conflicted with Rule 23. 559 U.S. at 395-406. In a portion of the opinion that garnered a majority, the Court made clear that, in assessing a potential conflict between the federal rules and state law, the first step in the analysis was to ask whether the federal and state rules "answer the same question." Id. at 399. If they do, federal courts do not apply the state law so long as the relevant federal rule does not violate the Rules Enabling Act. Id. at 398.

After Shady Grove, a circuit split has emerged over whether anti-SLAPP statutes like California's apply in federal court. On one side, the Ninth and the First Circuits have held that anti-SLAPP statutes can apply in federal court under a Shady Grove analysis. See CoreCivic, 46 F.4th at 1141-43 (California); Godin v. Schencks, 629 F.3d 79, 81 (1st Cir. 2010) (Maine). On the other, the Second, Fifth, Tenth, Eleventh, and D.C. Circuits have all refused to apply various states' anti-SLAPP statutes in federal court. See Reid, 966 F.3d at 86-88 (California); Klocke v. Watson, 936 F.3d 240, 244-49 (5th Cir. 2019) (Texas); Los Lobos Renewable Power, LLC v. AmeriCulture, Inc., 885 F.3d 659, 668-73 (10th Cir. 2018) (New Mexico); Carbone v. Cable News Network, Inc., 910 F.3d 1345, 1349-57 (11th Cir. 2018) (Georgia); Abbas v. Foreign Pol'y Grp., LLC, 783 F.3d 1328, 1333-37 (D.C. Cir. 2015) (Kavanaugh, J.) (D.C.). For its part, the Seventh Circuit has yet to weigh in. See Intercon Sols., Inc. v. Basel Action Network, 791 F.3d 729, 732 (7th Cir. 2015) ("This circuit's resolution of questions about how

the procedural aspects of other states' anti-SLAPP statutes work in federal court will have to await some other case.").

This court finds that the majority of circuits have the better argument, and it will therefore follow the Second Circuit's lead in Reid, and reject defendants' attempt to wield California's anti-SLAPP statute here. The Reid court held "that California's anti-SLAPP statute is inapplicable in federal court because it increases a plaintiff's burden to overcome pretrial dismissal, and thus conflicts with [Rules] 12 and 56." 966 F.3d at 83. In so doing, the court first "conclude[d] that the special motion to strike in California's anti-SLAPP statute answers the same question as Federal Rules 12 and 56." Id. at 87. According to the court, the "special motion to strike requires outright dismissal unless the plaintiff can 'establish[ ] a probability that he or she will prevail on the claim.'" Id. (quoting § 425.16(b)(1)). It "thus establishes the circumstances under which a court must dismiss a plaintiff's claim before trial, a question that is already answered (differently) by Federal Rules 12 and 56." Id. (cleaned up). In particular, the court explained, because Rule 12 employs a "plausibility" standard, it conflicts with § 425.16(b)(1)'s higher "probability" standard. Id. Put simply: "California's special motion requires the plaintiff to make a showing that the Federal Rules do not require." Id.

In so concluding, the court rejected the defendant's call to follow the Ninth Circuit's Newsham decision and hold that "California's anti-SLAPP statute and the Federal Rules 'can exist side by side . . . without conflict.'" Id. (quoting Newsham, 190 F.3d at 972). It also rejected policy arguments that the "probability" standard is a beneficial "supplement" to the federal rules, and that refusing to apply the statute would encourage forum shopping and lead to an increased workload for courts. Id. at 88. According to the court, "the more permissive

standards of the Federal Rules likewise reflect policy judgments as to what is sufficient" to move a claim forward. Id. (citing Shady Grove, 559 U.S. at 401 (because "Rule 23 permits all class actions that meet its requirements, . . . a State cannot limit that permission by . . . impos[ing] additional requirements")). And "the incentive to forum-shop created by a circuit split can be fixed," just not by the circuit court. Id.

The court then explained that "[l]ike the Eleventh Circuit" in Carbone, it had "little difficulty concluding that Rules 12 and 56 comply with the Rules Enabling Act, particularly because they affect only the process of enforcing litigants' rights and not the rights themselves." Id. at 88 (cleaned up). The court thus concluded that "federal courts must apply Rules 12 and 56 instead of California's special motion to strike." Id.

This court agrees with Reid's analysis. And it is not alone in doing so: At least one other court in this district also recently considered the circuit split over whether California's anti-SLAPP statute is preempted and followed Reid. See Braun, 2025 WL 662081, at *4. In Braun, the court denied the defendants' motion to strike the plaintiff's defamation complaint based on Georgia's and California's anti-SLAPP statutes, explaining that "[t]he problem for Defendants is that both . . . statutes attempt to address an issue that the federal rules of civil procedure already cover and thus cannot be applied in federal court." Id. The court then cited Reid and Carbone in explaining that the "Defendants cannot rely on state statutes to dismiss Plaintiffs' claims in federal court where federal rules already provide the exclusive means to do so." Id. So although the court recognized that the First and Ninth Circuits "have held otherwise and applied states' anti-SLAPP statutes in federal proceedings," it declined to follow those courts, and denied the motions to strike. Id.

It is true, as defendants assert, that other courts in this district have applied California's anti-SLAPP statute in federal cases. See Osundairo v. Geragos, 447 F. Supp. 3d 727, 744 (N.D. Ill. 2020); Wiley v. Am. Soc'y of Anesthesiologists, Inc., No. 25 CV 412, 2025 WL 2976482, at *2 (N.D. Ill. Oct. 21, 2025). But neither court analyzed the Shady Grove-driven circuit split. Cf. Manhart v. WESPAC Found., Inc., No. 24-CV-08209, 2025 WL 2257408, at *14 (N.D. Ill. Aug. 7, 2025) (noting that "at least some courts in this district have held that the ICPA is a substantive rule and can be applied by a court sitting in diversity," but explaining that "those decisions have not addressed whether the ICPA passes muster under *Shady Grove*'s standard"). The court therefore finds them unhelpful here.

In sum, the court finds that California's anti-SLAPP statute answers the same question as Rules 12 and 56. The court thus denies defendant's special motion to strike.

Whether California's Litigation Privilege Bars the State Claims

Defendants assert that the state law claims must be dismissed because California's litigation privilege, Cal. Civ. Code § 47, immunizes all litigation conduct and that litigation conduct is all that is alleged in the complaint. According to defendants, "the privilege is virtually without exception, even for alleged 'fraud[ ] . . . or perjury[ ].'" (Quoting Silberg v. Anderson, 50 Cal. 3d 205, 218 (1990)). Plaintiff contends in response that although the privilege is "absolute," there are "significant exceptions that apply directly to the conduct alleged here." To that end, plaintiff argues, "where the core injury arises from noncommunicative wrongful conduct—such as fabricating evidence, coaching witnesses to give false testimony, and suppressing documents—the privilege does not shield that conduct merely because it was

incidentally related to a judicial proceeding." (citing Rusheen v. Cohen, 37 Cal.4th 1048, 1058 & 1062 (2006)).

The court finds that California's litigation privilege bars plaintiff's state law claims. California's "litigation privilege protects a 'publication or broadcast' made '[i]n any . . . judicial proceeding.'" Wiley, 2025 WL 2976482, at *6 (quoting Cal. Civ. Code § 47(b)). The "privilege applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action." Rusheen, 37 Cal. 4th at 1057. The purpose of it is "to afford litigants and witnesses free access to the courts without fear of being harassed subsequently by derivative tort actions, to encourage open channels of communication and zealous advocacy, to promote complete and truthful testimony, to give finality to judgments, and to avoid unending litigation." Id. at 1063. "To effectuate this purpose, § 47(b) provides absolute immunity from liability in a derivative tort action seeking redress for prior litigation-related activity—that is, it provides absolute immunity from a claim alleging that a communication or communicative conduct in an earlier proceeding constituted a tort." Engate, Inc. v. Esquire Deposition Servs., L.L.C., 331 F. Supp. 2d 673, 706 (N.D. Ill. 2004), aff'd in part, rev'd, 208 F. App'x 946 (Fed. Cir. 2006).

The privilege is broad, "absolute[,] and applies regardless of malice." Rusheen, 37 Cal. 4th at 1063; see also Blanchard v. DIRECTV, Inc., 123 Cal. App. 4th 903, 921 (2004) (privilege applies even when communications are allegedly "fraudulent, perjurious, unethical, or even illegal" (citation omitted)). "Although originally enacted with reference to defamation, the privilege is now held applicable to any communication, whether or not it amounts to a

publication, and all torts except malicious prosecution." Rusheen, 37 Cal. 4th at 1057 (cleaned up); see also Engate, 331 F. Supp. 2d at 707 ("[T]he § 47(b) privilege bars causes of action seeking redress for the filing of baseless lawsuits—unless the plaintiff . . . pleads the elements of malicious prosecution."); Home Ins. Co. v. Zurich Ins. Co., 96 Cal. App. 4th 17, 20, 22-26 (2002) (applying the privilege to claims of fraud based on attorney's alleged misrepresentation to induce settlement of a lawsuit). It also "applies to any publication required or permitted by law in the course of a judicial proceeding to achieve the objects of the litigation, even though the publication is made outside the courtroom and no function of the court or its officers is involved." Rusheen, 37 Cal. 4th at 1057 (cleaned up). And "[i]t is not limited to statements made during a trial or other proceedings, but may extend to steps taken prior thereto, or afterwards." Id.

"[T]he key in determining whether the privilege applies is whether the injury allegedly resulted from an act that was communicative in its essential nature." Id. at 1058. According to the Rusheen court: the privilege has been applied in tort claims "alleging the filing of false or perjurious testimony or declarations." Id. And it has been applied to claims related to "preparing and presenting false documents"—as that "is equivalent to the preparation and presentation of false testimony"—and to a "claim that expert witness had manufactured false evidence for former wife in dissolution action." Id. (cleaned up).

At the end of the day, "if the gravamen of the action is communicative, the litigation privilege extends to noncommunicative acts that are necessarily related to the communicative conduct." Id. at 1065; see also id. at 1062 (explaining that "the gravamen of the action" before it was "the procurement of [a] judgment based on the use of allegedly perjured declarations of

service"). If, on the other hand, "an independent, noncommunicative, wrongful act was the gravamen of the action," then the litigation privilege would not apply. Id. at 1065.

Here, the gravamen of plaintiff's state law claims is communicative. According to the complaint, plaintiff's fraud claim is premised on defendants having "made repeated and knowing false statements of fact with the intent to induce [plaintiff] to spend money on sham litigation and enter into settlements." The complaint makes clear that these alleged "repeated and knowing false statements" were made in discovery responses, litigation filings, and depositions in the underlying litigations. The court disagrees with plaintiff that the alleged conduct of fabricating evidence, coaching witnesses to give false testimony, and suppressing evidence in responding to discovery is noncommunicative and would fall outside the privilege. See id. at 1058 (explaining that "preparing and presenting false documents is equivalent to the preparation and presentation of false testimony," and that a "claim that expert witness had manufactured false evidence for former wife in dissolution action was privileged" (citations omitted)). And in any event, such conduct is at least "necessarily related to the allegedly wrongful communicative act[s]" of sending discovery responses and filing documents with false testimony, and presenting false testimony at depositions. Id. at 1063; see id. at 1062 ("where the gravamen of the complaint is a privileged communication (i.e., allegedly perjured declarations of service) the privilege extends to necessarily related noncommunicative acts (i.e., act of levying)").

Because plaintiff's complaint has set forth "everything necessary to satisfy the affirmative defense" of California's litigation privilege, the court dismisses the state law claims. Motykie v. Motykie, No. 23 CV 1779, 2025 WL 2160719, at *6 (N.D. Ill. July 30, 2025) (dismissing counts because Illinois' litigation privilege applied); see also Engate, 331 F. Supp.

2d at 707 (granting motion to dismiss unfair competition claim under Rule 12(b)(6) because it was barred by California's litigation privilege). Counts IV-VI are thus dismissed without prejudice.

## CONCLUSION

The court grants in part and denies in part defendants' motion to dismiss [79]. The court denies the motion to dismiss as to Counts I-III as to all defendants except the Doe Defendants. The court grants the motion to dismiss as to Counts IV-VI, and dismisses those counts without prejudice. The court denies defendants' "Special Motion to Strike Pursuant to California Code of Civil Procedure 425.16 and For Attorneys' Fees" [81]. Defendants are directed to answer Counts I-III on or before December 7, 2026. The parties are directed to file a joint status report using this court's form on or before December 14, 2026.

**ENTER:**

**Robert W. Gettleman**
**United States District Judge**

**DATE: November 6, 2026**